UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

New Jersey Carpenters Health Fund, On Behalf of
Itself and All Others Similarly Situated



08 CIV 5310

                        Plaintiffs,

Civil Action No. _____

        -against-

NovaStar Mortgage Funding Trust, Series 2006-3,
NovaStar Mortgage Funding Trust, Series 2006-4,
NovaStar Mortgage Funding Trust, Series 2006-5,
NovaStar Mortgage Funding Trust, Series 2006-6,
NovaStar Mortgage Funding Trust, Series 2007-1,
NovaStar Mortgage Funding Trust, Series 2007-2,
NovaStar Mortgage Funding Corporation, Scott F.
Hartman, Gregory S. Metz, W. Lance Anderson,
Mark A. Herpich, The Royal Bank of Scotland
Group, plc, Greenwich Capital Holdings, Inc.,
Greenwich Capital Markets, Inc. d/b/a RBS
Greenwich Capital, Wachovia Securities, LLC,
Deutsche Bank Securities, Inc., Moody's Investors
Service, Inc., and The McGraw-Hill Companies,
Inc.,

**NOTICE OF REMOVAL**

                        Defendants.

-------------------------------------------------------------X

        Defendants The Royal Bank of Scotland Group, plc, Greenwich Capital Holdings,

Inc., and Greenwich Capital Markets, Inc. d/b/a RBS Greenwich Capital, Wachovia Capital

Markets, LLC, sued herein as Wachovia Securities, LLC, Deutsche Bank Securities, Inc., (the

"Removing Defendants"), by their undersigned attorneys, hereby remove the above-captioned

case pending in the Supreme Court of the State of New York, County of New York, to the

United States District Court for the Southern District of New York.[1] This Court has jurisdiction

---

[1]    By removing this matter, the Removing Defendants do not waive and expressly preserve
any and all defenses they may have including, but not limited to, lack of personal
jurisdiction and service of process.

over this matter pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), and the claims may be removed to this Court under 28 U.S.C. § 1453.

As grounds for removal, the Removing Defendants state as follows:

1.      On May 21, 2008, plaintiff New Jersey Carpenters Health Fund ("Plaintiff") filed this putative state court class action (the "State Court Action") by filing a complaint entitled *New Jersey Carpenters Health Fund v. NovaStar Mortgage Funding Trust, Series 2006-3, et al* (the "Class Action Complaint") in the Supreme Court of the State of New York, County of New York on behalf of all purchasers of certain NovaStar Home Equity Asset-Backed Certificates (the "NovaStar Bonds"). This case was assigned an index number of 601563/08.

2.      The Class Action Complaint alleges, among other things, that certain registration statements and prospectuses filed in connection with the NovaStar Bonds contained misstatements and omissions in violation of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, and 77o.

3.      Pursuant to 28 U.S.C. § 1446(a) and (b), this Notice of Removal is being filed in the United States District Court for the Southern District of New York within thirty days after May 21, 2008, *i.e.,* the date that the Removing Defendants received, through service or otherwise, a copy of the Summons and Complaint. Although it is not necessary, all defendants in this action consent to removal. *See* Consent to Notice of Removal, attached as Exhibit A hereto.

Class Action Fairness Act of 2005 ("CAFA")

4.      Pursuant to 28 U.S.C. §§ 1332(d)(2) and 1453, a putative "class action" commenced after February 18, 2005 may be removed to the appropriate United States District Court if: (a) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of

2

interest and costs; and (b) any member of the putative class is a citizen of a state different from any defendant. 28 U.S.C. § 1332(d)(2)(A).

5.    CAFA is applicable to the State Court Action because the Action was commenced on or about May 21, 2008, *i.e.,* after the effective date of CAFA. 28 U.S.C. §§ 1332, 1453.

6.    The State Court Action is a "class action" within the meaning of CAFA because Plaintiff seeks to represent a class of persons in a "civil action filed under" Article 9 of the New York Civil Practice Law and Rules, *i.e.,* a "State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a).

7.    The State Court Action satisfies CAFA's amount in controversy requirement. Under 28 U.S.C. § 1332(d)(6), the amount in controversy in a putative class action is determined by aggregating the amount at issue in the claims of all members of the putative class. Here, the Class Action Complaint alleges that the defendants made false and misleading statements in connection with the issuance of over $4.6 billion in home equity asset-backed certificates, and that the value of these certificates has declined substantially due to the defendants' alleged violations. *See* Class Action Complaint ¶¶ 1 & 3. While the Removing Defendants deny that Plaintiff or any putative class member is entitled to recover any amount or the other relief sought, these allegations plainly make the aggregate amount in controversy in this State Court Action more than $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2).

8.    The State Court Action satisfies CAFA's diversity of citizenship requirement. To establish diversity jurisdiction under CAFA, it is sufficient that any one member of the putative class is a citizen of a state different from any one defendant. 28 U.S.C. § 1332(d)(2)(A). Plaintiff asserts that it is a benefit fund with offices located in the State of New Jersey. *See* Class Action Complaint ¶ 7. Defendants Greenwich Capital Holdings, Inc. and Greenwich Capital

3

Markets, Inc. d/b/a RBS Greenwich Capital are Delaware corporations with their principal places of business in Connecticut.  Defendant The Royal Bank of Scotland Group, plc is a public limited company organized under the laws of the United Kingdom and headquartered in Edinburgh Scotland.  Defendants Wachovia Capital Markets, LLC, sued herein as Wachovia Securities, LLC, and Deutsche Bank Securities, Inc. are Delaware corporations with their principal places of business in North Carolina and New York, respectively.  Other defendants, on information and belief, are citizens of Missouri, Kansas, Delaware and New York.

9.       No exceptions to CAFA's applicability apply in this case.

Other Procedural Requirements

10.       In accordance with 28 U.S.C. § 1446(a), attached hereto as Exhibit A are file-stamped copies of all process, pleadings and orders served upon the Removing Defendants in the State Court Action, namely the Summons and Complaint.

11.       The Removing Defendants will promptly serve a copy of the Notice of Removal on Plaintiff's counsel and file with the Clerk of the Supreme Court of the State of New York, County of New York, a Notice of Filing of Notice of Removal pursuant to 28 U.S.C. § 1446(d).

12.       This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.  *See* 28 U.S.C. § 1446(a).

WHEREFORE, this action should proceed in the United States District Court for the

Southern District of New York, as an action properly removed thereto.

Dated:   June 10, 2008                          Respectfully submitted,

_____

Thomas C. Rice
trice@stblaw.com
James G. Gamble
jgamble@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:  212-455-2000
Facsimile:  212-455-2502

*Attorneys for Defendants The Royal Bank of
Scotland Group, plc, Greenwich Capital Holdings,
Inc., Greenwich Capital Markets, Inc. d/b/a RBS
Greenwich Capital, Wachovia Capital Markets,
LLC, sued herein as Wachovia Securities, LLC, and
Deutsche Bank Securities, Inc.*

5

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
New Jersey Carpenters Health Fund, On Behalf of
Itself and All Others Similarly Situated

                    Plaintiffs,

          -against-

NovaStar Mortgage Funding Trust, Series 2006-3,
NovaStar Mortgage Funding Trust, Series 2006-4,
NovaStar Mortgage Funding Trust, Series 2006-5,
NovaStar Mortgage Funding Trust, Series 2006-6,
NovaStar Mortgage Funding Trust, Series 2007-1,
NovaStar Mortgage Funding Trust, Series 2007-2,
NovaStar Mortgage Funding Corporation, Scott F.
Hartman, Gregory S. Metz, W. Lance Anderson,
Mark A. Herpich, The Royal Bank of Scotland
Group, plc, Greenwich Capital Holdings, Inc.,
Greenwich Capital Markets, Inc. d/b/a RBS
Greenwich Capital, Wachovia Securities, LLC,
Deutsche Bank Securities, Inc., Moody's Investors
Service, Inc., and The McGraw-Hill Companies,
Inc.,

                    Defendants.

-------------------------------------------------------------X

Civil Action No. _____

**NOTICE OF CONSENT TO
REMOVAL**

      Defendants NovaStar Mortgage Funding Trust, Series 2006-3, NovaStar

Mortgage Funding Trust, Series 2006-4, NovaStar Mortgage Funding Trust, Series 2006-5,

NovaStar Mortgage Funding Trust, Series 2006-6, NovaStar Mortgage Funding Trust, Series

2007-1, NovaStar Mortgage Funding Trust, Series 2007-2, NovaStar Mortgage Funding

Corporation, Scott F. Hartman, Gregory S. Metz, W. Lance Anderson, Mark A. Herpich,

Moody's Investors Service, Inc., and The McGraw-Hill Companies, Inc. (the "Defendants"),

hereby consent to the Notice of Removal filed in the above-captioned action by The Royal Bank

of Scotland Group, plc, Greenwich Capital Holdings, Inc., Greenwich Capital Markets, Inc. d/b/a

RBS Greenwich Capital, Wachovia Capital Markets, LLC, sued herein as Wachovia Securities, LLC, Deutsche Bank Securities, Inc., and further state as follows:

Plaintiff filed its Verified Complaint for Violation of Sections 11, 12 and 15 of the Securities Act of 1933 (the "Class Action Complaint") in the Supreme Court of the State of New York, County of New York, Case No. 601451/08, on May 21, 2008. This written consent is filed June 10, 2008, within thirty days after the first receipt by any of the Defendants of the Class Action Complaint. 28 U.S.C. § 1446(b).

The undersigned Defendants reserve the right to file a supplemental statement in support of their right to have federal jurisdiction maintained over the claims asserted against them.[2]

Dated: June 10, 2008

Respectfully submitted,

Floyd Abrams
Fabrams@cahill.com
Susan Buckley
Sbuckley@cahill.com
Adam Zurofsky
Azurofsky@cahill.com
Tammy L. Roy
Troy@cahill.com
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: 212-701-3000
Facsimile: 212-269-5420

*Attorneys for Defendant The McGraw-Hill Companies, Inc.*

---

[2] By consenting to the removal of this matter, the Defendants do not waive and expressly preserve any and all defenses they may have including, but not limited to, lack of personal jurisdiction and service of process.

_(signature)_

James J. Coster
jcoster@ssbb.com
Joshua M. Rubins
jrubins@ssbb.com
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, NY 10169
Telephone: 212-818-9200
Facsimile: 212-818-9606

*Attorneys for Defendant Moody's Investors Service, Inc.*

Martin M. Loring
martin.loring@huschblackwell.com
Michael Thompson
michael.thompson@huschblackwell.com
HUSCH BLACKWELL SANDERS, LLP
Plaza Colonnade
4801 Main Street, Suite 1000
Kansas City, MO 64112
816-983-8142
816-520-4235 (cell)
816-983-8080 (fax)

*Attorneys for Defendants NovaStar Mortgage*
*Funding Trust, Series 2006-3, NovaStar Mortgage*
*Funding Trust, Series 2006-4, NovaStar Mortgage*
*Funding Trust, Series 2006-5, NovaStar Mortgage*
*Funding Trust, Series 2006-6, NovaStar Mortgage*
*Funding Trust, Series 2007-1, NovaStar Mortgage*
*Funding Trust, Series 2007-2, NovaStar Mortgage*
*Funding Corporation, Scott F. Hartman, Gregory*
*S. Metz, W. Lance Anderson, and Mark A. Herpich*

3

James J. Coster
jcoster@ssbb.com
Joshua M. Rubins
jrubins@ssbb.com
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, NY 10169
Telephone: 212-818-9200
Facsimile: 212-818-9606

*Attorneys for Defendant Moody's Investors Service, Inc.*

Martin M. Loring
martin.loring@huschblackwell.com
Michael Thompson
michael.thompson@huschblackwell.com
HUSCH BLACKWELL SANDERS, LLP
Plaza Colonnade
4801 Main Street, Suite 1000
Kansas City, MO  64112
816-983-8142
816-520-4235 (cell)
816-983-8080 (fax)

*Attorneys for Defendants NovaStar Mortgage*
*Funding Trust, Series 2006-3, NovaStar Mortgage*
*Funding Trust, Series 2006-4, NovaStar Mortgage*
*Funding Trust, Series 2006-5, NovaStar Mortgage*
*Funding Trust, Series 2006-6, NovaStar Mortgage*
*Funding Trust, Series 2007-1, NovaStar Mortgage*
*Funding Trust, Series 2007-2, NovaStar Mortgage*
*Funding Corporation, Scott F. Hartman, Gregory*
*S. Metz, W. Lance Anderson, and Mark A. Herpich*

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

_____X

New Jersey Carpenters Health Fund, On Behalf
of Itself and All Others Similarly Situated,

             Plaintiff,

       – against –

NovaStar Mortgage Funding Trust, Series 2006-3,
NovaStar Mortgage Funding Trust, Series 2006-4,
NovaStar Mortgage Funding Trust, Series 2006-5,
NovaStar Mortgage Funding Trust, Series 2006-6,
NovaStar Mortgage Funding Trust, Series 2007-1,
NovaStar Mortgage Funding Trust, Series 2007-2,
NovaStar Mortgage Funding Corporation, Scott.
F. Hartman, Gregory S. Metz, W. Lance
Anderson, Mark A. Herpich, The Royal Bank of
Scotland Group, plc, Greenwich Capital Holdings,
Inc., Greenwich Capital Markets, Inc. d/b/a RBS
Greenwich Capital, Wachovia Securities, LLC
Deutsche Bank Securities, Inc., Moody's Investors
Service, Inc.; and The McGraw-Hill Companies,
Inc.,

          Defendants.

_____X

Index No.

NEW YORK
COUNTY CLERKS OFFICE

MAY 21 2008

NOT COMPARED
WITH COPY FILE

- 6 0 1 5 6 3 - 0 8

**SUMMONS**

To the above named Defendants:

    **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorneys a Verified Answer to the Verified Complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: May 21, 2008

                                     _____
                                     Frank R. Schirripa, Esq.
                                     Schoengold Sporn Laitman & Lometti, PC
                                     19 Fulton Street, Suite 406
                                     New York, New York 10036
                                     Tel: (212) 964-0046
                                     *Attorneys for Plaintiffs & Proposed Class*

Trial is desired in the County of New York.
The basis of venue designated above is that Defendants maintain and/or conduct their business in the County of New York.

by the ratings agencies about NovaStar, and their own internal investigation. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery. The claims asserted herein do not sound in or arise from allegations of fraud.

## NATURE OF THE ACTION

1.      This is a class action brought by New Jersey Carpenters Health Fund (the "Carpenters Health Fund") alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. §77a *et seq.* ("Securities Act"), on behalf of purchasers of NovaStar Home Equity Loan Asset-Backed Certificates ("Certificates" or "NovaStar Certificates") who purchased home equity loan asset-backed certificates, backed by a pool of residential, subprime mortgage loans, pursuant to or traceable to the:

a)      $1,089,000,000 offering of Series 2006-3 Asset-Backed Certificates on or about June 16, 2006 issued by defendant Novastar Mortgage Funding Trust, Series 2006-3 ("June 2006 Offering");

b)      $1,004,851,000 offering of Series 2006-4 Asset-Backed Certificates on or about August 18, 2006 issued by Novastar Mortgage Funding Trust, Series 2006-4 ("August 2006 Offering");

c)      $1,279,850,000 offering of Series 2006-4 Asset-Backed Certificates on or about September 22, 2006 issued by Novastar Mortgage Funding Trust, Series 2006-5 ("September 2006 Offering");

d)      $1,233,750,000 offering of Series 2006-6 Asset-Backed Certificates on or about November 20, 2006 issued by Novastar Mortgage Funding Trust, Series 2006-6 ("November 2006 Offering");

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
_____X

New Jersey Carpenters Health Fund, On Behalf          :
of Itself and All Others Similarly Situated,          :          Index No.
                                                      :
                        Plaintiff,                    :          **CLASS ACTION**
                                                      :
                     – against –                      :          **VERIFIED COMPLAINT FOR**
                                                      :          **VIOLATION OF SECTIONS 11,**
NovaStar Mortgage Funding Trust, Series 2006-3,       :          **12 and 15 OF THE SECURITIES**
NovaStar Mortgage Funding Trust, Series 2006-4,       :          **ACT OF 1933**
NovaStar Mortgage Funding Trust, Series 2006-5,       :
NovaStar Mortgage Funding Trust, Series 2006-6,       :
NovaStar Mortgage Funding Trust, Series 2007-1,       :
NovaStar Mortgage Funding Trust, Series 2007-2,       :
NovaStar Mortgage Funding Corporation, Scott.         :
F. Hartman, Gregory S. Metz, W. Lance                 :
Anderson, Mark A. Herpich, The Royal Bank of          :
Scotland Group, plc, Greenwich Capital Holdings,      :
Inc., Greenwich Capital Markets, Inc. d/b/a RBS       :
Greenwich Capital, Wachovia Securities, LLC           :
Deutsche Bank Securities, Inc., Moody's Investors     :
Service, Inc.; and The McGraw-Hill Companies,         :
Inc.,                                                 :
                                                      :
                        Defendants.                   :
_____X

Plaintiff alleges the following based upon the investigation of counsel, Schoengold Sporn

Laitman & Lometti, P.C., which included a review of United States Securities and Exchange

Commission ("SEC") filings by NovaStar Mortgage Funding Corporation ("NMFC") and

NovaStar Mortgage Funding Trust, Series 2006-3, NovaStar Mortgage Funding Trust, Series

2006-4, NovaStar Mortgage Funding Trust, Series 2006-5, NovaStar Mortgage Funding Trust,

Series 2006-6, NovaStar Mortgage Funding Trust, Series 2007-1 and NovaStar Mortgage

Funding Trust, Series 2007-2 (the "Issuers" or "NMFT") (collectively referred to herein as

"NovaStar" or the "NovaStar Defendants"), as well as regulatory filings and reports, ratings

agency reports and advisories about NovaStar, press releases and other public statements issued

e) $69,887,000 offering of Series 2007-1 Asset-Backed Certificates on or about February 23, 2007 issued by Novastar Mortgage Funding Trust, Series 2007-1 ("February 2007 Offering");

f) $1,324,400,000 offering of Series 2007-2 Asset-Backed Certificates on or about June 1, 2007 issued by Novastar Mortgage Funding Trust, Series 2007-2 ("June 2007 Offering") (collectively referred to herein as the "Offerings" or the "Certificate Offerings").

2.      All of these Certificate Offerings were issued pursuant to a common Registration Statement filed with the Securities Exchange Commission on or about May 25, 2006 (the "Registration Statement"). The Offerings also occurred in this venue. The Certificates herein are Mortgage-Backed Certificates ("MBCs") collateralized by mortgages originated by NovaStar Financial, Inc. ("NFI" or "Novastar"), a commercial and residential lender. The mortgages and liens on the mortgaged properties constituting the Certificate collateral were, as set forth in the Registration Statement, to be the principal source by which Certificate purchasers were to obtain repayment of their investment plus interest. As also set forth in the Registration Statement, the Certificate collateral was purportedly originated by NFI pursuant to specific underwriting procedures and guidelines. The Underwriters of the Offerings were defendants RBS Greenwich Capital ("RBS"), Wachovia Securities, LLC ("Wachovia") and Deutsche Bank Securities, Inc. ("DBS") (collectively the "Underwriters"). Each Underwriter was obligated to conduct meaningful due diligence to ensure that the Registration Statement contained no material misstatements and omissions including as related to the stated manner in which the mortgages had been originated. The Underwriters received massive fees for their work in connection with the Offerings. Based on, *inter alia*, the Underwriters' due diligence and the representations in

3

the Registration Statement relating the underwriting of the Certificate collateral, rating agencies such as defendants Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P") (collectively, the "Ratings Agencies" or "Rating Agency Defendants") assigned the Certificates among the highest ratings applicable to such debt issues. At the time of the Offerings, the Certificates were issued at approximately par or $1000.00 per Certificate.

3.       Following the issuance of the Certificates, disclosures began to emerge revealing that Novastar routinely disregarded the underwriting guidelines in originating mortgage collateral. These disclosures were confirmed by substantially higher rates of delinquencies and foreclosures on collateral for such highly rated debt issues. These disclosures and the poor performance of the collateral caused the defendant Rating Agencies to recognize that the true nature of the collateral had not been properly assessed at the time of the Offering. The defendant Rating Agencies thus applied new "methodologies" to reflect the actual "aggressive underwriting" which had been used to originate the Certificate collateral. As a result, the rating agencies dramatically downgraded the Certificates. The revelations regarding the true underwriting practices used to originate the collateral and the true value and quality of the Certificate collateral caused the value of the Certificates to substantially collapse. Plaintiff purchased Certificates at par for $100,000 at the time of the June 2007 Offering, but now, at the commencement of the action herein, they are valued at $23,653.92 – a 77% decline in value. Plaintiff further purchased Certificates valued at $25,000 at the time of the June 2007 Offering whose value has declined to $5,913.48 at the time of the commencement of this action. The claims asserted herein under the Securities Act do not sound in or arise from allegations of fraud.

## JURISDICTION AND VENUE

4.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

5.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

6.     Venue is proper in this County pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of many of the material misstatements and omissions contained in the Registration Statement and Prospectuses filed in connection with the Offerings, occurred in substantial part in this County. Additionally, the Certificates were actively marketed and sold in this County.  In addition, Defendants RBS and DBS maintain an offices in this County and Defendant Wachovia regularly conducts its business in this County.

## PARTIES

7.     Plaintiff, the New Jersey Carpenters Health Fund is a Taft-Hartley benefit fund with offices located in Edison, New Jersey.   The New Jersey Carpenters Health Fund purchased $125,000.00 face value of the NovaStar Mortgage Funding Trust Series 2007-2, Class M1 Certificates at par value on the offering on or about June 1, 2007.  Plaintiff purchased pursuant to the Registration Statement and Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  Plaintiff relied on the misstatements in the Prospectuses and has suffered damages pursuant to Sections 11 and 12 of the Securities Act.

8.     Defendant NovaStar Mortgage Funding Trust, Series 2006-3 was the issuing entity for the June 2006 Offering.  Per its filings with the SEC, NovaStar Mortgage Funding

Trust 2007-2 has listed 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114 as its principal office location. Defendant NovaStar Mortgage Funding Trust 2006-3 is a trust formed under the laws of the State of Delaware.

9.      Defendant NovaStar Mortgage Funding Trust, Series 2006-4 was the issuing entity for the August 2006 Offering. As set forth in its filings with the SEC, NovaStar Mortgage Funding Trust 2006-4 has listed 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114 as its principal office location. Defendant NovaStar Mortgage Funding Trust 2006-4 is a trust formed under the laws of the State of Delaware.

10.     Defendant NovaStar Mortgage Funding Trust, Series 2006-5 was the issuing entity for the September 2006 Offering. As set forth in its filings with the SEC, NovaStar Mortgage Funding Trust 2006-5 has listed 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114 as its principal office location. Defendant NovaStar Mortgage Funding Trust 2006-5 is a trust formed under the laws of the State of Delaware.

11.     Defendant NovaStar Mortgage Funding Trust, Series 2006-6 was the issuing entity for the November 2006-6 Offering. As set forth in its filings with the SEC, NovaStar Mortgage Funding Trust 2006-6 has listed 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114 as its principal office location. Defendant NovaStar Mortgage Funding Trust 2006-6 is a trust formed under the laws of the State of Delaware.

12.     Defendant NovaStar Mortgage Funding Trust, Series 2007-1 was the issuing entity for the February 2007 Offering. As set forth in its filings with the SEC, NovaStar Mortgage Funding Trust 2007-1 has listed 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114 as its principal office location. Defendant NovaStar Mortgage Funding Trust 2007-1 is a trust formed under the laws of the State of Delaware.

13.       Defendant NovaStar Mortgage Funding Trust, Series 2007-2 was the issuing entity for the June 2007 Offering. As set forth in its filings with the SEC, NovaStar Mortgage Funding Trust 2007-2 has listed 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114 as its principal office location. Defendant NovaStar Mortgage Funding Trust 2007-2 is a trust formed under the laws of the State of Delaware.

14.       Defendant NovaStar Mortgage Funding Corporation is the Depositor for the Offerings, and the Parent Company of Issuer entities named herein. According to its SEC filings, NMFC has is a Delaware Corporation with its principal offices located at 8140 Ward Parkway, Suite 300, Kansas City, Missouri, 64114.

15.       Defendant Scott F. Hartman ("Hartman") was, at all relevant times, NFMC's President as well as a Director of NFMC. Hartman signed the Registration Statement for the Offerings.

16.       Defendant Gregory S. Metz ("Metz") was, at all relevant times, NFMC's Secretary and Principal Financial Officer. Metz signed the Registration Statement for the Offerings.

17.       Defendant W. Lance Anderson ("Anderson") was, at all relevant times, a Director of NFMC. Anderson signed the Registration Statement for the Offerings.

18.       Defendant Mark A. Herpich ("Herpich") was, at all relevant times, a Director of NFMC. Herpich signed the Registration Statement for the Offerings.

19.       Defendants Hartman, Metz, Anderson, and Herpich are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with NMFC, possessed the power and authority to control the contents of NMFC's submissions to the SEC and the market, and participated in the drafting and editing of the Prospectuses. The

Individual Defendants all conducted business and had business residences at 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114.

20.      The Individual Defendants, as officers and/or directors each had a duty to promptly disseminate accurate and truthful information with respect to NMFC and NMFT, and to correct any previously issued statements issued by, or on behalf of the NMFC and NMFT that had become materially misleading.  The Individual Defendants' misrepresentations and omissions in the Prospectuses violated these specific requirements and obligations.  The Individual Defendants were signatories to the Registration Statement filed with the SEC and incorporated by reference in the Prospectuses.

21.      The Defendants are all liable, jointly and severally, as participants in the issuance of the NovaStar Certificates, including issuing, causing, or making materially misleading statements in the Prospectuses and omitting material facts necessary to make the statements contained therein not misleading.

22.      Defendant The Royal Bank of Scotland Group, plc ("RBS Group") is located at 600 Steamboat Road, Greenwich, Connecticut 06830.  RBS Group is a multi-national corporation that delivers banking and financial services throughout the world.  RBS Group is the parent and sole owner of Greenwich Capital Holdings, Inc.  RBS Group maintains an office in Manhattan located at 101 Park Avenue, New York, New York 10178.

23.      Defendant Greenwich Capital Holdings, Inc. ("GCH") is a wholly owned subsidiary of the RBS Group and is located at 600 Steamboat Road, Greenwich, Connecticut 06830.  Defendant GCH is the parent and sole owner of Greenwich Capital Markets, Inc.

24.      Defendant Greenwich Capital Markets, Inc. d/b/a "RBS Greenwich Capital" ("RBS") is an investment banking firm principally located at 600 Steamboat Road, Greenwich,

8

Connecticut 06830.  Defendant RBS is the wholly owned subsidiary of GCH.  Defendant RBS served as the Underwriters' co-lead Manager and Joint Book-Runner for the Offerings. Defendant RBS was intimately involved in the NovaStar Offerings.  Defendant RBS failed to perform the requisite level of due diligence in connection with the NovaStar Offerings complained of herein.   The Prospectuses disseminated in connection with the Offerings contained material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying subprime mortgage loans.  RBS is one of the leading underwriters in mortgage- and asset-backed securities in the United States.  Since 1987, RBS has helped mortgage lenders issue more than $400 billion in asset-backed securities.  RBS, as an essential part of its investment banking business, has substantial contacts with New York City and regularly and continually transacts business in New York – specifically in New York County (*i.e.*, Wall Street and the financial markets).

25.       Defendant Wachovia Securities, LLC ("Wachovia") is an investment banking firm and is a Delaware limited liability company with its principal executive offices located at Riverfront Plaza, 901 E. Byrd St., Richmond, Virginia 23219-4069.  Defendant Wachovia served as the Underwriters' co-lead Manager and Joint Book-Runner for the Offerings.  Defendant Wachovia was intimately involved in the NovaStar Offerings.  Defendant Wachovia failed to perform the requisite level of due diligence in connection with the NovaStar Offerings complained of herein.   The Prospectuses disseminated in connection with the Offerings contained material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying subprime mortgage loans.  Wachovia is one of the leading underwriters in mortgage- and asset-backed securities in the United States. Wachovia, as an essential part of its investment banking business, has substantial contacts with

9

New York City and regularly and continually transacts business in New York – specifically in New York County (*i.e.*, Wall Street and the financial markets).

26.    Defendant Deutsche Bank Securities, Inc. ("DBS") is an investment banking firm principally located at 60 Wall Street New York, New York 10005. Defendant DBS served as the Underwriters' co-lead Manager and Joint Book-Runner for the Offerings. Defendant DBS was intimately involved in the NovaStar Offerings. Defendant DBS failed to perform the requisite level of due diligence in connection with the NovaStar Offerings complained of herein. The Prospectuses disseminated in connection with the Offerings contained material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying subprime mortgage loans. DBS is one of the leading underwriters in mortgage- and asset-backed securities in the United States. DBS, as an essential part of its investment banking business, maintains its principal offices in New York County.

27.    Defendant Moody's Investors Services ("Moody's") is a credit rating agency with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007. Moody's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market. As a condition to the issuance of the NovaStar Certificates, Moody's purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned appropriate credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the NovaStar Certificates.

28.    Defendant The McGraw-Hill Companies, Inc. maintains a business division d/b/a "Standard & Poors' Ratings Services" ("S&P" shall refer to The McGraw-Hill Companies and its business division Standard & Poors' Ratings Services). Defendant S&P is a credit rating

10

agency with its headquarters located at 55 Water Street, New York, New York 10041. S&P's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market. As a condition to the issuance of the NovaStar Certificates, S&P purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned appropriate credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the NovaStar Certificates.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") on behalf of a class consisting of all persons who purchase or acquired the Certificates (the "Class") pursuant and/or traceable to the Registration Statement and Prospectuses issued in connection with the Offerings from the effective date through the date of the filing of this action. Excluded from the Class are Defendants, their respective officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and/or the Trustee for the Certificates and may be notified of the pendency of this action by mail, the internet or publication using the form of notice similar to that customarily used in securities class actions.

11

31.      Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory law complained of herein.

32.      Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class and securities litigation.

33.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the provisions of the Securities Act of 1933 was violated by the Defendants as alleged herein;

b.      whether the Registration Statement and Prospectuses contained materially untrue statements or omitted statements of material fact; and

c.      to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

34.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

12

35.     Currently, the United States is ensnared in a financial crisis arising, in material part, from the greed which drove financial firms to issue billions of dollars of debt securities "collateralized" or securitized with mortgages which are only recently have been revealed to have been recklessly underwritten and originated. The Plaintiff and Class as purchasers of the Certificates have been the victims of just such negligent practices having purchased the Certificates pursuant to a Registrtation Statement which contained misstatements and omissions concerning the mortgage collateral "securitizing" the Certificates. The NovaStar entities and other entities related to the Offerings, *i.e.*, the Underwriter Defendants, had enormous financial incentive to consummate the Offerings of the Certificates as quickly as possible since they were paid upon completion a percentage of the total dollar amount of the Offerings sold to investors. Since the risk of the ABS collateral failing was not assumed by either NovaStar or the Underwriters, it also had enormous incentive not to conduct full complete and meaningful due diligence of the statements in the Registration Statement including those relating to the mortgage collateral.

36.     The structure of the Offerings was as follows: on or about May 25, 2006, NovaStar Mortgage Funding Corporation filed a Registration Statement with the SEC in connection with the issuance of various series and classes of debt securities which would be governed by said Registration Statement. Subsequently, prior to each of the Offerings complained of herein, NMFC formed a trust under the laws of the State of Delaware, the NovaStar Mortgage Funding Trusts, which then filed Prospectuses as the issuing entities of the Certificates at issue herein.

37.     Typically, the loans are originated by the Sponsor, who then disposes of its loans primarily by selling them to third parties and through securitizations. The Sponsor works

13

with the underwriters and the rating agencies to select the pool of mortgage loans and structure the securitization transaction. The Sponsor also services the mortgage loans.  On the closing date of the offering, the Sponsor conveys the initial mortgage loans and the related mortgage insurance policies to the Depositor, who will in turn convey the initial mortgage loans and the related mortgage insurance policies to the Trustee.  The Certificates are backed by the Issuer, and consist of, *inter alia*, the mortgage loans; collections in respect of principal and interest of the mortgage loans received; and the amounts on deposit in the collection account, including the payment account in which amounts are deposited prior to payment to the certificate holders.  On the payment date, the certificate holders receive payments from the Trustee based on the particular tranche purchased; typically, available funds for each distribution date will equal the amount received by the trustee and available in the payment account on that distribution date, including interest which differs depending upon the trance held.

38.    In connection with the NovaStar Offerings, Defendants prepared and disseminated Prospectuses that contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their own detriment.

**The Registration Statement Contained**
**Material Misstatements and Omissions of Fact**

39.    The Registration Statement represented that all of the loans which made up the pool of residential, subprime mortgages used to support the Certificates were subject to certain underwriting guidelines which assessed the borrower's creditworthiness, including multi leveled reviews of loan applications and appraisals  with only "case by case" exceptions to guidelines :

Underwriting Standards for the Mortgage Loans

14

*The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan.* Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history. Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date. An appraisal is also required on all loans and in many cases a review appraisal or second appraisal may be required depending on the value of the property and the underwriter's comfort with the original valuation. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae. The properties securing the mortgage loans are appraised by qualified independent appraisers who are generally approved by the related originator. A streamline appraisal program is offered by our Retention division for borrowers that currently have a mortgage loan with the sponsor. Under this program an AVM can be used to determine valuation if the full appraisal from the previous loan is less than two years old. The maximum increase in value that can be supported with an AVM is 10%. The mortgagor may also include information regarding verification of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been used for underwriting purposes.

The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement." Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub. Under the Limited Documentation program, no such verification is required, however, bank statements for the most recent consecutive 6-month period are required to evidence cash flow. Under the Stated Income program, an applicant may be qualified based on monthly income as stated in the loan application. Under the "No Documentation" program, an applicant provides no information as it relates to their income. Under the "No Income/No Asset" program, the applicant's income and assets are not verified, however the applicant's employment is verified. Under the Streamline program, this is allowed only for our Retention division for borrowers that currently have a mortgage with the sponsor. The documentation required for this loan is based on previous documentation type. If a "Streamline loan's original documentation type was "Full Documentation," then a verification of the applicant's employment is the only requirement. Mortgage loans originated under any program other than the

15

"Full Documentation" program require less documentation and verification than do traditional "Full Documentation" programs. The Full Doc/12 Months Personal Bank Statement Program allows self-employed or fixed income borrowers to substitute most recent consecutive 12-months bank statements for wage earner's W-2 forms and recent pay stubs. Given that the sponsor primarily lends to non-conforming borrowers, it places great emphasis on the ability of collateral to protect against losses in the event of default by borrowers.

On a case-by-case basis, exceptions to the underwriting guidelines are made where the sponsor believes compensating factors exist. Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception. All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor. All loans over $750,000 require the approval of the VP of Operations and Corporate Credit Department or its approved designees. In addition, the President of the sponsor approves all loans in excess of $1,100,000.

NovaStar Mortgage Funding Corporporation Form S-3, May 25, 2006 at S-57-58.

40.     The statements in the preceding paragraph contained misstatements and material omissions including in connection with the underwriting of the collateral mortgages. As set forth below, a material portion of the underlying collateral for the NovaStar Certificates originated by NMI was not "in accordance with its credit, appraisal and underwriting standards."

41.     The Registration Statement also described NovaStar's attention to credit risk in underwriting and "quality control" as follows:

*Close attention is paid to geographic diversification in managing credit risk.* The sponsor believes one of the best tools for managing credit risk is to diversify the markets in which it originates and purchases mortgage loans. The sponsor has established a diversification policy to be followed in managing this credit risk which states that no one market can represent a percentage of total mortgage loans owned by the sponsor higher than twice that market's percentage of the total national market share.

*Quality control reviews are conducted to ensure that all mortgage loans meet quality standards.* The type and extent of the reviews depend on the production channel through which the mortgage loan was obtained and the characteristics of the mortgage loan. The sponsor reviews 8 to 10% of each month's production. The random audit selection criteria includes a proportional

16

representation of loan type, loan product, loan purpose, FICO score, LTV, underwriting grade, state and broker.

Credit scores for the borrowers on loans originated prior to April 10, 2007 were calculated by averaging all the available individual borrower and co-borrower credit scores on loans originated prior to April 10, 2007. Credit scores for the borrowers on loans originated after April 10, 2007 are calculated by using the primary borrower's middle of three or lower of two, as applicable, credit score.

(*Id.*, at S-66).

42.    The statements in the preceding paragraph contained misstatements and material omissions including that "credit risk" and "quality control" were materially disregarded in favor of generating sufficient loan volume to complete the massive Certificate securitizations alleged herein.

## The Prospectuses State That The Price of The Bonds Were Tied To Credit Ratings

43.    The Certificates were rated by the Rating Agencies, which purported to take into account, *inter alia*, the underwriting standards used in originating the underlying mortgages to address the likelihood of the receipt of all distributions on the mortgage loans by the Certificateholders. The Prospectuses stated as follows

Ratings.

It is a condition to the issuance of the offered certificates that each of the offered certificates be rated the ratings listed on page S-11 of this prospectus supplement. S&Ps ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement. *S&Ps ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the certificates, and the extent to which the payment stream in the mortgage pool is adequate to make payments required under the certificates.* S&Ps rating on the certificates does not, however, constitute a statement regarding frequency of prepayments on the mortgages. See "*Certain Yield and Prepayment Considerations*" herein. The ratings issued by S&P on payment of principal and interest do not cover the payment of any pre-payment interest shortfalls, any Relief Act shortfalls or the Available Funds Cap Shortfall. *The rating process of Moodys addresses the structural and legal aspects associated with the certificates, including the*

17

> *nature of the underlying mortgage loans.* The ratings assigned to the certificates do not represent any assessment of the likelihood or rate of principal prepayments. The ratings do not address the possibility that certificatcholders might suffer a lower than anticipated yield. The ratings do not address the likelihood that certificateholders will be paid the Available Funds Cap Shortfall. The depositor has not requested a rating on the certificates by any rating agency other than S&P and Moodys. However, there can be no assurance as to whether any other rating agency will rate the certificates, or, if it does, what rating would be assigned by any such other rating agency. A rating on the certificates by another rating agency, if assigned at all, may be lower than the ratings assigned to the cer-tificates by S&P and Moodys. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to the certificates are subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the certificates.

*See* June 2007 Offering Prospectus at S-171 (emphasis added.); *see similarly,* June 2006 Offering at S-161; August 2006 Offering at S-157; September 2006 Offering at S-161; November 2006 Offering at S-159; February 2007 Offering at S-170.

44.    The statements contained the preceding paragraph -- and the initial ratings themselves -- contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since the Rating Agencies issued the ratings based on an outdated credit rating methodology designed in or about 2002 and because the Rating Agencies presumed that the loans were of high credit quality issued in compliance with the stated underwriting guidelines when, in fact, NovaStar had systematically disregarded its stated Underwriting Guidelines, as set forth herein.

**Disclosures Relating To NovaStar's Deficient Lending Practices**

45.    Since the Offerings were consummated, NovaStar's actual deficient lending practices have come to light, causing NovaStar to largely shut down its lending operations and teeter on the brink of bankruptcy.

18

46.     NovaStar's actual lending practices were disclosed in part in a class action complaint filed against the Company on or about October 17, 2007.  It was disclosed that the underwriting process at NovaStar was severely weakened by cost-cutting efforts at the Company which resulted in fewer underwriters and staff examining loans, and by a huge increase in the processing of loans which failed to comply with NovaStar's stated underwriting standards and loans that contained serious defects.

47.     NovaStar's exception-granting procedures regarding underwriting guidelines spun out of control when the Company began providing underwriters with up to four "exceptions" on a loan when the stated Company policy allowed only one.  For example, these "exceptions" included overlooking previously-filed liens on the property at issue and ignoring facts such as spouses seeking loans when the other spouse was not a co-signer on the loan.

48.     NovaStar had other high-risk loan programs such as the "No History Housing Loan Program," which allowed individuals with a minimum credit score of 580, and a 10 percent down payment to obtain a loan for a house, even if they had no independent housing history and had always lived at their parents' home or with relatives.  At the time, NovaStar never checked the applicants' credit histories to determine whether they had a history of independent housing, including another mortgage, and therefore was hiding the increased risk of the loan.

49.     In addition, NovaStar wrote two controversial types of loans, the TIN loan and the Condex loan. TIN loans were made to individuals who had no Social Security number, but could present a Tax Identification Number ("TIN"). NovaStar allowed individuals seeking TIN loans to "state" their income instead of providing W-2s or other documentation, as many of them worked cash jobs -- however, the Company was then left without a way to verify this information.  NovaStar also was unable to determine whether the Tax Identification Number was

19

real or whether it had been stolen or misused in some other way. In addition, NovaStar allowed "100% loan to value" mortgages on the TIN loans, which further increased the risk of default if home prices did not continually increase, or declined.

50.     Condex loans were intended to be short-term in nature, and were made to individuals seeking to convert houses into condominiums by splitting them up, and then "flipping" the individual units for short-term gain. For example, the buyer would purchase a house for $100,000, convert the house into condominium units, and then sell the units for $120,000 each. The borrower thus stood to make a tremendous profit – but only if the conversion project worked. The loans were considered more risky because of the nature of the transaction, as the individual loan for the house would need to be changed to a business loan when the condominium complex was completed. NovaStar offered loans on these types of properties to the buyers of the condo units from the inception of the Independence, Ohio office; however, these loans ran counter to NovaStar's guidelines in 2006 because the Company avoided issuing loans on properties showing "rapid appreciation" from the time the house last transferred hands. In those cases, the underwriter was supposed to deny the loan; nevertheless, NovaStar allowed Condex loans.

51.     In its rush to generate more loans, not only was tremendous pressure placed on underwriters to close as many loans as possible, but NovaStar also encouraged loaning money to borrowers who may have had the appropriate credit score for a particular loan program, but otherwise were not the "right" type of borrowers for that particular program. For example, a Payment Option Adjustable Rate Mortgage ("ARM") would not make sense for a borrower on a fixed income because the loan amortized negatively over time, *i.e.*, if the borrower only made minimum payments on the loan, the loan value could reach *110 percent* of its original value,

20

which would force the borrower to make higher payments and thus set the borrower up for a default. Initially, the Company was very cautious about the types of borrowers who could qualify for the Payment Option ARM loan, but about six months after it introduced this type of loan, NovaStar became less careful.

52.      Further, reports also began to emerge regarding NovaStar's negligent and reckless lending practices including that Novastar actually marketed to potential borrowers that it "ignored" the potential borrower's creditworthiness.  As reported in the *New York Times* on or about November 18, 2007, NovaStar, once considered to be one of the nation's top twenty mortgage concerns, "was about as freewheeling a lender as there was during the recent boom. 'Did you know that NovaStar offers to completely ignore consumer credit' screamed a flyer sent by NovaStar to brokers in 2003."

53.      As reported by the *New York Times* on the same date, "by 2006 the combined loan to value ration on the Company's [NovaStar's] mortgages was 87 percent, up from 81 percent in 1998.   And in 2005, almost *53 percent* of its mortgages had not required documentation of a borrower's income, up from 35 percent in 1998, according to the Company."

54.      On or about November 24, 2007 it was reported in the *Wall Street Journal* that NovaStar's insurer, PMI, had begun, in as early as 2003, refusing to pay claims on defaulted on NovaStar loans because the loans were improperly issued.

55.      Then on December 19, 2007, it was reported in *The Washington Post* that NovaStar had settled a consumer class action brought against the Company for $5.1 million, without admitting any wrongdoing for allegedly pushing borrowers into unsuitable loans to achieve higher fees by, *inter alia*, failing to disclose "yield spread premiums."  As reported, "a yield spread premium is a fee a lender pays a mortgage broker for placing a borrower into a

home loan with a higher interest rate. It's a back-end way for the broker to earn more money. In some cases the borrower could qualify for a less expensive loan."

56.     On December 30, 2007, in an article in the *Kansas City Star*, it was reported that the prior lending practices of Novastar and other major "subprime lenders" have left "wall street investors holding worthless real estate securities."

57.     Moreover, as reported on *Dow Jones Factiva* on January 11, 2008, in a speech in April 2007, the Chief Executive Officer of Countrywide Financial Corporation, Anthony Mozilo, pointed to NovaStar as one of the principal companies which had lowered loan origination standards.

58.     On or about January 15, 2008, as reported in the *Denver Post*, the City of Cleveland, Ohio brought a lawsuit against NovaStar, Deutsche Bank Trust and RBS Greenwich Capital for alleging that their collective wrongdoing in connection with subprime lending resulted in over 7,500 foreclosures in 2007 alone.

59.     Thereafter, on February 3, 2008, it was reported in the *New York Times* that the Federal Bureau of Investigation ("FBI") had commenced a criminal investigation into 19 companies responsible for the "mortgage boom and bust." These companies included Defendant NovaStar.

60.     On April 2, 2008, NovaStar disclosed that more than half a dozen regulators and law enforcement authorities, including the FBI, the SEC, the Federal Trade Commission ("FTC"), the United States Department of Justice ("DOJ"), the United States Department of Housing and Urban Development ("HUD"), the United States Department of Labor and the Office of the Attorney General of New York State, had requested information from the subprime

22

mortgage lender in connection with their origination and underwriting of billions of dollars in subprime loans over recent years.

61.     The disclosures and poor performance of NovaStar has led to the Company's near complete financial collapse. The collapse of the "sub-prime" lending market in the United States has made headlines in recent months, and at the forefront of the massive implosion was Defendant NovaStar. NovaStar relied greatly on its business of originating loans referred to it by Real Estate brokers. Before funding, however, the loans would need to get approved by Underwriters at NovaStar, who were to apply funding guidelines created by the Company itself.

62.     After the issuance of the Registration Statement containing the Company's purportedly adherence to underwriting guidelines and standards, NovaStar routinely deviated from those guidelines so that overly risky loans were approved in order to continually fuel the securitization process and NovaStar's profits. The Company then issued bonuses for the underwriters based solely on the number of loans they reviewed. This led to immense pressure on underwriters to approve risky loans.

**RBS Greenwich Capital Comes Under Investigation**
**For Its Role in the Collapse of the Subprime Market**

63.     RBS Greenwich Capital played a prominent role in rise and fall of the U.S. subprime mortgage market. Since 1987, RBS Greenwich Capital has helped mortgage lenders issue more than $400 billion in asset-backed securities. As an underwriter on transactions involving more than $183 billion of securities issued in 2004, RBS Greenwich Capital ranked as the industry's No. 1 underwriter of sub-prime mortgages and the top asset-backed sales organization. In 2005, RBS Greenwich Capital ranked No. 2 in the top ten subprime MBS underwriters. In both 2004 and 2005, RBS Greenwich Capital ranked No. 3 in the top ten non-agency MBS underwriters.

64.     On March 8, 2008, it was reported in a *Stamford Tribune* article entitled "RBS

Arm Involved in SEC Inquiry," that RBS confirmed that its Greenwich Capital unit is part of a

SEC probe into the collapse of the subprime market and has been order to turn over financial

documents to the SEC regarding, *inter alia*, originations of mortgages, accounting, due diligence,

sales and insider trading:

> Feb 08, 2008 (The Stamford Advocate - McClatchy-Tribune Information Services via COMTEX) *The Royal Bank of Scotland has confirmed its Greenwich Capital unit is part of a Securities Exchange Commission probe into the collapse of the subprime mortgage market.*
>
> The SEC has opened about three dozen inquiries, including those that involve major investment banks, according to recent published reports.
>
> *Greenwich Capital, a top issuer of mortgage-backed securities in the subprime market, is based on Steamboat Road in Greenwich. The unit was asked by the SEC to hand over some of its financial documents*, but RBS officials would not comment on the probe beyond that.
>
> "We will fully cooperate with the SEC or any regulators," said Carolyn McAdam, a spokeswoman for RBS global headquarters in the United Kingdom.
>
> The SEC will not confirm or deny any of the companies it is investigating, a spokesman for the commission said this week.
>
> \*       \*       \*
>
> The SEC opened its investigation in June, launching a dozen investigations into collateralized debt obligations linked to the plummeting value of subprime mortgages.
>
> *The SEC is said to be looking at originations of mortgages, accounting, due diligence, sales of securities and insider trading.*
>
> Recent published reports cite sources claiming the SEC investigation now is moving at a more vigorous pace.

(Emphasis added).

24

65.     In connection with the Offerings, RBS failed to conduct meaningful due diligence, including in connection with the underwriting standards used to originate the Certificate collateral.

**Wachovia Securities and Deutsche Bank Securities'**
**Failure To Adhere To Underwriting Guidelines Result**
**In Massive Write-Downs and Federal Investigations**

66.     Wachovia also played a key role in the subprime mortgage market and its ultimate collapse. According to Wachovia's 2005 Annual Report, in 2005, Wachovia was the Number one U.S. collateralized mortgage backed securities loan contributor and master servicer; among the top three participants in leveraged loan syndications and U.S. collateralized debt obligations; and among the top three U.S. asset-based lending lead arrangers.    Further, Wachovia's "advisory, underwriting and other investment banking fees" increased 16 percent to over $1.1 billion, driven by growth in investment grade loan syndications and equity capital markets originations.

67.     Wachovia's good fortune didn't last long. Instead, Wachovia reported that its net income fell 97.7% in the fourth quarter of 2007, compared to the same quarter in 2006. On or about April 15, 2008, Wachovia, America's fourth-largest bank, In the first quarter of 2008, Wachovia incurred a surprise $350 million loss compared with a $2.3 billion profit a year earlier, driving its shares down 10%. Wachovia admitted it needed to raise at least $7 billion through emergency fundraising after running up losses caused by the sub-prime mortgage crisis and boosted its provision for credit losses to $2.8 billion in the fourth quarter, citing more severe deterioration in the housing market than had been anticipated, particularly in California and Florida. In late April 2008, Wachovia slashed its dividend by 41 percent to conserve capital.

68.    Similarly, DBS played a key role in the growth of the global MBS market. DBS, in its 2005 Annual Review, stated that it had "consolidated its position as a Top 3 player in the global Commercial Mortgage-Backed Securities market and in Real Estate Collateralised Debt Obligations ("CDO"). Deutsche Bank was voted the No. 1 Commercial Real Estate Bank in Euromoney's inaugural Real Estate poll." However, like Wachovia and RBS, DBS played a role in the downfall of those markets. DBS was forced to write down $3.1 billion in subprime-related investments in the third quarter of 2007. In late April 2008, DBS marked down EUR 2.7 billion (approximately $6 billion) in connection with "leveraged loans and loan commitments, commercial real estate and residential mortgage-backed securities." Furthermore, DBS also was caught up in governmental investigations of the collapse of the subprime market. On December 7, 2007, as reported in *The Wall Street Journal*, the office of the New York State Attorney General served subpoenas to several Wall Street firms – including DBS – seeking information related to the packaging and selling of debt tied to high-risk mortgages. According to the Journal, "The review . . . is examining how adequately the investment banks reviewed the quality of mortgages before packaging them into products that were then sold to investors... The subpoenas also requested information about how the debt was pooled into securities, including the banks' relationship with credit-rating firms."

69.    In connection with these Offerings, neither Wachovia nor DBS conducted meaningful due diligence, including in connection with the underwriting standards used to originate the Certificate collateral.

70.    Further, in connection with the SEC probe into the collapse of the subprime market, as set forth above, on March 8, 2008, RBS confirmed that its Greenwich Capital unit

had been ordered to turn over financial documents to the SEC regarding originations of mortgages, accounting, due diligence, sales and insider trading.

**Disclosures of Novastar's True Deficient Lending Practices**
**Underwriter Lapses and High Certificate Collateral**
**Delinquency Rates Result in Certificates Collateral Downgrades**

71.      On or about October 11, 2007, Moody's announced it had downgraded $33.4 billion of debt securities issued in 2006 backed by subprime loans.  These downgrades included certificates issued by NovaStar Mortgage Funding Trust Series 2006-3, 2006-4, 2006-5 and 2006-6.  Moody's explained that its downgrades reflected "updates to its analytical model" that included, among other fictions, recognition of "*aggressive loan underwriting standards.*"  The downgrades were as follows:

| Series | Class | Original Rating | Revised Rating |
|---|---|---|---|
| Series 2006-4 | M-5 | A2 | A3 |
| Series 2006-4 | M-6 | A3 | Baa1 |
| Series 2006-4 | M-7 | Baa1 | Baa3 |
| Series 2006-4 | M-8 | Baa2 | Baa3 |
| Series 2006-4 | M-9 | Baa3 | Ba2 |
| Series 2006-3 | M-6 | Baa1 | Baa2 |
| Series 2006-3 | M-7 | Baa2 | Baa3 |
| Series 2006-3 | M-8 | Baa3 | Ba1 |
| Series 2006-5 | M-4 | A1 | A2 |
| Series 2006-5 | M-5 | A2 | Baa1 |
| Series 2006-5 | M-6 | A3 | Baa2 |
| Series 2006-5 | M-7 | Baa1 | Ba1 |
| Series 2006-5 | M-8 | Baa2 | Ba3 |
| Series 2006-5 | M-9 | Baa3 | B2 |
| Series 2006-6 | M-4 | A1 | A2 |
| Series 2006-6 | M-5 | A2 | Baa1 |
| Series 2006-6 | M-6 | A3 | Baa2 |
| Series 2006-6 | M-7 | Baa1 | Ba1 |
| Series 2006-6 | M-8 | Baa2 | Ba2 |
| Series 2006-6 | M-9 | Baa3 | B2 |

72.    Subsequently, on or about April 23, 2008, using these "new" ratings criteria that take into account "aggressive loan underwriting standards," Moody's and S&P downgraded the NovaStar Certificates in Series 2007-2 as follows:

| | Initial Certificate Ratings | | Revised Certificate Ratings | |
|---|---|---|---|---|
| Class | Moody's | S&P | Moody's | S&P |
| M1 | Aa1 | AA+ | A2 | AA+*- |
| M2 | Aa2 | AA | Baa3 | AA |
| M3 | Aa3 | AA- | Ba2 | CCC |
| M4 | A1 | A+ | Ba3 | CCC |
| M5 | A2 | A | B1 | CCC |
| M6 | A3 | A- | B1*- | CCC |
| M7 | Baa1 | BBB+ | B2*- | CCC |
| M8 | Baa2 | BBB | B3*- | CCC |
| M9 | Baa3 | BBB- | Caa1 | CCC |
| M10 | Ba1 | AAA | BB | CCC |

73.    The other series issued under the same Registration Statement were downgraded as follows:

NovaStar Mortgage Funding Trust 2006-3

| 2006-3 | Initial Certificate Ratings | | | 2008 Revised Certificate Ratings | | |
|---|---|---|---|---|---|---|
| Class | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| A1A | Aaa | AAA | AAA | Aaa | AAA | AAA- |
| A2C | Aaa | AAA | AAA | Aaa | AAA | AAA- |
| A2D | Aaa | AAA | AAA | Aaa | AAA | AA |
| M1 | Aa2 | AA+ | AA+ | Aa2 | AA+ | BBB |
| M2 | Aa3 | AA | AA- | A3 | AA | BB |
| M3 | A1 | AA | AA- | Ba1 | AA | BB |
| M4 | A2 | AA- | A+ | B2- | AA- | B |
| M5 | A3 | A+ | A- | B3- | A+ | B |
| M6 | Baa1 | A+ | A- | Caa1 | A | CCC |
| M7 | Baa2 | A | BBB+ | Caa2 | BBB | CCC |
| M8 | Baa3 | BBB+ | BBB | Caa3 | BB | CCC |

28

NovaStar Mortgage Funding Trust 2006-4

| 2006-4 | Initial Certificate Ratings | | | 2008 Revised Certificate Ratings | | |
|--------|---------|-----|-------|---------|-----|-------|
| Class | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| A1A | Aaa | AAA | AAA | Aaa | AAA | AAA- |
| A2C | Aaa | AAA | AAA | Aaa | AAA | AAA- |
| A2D | Aaa | AAA | AAA | Aaa | AAA | AA |
| M1 | Aa1 | AA+ | AA+ | Aa1 | AA+ | AA+*- |
| M2 | Aa2 | AA | AA | Baa1 | AA | BB |
| M3 | Aa3 | AA | AA- | Ba2 | AA | B |
| M4 | A1 | AA- | A+ | B2- | AA- | B |
| M5 | A2 | A+ | A- | B3- | A | CCC |
| M6 | A3 | A+ | A- | Caa1 | BBB | CCC |
| M7 | Baa1 | A | BBB+ | Caa2 | BB | CCC |
| M8 | Baa2 | A- | BBB+ | Caa2 | BB | CC |
| M9 | Baa3 | BBB+ | BBB | Caa3 | B | CC |
| M10 | N/R | BBB | BBB- | N/R | B | CC |
| M11 | N/R | BBB- | N/R | N/R | CCC | N/R |
| M12 | N/R | BB+ | N/R | N/R | CCC | N/R |

NovaStar Mortgage Funding Trust 2006-5

| 2006-5 | Initial Certificate Ratings | | 2008 Revised Certificate Ratings | |
|--------|---------|-----|---------|-----|
| Class | Moody's | S&P | Moody's | S&P |
| M1 | Aa1 | AA+ | Aa2 | AA+ |
| M2 | Aa2 | AA | Ba1 | BBB |
| M3 | Aa3 | AA | B1- | BB |
| M4 | A1 | AA- | B2- | B |
| M5 | A2 | A+ | B3- | B |
| M6 | A3 | A | Caa1 | CCC |
| M7 | Baa1 | A- | Caa2 | CCC |
| M8 | Baa2 | BBB+ | Caa3 | CCC |
| M9 | Baa3 | BBB | Caa3 | CCC |
| M10 | N/R | BBB- | N/R | CC |
| M11 | N/R | BB+ | N/R | CC |
| M12 | N/R | BB- | N/R | D |

NovaStar Mortgage Funding Trust 2006-6

| 2006-6 | Initial Certificate Ratings | | 2008 Revised Certificate Ratings | |
|--------|---------|-----|---------|-----|
| Class | Moody's | S&P | Moody's | S&P |

29

| M1 | Aa1 | AA+ | A1 | A |
| M2 | Aa2 | AA | Ba1 | BBB |
| M3 | Aa3 | AA | B1- | BB |
| M4 | A1 | AA | B2- | B |
| M5 | A2 | AA- | B3- | CCC |
| M6 | A3 | A+ | Caa1 | CCC |
| M7 | Baa1 | A | Caa2 | CCC |
| M8 | Baa2 | A- | Caa2 | CCC |
| M9 | Baa3 | BBB+ | Caa3 | CCC |
| M10 | N/R | BBB | N/R | CCC |
| M11 | N/R | BBB- | N/R | CC |
| M12 | N/R | BB+ | N/R | CC |
| M13 | N/R | BB | N/R | CC |

NovaStar Mortgage Funding Trust 2007-1

| 2007-1 | Initial Certificate Ratings | | 2008 Revised Certificate Ratings | |
|--------|---------|------|---------|------|
| Class | Moody's | S&P | Moody's | S&P |
| M1 | Aa1 | AA+ | A3 | AA+ |
| M2 | Aa2 | AA | B1 | A |
| M3 | Aa3 | AA- | B2- | B |
| M4 | A1 | A+ | B3- | CCC |
| M5 | A2 | A | Caa1 | CCC |
| M6 | A3 | A- | Caa2 | CCC |
| M7 | Baa1 | BBB+ | Caa3 | CCC |
| M8 | Baa2 | BBB | Caa3 | CCC |
| M9 | Baa3 | BBB- | Ca | BB- |
| M10 | Ba1 | BB+ | Ca | B+ |
| M11 | Ba2 | BB | C | B- |

74.     As a result of these disclosures and the rating agencies reassessment of the appropriate ratings to be assigned to the Certificates, the value of the Certificates has substantially collapsed. The Carpenters Fund's investment in NovaStar Certificates has declined by approximately *73%* - from *$100,000* at the time of the June 2007 Offering to *$23,653.92* at the time this action was commenced and from *$25,000* at the time of the June 2007 Offering to *$5,913.48* at the time this action was commenced.

## COUNT I

### Violation of Section 11 of The Securities Act
### (Against All Defendants)

75.       Plaintiff repeats and realleges each and every allegation contained above.

76.       This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act and asserted on behalf of all other members of the Class who purchased or acquired NovaStar Certificates on or traceable to the Offerings.

77.       Defendants NMFC is the registrant for the Offerings and filed the Registration Statement and Prospectuses as the issuer of the NovaStar Certificates, as defined in Section 11(a)(1) of the Securities Act.

78.       The Individual Defendants were officers and/or directors of NMFC at the time the Registration Statement before the Offerings became effective, and at the time of the Prospectuses, and with their consent were identified as such in the Registration Statement. The Individual defendants are liable for the misstatements and omissions in the Registration Statement alleged herein under § 11(a)(1) of the Securities Act.

79.       Defendants RBS, Wachovia and DBS served as the Underwriters for the Offerings and qualify as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, they each participated in the solicitation, offering, and sale of the NovaStar Certificates to the investing public pursuant to the Registration Statement and the Prospectuses.

80.       The Ratings Agency Defendants prepared valuations, *i.e.*, assigned ratings to the Certificates, in connection with the Offerings, as defined in Section 11(a)(4) of the Securities Act.

31

81.     The Registration Statement and the Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

82.     The Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Registration Statement and Prospectuses were true, did not omit any material fact, and were not materially misleading.

83.     Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Registration Statement and the Prospectuses.

84.     Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Registration Statement and the Prospectuses, for which they are entitled to compensation.

85.     Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### (Against NMFT, NMFC, RBS, Wachovia and DBS)

86.     Plaintiff repeats and realleges each and every allegation contained above.

87.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

88.     By means of the Registration Statement and Prospectuses, and by using means and instruments of transportation and communication in interstate commerce and of the mails,

32

the Defendants through the Offerings sold NovaStar Certificates to Plaintiff and other members of the Class.

89.     Defendants NFMC, NFMT, the Individual Defendants and the Underwriter Defendants each successfully solicited these purchases motivated at least in part by its own financial interest. The Defendants each reviewed and participated in drafting the Prospectuses. Through ensuring the successful completion of the Offerings, the Underwriter Defendants obtained substantial underwriting fees.

90.     The Registration Statement and the Prospectuses, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

91.     Defendants as "sellers" owed to the purchasers of the NovaStar Certificates, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectuses, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

92.     Plaintiff and other members of the Class purchased or otherwise acquired NovaStar Certificates pursuant to the defective Registration Statement and Prospectuses. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement and the Prospectuses.

33

93.     Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.  Class members who have sold their NovaStar Certificates are entitled to rescissionary damages.

94.     By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold NovaStar Certificates purchased pursuant and/or traceable to the Offerings have the right to rescind and recover the consideration paid for their NovaStar Certificates and hereby elect to rescind and tender their NovaStar Certificates to the Defendants sued herein.  Plaintiff and Class members who have sold their NovaStar Certificates are entitled to rescissionary damages.

### COUNT III

#### Violation of Section 15 of The Securities Act
#### (Against Defendants NFMC, NMFT and the Individual Defendants)

95.     Plaintiff repeats and realleges each and every allegation contained above.

96.     This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act and asserted on behalf of all Class members who purchased or acquired NovaStar Certificates in the Offerings.

97.     The Individual Defendants at all relevant times participated in the operation and management of NMFC and NMFT, and conducted and participated, directly and indirectly, in the conduct of NMFC and NMFT's business affairs.

98.     As officers and/or directors of NMFC, the Individual Defendants had a duty to disseminate accurate and truthful information in the Registration Statement and the Prospectuses.

34

99.     Defendant NMFC is the Parent Corporation and sole owner of NMFT, and at all relevant times participated in the operation and management of the NMFT, and conducted and participated, directly and indirectly, in the conduct of NMFT business affairs.

100.     As set forth above, it is alleged that the Registration Statement and Prospectuses issued in connection with the NovaStar Offerings contained material misstatements of fact, and omitted facts necessary to make the facts contained therein not misleading, in violation of Sections 11 and 12 of the Securities Act.

101.     Because of their positions of control and authority as senior officers and directors of NMFC, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.   The Individual Defendants were therefore "controlling persons" of NMFT within the meaning of Section 15 of the Securities Act.

102.     In addition, because of its sole ownership of NMFT and its control and authority as Parent Corporation, Defendant NMFC was able to, and did, control the contents of the Registration Statement and the Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  Defendant NMFC was therefore a "controlling person" of NMFT within the meaning of Section 15 of the Securities Act.

103.     Plaintiff and other Class members purchased NovaStar Certificates issued pursuant to the Offerings.  The Offerings were conducted pursuant to the Registration Statement and the Prospectuses.

104.    The Registration Statement and Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

105.    Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Registration Statement and the Prospectuses.

106.    Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Registration Statement and the Prospectuses, for which they are entitled to compensation.

107.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under CPLR Article 9;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:    May 21, 2008
          New York, New York

Respectfully submitted,

By: _____
    Samuel P. Sporn
    Joel P. Laitman
    Christopher Lometti
    Jay P. Saltzman
    Frank R. Schirripa
    Daniel B. Rehns
**SCHOENGOLD SPORN LAITMAN &
LOMETTI , P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137

*Counsel for the Plaintiff and Proposed
Class*

37

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————————X

New Jersey Carpenters Health Fund, On Behalf       :
of Itself and All Others Similarly Situated,       :        Index No.
                                                   :
                    Plaintiff,                     :
                                                   :
            – against –                            :
                                                   :
NovaStar Mortgage Funding Trust, Series 2006-3,    :
NovaStar Mortgage Funding Trust, Series 2006-4,    :
NovaStar Mortgage Funding Trust, Series 2006-5,    :
NovaStar Mortgage Funding Trust, Series 2006-6,    :        **VERIFICATION**
NovaStar Mortgage Funding Trust, Series 2007-1,    :
NovaStar Mortgage Funding Trust, Series 2007-2,    :
NovaStar Mortgage Funding Corporation, Scott.      :
F. Hartman, Gregory S. Metz, W. Lance              :
Anderson, Mark A. Herpich, The Royal Bank of       :
Scotland Group, plc, Greenwich Capital Holdings,   :
Inc., Greenwich Capital Markets, Inc. d/b/a RBS    :
Greenwich Capital, Wachovia Securities, LLC        :
Deutsche Bank Securities, Inc., Moody's Investors  :
Service, Inc.; and The McGraw-Hill Companies,      :
Inc.,                                              :
                                                   :
                    Defendants.                    :

———————————————————————————X

(STATE OF NEW YORK          )
(CITY OF NEW YORK           )
(COUNTY OF NEW YORK         )

    Frank R. Schirripa, being duly sworn, states that he is one of the attorneys for Plaintiff in this action and that the foregoing complaint is true to his own knowledge, except as to matters therein stated on information and belief and as to those matters he believes to be true; that the ground of his belief as to all matters not stated upon his knowledge are upon review of publicly available information filed with the United States Securities and Exchange Commission, media and newspaper articles and information contained on the internet; and that the reason why the verification is not made by Plaintiff is that, Plaintiff New Jersey Carpenters Health Fund is not in the county where Plaintiff's attorney has their office.

_____
Frank R. Schirripa, Esq.

_____
Notary Public

Sworn to me before this
21ˢᵗ day of May, 2008

JAY P. SALTZMAN
Notary Public, State of New York
No. 02SA5064567
Qualified in Nassau County
Commission Expires September 27, 20 10

38

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------X

New Jersey Carpenters Health Fund, On Behalf :
of Itself and All Others Similarly Situated,  :   Index No.

            :

     Plaintiff,      :

            :

    – against –     :

            :

NovaStar Mortgage Funding Trust, Series 2006-3, :
NovaStar Mortgage Funding Trust, Series 2006-4, :
NovaStar Mortgage Funding Trust, Series 2006-5, :
NovaStar Mortgage Funding Trust, Series 2006-6, :
NovaStar Mortgage Funding Trust, Series 2007-1, :
NovaStar Mortgage Funding Trust, Series 2007-2, :
NovaStar Mortgage Funding Corporation, Scott :
F. Hartman, Gregory S. Metz, W. Lance  :
Anderson, Mark A. Herpich, The Royal Bank of :
Scotland Group, plc, Greenwich Capital Holdings, :
Inc., Greenwich Capital Markets, Inc. d/b/a RBS :
Greenwich Capital, Wachovia Securities, LLC :
Deutsche Bank Securities, Inc., Moody's Investors :
Service, Inc.; and The McGraw-Hill Companies, :
Inc.,           :

            :

    Defendants.     :

---------------------------------------------------------X

## VERIFIED COMPLAINT

**SCHOENGOLD SPORN LAITMAN &**
**LOMETTI , P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137

*Counsel for the Plaintiff*
*and Proposed Class*