

**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NEW JERSEY CARPENTERS HEALTH FUND,
*on Behalf of Itself and All Others Similarly
Situated,*

                    Plaintiff,

      *v.*

NOVASTAR MORTGAGE, INC., NOVASTAR
MORTGAGE FUNDING CORPORATION,
SCOTT F. HARTMAN, GREGORY S. METZ,
W. LANCE ANDERSON, MARK HERPICH,
RBS SECURITIES, INC. f/k/a GREENWICH
CAPITAL MARKETS, INC., d/b/a RBS
GREENWICH CAPITAL, DEUTSCHE BANK
SECURITIES, INC., WELLS FARGO
ADVISORS, LLC f/k/a WACHOVIA
SECURITIES LLC, MOODY'S INVESTORS
SERVICES, INC. and THE MCGRAW-HILL
COMPANIES, INC.,

                  Defendants.

---

Case No.: 08-CV-5310 (DAB)

**CONSOLIDATED FIRST
AMENDED SECURITIES CLASS
ACTION COMPLAINT**

**ECF CASE**

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION .................................................................1

II.     JURISDICTION AND VENUE.............................................................11

III.    PARTIES AND RELEVANT NON-PARTIES ...............................................11

IV.     BACKGROUND ...................................................................................19

        A.      Emergence of the Massive Market for Subprime Mortgage-Backed Securities....19

                1.      NovaStar Emerges as a Significant Issuer
                        and Originator of Mortgage-Backed Securities .........................................22

                2.      Defendants GCM, DBS and Wachovia Emerge as High Volume
                        Issuers and Underwriters of Mortgage-Backed Securities........................24

        B.      NovaStar's Origination and Securitization Operations..........................................25

                1.      NovaStar's Origination Practices..................................................26

                2.      NovaStar's "Due Diligence" Practices .....................................27

                3.      NovaStar's Securitization of Subprime Loans into MBS .........................28

V.      DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM
        THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT......................30

        A.      Exponential Increases in Borrower Delinquencies
                Shortly After Certificate Offerings Reflects
                Defective Loan Collateral and Faulty Origination.................................30

        B.      The Collapse of the Certificates' Ratings Shortly After Certificate
                Offerings Reflects Defective Loan Collateral and Faulty Origination .................32

        C.      Investigations and Disclosures Subsequent to
                Offerings Evidence That NMI Disregarded
                Stated Mortgage Loan Underwriting Guidelines.....................................33

        D.      The Offering Documents Failed to Disclose the Underwriter
                Defendants' Failure to Conduct Due Diligence with Respect to
                Compliance with Stated Mortgage Loan Underwriting Guidelines ....................39

E.      Governmental Agency Investigations and Subsequent
Findings Related to the Residential Mortgage Industry
Evidence Faulty Loan Origination and Securitization ........................................... 43

F.      The Offering Documents Failed to Disclose that NovaStar
Relied on S&P and Moody's Outdated Models to
Determine Levels of Credit Enhancement and Ratings ........................................ 44

G.     The Ratings Agencies Relaxed the Ratings Criteria Which
Led to Artificially High Ratings Awarded to the Certificates .............................. 49

H.     The Prospectus Supplements Did Not
Reflect the True Risk of the Certificates................................................................ 52

I.       The Offering Documents Failed to Disclose "Ratings
Shopping" Practices Used to Engage the Ratings Agencies.................................. 53

J.       The Offering Documents Failed to Disclose the True
Roles of Ratings Agencies in Forming and Structuring
the Certificates for Sale as Primarily AAA Securities ......................................... 55

K.     The Offering Documents Failed to Disclose Material Financial Conflicts
of Interest between NovaStar and the Ratings Agency Defendants ..................... 56

L.      Subsequent Disclosures Evidence the Underwriter Defendants'
Massive Losses, Write-Downs and Near Collapse Due to Their
Role in the Underwriting of Mortgage-Backed Securities ................................... 62

       1.     Defendant GCM ....................................................................... 63

       2.     Defendant DBS ......................................................................... 65

       3.     Defendant Wachovia ................................................................ 67

M.    Federal District Court Rules That Moody's Non-
Independence in MBS and CDO Ratings Is a Material
Misrepresentation in Moody's Securities Fraud Case ........................................... 69

VI.   **MATERIAL MISSTATEMENTS AND**
     **OMISSIONS IN THE OFFERING DOCUMENTS** ...................................................70

    A.    The Offering Documents Included Material Misstatements and Omitted
        Information Regarding Stated Mortgage Loan Underwriting Guidelines .............70

        1.    The Registration Statement .......................................................70

        2.    The Prospectus Supplements ....................................................73

    B.    The Offering Documents Included Material Misstatements and
        Omitted Information Regarding Delinquencies as of the Cut-Off Dates .............78

    C.    The Offering Documents Included Material Misstatements
        and Omitted Information Regarding Credit Support ..............................................81

    D.    The Prospectus Supplements Misstated the True Loan-to-
        Value Ratios Associated with the Underlying Mortgages .....................................87

    E.    The Prospectus Supplements Misstated
        the Certificates' True Investment Ratings .............................................................89

VII.   **CLASS ACTION ALLEGATIONS** ...............................................................91

VIII.  **CAUSES OF ACTION** ...................................................................................94

IX.    **PRAYER FOR RELIEF** ..............................................................................102

# I.

## SUMMARY OF THE ACTION

1.     This Amended Complaint (the "Complaint") is alleged upon personal knowledge with respect to Plaintiff, and upon information and belief with respect to all other matters.  This action is brought pursuant to the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a, *et seq.*, by Court-Appointed Lead Plaintiff New Jersey Carpenters Health Fund ("Carpenters Health Fund," Lead Plaintiff" or "Plaintiff") on its own behalf and as a class action on behalf of all persons and entities (the "Class") who purchased or otherwise acquired interests in the NovaStar Mortgage Funding Trusts (the "NovaStar Trusts" or "Issuing Trusts"), as set forth in ¶ 33, *infra*, pursuant or traceable to a single Registration Statement and accompanying Prospectus filed with the Securities and Exchange Commission (the "SEC") by NovaStar Mortgage Funding Corporation a/k/a NovaStar Certificates Financing Corporation ("NMFC") on June 16, 2006 (No. 333-134461) (the "Registration Statement").

2.     Pursuant to the Registration Statement and the Prospectus Supplements incorporated therein (collectively, the "Offering Documents"), RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc. d/b/a RBS Greenwich Capital ("GCM"), Deutsche Bank Securities, Inc. ("DBS") and Wachovia Securities LLC ("Wachovia") (collectively referred to herein as the "Underwriters" or "Underwriter Defendants") underwrote and sold to Plaintiff and the Class $7.75 billion of Home Equity Loan Asset-Backed Certificates (the "Certificates" or the "NovaStar Certificates").  The Certificates were issued in six (6) Offerings which took place between June 22, 2006 and May 25, 2007 (collectively, the "NovaStar Offerings," the "Certificate Offerings" or the "Offerings").

3.     As set forth below, the Offering Documents contained material misstatements and omitted material information.  Defendants are strictly liable for these material misstatements and omissions under Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  The Complaint asserts no allegations or claims sounding in fraud.

4.     Plaintiff seeks redress against Defendant NMFC, who prepared and filed the Registration Statement and was the Depositor of the underlying collateral into the Issuing Trusts; Defendants Scott F. Hartman ("Hartman"), Gregory S. Metz ("Metz"), W. Lance Anderson ("Anderson") and Mark A. Herpich ("Herpich"), who were the individual signatories to the Registration Statement filed by NMFC; Defendant NovaStar Mortgage, Inc. ("NMI"), the Sponsor/Seller for each of the Offerings, as well as the Originator and Servicer for all of the underlying mortgage loan collateral for each of the Offerings; Defendants GCM, DBS and Wachovia, the Underwriters of the Certificate Offerings; and Defendant Moody's Investors Services, Inc. ("Moody's") and Defendant McGraw-Hill Companies, Inc. ("McGraw-Hill") inclusive of its Standard & Poor's Ratings Services ("S&P") division, one of the Nationally Recognized Statistical Ratings Organizations (the "NRSROs"), who, along with GCM, DBS and Wachovia, determined the composition of the underlying mortgage pools and the Certificates' structure.  S&P, inclusive of Defendant McGraw-Hill, and Defendant Moody's are collectively referred to as the "Ratings Agencies," the "Ratings Agency Defendants" or the "Ratings Agency Underwriters."   NMI and NMFC, together with their affiliates and subsidiaries, are collectively referred to as "NovaStar" or the "NovaStar Entities."

5.     This action arises from the role of NovaStar, its affiliates and subsidiaries, the Underwriter Defendants and the Ratings Agency Defendants in acquiring and then converting approximately 37,000 mainly sub-prime (*i.e.,* to borrowers with compromised credit) first- and

second-lien adjustable and fixed-rate mortgage loans into $7.75 billion of purportedly "investment grade" residential mortgage-backed securities ("RMBS" or "MBS"), which were then sold to Plaintiff and the Class in the six (6) Offerings made pursuant to the Offering Documents.  The value of the Certificates was directly tied to repayment of the underlying mortgage loans since the principal and interest payments due to investors were secured and derived from cash flows from those loans.[1]

6.      As of mid-year 2001, NovaStar operated only 24 offices in the United States and originated less than $6 million in loans per month.  By 2004, NovaStar had become one of the largest originators of non-conforming mortgage loans in the country - with over 432 mortgage offices in 39 states, and mortgage loan origination of over $600 million per month.  By late 2004, the Company's assets under management eclipsed the $10 billion mark.  According to *Inside Mortgage Finance* ("IMF"), in 2005, NovaStar issued $8.01 billion of MBS.

7.      In connection with the Certificates, NovaStar controlled almost every aspect of the origination and securitization processes.   All of the mortgage loans underlying the Certificates were originated by NMI, or "acquired" by NMI from the over 100 NovaStar correspondent mortgage lenders throughout the Country.  (¶¶ 47-49, 53-62).  NMI formed NMFC, a Special Purpose Entity ("SPE") created for the sole purpose of acquiring the mortgage loan collateral from NMI and thereafter transferring the collateral into the Issuing Trusts in the form of the Certificates.  The Certificates were purchased by the Underwriter Defendants from the Trusts and then sold to investors pursuant to the Offering Documents.  Once the Certificates

---

[1]      As the original borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates.  If borrowers failed to pay back their mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors.  As set forth in the Prospectus Supplements, the Certificates were divided into a structure of classes, or "tranches," reflecting different priorities of seniority, payment, exposure to risk and default, and interest payments.

were issued and sold to investors, NMI's servicing division collected the mortgage payments submitted by borrowers and deposited the funds into the Trusts pursuant to the terms of the Indenture.  The Trustee that oversaw the administration of the Issuing Trusts then periodically distributed payments to investors.

8.     In order for the Certificates to be marketable, they had to be assigned, in substantial part, the highest investment grade rating by at least two NRSROs.  The reason was clear.  Without the award of high investment grade ratings, the Certificates could not be purchased by NovaStar's and the Underwriters' principal clientele – *i.e.,* institutional investors, namely pension funds and insurance companies.  NovaStar did not leave the assignment of these ratings to chance.  In fact, NovaStar ensured such ratings were assigned by engaging Moody's and S&P not merely to "rate" the Certificates at issuance, but more importantly, to directly participate in the securitization process.  (¶¶ 63-68, 105-115, 129-130).  Undisclosed to Plaintiff and the Class, the Ratings Agency Defendants played a critical role in determining which NovaStar-originated loans were to be included in the mortgage pools underlying the Certificates and in structuring the Certificates themselves – *i.e.*, determining the level of subordination in terms of the number of classes, or tranches, the Offering would include, and the amount and type of investment protection or "credit enhancement" built into the Certificate structure.  (¶¶ 105-140).  Also undisclosed to Plaintiff and the Class was the fact that NovaStar engaged the Ratings Agencies by way of "ratings shopping," the practice of having the Ratings Agencies provide proposed ratings on the Certificates as part of their bid for the Certificate engagements.  (¶¶ 125-128).

9.     As a result, a substantial portion of the Certificates were assigned the highest investment ratings by the Ratings Agencies at the time of issuance.  (¶¶ 73-76, 106).  Moody's

assigned its highest investment grade rating of "Aaa" to 83.2%, or $6.41 billion, of the Moody's-rated Certificates, and S&P assigned its highest investment grade rating of "AAA" ("AAA" and "Aaa" are collectively referred to herein as "AAA") to 82.9%, or $6.41 billion, of the S&P-rated Certificates.  (*Id.*)  These ratings reflected the risk or probability of default by the borrower according to the Offering Documents.  (*Id.*)  None of the Certificates were initially rated below "investment grade" ("Ba1" and below for Moody's and "BB+" and below for S&P).  The Certificates were sold to Plaintiff and the Class at approximately par, or $1.00 per unit.

10.     Soon after issuance, and as a result of massive increases in borrower delinquency, foreclosure, repossession and bankruptcy in the underlying Certificate collateral, the value of the Certificates collapsed.  Plaintiff's holdings have lost **over 93%** of the initial value.  (¶ 20). Moreover, the likelihood of the value of the Certificates ever recovering is severely diminished by the fact that **over 51%** of the mortgage loans underlying the Certificates – the source of the financial return for Certificate investors – are delinquent, in default, in foreclosure or in bankruptcy.  (¶¶ 69-72, 76, 181).  Further, the delinquency, default, foreclosure, repossession and bankruptcy rates for the Certificates' underlying collateral – arising from defective collateral and faulty origination practices – triggered unprecedented downgrades of the Certificates' credit ratings by the Ratings Agencies.  (¶¶ 73-76).  Moody's and S&P have downgraded over 95%, or $7.26 billion, and 60%, or $4.52 billion, respectively, of the $7.75 billion of Certificates publicly issued.  In doing so, the Ratings Agency Defendants cited "aggressive" loan underwriting practices as a main factor in downgrading the Certificates' ratings.  To date, over 76% of the Certificates have been downgraded to speculative junk bond investments.  (*Id.*)

11.     Since the Certificate investors were dependent on the quality of the mortgage collateral for financial returns, the descriptions of the loan origination practices were highly

material disclosures to them.  The Offering Documents purported to describe that the collateral was originated pursuant to guidelines which generally included an examination of borrower creditworthiness and appraisal of the underlying properties.  (¶¶ 164-176).  These portions of the Offering Documents contained material misstatements and omissions since, as emerged only well after issuance of the Certificates, the principal Originator, *i.e.,* NMI, systematically disregarded the stated underwriting guidelines set forth in the Offering Documents.  (*Id.*)  These misstatements and omissions were reflected in the fact that the Ratings Agencies themselves, in downgrading the Certificates from the highest investment grade to junk bond investments, specifically attributed the downgrades to "aggressive underwriting" in the origination of the loans (¶¶ 10-11, 103); the utter collapse of the AAA ratings originally assigned the Certificates (¶¶ 73-76); and the uniform pattern of exponential increases in delinquency, default and disclosure rates almost immediately after the Offerings (regardless of when the Offering occurred). (¶¶ 69-72, 76, 181).

12.     While compliance with those loan underwriting guidelines was highly material to Certificate investors, who were dependent on the creditworthiness of the borrowers for interest and principal payments, NovaStar, the Underwriters and the Ratings Agencies had no such similar financial interest, since their compensation was earned when the Offerings were completed.  As a result, the Underwriter Defendants conducted inadequate due diligence with respect to whether the loans were originated in conformity with the underwriting guidelines stated in the Offering Documents.  In fact, the Underwriter Defendants failed to conduct any due diligence on the underlying collateral at the underwriting stage of the Offerings, relying on the defective reviews and examinations of small samples of the underlying collateral by third-party firms.  (¶¶ 30-32, 60-62, 72, 93-99, 122-124, 141-161).  The actual due diligence on the loan

collateral, which was cursory at best, was conducted at periodic intervals by third-party contractors who were engaged by NovaStar to examine a small sample – 7-8% at most – of the mortgage loans in NovaStar's loan warehouse. (¶¶ 60-62).  At that stage, there was a disincentive for NovaStar to reject loans as non-compliant with stated guidelines since NovaStar itself was the entity originating the underlying mortgage loan collateral.  Moreover, NovaStar was also loath to eliminate any substantial portion of the loan collateral as non-compliant because fewer loans meant smaller securitizations, which resulted in lower fees and profits from the Offering.  NovaStar did not have a mechanism in place to prevent previously "kicked-back" loans from being resubmitted as part of later pools by NMI, and as such, even those loans which were singled out as defective or fraudulent could be, and in fact were constantly re-submitted as part of subsequent securitizations. (*Id*.)  Therefore, NovaStar's "due diligence" was limited, inadequate and defective.  (*Id*.)

13.    NovaStar contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities.  As disclosed as part of an ongoing investigation of investment banking and MBS issuer misconduct in underwriting MBS being conducted by the New York Attorney General (the "NYAG"), Clayton and Bohan routinely provided issuers with detailed reports of loans non-compliant with underwriting guidelines, but the Defendants (*i.e.,* NovaStar and the Underwriter Defendants) routinely overrode and/or ignored these reports.  (¶¶ 93-99).  Further, Bohan's

President stated that, by the time the Offerings of the Certificates took place, issuers were requiring a review of only 7-8% of the entire loan pools.  (¶¶ 60-62).[2]

14.     The Offering Documents failed to disclose that, given the systematic disregard for the underwriting guidelines by NovaStar, the amount of credit enhancement supporting the Certificates was insufficient to substantiate the assigned AAA and other investment grade ratings, and that the Ratings Agency Defendants caused this understatement by failing to timely and adequately update the models employed to make those assessments.  It was only disclosed well after the issuance of the Certificates that S&P's models had not been materially updated since 1999, and Moody's models had not been materially updated since 2002.  Since these models employed statistical assumptions based on the performance of mortgage loans issued in or before 2002, they failed to accurately reflect the performance of the Certificate collateral, which included substantial portions of the type of loans which only began to be originated *en masse* after 2002 – *i.e.,* sub-prime and Alt-A loans, adjustable rate mortgage loans ("ARMs")[3] and non-traditional or hybrid-ARMs (*i.e.,* negative amortization loans[4] or interest-only loans) (all issued with limited borrower documentation or employment verification).  (¶¶ 38-52).

15.     The Offering Documents also failed to disclose material financial conflicts of interest between the Ratings Agencies and NovaStar, including NovaStar's engagement of the

---

[2]      As former head of MBS at Moody's, Brian Clarkson stated in an October 17, 2008 article in the *Financial Times*, in structured finance, including mortgage backed securities, "[y]ou start with a rating and build a deal around a rating."  (¶ 114).

[3]      See ¶¶ 38-46, *infra*.

[4]      As discussed below, originations of non-traditional adjustable mortgages, interest only and negative amortization ("Neg Am") loans increased dramatically between 2004 and 2006.  (¶¶ 38-46).  These types of loans presented the greatest potential for **"payment shock"** to the borrower since they both provide small initial fixed rates for a limited period of time which then reset thereafter to much higher monthly payment amounts. Specifically, Neg Am loans are defined as mortgage loans which may have a low introductory interest rate, and thereafter have a mortgage interest rate which adjusts periodically based on the related index; however, the borrower is only required to make a minimum monthly payment which may not be sufficient to pay the monthly amount due.

Ratings Agencies through "ratings shopping."  (¶¶ 65-68, 125-128).  These conflicts of interest were detailed in a report released by the SEC in July 2008 (the "July 2008 SEC Report"), after a year-long investigation into the Ratings Agencies' activities relating to the issuance of RMBS in the period spanning 2005 through 2007.  The July 2008 SEC Report disclosed that the Ratings Agencies were typically engaged by way of "ratings shopping" whereby the Ratings Agency that was ultimately engaged was the one which provided the most profitable rating to the investment bank in "bidding" for the engagement.  The July 2008 SEC Report also explained that the Ratings Agencies were incentivized, due to the highly profitable nature of these MBS engagements and the concentration of business in the hands of a relatively small group of investment banks, to not update their models lest they become unable to provide to the investment bank the most profitable credit enhancement and rating structure for the mortgage securitization.  (¶¶ 125, 130-133).  Moreover, the conflicts of interest which "plagued" the relationship between MBS issuers and the Ratings Agencies were further expounded upon in a report issued by the Congressional Oversight Panel ("COP") in January 2009 (the "January 2009 COP Report") which stated, in no uncertain terms, that the conflicts of interest arising out of the fee-based relationship between MBS issuers and the Ratings Agencies and the use of inadequate and incorrect ratings models played a key role in the catastrophic decline in the value of MBS resulting in billions of dollars of investor losses.  (¶¶ 136-140).

16.     As set forth herein, the Offering Documents contained material misstatements and omissions of material facts in violation of Sections 11 and 12 of the Securities Act, including the failure to disclose that: (i) the Certificate mortgage loan collateral was not originated in accordance with the loan underwriting guidelines stated in either the Registration Statement or the Prospectus Supplements, with NMI having failed to conduct both a meaningful assessment of

the borrowers' creditworthiness and an effective appraisal of the mortgaged properties in originating the mortgage loan collateral (¶¶ 164-178); (ii) NMFC, the Underwriter and Ratings Agency Defendants failed to conduct adequate, and in some cases any, due diligence with respect to NMI's compliance with the loan underwriting guidelines stated in the Offering Documents (¶¶ 76-104, 187-191); (iii) the stated credit enhancement did not support the investment grade ratings assigned to the Certificates in light of the true undisclosed and impaired quality of the mortgage collateral (¶¶ 105-124, 182-186); (iv) there were material undisclosed conflicts of interest between NovaStar, the Underwriter Defendants and the Ratings Agency Defendants, including those reflected in the undisclosed "ratings shopping practices," which incentivized the Ratings Agencies to understate what would have been the minimum required credit enhancement for the Certificates and inflate the Certificate ratings to maintain its relationship with the issuer banks (¶¶ 125-140, 162-163, 187-191); and (v) the amount of credit enhancement provided to the Certificates was inadequate to support the AAA and investment grade ratings because those amounts were determined primarily by the Ratings Agency Defendants' models which had not been updated in a timely manner. (¶¶ 105-115, 129-130, 192-197).

17.     As a result of these material misstatements and omissions of material fact, Plaintiff and the Class have suffered damages for which Defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act.

## II.

## JURISDICTION AND VENUE

18.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act, and venue is proper pursuant to Section 22 of the Securities Act.

19.     The violations of law complained of herein, including the dissemination of materially false and misleading statements made in connection therewith, occurred in this County.  All of the Defendants named herein, as well as their affiliates and subsidiaries, conduct or conducted business in this County.

## III.

## PARTIES AND RELEVANT NON-PARTIES

20.     Court-Appointed Lead Plaintiff Carpenters Health Fund is a Taft-Hartley Pension Fund.  As reflected in the certification filed herein, the Carpenters Health Fund purchased the following Certificates pursuant and traceable to the Registration Statement and subsequent Prospectus Supplements and has been damaged thereby.

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of the Date of Filing of Complaint (Per Unit) |
|---|---|---|---|
| NovaStar Home Equity Loan Asset-Backed Certificates, Series 2007-2, Class M1 | 100,000 | $ 1.0000 | $ 0.0634 |

21.     Defendant NMI, a wholly-owned subsidiary of NFI Holding Corporation, Inc., is a Virginia corporation and is principally located at 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114.  NMI acted as the Sponsor/Seller for the Certificates issued pursuant to the Registration Statement, originated all of the mortgage loan collateral underlying the value of the Certificates and served as Servicer of the mortgage loans post-securitization.   NovaStar

11

originated all underlying mortgage collateral for the various Offerings from the Sponsor/Seller and Originator, NMI.  The principal offices for the Sponsor's lending operations are located in Lake Forest, California, Cleveland, Ohio and Salt Lake City, Utah.  NMI made certain misleading representations and warranties in connection with the loan pools collateralizing the Certificates.  (¶¶ 164-178).  As set forth in the Registration Statement, once originated, NMI would then convey the mortgages to a Special Purpose Entity ("SPE"), namely the Depositor, Defendant NMFC, created for the sole purpose of forming, collecting and thereafter depositing the collateral into, the Issuing Trusts.  The Issuing Trusts then issued the Certificates supported by the cash flows from the assets and were secured by those assets.  (¶¶ 38-68).

22.     Defendant NMFC is a wholly-owned subsidiary of Defendant NMI and is located at 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114.  Defendant NMFC filed the Registration Statement and Prospectus with the SEC in connection with the Offerings on or about June 16, 2006.  Defendant NMFC served as the Depositor in connection with each of the Offerings.  The role of the Depositor was to purchase the mortgage loans from the Seller, NMI, and then assign the mortgage loans and all of its rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the Certificate-holders.  NMFC, as Depositor, was also responsible for preparing and filing any reports required under the Securities Exchange Act of 1934.

23.     Defendant NMFC filed the following Registration Statement and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| May 25, 2006 | S-3 | $ 1,000,000 |
| March 31, 2006 | S-3/A | $ 17,974,575,431[5] |

24.     Defendant Scott F. Hartman ("Hartman") was, at all relevant times, NFMC's President as well as a Director of NFMC.  Hartman signed the Registration Statement for the Offerings.  Furthermore, Defendant Hartman was, at all times, NovaStar's Chief Executive Officer.  (¶¶ 47-52).

25.     Defendant Gregory S. Metz ("Metz") was, at all relevant times, NFMC's Secretary and Principal Financial Officer.  Metz signed the Registration Statement for the Offerings.

26.     Defendant W. Lance Anderson ("Anderson") was, at all relevant times, a Director of NFMC.  Anderson signed the Registration Statement for the Offerings.  Furthermore, Defendant Anderson serves as NovaStar's President and Chief Operating Officer.  (¶¶ 47-52).

27.     Defendant Mark A. Herpich ("Herpich") was, at all relevant times, a Director of NFMC.  Herpich signed the Registration Statement for the Offerings.

28.     The Defendants identified in ¶¶ 24-27 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors of the Issuing Trusts as they were officers and/or directors of NMFC and signed the Registration Statement for the registration of the securities thereafter issued by the Issuing Trusts.

---

[5]     The amount registered under the 2006 Registration Statement includes $622,501,431.00 of securities previously registered under Registration No. 333-131111 on January 19, 2006 which remained unissued as of June 16, 2006, in addition to $2,352,074,000.00 of securities previously registered under Registration No. 333-114297 on April 8, 2004 which remained unissued as of June 16, 2006.

29.     The Individual Defendants participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct, or otherwise caused the damages and injuries claimed herein, and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

30.     Defendant GCM is an SEC-registered broker-dealer.  GCM is principally located at 600 Steamboat Road, Greenwich, Connecticut 06830 and is a wholly-owned subsidiary of Greenwich Capital Holdings, Inc.  Defendant GCM served as the underwriter for all of the Certificate Offerings.  GCM was intimately involved in all of the NovaStar Offerings.  GCM failed to perform the requisite level of due diligence not merely once, but at all times in connection with all of the NovaStar Offerings complained of herein.   The Prospectuses disseminated in connection with each of the Offerings contained the same material misstatements and omissions of material fact relating to the "underwriting standards" employed in originating the underlying mortgage loans.   GCM abdicated its duty to conduct due diligence on the underlying loan collateral, relying rather on the cursory examination of the mortgage loans conducted by NovaStar and third-party contractors, including Bohan and Clayton.  GCM is one of the leading underwriters of mortgage-backed securities in the United States.  Since 1987, GCM has helped mortgage lenders issue more than $400 billion in asset-backed securities. GCM, as an essential part of its investment banking business, has substantial contacts within this County and regularly and continually transacts business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.

31.     Defendant DBS served as the Underwriter for all of the NovaStar Certificate Offerings.  DBS is an SEC registered broker-dealer, principally located at 60 Wall Street, New York, New York 10005.  DBS failed to perform the requisite level of due diligence not merely

once, but at all times in connection with all of the NovaStar Offerings complained of herein.  The Prospectuses disseminated in connection with each of the Offerings contained the same material misstatements and omissions of material fact relating to the "underwriting standards" employed in originating the underlying mortgage loans.  DBS abdicated its duty to conduct due diligence on the underlying loan collateral, relying rather on the cursory examination of the mortgage loans conducted by NovaStar and third-party contractors, including Bohan and Clayton.  DBS is one of the leading MBS underwriters in the United States.  DBS, as an essential part of its investment banking business, in addition to maintaining its principal offices, has substantial contacts within this County and during the relevant time period transacted and continues to transact business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.  DBS actively served as the Underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

32.     Defendant Wachovia served as the Underwriter for all of the NovaStar Certificate Offerings.  Wachovia is an SEC registered broker-dealer, with executive offices located in Richmond, Virginia and Charlotte, North Carolina and its headquarters at 401 South Tryon Street, St. Louis, Missouri 28288.  As of January 1, 2009, Wachovia has operated as a non-bank affiliate of Wells Fargo & Company.[6]  Wachovia failed to perform the requisite level of due diligence not merely once, but at all times in connection with all of the NovaStar Offerings

---

[6]     The Initial Complaint filed in the within action on May 21, 2008, in New York State Supreme Court, New York County, Index No. 2008-601563, named Wachovia Securities LLC as a Defendant.  Pursuant to a Merger Agreement between Wachovia Corporation, the parent company of Wachovia Securities, LLC, and Wells Fargo & Company, on or about December 31, 2008 Wachovia Securities became a non-bank subsidiary of Wells Fargo & Company.  As of May 1, 2009, Wachovia was rebranded Wells Fargo Advisors, LLC.  Wells Fargo & Company maintains its principal offices at 420 Montgomery Street, San Francisco, California 94163.

Wells Fargo Advisors is a trade name used by three separate non-bank subsidiaries of Wells Fargo & Company: Wells Fargo Advisors, LLC, Wells Fargo Advisors Financial Network, LLC and Wells Fargo Investments, LLC.

complained of herein.  The Prospectuses disseminated in connection with each of the Offerings contained the same material misstatements and omissions of material fact relating to the "underwriting standards" employed in originating the underlying mortgage loans.  Wachovia abdicated its duty to conduct due diligence on the underlying loan collateral, relying rather on the cursory examination of the mortgage loans conducted by NovaStar and third-party contractors, including Bohan and Clayton.  Wachovia was one of the leading MBS underwriters in the United States.  Wachovia, as an essential part of its investment banking business, in addition to having maintained offices, had and continues to have substantial contacts within this County and during the relevant time period transacted business in this County (*i.e.*, Wall Street and the financial markets), including through the Offerings.  Wachovia actively served as the Underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

33.     GCM, DBS and Wachovia served as the Underwriters and Joint Book-Runners in the sale of the NovaStar Certificates and assisted in drafting and disseminating the Offering Documents for the following Offerings of said Certificates which were issued pursuant to the Registration Statement:

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| NovaStar Mortgage Funding Trust, Series 2006-3 | $ 1,089,000,000 | June 22, 2006 | GCM/DBS/Wachovia | NovaStar Mortgage Funding Corporation | NovaStar Mortgage, Inc. |
| NovaStar Mortgage Funding Trust, Series 2006-4 | $ 1,004,851,000 | August 18, 2006 | GCM/DBS/Wachovia | NovaStar Mortgage Funding Corporation | NovaStar Mortgage, Inc. |
| NovaStar Mortgage Funding Trust, Series 2006-5 | $ 1,279,850,000 | September 22, 2006 | GCM/DBS/Wachovia | NovaStar Mortgage Funding Corporation | NovaStar Mortgage, Inc. |
| NovaStar Mortgage Funding Trust, Series 2006-6 | $ 1,233,750,000 | November 20, 2006 | GCM/DBS/Wachovia | NovaStar Mortgage Funding Corporation | NovaStar Mortgage, Inc. |
| NovaStar Mortgage Funding Trust, Series 2007-1 | $ 1,813,274,000 | February 23, 2007 | GCM/DBS/Wachovia | NovaStar Mortgage Funding Corporation | NovaStar Mortgage, Inc. |
| NovaStar Mortgage Funding Trust, Series 2007-2 | $ 1,324,400,000 | May 25, 2007 | GCM/DBS/Wachovia | NovaStar Mortgage Funding Corporation | NovaStar Mortgage, Inc. |

34.     Each of the Issuing Trusts for the various Offerings was a common law trust formed for the sole purpose of holding and issuing the Certificates.  Each of the Issuing Trusts

issued hundreds of millions of dollars worth of Certificates pursuant to a Prospectus Supplement, incorporated by reference into its corresponding Registration Statement, which each listed numerous classes of offered Certificates.

35.    Defendant McGraw-Hill is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.  Standard & Poor's Ratings Service is a division of Defendant McGraw-Hill which provides credit ratings, risk evaluation, investment research and data to investors.  S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.  In addition, S&P worked with NovaStar in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

36.    Defendant Moody's is a subsidiary of Moody's Corporation and is principally located at 250 Greenwich Street, New York, New York 10007.  Moody's provides credit ratings, risk evaluation, investment research and data to investors.  Defendant Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.  In addition, Moody's worked with NovaStar in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

37.    Defendants McGraw-Hill, inclusive of S&P, and Moody's are collectively referred to herein as the "Ratings Agencies," the "Ratings Agency Defendants" or the "Ratings Agency Underwriters."  The Ratings Agencies are not being sued herein pursuant to Section 11(a)(4) as persons who prepared or certified the ratings portion of the Registration Statement

because, in accordance with Securities Act Rule 436(g), the ratings assigned to a class of debt securities shall not be considered part of the Registration Statement "prepared or certified by a person within the meaning of Section 11 of the Securities Act." Instead, they are being sued on the basis of their roles, as alleged in detail, *infra*, as underwriters and control persons within the meaning of Sections 11 and 15 of the Securities Act, including their activities both before and after their engagement to "rate" the Certificates in determining which mortgage loans were to be included and excluded from the underlying collateral and composition of the Certificate credit enhancement needed in order to sell the Certificates with AAA ratings.

## IV.

## BACKGROUND

### A.    Emergence of a Massive Market for Subprime Mortgage-Backed Securities

38.    As illustrated below, a mortgage securitization occurs where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



39.    When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash flow is distributed to the holders of the MBS certificates in

order of priority based on the specific tranche held by the MBS investor.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgages.  Of course, because the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

40.     The securitization of loans fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans.  When the originator holds the mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss should the borrower default on repayment of the loan or the property value is not sufficient to repay the loan.  Traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  As a result, in securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

41.     In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in these early GSE securitizations were provided protections because the underlying loans were originated pursuant to strict underwriting guidelines.

42.     Between 2001 and 2006, however, there was dramatic growth in non-GSE loan originations and securitizations, for which there were no such underwriting limitations.  That growth resulted in a commensurate increase in subprime securitizations.  According to *Inside Mortgage Finance* (2007), in 2001, agency originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-agency originations of $680 billion and securitizations of $240 billion.   In 2006, agency originations grew to $1.040 trillion while securitizations declined to $904 million. In that same period, however, non-agency originations had grown by 100% to $1.480 trillion, and non-agency securitizations had grown by 330% to $1.033 trillion in 2006.  Further, non-agency origination of subprime loans grew by 315% – from $190 billion in 2001 to $600 billion in 2006; and non-agency Alt-A origination grew by 566% – from $60 billion in 2001 to $400 billion in 2006.  Non-agency securitizations of subprime loans had also grown exponentially by 415% – from $87.1 billion in 2001 to $448 billion in 2006.

43.     Specifically, a subprime mortgage loan is a mortgage loan to a borrower with sub-standard credit.   In the decade since the subprime mortgage loan was first developed, it flourished as the vehicle by which lenders funded loans to borrowers who, for various reasons ranging from poor credit histories to unstable income levels, would not generally qualify for traditional or prime rate loans.

44.     To compensate for the increased risk of making subprime loans, the upfront and continuing costs of a subprime loan are higher than that of a traditional loan.  For example, the average interest rate of a fixed-rate subprime loan at origination was over two percent higher than the rate of prime loans at origination from 1995 to 2004. As was all too often overlooked by the prospective subprime borrower, however, the majority of subprime loans tend to be adjustable-rate mortgages ("ARMs").  ARMs shift the risk of rate fluctuation from the lender to

the borrower.  Lenders generally charge lower initial interest rates for ARMs which result in less pressure on the borrower's pocketbook in the short-term.  In some situations, such as when "discounted" or "teaser rates" are involved, the initial interest rate will be lower-than-market and will later adjust to a substantially higher prevailing market rate.  All types of ARMs present the risk that an increase in interest rates will lead to a significantly higher monthly payment.

45.     Many borrowers obtained ARMs under the impression that they would be able to refinance at favorable terms before rising interest rates triggered the ARMs to reset.  In the subprime mortgage environment, ARMs could present significant and widespread mortgage default risks because of the likelihood that subprime borrowers will be unable to service the debt after a rate adjustment.  According to a study by First American CoreLogic, in 2007 and 2008, "trillions of dollars of adjustable-rate mortgages [had] their payments reset."

46.     The subprime lending spree hit its zenith between 2004 and 2006.  It is estimated that well over $2 trillion in ARMs were originated from 2004 to 2006.  A substantial portion of these ARMs were subprime loans, representing a historical departure from traditional prime loan underwriting requirements in favor of the origination of riskier loans.  According to the Mortgage Bankers Association, approximately 13.1% of all outstanding mortgage indebtedness in the United States is subprime in nature.  This departure was a direct function of the fundamentally different approach to the securitization of the subprime loan relative to the traditional prime home loan.

     **1.    NovaStar Emerges as a Significant Issuer
          and Originator of Mortgage-Backed Securities**

47.     NFI was incorporated in 1996 headed by Defendants Hartman and Anderson. Hartman served as the Company's chief executive officer and Anderson served as NovaStar's president and chief operating officer.  NFI thereafter became a publicly traded company upon

completion of an initial public offering of common stock in October 1997.  By mid-1998, NovaStar's origination volume was over $100 million per month.  That volume shrunk, however, to less than $20 million per month by the end of 1999.   In an effort to expand its business and increase its loan origination volume, NovaStar formed NovaStar Home Mortgage ("NHM") in late 1999 as a subsidiary responsible for the creation and oversight of the establishment of NovaStar branch direct lending offices throughout the Country.

48.    By mid-2001, NHM's network of branch offices, overseen by Defendant Anderson, had grown considerably; between June 2000 and June 2001, the number of satellite offices swelled from 24 to 86, fueling an exponential rise in NovaStar's loan-production volume. NovaStar originated over $394 million in mortgage loans during the first six months of 2001, as compared to less than $34 million in volume during that same period in 2000.

49.    Furthermore, in 2002, NovaStar originated $2.5 billion in non-conforming mortgage loans, averaging just over $200 million per month, and more than doubled that volume in 2003, originating $5.3 billion in loans for the year, or just under $450 million per month.  The number of NHM branch offices increased dramatically as well, and by the end of 2003, there were 432 NovaStar Home Mortgage offices in 39 states.  Loan production, once reduced to $20 million per month, had catapulted to $600 million per month. According to *Inside Mortgage Finance*, NovaStar originated $8.365 billion of subprime MBS in 2004.  The following year, Novastar was ranked among the top mortgage securities issuers in the country with a total MBS volume of $8 billion.  In 2006 Novastar increased its MBS volume to $8.12 billion.  In 2007, Inside Mortgage Finance again ranked Novastar Mortgage among the top twenty-four subprime securities issuers with $3.2 billion in subprime issuance through the first nine months of 2007.

2.     **Defendants GCM, DBS and Wachovia Emerge as High Volume
Issuers and Underwriters of Mortgage-Backed Securities**

50.     By 2004, GCM had become a major Underwriter of MBS. According to *Inside Mortgage Finance*, GCM issued $10.747 billion and $36.548 billion of non-agency MBS in 2004 and 2005, respectively. Furthermore, GCM underwrote $92.69 billion and $120.312 billion of non-agency MBS in 2004 and 2005, respectively. (Moody's, *Bloomberg Asset Securitization*, January 2008).

51.     Furthermore, in 2005, according to *Inside Mortgage Finance*, DBS issued $17.378 billion of MBS, of which $17.2 billion was non-agency MBS, making it the twenty-ninth largest mortgage securities issuer. In 2005, DBS was the eighth largest MBS underwriter, producing $57.05 billion of MBS. In the following year DBS continued to grow, issuing $25.328 billion of non-agency MBS and underwriting $72.765 billion. In 2007, DBS was ranked as the tenth largest subprime MBS Issuer and the eighth largest subprime MBS underwriter with $6.789 billion and $11.941 billion, respectively.

52.     Wachovia was a major player in the MBS market – topping the rankings for contributions and underwriting of Commercial MBS in 2005 through 2007. Wachovia also had a significant presence in the market for Residential MBS. Specifically, in 2006, Wachovia was ranked thirty-eighth in top mortgage securities producers by *Inside Mortgage Finance*, issuing more than $10 billion in MBS. The following year, Wachovia ranked twenty-third in the list of top home equity loan security originators/issuers, with volume of over $3.5 billion.

**B.**   **NovaStar's Origination and Securitization Operations**

53.   As set forth above, NovaStar experienced unprecedented exponential growth in its subprime mortgage loan origination business beginning in 2001 and extending into 2007. During this time, NovaStar's origination and securitization business was headquartered at its offices in Kansas City, Missouri.  (¶¶ 21-22).

54.   NovaStar derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.  The goal for NovaStar was to sell the Certificates for a price above par, or $1.00 per unit.  For securitized Certificates to be marketable to investors, approximately 80% of the Certificates had to have the highest rating from the Ratings Agencies.  With that condition met, subprime securitizations – as opposed to prime or Alt-A securitizations – provided NovaStar with the largest fees and profits.

55.   With the securitization structure in place, the Certificates were then issued through NovaStar Trusts designated with a "shelf" name – specifically, "Novastar Mortgage Funding Trust" ("NMFT").  The shelf name reflected the types of mortgage collateral underlying the Offerings.  As such, the underlying mortgages in the NovaStar Trusts were predominantly first-lien and second-lien adjustable-rate (approximately 80% of each Issuing Trust) and fixed-rate mortgage loans (approximately 20% of each Issuing Trust).  Moreover, the principal balances of the Issuing Trusts were comprised of approximately 95% first-lien and 5% second-lien mortgages.  NovaStar completed six (6) NMFT Offerings pursuant to the Offering Documents between June 22, 2006 and May 25, 2007, which are all the subject of this action.

56.   In order to ensure that a substantial portion of the Certificates were awarded the highest ratings by the Ratings Agencies, NovaStar made sure the Ratings Agencies participated in all aspects of the formation and structuring of the Certificates.  NovaStar had the Ratings

Agencies compete for the engagement by including their proposed ratings on the Certificates as part of their bid for the Certificate rating engagement.  This ratings shopping process resulted in **over 83%** of the Certificates being assigned the highest AAA designation.  The "ratings shopping," as applied to MBS, only first began to be meaningfully disclosed to the public in July 2008 (¶¶ 15, 68, 125, 130-133).

### 1.    NovaStar's Origination Practices

57.    The underlying collateral of the Certificates in the six (6) Offerings complained of herein was originated by NMI.  NMI was the origination arm of NFI.  NovaStar had to acquire the underlying collateral in order to consummate the Certificate Offerings, and did so in two separate ways.

58.    First, NovaStar originated loans through its direct lending arm, NovaStar Home Mortgage ("NHM").  By 2005, NovaStar maintained over 450 NHM lending branches in over 40 States.  All of the loans originated by NHM were "acquired" by NMI pursuant to Purchase and Sale Agreements.  A computerized model priced the loans on a loan-by-loan basis.  Once the loans were acquired by NMI, they were entered into NMI's computerized subprime loan "warehouse" database which recorded the characteristics of each loan NMI acquired, including, among others, amount, type, borrower credit information and appraisal information of the specific loans.

59.    NovaStar's second method of acquiring mortgage loans for securitization was through "flow agreements" entered into with small local and regional lenders, known as "correspondent lenders," throughout the country.  By 2005, NovaStar was acquiring subprime mortgage loans for securitization from over 100 correspondent lenders throughout the country by way of flow agreements.  Flow agreements between lenders and NMI set the terms by which the

lender would originate, and NMI would compensate for, a certain number of loans in compliance with the underwriting guidelines set forth in the flow agreement (identical to those set forth in the Offering Documents) by NMI.  Once the flow loan was approved and finalized, the loan file was sent directly by the lender or mortgage broker to NMI's servicing division.  Simultaneously, an electronic record would be sent to NMI's origination division, at which point it became part of NovaStar's loan warehouse.  Although the flow of loans occurred daily, and NovaStar would price the loans on a loan-by-loan basis, the flow agreements themselves would set a weekly or monthly settlement date with the correspondent lender.

### 2.    NovaStar's "Due Diligence" Practices

60.    Once NMI had acquired possession of the mortgage loan collateral, a process of cursory "due diligence" on the loans was conducted.  The review's ostensible purpose was to determine principally whether the loans contained the requisite legal documentation as reflected in the loan tape provided before the auction and whether the loans were originated in accordance with NMI's loan underwriting guidelines.  The due diligence that was conducted on the collateral was not specific to a securitized pool of mortgage loans.  Rather, the due diligence that was performed, as set forth below, was periodically performed on a small sample (5% to 8% at most) of the entire warehouse of NMI's mortgage loan collateral.

61.    NovaStar contracted this "due diligence" work to outside firms – namely, Bohan and Clayton – who, in turn, hired outside contractors to review the loan files of 5% to 8% of the total amount of loans included in the loan pool being securitized.  NovaStar's Due Diligence Team ("DDT") was responsible for overseeing the work performed by firms such as Clayton and Bohan.  These firms were supposed to be examining the loans for their conformity with NMI's underwriting guidelines – specifically, requisite legal documentation, background information of

the borrower and independent appraisal.  Each loan reviewed would be rated either category "1," "2" or "3".  The loans rated category "3" loans were found to be defective or fraudulent and recommended by the reviewer to be excluded, while those rated category "2" were deemed to be questionable.  The rating of the audit loans was provided to NovaStar's DDT on a computerized spreadsheet, and it determined whether the loans should be "kicked-out," or eliminated from the loan pool.  NovaStar's DDT exercised its discretion and rarely excluded either category "2" or "3" rated loans.  NovaStar was incentivized not to "kick-out" loans even if they were designated category "3" since, if NovaStar rejected any significant portion of the loans, the size of the securitization, and thus the size of the fees derived from the securitization by NovaStar, would be decreased significantly, and moreover, the loans would remain as an asset on NovaStar's mortgage ledger, subjecting NovaStar to the risk of default or disclosure, rather than passing it on to the investor via securitization.  In addition, NovaStar knew it was able to securitize even loans designated category "3" and so at most, NovaStar would generally use the evidence of non-conforming loans to negotiate purchasing the specific loan from a correspondent lender for a lower price.

62.     Rather than conduct their own due diligence, the Underwriter Defendants abdicated their duty to conduct any examination of the underlying collateral, and instead relied on the cursory due diligence conducted by NovaStar and third-party firms.

### 3.     NovaStar's Securitization of Subprime Loans into MBS

63.     NovaStar engaged Defendants GCM, DBS and Wachovia to serve as the Underwriters or Joint Book-Runners for all of the Offerings.  Each of the Underwriters maintained a sales desk whose purpose was to assess the demand for certain securities from the clients of the investment bank and assist NovaStar in structuring the Offerings of Certificates.

This attempt to "pre-sell" the Certificates was crucial to NovaStar in that the risk of holding the Certificates post-securitization subjected NovaStar to increased risk exposure due to the fact that they would then own the collateral and the Certificates. Therefore, the Underwriter Defendants' role in assessing market demand and assuring NovaStar that sale of the Certificates to investors would be completed immediately after securitization was key to the Offerings' success.

64.     A Structuring Team at NovaStar was responsible for contact with the Underwriters of the Offering. Concurrently, the Structuring team negotiated with the Ratings Agencies in order to structure the deal so as to maximize NovaStar's profit and fees – *i.e.,* ensure the Certificates were assigned, in substantial part, the highest AAA rating.

65.     NovaStar ultimately engaged the Ratings Agency Defendants through a "ratings shopping" process. Initially, a NovaStar Collateral Analyst would send the preliminarily structured deal to the Ratings Agencies for feedback. NovaStar's in-house ratings analysts would oversee the communications with the Ratings Agencies. Thereafter, S&P, for example, would run the loan tape through both its LEVELS and SPIRE Models again and provide NovaStar with the deal structuring results in an effort to obtain the ratings engagement. Through the LEVELS Model, S&P would advise NovaStar that, for example, 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates were subordinate. This 5.75% was the amount of loss coverage required. NovaStar would then again "negotiate" with S&P before the engagement was finalized, in order to decrease the amount of loss coverage and credit enhancement S&P's model required for the specific deal, while still maintaining the highest percentage of AAA-rated Certificates.[7]

---

[7]     S&P would also again run the Deal File through its SPIRE Model in order to provide a deal structure that was within its acceptable levels of subordination or overcollateralization in order to obtain class sizes with the appropriate ratings.

66. Furthermore, Moody's would run the information provided by NovaStar through its model – namely, its M-3 Model – which was intended to provide ratings based on a complete assessment of the quality of the collateral underlying the Certificates.

67. All of this work by S&P and Moody's, referred to at S&P as "bid package" work, was performed without any compensation from NovaStar in an effort to engender goodwill so that NovaStar would ultimately engage either Ratings Agency to rate the loans at the underwriting stage.

68. NovaStar relied on this "ratings shopping" process to obtain the most profitable structure on the Offerings. As set forth below, ratings shopping was disclosed in detail in the July 2008 SEC Report (¶¶ 125, 130-133), in testimony by former Moody's and S&P managers in October 2008 (¶¶ 110-128) and the January 2009 COP Report. (¶¶ 136-140). The practice was effectively curtailed in many respects by way of an agreement entered into between the Ratings Agencies and the NYAG in 2008. (¶¶ 126, 134-135).

**V.**

### DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT

**A.  The Pattern of Exponential Increases in Borrower Delinquencies Shortly After Certificate Issuance Reflects Defective Loan Collateral and Faulty Origination**

69. The defective nature of the Certificate collateral was reflected in the recurring pattern in the six (6) Offerings of exponential increases in borrower delinquencies in the months after issuance.

70. Four months after each of the Offerings were consummated, borrower delinquency and default rates on the underlying mortgage collateral increased by a staggering 1,020% – from an average of 0.76% to over 8.5% of the mortgage loan balance. Furthermore,

within six months of issue that average increased to over 12.6% of the outstanding collateral balance. This spike in borrower default and delinquency rates has continued to worsen. To date, *over 51%* of mortgage collateral is either delinquent or in default, foreclosure or repossession.

71. These early payment defaults and delinquency rates are reflective of a disregard for underwriting guidelines. (¶¶ 70, 76, 101, 181, 189). As reported by the Federal Bureau of Investigation (the "FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications. The study, cited by the FBI and conducted by Base Point Analytics, found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not. The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, fictitious employers and falsified tax returns. The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., concluding that the same top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the same top states with the highest percentage of early payment defaults.

72. This pattern of borrower default shortly after the completion of the Offerings evidences substantial defects in the origination of the underlying collateral due to the significant early-payment default figures. The origination of such fundamentally impaired loan collateral could only have occurred as a result of systematic failures to abide by the underwriting guidelines in the Offering documents and as a result of inadequate due diligence by NovaStar in monitoring compliance with those guidelines.

**B.      The Collapse of the Certificates' Ratings Shortly after Certificate
          Offerings Reflects Defective Loan Collateral and Faulty Origination**

73.      The Ratings Agencies rated the Certificates pursuant to the following twenty-three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

74.      As noted above, Moody's rated $7.70 billion and S&P rated $7.72 billion of the total $7.75 billion of Certificates issued pursuant to the NovaStar Offerings complained of herein.  (¶¶ 23, 33).  Moreover, Moody's assigned its highest investment grade rating to over

83%, or $6.41 billion, of the Moody's-rated Certificates, and S&P assigned its highest investment grade rating to 82.9%, or $6.41 billion, of the S&P-rated Certificates. As a general matter, a rating downgrade of even one level – *e.g.*, from AAA to AA or from Aaa to Aa – is considered material to the financial condition of the rated entity or security. Here, the magnitude of the Certificate downgrades is unprecedented, and currently over $5.89 billion, or 77%, of the Moody's-rated Certificates have been downgraded to speculative junk bond investments.

75.     In fact, the NovaStar Certificates have now been downgraded by as many as the maximum 23 levels (*i.e.,* from Aaa to "D"). For example, 72%, or $4.60 billion, of the total $6.41 billion in Certificates initially rated Aaa, have now been downgraded to "Ba1" ("speculative") or below. Moreover, of that $4.60 billion, $972.4 million, or 22%, of initially Aaa-rated Certificates have been downgraded and are currently rated "Caa1" ("substantial risk of default") and below. The remaining Certificate tranches have fared no better. Of the $1.30 billion of Moody's-rated Certificates that were not awarded initial ratings of Aaa – but were nevertheless awarded investment-grade ratings – 100% have now been downgraded to a rating of "C" ("in or extremely close to default") and below. This historic and dramatic reversal in the financial assessment of the Certificates by the Ratings Agencies underscores that these securities were impaired from the outset.

**C.     Investigations and Disclosures Subsequent to Offerings Evidence That NMI Disregarded Stated Mortgage Loan Underwriting Guidelines**

76.     NMI was the principal originator of the mortgage loan collateral underlying the NovaStar Certificates. (¶¶ 4, 7, 21, 57-59). The total value of the six (6) Offerings for which NMI was the principal originator was $7.45 billion, of which over 83%, or $6.41 billion, was awarded initial ratings of AAA. Following issuance of the Certificates, information indicating

that NMI systematically disregarded the underwriting guidelines set forth in the Offering Documents began to emerge. As a result, 72%, or $4.60 billion, of the initially-rated AAA Certificates have been downgraded to speculative "junk" status and below. Moreover, current delinquency and default rates on the NMI-originated collateral has risen exponentially since the Certificates were issued – from 0.76% as of the cut-off dates to over 51% as of June 1, 2009.

77.     After issuance of the Certificates, reports also began to emerge regarding NMI's negligent and reckless lending practices including that NMI actually marketed to potential borrowers that it "ignored" the potential borrower's creditworthiness. As reported in the *New York Times* on or about November 18, 2007, NMI, once considered to be one of the nation's top twenty mortgage concerns, "was about as freewheeling a lender as there was during the recent boom. 'Did you know that NMI offers to completely ignore consumer credit' screamed a flyer sent by NMI to brokers in 2003."

78.     As reported by the *New York Times* on the same date, "by 2006 the combined loan to value ratio on [NMI's] mortgages was 87 percent, up from 81 percent in 1998. And in 2005, almost *53 percent* of its mortgages had not required documentation of a borrower's income, up from 35 percent in 1998, according to the Company."

79.     Moreover, according to a report in the *Seattle Times* on June 22, 2007, NMI settled a class action lawsuit brought on behalf of borrowers who said they were overcharged in a yield-spread premium ("YSP") scheme by lenders who put them into loans with higher interest rates than for which they qualified. A YSP is the cash rebate paid to a mortgage broker based on selling an interest rate above the wholesale par rate for which the borrower qualifies. A 2004 study by the Center for Responsible Lending found that YSPs were included in 85-90% of all subprime mortgages, and that loans which included YSPs cost borrowers an additional $800 to

$3,000 more than loans that did not have yield-spread premiums. The $5.1 million NMI settlement came after a Washington judge ruled that the failure to disclose the payment of yield-spread premiums was unfair or deceptive under Washington law.

80.     The underwriting process at NMI was severely weakened by cost-cutting efforts at the Company which resulted in fewer underwriters and staff examining loans, and by a huge increase in the processing of loans which failed to comply with NMI's stated underwriting standards and loans that contained serious defects. As such, on or about November 24, 2007 it was reported in the *Wall Street Journal* that NMI's insurer, PMI, had begun refusing to pay claims on defaulted on NMI loans because the loans were improperly issued.

81.     On December 30, 2007, in an article in the *Kansas City Star*, it was reported that the prior lending practices of NMI and other major "subprime lenders" have left "wall street investors holding worthless real estate securities."

82.     As reported on *Dow Jones Factiva* on January 11, 2008, in a speech in April 2007, the Chief Executive Officer of Countrywide Financial Corporation, Anthony Mozilo, pointed to NMI as one of the principal companies which had lowered loan origination standards in hopes of increasing loan origination volume.

83.     On or about January 15, 2008, as reported in the *Denver Post*, the City of Cleveland, Ohio brought a lawsuit against NMI, Deutsche Bank Trust and RBS Greenwich Capital for alleging that their collective wrongdoing in connection with subprime lending resulted in over 7,500 foreclosures in 2007 alone.

84.     Thereafter, on February 3, 2008, it was reported in the *New York Times* that the FBI had commenced a criminal investigation into 19 companies responsible for the "mortgage boom and bust." These companies included Defendant NMI.

85.     On April 2, 2008, NMI disclosed that more than half a dozen regulators and law enforcement authorities, including the FBI, the SEC, the Federal Trade Commission ("FTC"), the United States Department of Justice ("DOJ"), the United States Department of Housing and Urban Development ("HUD"), the United States Department of Labor and the Office of the Attorney General of New York State, had requested information from the subprime mortgage lender in connection with their origination and underwriting of billions of dollars in questionable subprime loans to unqualified borrowers in 2006 and 2007.

86.     As set forth herein, the Offering Documents disclosed potential exceptions to NMI's underwriting guidelines for borrowers under special conditions.  (¶¶ 168, 175, 177). However, as alleged in class action lawsuit filed in October 2007, *In re 2007 NovaStar Financial, Inc. Securities Litigation*, 07-0139-CV-W-ODS, NMI's exception-granting procedures regarding underwriting guidelines spun out of control when the Company began providing underwriters with up to four "exceptions" on a loan when the stated Company policy allowed only one.  For example, these "exceptions" included overlooking previously-filed liens on the property at issue and ignoring facts such as spouses seeking loans when the other spouse was not a co-signer on the loan.  *In re 2007 NovaStar Financial, Inc. Securities Litigation*, 07-0139-CV-W-ODS, Consolidated Amended Complaint filed October 19, 2007, at 22.

87.     NMI had other high-risk loan programs such as the "No History Housing Loan Program," which allowed individuals with a minimum credit score of 580, and a 10 percent down payment to obtain a loan for a house, even if they had no independent housing history and had always lived at their parents' home or with relatives.  At the time, NMI never checked the applicants' credit histories to determine whether they had a history of independent housing, including another mortgage, and therefore were hiding the increased risk of the loan.  *Id*., at 23.

88.     In addition, NMI wrote two controversial types of loans, the TIN loan and the Condex loan.  TIN loans were made to individuals who had no Social Security number, but could present a Tax Identification Number ("TIN").  NMI allowed individuals seeking TIN loans to "state" their income instead of providing W-2s or other documentation, as many of them worked cash jobs. This left the Company without a way to verify this information.  NMI also was unable to determine whether the Tax Identification Number was real or whether it had been stolen or misused in some other way.  In addition, NMI allowed "100% loan to value" mortgages on the TIN loans, which further increased the risk of default if home prices did not continually increase, or declined.  *Id*., at 23-24.

89.     Condex loans were intended to be short-term in nature, and were made to individuals seeking to convert houses into condominiums by splitting them up, and then "flipping" the individual units for short-term gain.  For example, the buyer would purchase a house for $100,000, convert the house into condominium units, and then sell the units for $120,000 each.  The borrower thus stood to make a tremendous profit – but only if the conversion project worked.  The loans were considered more risky because of the nature of the transaction, as the individual loan for the house would need to be changed to a business loan when the condominium complex was completed.  However, these loans ran counter to NMI's guidelines in 2006 because the Company avoided issuing loans on properties showing "rapid appreciation" from the time the house last transferred hands.  In those cases, the underwriter was supposed to deny the loan; nevertheless, NMI allowed Condex loans.  *Id*., at 23-25.

90.     In its rush to generate more loans, not only was tremendous pressure placed on underwriters to close as many loans as possible, but NMI also encouraged loaning money to borrowers who may have had the appropriate credit score for a particular loan program, but

otherwise were not the "right" type of borrowers for that particular program.  For example, a Payment Option Adjustable Rate Mortgage ("ARM") would not make sense for a borrower on a fixed income because the loan amortized negatively over time, *i.e.*, if the borrower only made minimum payments on the loan, the loan value could reach ***110%*** of its original value, which would force the borrower to make higher payments and thus set the borrower up for a default. *Id*. at 26.

91.     The disclosures and poor performance of NMI has led to the Company's near complete financial collapse.  The collapse of the "sub-prime" lending market in the United States has made headlines in recent months, and at the forefront of the massive implosion was Defendant NMI.  NMI relied greatly on its business of originating loans referred to it by real estate brokers.  Before funding, however, the loans would need to get approved by loan underwriters at NMI, who were to apply funding guidelines created by the Company itself.

92.     Thus, it is clear that after the issuance of the Registration Statement containing the Company's purportedly adherence to underwriting guidelines and standards, NMI routinely deviated from those guidelines so that overly risky loans were approved in order to continually fuel the securitization process and NMI profits.  The Company then issued bonuses for the underwriters based solely on the number of loans they reviewed.  This led to immense pressure on underwriters and correspondent lenders throughout the country to approve more risky loans to unqualified borrowers.

**D.     The Offering Documents Failed to Disclose the Underwriter
        Defendants' Failure to Conduct Due Diligence with Respect to
        Compliance with Stated Mortgage Loan Underwriting Guidelines**

93.     The Registration Statement provides that the loan underwriting guidelines used to
originate the loan collateral is as specifically set forth in each of the Prospectus Supplements.
(¶¶ 164-178).   The Prospectus Supplements provide that the mortgage loans underlying the
Certificates were originated pursuant to NMI's stated underwriting guidelines adhered to by NMI
and correspondent lenders in originating the mortgage loans.  *Id.*

94.     As Underwriters of the Certificates Offerings, the Underwriting Defendants
conducted inadequate due diligence with respect to whether the NovaStar collateral was
originated in compliance with the loan underwriting guidelines described in the Offering
Documents.  In fact, very little, if any, due diligence was actually conducted by the Underwriter
Defendants themselves.  Instead, the Underwriter Defendants largely relied on the examination
of NovaStar and third-party contractors, including Bohan and Clayton, of the underlying
mortgage loan collateral in preparing the Offering Documents.

95.     In June 2007, the NYAG subpoenaed documents from Bohan and Clayton related
to their due diligence efforts on behalf of the investment banks that underwrote mortgage backed
securities.  The NYAG, along with Massachusetts, Connecticut and the SEC (all of which also
subpoenaed documents) are investigating whether investment banks held back information they
should have provided in the disclosure documents related to the sale of mortgage backed
securities to investors.

96.     In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on
Loans," *The New York Times* reported:

An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.

Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  But the banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.

*       *       *

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

*       *       *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the

40

loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco.  Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

*     *     *

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said lenders and investment banks routinely ignored concerns raised by these consultants,

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said, "We stopped checking."

97.     On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  On the same day, both the *New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature of the NYAG's investigation and Clayton's testimony.  The *Wall Street Journal* reported that the NYAG's investigation is focused on "the broad language written in prospectuses about the risky nature of these securities changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising."  According to the *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

98.     A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated

41

or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.
>
> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous. And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.
>
> The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

*The Los Angeles Times*, "Subprime Watchdogs Ignored," March 23, 2008.

99.     Moreover, while issuers would have sought to have Clayton review 25% to 40% of loans in a pool that was going to be securitized earlier in the decade, by 2006 the typical percentage of loans reviewed for due diligence purposes was at most ***seven percent***.  Bohan's President, Mark Bohan, stated that "[b]y contrast, buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

**E.      Governmental Agency Investigations and Subsequent**
**Findings Related to the Residential Mortgage Industry**
**Evidence Faulty Loan Origination and Securitization**

100.    In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission (the "CFTC") (hereinafter referred to as the "President's Working Group") to investigate the causes of the market turmoil. After a seven-month investigation, the President's Working Group issued its report on March 13, 2008. The President's Working Group found:

- A significant erosion of market discipline by those involved in the securitization process, including *originators, underwriters, credit rating agencies, and global investors,* related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages…*

(Emphasis added).

101.    Further, as noted, relatively soon after issuance, the delinquency and foreclosure rates of the Certificate collateral began to increase. (¶¶ 10, 70, 181). This performance was an indication to S&P of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes. On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous RMBS Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data. This announcement triggered several governmental investigations which only began reporting their findings in 2008. (¶¶ 15, 56, 68, 116-140).

102.    S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of loosened underwriting at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

103.    One day later, on July 11, 2007, Moody's announced it also was revising its methodology used to rate the Certificates and anticipated Certificate downgrades in the future. Moody's did in fact significantly downgrade most of the Certificate classes, noting aggressive underwriting used in the origination of the collateral.

104.    Further, as set forth fully herein, disclosures emerged well after the issuance of the Certificates with respect to NMI which further evidenced that they had engaged in loan underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statement and Prospectus Supplements.  (¶¶ 76-92, 164-178).

**F.    The Offering Documents Failed to Disclose that NovaStar
Relied on S&P and Moody's Outdated Models to
Determine Levels of Credit Enhancement and Ratings**

105.    The Prospectus Supplements describe the varying forms of credit enhancement, including by way of subordination and over-collateralization.  The Supplements contain material misstatements and omissions of fact, including the failure to disclose that the amounts and forms of credit enhancement were understated and insufficient because they were largely determined by Ratings Agencies' models that had not been materially updated since 1999 (for S&P) and 2002 (for Moody's).  As a result, these outdated models were based primarily on the performance of fixed interest loans and not subprime, Alt-A, no or limited documentation loans – which were the kinds of loans substantially included in the Certificate collateralizations.  The

models failed both to provide sufficient, appropriate credit enhancement and to disclose the deficiencies in the manner in which credit enhancement was determined.

106.    The Ratings Agencies' determinations of the amount and kind of credit enhancement to be included in the Certificates were faulty.  These same faulty determinations were then used by the same firms to assign inflated and faulty AAA ratings to a substantial portion of the total Certificate value of the Offerings (92.21% by S&P and 92.73% by Moody's). These ratings were unjustifiably high because they were determined pursuant to the same models used to determine credit enhancement – models that had not adequately been updated at the time the Certificates were issued.

107.    The truth about the Ratings Agencies' undisclosed use of outdated models in rating RMBS deals only began to emerge in 2008.  The inadequacy of the models used to rate (and determine the amount of credit enhancement needed to support the rating) was discussed in the April 2008 issue of *Mortgage Banking,* which explained that the Ratings Agencies' models used statistical assumptions that were too heavily based on the performance of 30-year-fixed mortgages, which were not the kinds of mortgages that had been securitized in the prior four years:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."

> But why?  Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best.  "I think their [credit-rating] methodologies were demonstrably insufficient," he says.

> "Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper.  And the data that the rating agencies used when evaluating mortgage-backed securities-- including those backed by subprime mortgages--were heavily biased by over-

reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.

"This is not your historical mortgage loan," he says.  "This is more like a credit-card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

108.  *The New York Times* noted, with respect to Moody's April 2007 disclosure, in an article published on April 8, 2008, that it was "revising" its model which had not been revised since 2002:

In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model "was first introduced in 2002.  Since then, the mortgage market has evolved considerably."  This was a rather stunning admission; its model had been based on a world that no longer existed.

109.  The article explained that when Moody's had analyzed subprime delinquency data in 2007 it had found trends that its 2002 model never accounted for:

Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined.  This was rather intuitive; Moody's simply hadn't reckoned on it.  Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time.  Translation: even people with good credit scores were defaulting.  Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets."  Indeed.  And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them.  Homeowners' equity had never been as high as believed because appraisals had been inflated.

110.  On October 22, 2008, the House Oversight Committee heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of RMBS at S&P from March 1995 through April 2005.  Raiter testified that the ratings on S&P deals turn in part on the credit rating of the individual mortgages.  It was from this credit analysis that S&P determined *(1) the expected default probability* of a loan and *(2) the loss that would occur in*

46

*the event of a default* which, in turn, was used to establish the amount of AAA bonds that could be issued against the pool and amount of equity or "credit enhancement" needed to protect the AAA bonds from experiencing losses:

> A mortgage backed security consists of a pool of individual mortgage loans. Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A or HEL) underlying a given security, the pool could consist of 1,000 to 25,000 loans. The ratings process consists of two distinct operations – the credit analysis of individual mortgages and a review of the documents governing the servicing of loans and the payments to investors in the securities.
>
> *The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default.* These, in turn, establish the expected loss for the entire pool and determine the amount of AAA bonds that can be issued against the pool. It is analogous to your equity position in your home and the underlying mortgage.
>
> The loss estimate determines the equity needed to support the bond – it is intended to protect the AAA bonds from experiencing any losses, much the same as the homeowners' equity stake in a house protects the lender from loss in the mortgage loan.

Raiter Testimony, at 3 (emphasis added).

111.    Raiter testified that in 1995, S&P developed a sophisticated model to estimate the default and loss of individual loans and pools – a model based on approximately 500,000 loans with performance data going back five or more years. This "LEVELS" Model was updated in early 1999 based on a database of 900,000 loans. Raiter testified further that *"it was critical to maintain the best models as they were the linchpins of the rating process."* Raiter Testimony, at 4 (emphasis added). After the housing boom took off in 2001, S&P developed a far better model in 2001, with updated data in 2003 and 2004, based on approximately 9.5 million loans *"covering the full spectrum of new mortgage products, particularly in AAA and fixed/floating payment type categories."* (*Id.* (emphasis added.))

112.    Nevertheless, S&P failed to implement this updated model, which, in Raiter's view, would have forewarned the loan losses from the new loan products, in particular:

> [T]he analysts at S&P had developed better methods for determining default which did capture some of the variations among products that were to become evident at the advent of the crisis.  It is my opinion that had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses.  That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market as they would have been too expensive to put into bonds.

Raiter Testimony, at 4.

113.    As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."  Raiter Testimony, at 5.  S&P's current President, Deven Sharma, agreed, noting in his October 22, 2008 testimony before the House Oversight Committee, "[i]t is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work…   [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred." (*Id.*)

114.    Executives at Moody's also acknowledged a lack of investment in Moody's ratings models and the failure of Moody's ratings models to capture the decrease in lending standards.  In a confidential presentation to Moody's Board of Directors in October 2007, released by the House Oversight Committee on October 22, 2008 during the Committee's "Hearing on the Credit Agencies and the Financial Crisis" (the "House Oversight Committee

Hearing"),[8] Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."  McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape.  (*Id.*)  Brian Clarkson – Moody's former President and Chief Operating Officer – also recognized  during a Moody's Town Hall on September 10, 2007, the transcript of which was released during the House Oversight Committee Hearing on October 22, 2008, Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]."

115.    Not only were Moody's and S&P's models based on outmoded data but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.  And, in some instances, real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor ratings agency.

**G.      The Ratings Agencies Relaxed the Ratings Criteria Which
          Led to Artificially High Ratings Awarded to the Certificates**

116.    Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  In a September 25, 2008 article published by *Bloomberg*, titled "Race to Bottom at Moody's, S&P Secured Sub-prime's Boom, Bust," a former S&P Managing Director – Richard Gugliada – explained the easing of standards as a "'*market-share war where criteria were relaxed*'" and admitted, "'***I knew it was wrong at the time… [I]t was either that or skip the business***.  That wasn't my mandate.  My mandate was to find a way.  Find the way.'"  (*Id.*) (Emphasis added).  According to Gugliada, when the subject

---

[8]         All exhibits released by the House Oversight Committee from the Committee's "Hearing on Credit Agencies and the Financial Crisis" can be found on the Committee's website at www.oversight.house.gov.

of tightening S&P's ratings criteria came up, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose."  (*Id.*)

117.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney"), two S&P analysts, from April 5, 2007, that described S&P's rating of an investment similar to the Trusts and that was submitted during the House Oversight Committee Hearing:

> **Shah:** btw – that deal is ridiculous
>
> **Mooney:** i know right ... model def does not capture half of the rish [sic]
>
> **Mooney:** *risk*
>
> **Shah:** we should not be rating it
>
> **Mooney:** we rate every deal
>
> **Mooney:** it could be structured by cows and we would rate it
>
> **Shah:** but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

118.    In an email sent on December 5, 2006, released during the House Oversight Committee Hearing, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] ***even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters***." (Emphasis added).

119.    On October 28, 2008, former Moody's Managing Director Jerome S. Fons ("Fons") testified before the House Oversight Committee (hereinafter "Fons Testimony").  Fons had been an Executive at Moody's for 17 years, in various positions including Managing Director of Credit Policy.  Fons testified that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors

to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

120.   Fons explained that the originators of structured securities were free to shop around for the ratings agency that would give them the highest rating and **"*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality*."** Fons Testimony, at 3 (emphasis added).  Fons noted that the ratings agencies' "drive to maintain or expand market share made [them] willing participants in this [ratings] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  (*Id.*)  Fons said it was this business model that **"*prevented analysts from putting investor interests first*."** (*Id.*) (Emphasis added.)

121.   Raymond McDaniel, the current CEO of Moody's, also acknowledged the degradation of ratings standards.  In the same confidential presentation to Moody's Board of Directors in October 2007, cited *supra*, McDaniel told the Board: "The real problem is not that the market ... underweights ratings quality but rather that in some sectors, it actually penalizes quality .... It turns out that **_ratings quality has surprisingly few friends_**." (*Id.*) (Emphasis added.) He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'" (*Id.*)   In fact, *The Wall Street Journal,* in an article published on April 24, 2007, found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different ratings agency.

**H.      The Prospectus Supplements Did Not Reflect the True Risk of the Certificates**

122.    The Ratings Agencies rated the Certificates based in large part on data about each mortgage loan that NovaStar provided to them – including appraisal values, LTV ratios, borrower creditworthiness, required levels of documentation provided by borrowers used verify assets and/or income levels and quality control or oversight procedures followed by the Originators in underwriting the mortgage loans.  As discussed above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, disregard of Originator internal controls and procedures in addition to other facets of defective underwriting addressed in this Complaint.  Not only did the Underwriter Defendants fail to conduct proper due diligence, as set forth above, but neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence had been performed.  During Moody's September 2007 "Town Hall Meeting," hosted by Moody's Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the Ratings Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true ... [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law.  We know that's a lie.

*      *      *

> There's a lot of fraud that's involved there, things that we didn't see ... We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.

*      *      *

> [W]e're being asked to figure out how much everyone lied... [I]f all of the information was truthful and comprehensive and complete, we wouldn't have an

issue here…

What we're really being asked to do is figure out how much lying is going on and bake that into a credit ... which is a pretty challenging thing to do.  I'm not sure how you tackle that from a modeling standpoint.

Moody's Town Hall Meeting Transcript, at 16, 58.

123.     In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's sub prime ratings leading to massive leading to massive downgrades and potential more downgrades to come? We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that *we had blinders on and never questioned the information we were given.* Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan?  *As for #2, it is our job to think of the worst case scenarios and model them ... Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both.*

Moody's Town Hall Meeting Transcript, at 79 (emphasis added).

124.     Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk, and the Certificates were given investment-grade ratings when in reality they were not of investment grade quality.  These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

## I.     The Offering Documents Failed to Disclose "Ratings Shopping" Practices Used to Engage the Ratings Agencies

125.     The Registration Statement disclosed the engagement of Ratings Agencies but omitted disclosure of the manner in which the Ratings Agencies were engaged – so-called "ratings shopping."  As noted, the July 2008 SEC Report set forth that S&P and Moody's

engaged in the practice of "ratings shopping," as indicative of one of the practices which may have pressured Ratings Agencies to issue faulty ratings for MBS.  (¶¶ 56-68, 140).

126.   In June 2008, the NYAG announced that after an investigation of the Ratings Agencies in the MBS context, it had reached an agreement with S&P, Moody's and Fitch which contemplated a complete overhaul of the then-current ratings procedures and guidelines and to put an end to what had been termed "ratings shopping."  Instead of investment banks looking to issue mortgage-backed bonds going to all three agencies for a review, but only use, and pay for, the most optimistic rating, the agencies now will get paid up front regardless if they are hired to assign a rating, a move expected to remove any potential for conflicts of interest.

127.   As set forth above, in Fons' Testimony before the House Oversight Committee, he explained that Moody's provided inadequate ratings on RMBS because of conflicts of interest and being forced to "bid" or "shop" its ratings to obtain engagements:

> Why did it take so long for the rating agencies to recognize the problem?  Why were standards so low in the first place?  And what should be done to see that this does not happen again?
>
> **_My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pays business model and rating shopping by issuers of structured securities._**  A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree.  It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency.  Originators of structured securities typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality.  While the methods used to rate structured securities have rightly come under fire, in my opinion, the business model prevented analysts from putting investor interests first.

Fons Testimony, at 3 (emphasis added).

128.   In further testimony at the October 22, 2008 House Oversight Committee Hearing, Sean J. Egan ("Egan"), Managing Director of Egan-Jones Rating Co., stated, in part:

Assigning ratings on structured finance bonds differs from the process for corporate and municipal bonds. In the unsecured corporate and municipal markets, debt issuers are subject to being rated by all of the rating agencies because financial information is publicly available to all parties. The structured finance market has been a "rating by request" market where the debt issuers invite some or all of the major rating agencies to preview the collateral pools so the rating agencies can provide preliminary rating indications that can be used to size the bond classes and structure the bond transactions.

*Historically, all of the rating agencies have agreed to bow out of the rating process if they are not actually selected by the debt issuer to rate a securities transaction. This has encouraged the debt issuers to shop for the best ratings so they can optimize their securitization proceeds.*

House Oversight Committee Hearing, October 22, 2008, Egan Testimony, at 9 (emphasis added).

**J.      The Offering Documents Failed to Disclose the True
Roles of Ratings Agencies in Forming and Structuring
the Certificates for Sale as Primarily AAA Securities**

129.    An article appearing in *The Financial Times* on October 17, 2008, entitled "When Junk Was Gold," addressed the unique role of the Ratings Agencies in structured finance deals such as mortgage backed securities:

The first mortgage-backed bonds were created in the late 1980's, well before Clarkson's time, by a trader called "Lewie" Ranieri. Ranieri, the head of the mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate. What he struck upon in structured finance was a process of pure alchemy: a way of turning myriad messy mortgage loans into standardized, regimented and easy-to-assess bonds.

Ranieri knew that the magic of structuring was in the packaging. Packaged in the right way, mortgages could come to create a huge, new tradable bond market. And this is where the rating agencies came in. Structured bonds, like any other bond, needed ratings in order to be sold. *But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating. This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them. "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined. In some cases, the ratings are known before the bonds have even been inked. "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.*

(Emphasis added).

130.    The Ratings Agencies' unique role in influencing the structure of the securitization was more fully discussed in the July 2008 SEC Report.  The July 2008 SEC Report confirmed that S&P and Moody's provided "feed back" to the Sponsor of the Offerings as to the structure, which would result in the highest rating:

> The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs.  ***The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence),*** the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS trance issued by the trust.  Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger.  ***The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating.  Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.***

July 2008 SEC Report, at 22 (emphasis added).

## K.    The Offering Documents Failed to Disclose Material Financial Conflicts of Interest between NovaStar and the Ratings Agency Defendants

131.    The Offering Documents make no mention of the material financial conflicts of interest between NovaStar and the Ratings Agency Defendants, including the fact that the analysts involved in rating were also involved in the rating fees or the Ratings Agencies' business interests. The July 2008 SEC Report confirmed significant undisclosed conflicts of interest which gave the Ratings Agencies an incentive to issue inflated ratings.  The July 2008 SEC Report found, in violation of SEC Rules, that "key participants" in the securitization

process negotiated fees the Ratings Agency would receive in exchange for its high ratings.  July 2008 SEC Report, at 23-24.

132.   The July 2008 SEC Report also noted, *inter alia*, that analysts are "aware" of the rating firm's "business interests when securing the rating of the deal" as follows:

- ***While each rating agency has policies and procedures restricting analysts from participating in fee discussions,*** these policies still allowed key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal.  The Staff notes multiple communications that indicated that some analysts were aware of the firm's fee schedules, and actual (negotiated) fees.  There does not appear to be any internal effort to shield analysts from emails and other communications that discuss fees and revenue from individual issuers.

- ***"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."***

July 2008 SEC Report, at 24-25 (emphasis added).

133.   The July 2008 SEC Report found that a number of factors unique to the rating of RMBS may have "exacerbated" the effect of conflicts of interest inherent in the fact that the issuer or arranger pays for the ratings.  These factors include that the arranger of the deal has:

- ***"More flexibility to adjust the deal to obtain a desired credit rating as compared to arrangers of non-structured asset classes."***

- "Second, there is a high concentration in the firms conducting the underwriting function…   While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed.   The high concentration of arrangers with the influence to determine the ***choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.***   Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Ratings Agencies may be pressured by arrangers to produce a more *favorable outcome or reduce credit enhancement levels,* thus reducing *the cost of the debt for a given level of cash inflows from the asset pool.* When the arranger also sponsors the RMBS or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- *High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.* Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

July 2008 SEC Report, at 31-33 (emphasis added).

134.    As reported in *The Washington Post* on June 6, 2008, the NYAG announced that

it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

… change the way they evaluate mortgage securities that have roiled financial markets for the past year.

The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings. The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.

The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured. Regulators and investors have alleged that the agencies have a conflict of interest because they are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.

The agreement seeks to end this practice by having the issuers pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.

Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether issuers sought, but subsequently decided not to use, ratings from a specific agency. This will allow investors to see whether investment banks shopped around for the agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

58

135.     As reported in *The Washington Post*, the NYAG further stated that:

The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement.  "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse.

136.     Furthermore, in January 2009, the Congressional Oversight Panel ("COP") issued a Special Report on Regulatory Reform, Modernizing the American Financial Regulatory System:   Recommendations for Improving Oversight, Protecting Consumers and Ensuring Stability" (the "January 2009 COP Report").   The January 2009 COP Report stated, in no uncertain terms:

**Problem with current [Credit Ratings] system: *The credit rating system is ineffective and plagued with conflicts of interest.***

***The major credit rating agencies played an important-and perhaps decisive-role in enabling (and validating) much of the behavior and decision making that now appears to have put the broader financial system at risk.*** In the subprime-related market specifically, high ratings for structured financial products - especially mortgage-backed securities … - were essential for ensuring broad demand for these products.   High ratings not only instilled confidence in potentially risk-averse investors, but also helped satisfy investors' regulatory requirements, which were often explicitly linked to ratings from the major credit rating agencies. By 2006, Moody's business in rating structured financial products accounted for 44 percent of its revenues, as compared to 32 percent from its traditional corporate-bond rating business.  It has also been reported that "roughly 60 percent of all global structured products were AAA-rated, in contrast to less than 1 percent of corporate issues."  Financial firms, from Fannie Mae to AIG, also benefited greatly from having high credit ratings of their own-especially AAA-allowing them not only to borrow at low rates on the short-term markets to finance longer-term (and higher yielding) investments but also to sell guaranties of various sorts, effectively "renting out" their credit rating.

January 2009 COP Report, at 40-41.

137.     This stance is in stark contrast to the findings of the SEC in a Report issued in January 2003, titled Report on the Role and Function of Credit Rating Agencies in the Operation

of the Securities Markets (defined herein as the "January 2003 SEC Report") which the commission released as required by Rule 702(b) of the Sarbanes-Oxley Act of 2002 in the wake of the Enron debacle.  The January 2003 SEC Report examined the presence and effects of any *"potential" conflicts of interest* that may exist and arise in the relationship between Ratings Agencies and Issuers/Subscribers securities.  In contrast to the statements made in the January 2009 COP Report, the January 2003 SEC Report contained the following:[9]

> c.    *Concerns Regarding Credit Rating Agencies (e.g., Potential Conflicts of Interest or Abusive Practices)*
>
> i.    <u>Issuer Influence</u>.  ***In general, hearing participants [including executives of major Credit Rating Agencies] did not believe that reliance by rating agencies on issuer fees leads to significant conflicts of interest, or otherwise calls into question the overall objectivity of credit ratings.…***

January 2003 SEC Report, at 23. (Emphasis added).

138.    As a result, the conclusion set forth in the January 2003 SEC Report relating to "Potential Conflicts of Interest" was:

> 1.    The Commission will explore whether NRSROs should implement procedures to manage potential conflicts of interest that arise when issuers pay for ratings.
>
> 2.    The Commission will explore whether NRSROs should prohibit (or severely restrict) direct contacts between rating analysts and subscribers.
>
> 3.    The Commission will explore whether NRSROs should implement procedures to manage potential conflicts of interest that arise when ratings agencies develop ancillary fee-based businesses.

January 2003 SEC Report, at 44.

139.    No supplemental report or decisive action had been issued or taken by the Commission addressing these "potential conflicts" or providing investors with any additional

---

[9]    The report was based on testimony gathered from executives of the top NRSROs, including Sean J. Egan, Stephen W. Joynt, and Raymond W. McDaniel, whose testimony, as set forth in detail herein, had changed dramatically by 2008.  (¶¶ 110-121).

insight into the role of the Ratings Agency Defendants in the structuring of MBS and massive incentives to provide AAA ratings to them, despite the passing of the Ratings Agency Act of 2006, Pub. Law No. 109-291, until after the collapse of the subprime markets.  However, on April 21, 2005, in testimony before the Senate Committee on Banking, Housing and Urban Affairs, Allen L. Beller, Director of the SEC's Division of Corporate Finance, stated, in part:

> [I]n late 2002, staff of the Commission, Department of Treasury and OFHEO conducted a joint study of disclosure regarding mortgage-backed securities with a view to ensure that investors in mortgage-backed securities are provided with the information that they should have.  The task force issued a report in January 2003. [Footnote omitted.]  ***The report notes that market participants found the mortgage-backed securities market extremely efficient…***

Testimony of Allen L. Beller before the Senate Committee on Banking, Housing and Urban Affairs, April 21, 2005. (Emphasis added.)

140.    Furthermore, the January 2009 COP Report set forth the effect of outdated models and issuer conflicts of interest, stating:

> Regarding conflicts of interests, worrisome is the rating agencies' practice of charging issuers for their ratings, a practice that began at Fitch and Moody's in 1970 and at Standard & Poor's a few years later.  ***Although the practice of collecting payments from issuers has long provoked criticism, market observers often downplayed these concerns, suggesting that "the agencies have an overriding incentive to maintain a reputation for high-quality, accurate ratings." Others, [such as Jeremy Fons], however, claim that the "issuer pays" model biases ratings upward and also encourages "ratings shopping" by issuers, which in turn provokes a race to the bottom on the part of the rating agencies, each willing to lower quality standards to drum up more business.***
>
> ***Beyond the ratings themselves, credit rating agencies also charge issuers for advice, including pre-rating assessments (in which issuers learn what ratings will likely be under various hypothetical scenarios) and risk-management consulting. In some cases, credit rating agency analysts subsequently go to work for the companies they had been rating.  This revolving-door practice creates not only the potential for conflicts of interest but also for gaming of the system, since former employees of the rating agencies presumably know how best to exploit weaknesses in the agencies' risk assessment models.***
>
> Many critics charge that it was the models themselves-and overreliance on them- that got the credit rating agencies into trouble in recent years, particularly in

assigning ratings to structured financial products. ***"Instead of focusing on actual diligence of the risks involved, demanding additional issuer disclosures, or scrutinizing collateral appraisers' assessments…rating agencies primarily relied on mathematical models that estimated the loss distribution and simulated the cash flows of RMBS [residential mortgage backed securities] and CDOs using historical data.***

***Many of the models involved excessively rosy assumptions about the quality of the underlying mortgages, ignoring the fact that these mortgages (especially subprime mortgages) were far riskier than ever before and were in fact becoming steadily riskier year by year.  Credit rating agency modeling of mortgage-related securities may also have involved mistaken assumptions about the independence of the underlying mortgages-including the assumption that defaults would not be highly correlated across a broad bundle of mortgages or mortgage-related securities.***  By extension, many of the rating agencies' models may also have involved overly optimistic assumptions about the direction of housing prices (that is, that they would not fall by much, if at all).  When asked on a conference call in March 2007 about how a 1 to 2 percent decline in home prices over an extended period of time would affect Fitch's modeling of certain subprime-related securities, a Fitch representative conceded, "The models would break down completely."

January 2009 COP Report, at 41-42. (Emphasis added.)

**L.    Subsequent Disclosures Evidence Underwriter Defendants'
Massive Losses, Write-Downs and Near Collapse Due to Their
Role in the Underwriting of Mortgage-Backed Securities**

141.    Each of the Underwriter Defendants maintained operations through which they conducted issuance and sale to investors of massive quantities of MBS in 2005 and through 2007.  These securities were collateralized with sub-prime and Alt-A mortgage loans originated pursuant to practices which failed to comply with stated mortgage loan underwriting guidelines. As delinquencies, foreclosures and repossessions began to skyrocket as early as four months after the initial Offering dates, all of the Underwriter Defendants were forced to write-down a significant portion of the value of their mortgage-related securities holdings, have been and continue to be subject to Federal and State investigations and in some cases, have been forced into bankruptcy from the resultant mortgage-related losses.

1.    **Defendant GCM**

142.    Defendant GCM played a prominent role in the rise and fall of the U.S. subprime mortgage market.  Since 1987, GCM has helped mortgage lenders issue more than $400 billion in asset-backed securities.  As the sole Underwriter of the Certificates Offerings, GCM conducted inadequate due diligence with respect to whether the various Originators complied with the loan underwriting guidelines described in the Prospectus Supplements.

143.    As an underwriter, GCM, according to IMF, was the largest producer of subprime MBS, underwriting $44.86 billion worth of securities.  In 2005, GCM ranked second among the largest subprime MBS underwriters and fifteenth among the top mortgage securities issuers, issuing $36.568 billion in mortgage backed securities.  In both 2004 and 2005, GCM ranked third among the top non-agency MBS underwriters.  In 2006, IMF ranked GCM as the fourth largest ($102.156 billion) non-agency MBS underwriter, sixteenth largest ($28.085 billion) non-agency MBS issuer and twentieth largest ($28 billion) mortgage securities producer.  In 2007, RBS remained a strong force as the twenty-first largest ($3.79 billion) subprime securities issuer and third largest ($19.313 billion) subprime MBS underwriter.

144.    In June 2007, the NYAG launched an investigation into whether underwriters of mortgage-backed bonds turned a blind eye to the possibility that many of the securities' underlying home loans were facing default.  In a December 6, 2007 article published in *The New York Times*, it was reported that:

> Mr. Cuomo is also examining the relationship between mortgage lenders, third party-due diligence firms, the credit rating agencies and the underwriting banks to see if they colluded to ignore risks.
>
> \*          \*          \*
>
> Since bond underwriters have an obligation to make sure that the statements made in the securities' offering documents are accurate, Mr. Cuomo is investigating

how much, if any, due diligence they conducted themselves.  He is also seeking to determine whether they should have done more.

145.    In connection with the SEC probe into the collapse of the subprime mortgage market, on March 8, 2008, RBS confirmed that its Greenwich Capital unit had been ordered to turn over financial documents to the SEC regarding originations of mortgages, accounting, due diligence, sales and insider trading.

146.    On November 28, 2008, RBS announced that the government would take majority control of the bank, buying a 57.9% stake in the Company in exchange for £20 billion pounds. In a February 27, 2009 article in *MarketWatch*, it was reported that RBS was receiving another £19.5 billion ($28 billion) in new capital from the U.K. Treasury in an agreement struck this week that gives the struggling bank the option to raise another £6 billion ($8.7 billion) from the government if needed.

147.    On March 23, 2009, in a *Telegraph* article titled "RBS Traders Hid Toxic Debt," it was uncovered that although the Chief Executive of RBS, Sir Fred Goodwin, had repeatedly stated that RBS "don't do sub-prime," traders at RBS's U.S. subsidiaries were buying up billions of dollars of subprime assets.

> RBS began buying up about £34 billion of sub-prime assets as US banks were offloading the mortgages.  RBS was unable to sell the assets on as planned leading to the taxpayer bail-out.
>
> The system of annual cash bonuses encouraged bankers to buy up the assets with insufficient regard to the risks involved.
>
> *            *            *
>
> Its investment banking division had some £20 billion of sub-prime assets. Citizens Bank [RBS's other US banking subsidiary] had about £14 billion worth of sub-prime exposure.

148.    On January 29, 2009, ten lawsuits filed against various Greenwich Capital entities, including GCM, alleging violations of the federal securities laws, were consolidated in the United States District Court for the Southern District of New York. *Zemprelli v. The Royal Bank of Scotland Group PLC, et al*, No. 09-CV-0300.[10]  The actions all allege that Greenwich Capital, its affiliates and subsidiaries, concealed the true nature of their exposure to the U.S. subprime market until August 8, 2008 when the company announced its first-ever loss after being forced to take £5.9 billion in write-downs.

149.    As alleged herein, GCM failed to conduct due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the NovaStar Offerings complained of herein, and instead relied largely on the cursory due diligence on small samples of securitized loan pools performed by NovaStar and third-party firms engaged by NovaStar.

### 2.    **Defendant DBS**

150.    Deutsche Bank Securities, Inc. ("DBS"), or Deutsche Bank, serves as the U.S. investment banking and securities arm of German Deutsche Bank AG.  DBS was founded in 1973 as a subsidiary of Deutsche Bank AG.  DBS is an SEC registered broker-dealer registered and is a member of NASD and the New York Stock Exchange.

151.    In 2005, DBS was ranked twenty-second in non-agency MBS issuers by *IMF*, issuing more than $17 billion.  Moreover, in that same year, DBS was ranked eighth among non-agency MBS underwriters with $7.05 billion in volume.  This was a drastic increase from its

---

[10]      The consolidated cases are *Harold H. Powell Trust U/A Dated December 21, 1988 v. Royal Bank of Scotland Group plc,* No. 09-CV-0617-DAB; *Gordon v. The Royal Bank of Scotland Group, plc,* No. 09-CV-704-DAB; *Levy v. The Royal Bank of Scotland Group plc,* No. 09-CV-856-DAB; *Wacksman v. The Royal Bank of Scotland Group plc,* No. 09-CV-857-DAB;  *Kosseff v. Royal Bank of Scotland Group plc,* No. 09-cv-00890-DAB; *Brown v. The Royal Bank of Scotland Group plc,* No. 09-CV-01096-DAB; *Fitter v. The Royal Bank of Scotland Group PLC,* No. 09-CV-01650-DAB; *Raynor v. The Royal Bank of Scotland Group plc,* No. 09-CV-01854-DAB; *Lindsay v. The Royal Bank of Scotland Group plc,* No. 09-CV-02325-DAB.

2004 underwriting volume of $29.9 billion.  In 2006, DBS climbed two spots among non-agency MBS underwriters with $72.765 billion.  In that same year, *IMF* ranked DBS and its $25.328 billion in volume as the twenty-first largest mortgage securities producer and the sixth largest home equity loan security underwriter with $29.46 billion in volume.  In 2007, DBS underwrote $11.94 billion and ranked eighth among the top subprime MBS underwriters.

152.    On October 3, 2007, *The New York Times* reported that DBS expected to write down $3.1 billion in loans and mortgage backed assets.  On July 31, 2008, as reported by *Reuters*, Deutsche Bank AG announced another $3.6 billion in write-downs primarily due to DBS' over exposure to mortgage-related investments.  DBS' July 2008 write-down brought its total losses and write-downs from over-exposure to mortgage-related investments to over $11 billion.

153.    On June 27, 2008, a lawsuit was filed in the Supreme Court of the State of New York alleging violations of federal securities law against DBS.  *Massachusetts Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities, Inc.,* No. 08-CV-3178(LDW) (removed to the Eastern District of New York on August 5, 2008) (the "Bricklayers Complaint" or "Bricklayers Compl.").  The Bricklayers Complaint alleges that DBS, as underwriter of the mortgage-backed certificates, failed to perform adequate due diligence on the mortgage loans DBS securitized into MBS.

154.    On March 20, 2009, another lawsuit, this time against Deutsche Bank AG, was filed in the United States District Court for the Southern District of New York alleging that the Bank, its subsidiaries and its officers violated the Securities Act of 1933 by issuing false and misleading registration statements, prospectuses and other documents.  *Kaess et al v. Deutsche Bank AG et al*, No. 09-CV-2556 Initial Complaint (the "Kaess Complaint" or the "Kaess

Compl."). The Kaess Complaint alleged, *inter alia*, that Deutsche Bank AG, with respect to its mortgage-related securities:

- failed to properly record provisions for credit losses, residential mortgage-backed securities, commercial real estate loans…

- The Company's internal controls were inadequate to prevent it from improperly recording provisions for credit losses, residential mortgage-backed securities, commercial real estate loans…

Kaess Compl., ¶ 47 (emphasis added).

155.   As alleged herein, DBS failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the NovaStar Offerings complained of herein, and instead relied largely on the cursory due diligence on small samples of securitized loan pools performed by NovaStar and third-party firms engaged by NovaStar.

### 3.   **Defendant Wachovia**

156.   Since January 2009, Wachovia Securities LLC, or Wachovia, has operated as an affiliate of Wells Fargo & Company and as of May 1, 2009, was rebranded as Wells Fargo Advisors, LLC.   (¶ 32).   Wells Fargo Advisors, LLC is an SEC registered broker-dealer registered and is a member of NASD and the New York Stock Exchange.

157.   In 2006, Wachovia was ranked thirty-eighth in top mortgage securities producers by *IMF*, issuing more than $10 billion in volume.  The following year, Wachovia ranked twenty-third in the list of top home equity loan security originators/issuers, with over $3.5 billion in volume.  As a result of massive exposure to high-risk mortgage-backed securities and related investments, the Federal Government placed Wachovia up for "forced-sale" in late 2008, leading to a bidding war between Citigroup and Wells Fargo & Company for the former investment banking heavyweight.

158.    Wachovia's high-risk exposure in the market for MBS and mortgage-related investments was a direct cause of its rapid decline and ultimate demise.  In a November 2007 SEC filing, Wachovia reported a $1.1 billion drop in the value of its asset-backed debt for the month of October alone.  Moreover, Wachovia anticipated additional losses of $500 to $600 million in the fourth quarter, due to losses in the subprime mortgage market, and related to its acquisition of Golden West Financial.  On January 22, 2008, Wachovia reported meager earnings per share of $160 million, down over sixty-eight percent from the year before.

159.    As reported by the *Associated Press* on April 14, 2008:

> Wachovia posted a staggering loss of $393 million, or 20 cents per share, compared with a year-earlier profit of $2.3 billion, or $1.20 per share. Excluding 'one-timers,' the loss was $270 million, or 14 cents per share. Revenue on a taxable equivalent basis fell 5% to $7.9 billion.

160.    A *New York Times* article on September 27, 2008 reported on Wachovia's search for a lifeline, as one of the banks hardest hit by the housing crisis. Soon thereafter, on October 3, 2008, it was announced that Wells Fargo would "merge with Wachovia – including the troubled Charlotte bank's banking operations – in a $15.1 billion all-stock merger."  According to its own SEC filings, the merger required Wells Fargo & Company to absorb substantial past and ongoing losses resulting from Wachovia's high-risk portfolio of mortgage-related investments.

161.    As alleged herein, Wachovia failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the NovaStar Offerings complained of herein, and instead relied largely on the cursory due diligence on small samples of securitized loan pools performed by NovaStar and third-party firms engaged by NovaStar.

**M.**     **Federal District Court Rules That Moody's Non-
         Independence in MBS and CDO Ratings Is a Material
         Misrepresentation in Moody's Securities Fraud Case**

162.     On February 19, 2009, in *In re Moody's Corporation Securities Litigation*, Civ.

No. 07-CV-8375 (SWK), 2009 U.S. Dist. LEXIS 13894, Judge Kram of the United States

District Court for the Southern District of New York denied Defendant Moody's motion to

dismiss, finding that statements regarding the ratings agency's independence in issuing ratings

constituted an actionable and material misrepresentation (the Moody's Decision" or the

"Moody's Dec."). In that case, Moody's Corp. investors had filed a class action against

Moody's claiming that the company had made material misrepresentations and omissions

respecting, among other things, its business, the meaning and the method of its credit ratings and

the manner in which it generated financial results and growth. In her decision, Judge Kram

stated in part:

- Plaintiff's core allegation I that Moody's falsely claimed that it was an
  independent body publishing ratings accurately and impartially. Defendants
  contend that the statements cited by plaintiffs are declarations of intent or
  vague pronouncements constituting "puffery." The Court disagrees with
  Defendants' characterizations. (Moody's Dec., at 28).

- The AC [Amended Complaint] adequately alleges that Moody's employees
  and clients attempted to raise questions about the Company's independence.
  In a confidential presentation, CEO McDaniel admits that *analysts and
  managing directors sometimes succumb to the pressure placed upon them
  by issuers and ignore the strictures of the ratings system.* (Moody's Dec., at
  29).

- Collectively, the facts belie Defendants' claim of independence and ratings
  integrity. The acts alleged by Plaintiffs challenge the Company's assertion
  that it applies its "opinions consistently, fairly, and objectively." Similarly,
  the revelations that *it [Moody's] altered ratings at the request of issuers*
  called into question Moody's claim that it "maintains independence in its
  relationships with Issuers and other interested entities." (Moody's Dec., at
  30).

- Moody's statements regarding its own independence do not constitute inactionable puffery.   They were neither "vague" nor "non-specific" pronouncements that were incapable of "objective verification."   Moody's not only proclaimed its independence; it also listed verifiable actions it was taking to ensure its independence.   Rather than being general statements, these were specific steps that Moody's was taking to ensure its independence and ratings integrity.  (Moody's Dec., at 33).

- Plaintiffs have alleged sufficient facts to show that ***Moody's rating methodologies were not "accurately disclosed"*** by alleging that Moody's did not even start to assess originator practices until well after it claimed it had. (Moody's Dec., at 34).

(Emphasis added.)

163.    In or about July 2008, both Moody's and S&P sought to make internal changes to reform the conflicts of interest problems identified by the SEC.  In a *Reuters* article, S&P Draws Criticism as Sets Ratings Reform, published on July 2, 2008, it was reported that S&P had "unveiled an overhaul of its ratings process on Thursday, responding to widespread criticism of the quality and accuracy of credit ratings" and had:

> [A]nnounced 27 steps that its aid would boost confidence in credit ratings.  It came on the heels of planned reforms announced this week by its major rivals, [Moody's and Fitch].

> Ratings agencies have come under fire from regulators and investors who say they helped precipitate the U.S. subprime mortgage crisis and credit tightening that began in 2007.

> "The supposed reforms announced today by Standard & Poor's and by Moody's on Tuesday are too little, too late," New York State Attorney General Andrew Cuomo said in a statement.  "Both S&P and Moody's are attempting to make piecemeal change that seem more like public relations window-dressing than systematic reform."   He pledged to continue investigating their roles in the mortgage crisis.

> Critics say the agencies at first assigned high ratings to hundreds of billions of dollars of securities linked to low-quality debt, only to exacerbate market turmoil by later rapidly downgrading many of those same securities.

> This has contributed to write-downs piling up in the financial industry, hurting stock prices and causing losses in a variety of pension and mutual funds.

**VI.**

**MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS**

**A.      The Offering Documents Included Material Misstatements and Omitted
          Information Regarding Stated Mortgage Loan Underwriting Guidelines**

      **1.      The Registration Statement**

164.    The Registration Statement filed by NMFC on June 16, 2006 (¶ 23), described

that generally the adequacy of the property financed by the loan will have been determined by an

appraisal according to guidelines as follows:

> ***An appraisal is also required on all loans and in many cases a review appraisal
> or second appraisal may be required depending on the value of the property and
> the underwriter's comfort with the original valuation.***    All appraisals are
> required to conform to the Uniform Standards of Professional Appraisal Practice
> adopted by the Appraisal Standards Board of the Appraisal Foundation and are
> generally on forms acceptable to Fannie Mae.    ***The properties securing the
> mortgage loans are generally appraised by qualified independent appraisers
> who are generally approved by the related originator.***

NovaStar Mortgage Funding Corporation, Form S-3/A Registration Statement, filed June 16,
2006, at S-57. (Emphasis added.)

165.    ***Omitted Information:*** In fact, NovaStar made no attempt to confirm the standards

actually used by mortgage brokers, correspondents and other third-parties from which they

acquired mortgages.  As set forth above, since issuance of the Certificates, public disclosures

revealed that the Originators ignored stated appraisal requirements and in many cases employed

fraudulent underwriting practices, which included the use of interested appraisers.  Higher deal

fees and more profitable market conditions were motivation for NovaStar not to spend the time

and money to investigate the validity of appraisal values on the underlying mortgaged properties

prior to securitization.  Specifically, only a small sampling of the mortgage loan pool, no more

than 5% to 7%, was reviewed before NovaStar securitized the loans, leaving a substantial

71

amount of bad loans to escape inspection. Further, with NovaStar's use of the structuring software, the loans became numbers blindly plugged into a computer with little or no attention paid to the underlying collateral, as long as the averages of the loan pool fit within certain loosely defined parameters.

166.    According to stated underwriting guidelines, borrowers were required to submit applications to the originators that were then verified for creditworthiness. For example, the Registration Statement provided:

> The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan. Each loan applicant completes an application that includes information with respect to the applicant's income, assets, liabilities and employment history. Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date.

NovaStar Mortgage Funding Corporation, Form S-3/A Registration Statement, filed June 16, 2006, at S-57.

167.    ***Omitted Information:*** In fact, NovaStar originators and correspondent lenders were instructed to push, onto unfit and unqualified borrowers, specific types of mortgage loans, namely ARMs which readjusted after two or three years to significantly higher rates. Furthermore, NMI incentivized their branch and correspondent lenders with "kick-backs" for placing borrowers into higher interest rate mortgages than they had qualified for.

168.    The Registration Statement, with regards to documentation requirements for full documentation and less-than full documentation loans further stated:

> The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation", "Stated Income", "No Documentation", "No Income/No Asset", "Streamline" and "24-Month Bank Statement." Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay

stub or prior two years W-2 forms and most recent pay stub. Under the Limited Documentation and 24-Month Bank Statement programs, no such verification is required, however, bank statements for the most recent consecutive 12- or 24-month period are required to evidence cash flow. Under the Stated Income program, an applicant may be qualified based on monthly income as stated in the loan application. Under the "No Documentation" program, an applicant provides no information as it relates to their income. Under the "No Income/No Asset" program, the applicant's income and assets are not verified, however the applicant's employment is verified. Under the Streamline program, this is allowed only for our Retention division for borrowers that currently have a mortgage with the sponsor.

*Id.,* at S-57-58 (emphasis added).

169.   ***Omitted Information:*** NovaStar was not nearly as thorough in obtaining and verifying documentation from or about borrowers as these statements imply. As set forth herein in detail, NovaStar and its "underwriting officers" placed the emphasis not on adherence to underwriting guidelines, but rather, on getting loans "done," severely hindering the quality of the mortgage loans and resulting in flawed and in many cases fraudulent loan applications which, among other things, inflated borrower income levels, failed to contain employment verification, over-valued properties at appraisal or required, in many cases, no proof in the form of documentation at all. These statements were materially misleading with respect to the appraisal standards which were largely disregarded and the values of the underlying mortgage properties were, in many instances, inflated in the loan origination process.

### 2.   The Prospectus Supplements

170.   The underlying loan collateral for the Certificates issued by the Issuing Trusts (¶ 33) was originated entirely by NMI. As set forth above, NMI originated all of the mortgage loan collateral underlying the Certificates, served as Sponsor of the collateral and securitizations, and acted as servicer of the mortgage loans after securitization. The Prospectus Supplements

described the underwriting guidelines used by NMI in originating Certificates' underlying collateral.

171.    NMI's underwriting guidelines generally required a description of the borrower's income, employment documentation and a credit report.   For example, the Prospectus Supplement for the NMFT 2006-5 Certificate Offering stated:

> The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan.  Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history.   Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date.

> *         *         *

> ***Quality control reviews are conducted to ensure that all mortgage loans meet quality standards.***  The type and extent of the reviews depend on the production channel through which the mortgage loan was obtained and the characteristics of the mortgage loan.  The sponsor reviews, at a minimum, 7% of each month's production.    The random audit selection criteria includes a proportional representation of loan type, loan product, loan purpose, FICO score, LTV, underwriting grade, state and broker.

NMFT Series 2006-5 Prospectus Supplement, Form 424B5, filed September 22, 2006, at S-77, 81. (Emphasis added.)

172.    ***Omitted Information***:  As set forth above, NMI failed to conduct proper due diligence and verify the information contained in borrower mortgage loan applications.  Further, NMI's emphasis on increasing the volume of loans at the expense of the quality of loans gave rise to an increasing number of fraudulently originated mortgage loans, with missing or completely fabricated borrower information, to go sight unseen by any review.  Moreover, NMI lending officers regularly dealt with adverse information in a borrower's credit report by simply

ignoring such information.   Consumer credit rating agencies must remove non-confirmable adverse information within a certain time period from consumer credit reports.  Lending officers and originators knew that borrowers frequently complained to consumer credit rating agencies about accurate adverse information in an effort to increase their credit scores, and thus would not take such information into account.

173.    The Prospectus Supplements describe the importance of appraisals of mortgaged properties.  For example, the NMFT Series 2006-5 Prospectus Supplement also stated that:

> An appraisal is also required on all loans and in many cases a review appraisal or second appraisal may be required depending on the value of the property and the underwriter's comfort with the original valuation.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae.  The properties securing the mortgage loans are appraised by qualified independent appraisers who are generally approved by the related originator.  A streamline appraisal program is offered by our Retention division for borrowers that currently have a mortgage loan with the sponsor. Under this program an AVM can be used to determine valuation if the full appraisal from the previous loan is less than two years old.  The maximum increase in value that can be supported with an AVM is 10%.  The mortgagor may also include information regarding verification of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been used for underwriting purposes.

*Id.*, at S-77-78.

174.    ***Omitted Information***: As stated herein, NMI's home loan appraisals were not obtained from independent appraisers or appraisal services, but rather from appraisers who understood that their appraisals must conform to predetermined levels at which a loan could be approved, or risk their association and employment with NMI or brokers employed by NMI correspondent lenders throughout the country.  The effect was that purportedly independent appraisals were not prepared in conformance with Fannie Mae or Freddie Mac appraisal standards.  NMI failed to confirm that appraisers were following the guidelines described, and

this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Offering Documents.  This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 and 2005.  Thus, the aggressive lending practices introduced during those years where, for example, borrowers with mortgages in excess of their ability to pay were assured that by the promise of refinancing to a lower rate, were unavailable.

175.    The Prospectus Supplements detailed NMI's programs for issuing mortgage loans where less than full documentation was required.  However, even those programs were subject to underwriting procedures and required appraisals (as set forth in ¶¶ 164-178, herein).  For example, the NMFT Series 2006-5 Prospectus Supplement stated that:

> The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement."   Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub.   Under the Limited Documentation program, no such verification is required, however, bank statements for the most recent consecutive 6-month period are required to evidence cash flow.   Under the Stated Income program, an applicant may be qualified based on monthly income as stated in the loan application. Under the "No Documentation" program, an applicant provides no information as it relates to their income.   Under the "No Income/No Asset" program, the applicant's income and assets are not verified, however the applicant's employment is verified.   Under the Streamline program, this is allowed only for our Retention division for borrowers that currently have a mortgage with the sponsor.   The documentation required for this loan is based on previous documentation type. If a "Streamline loan's original documentation type was "Full Documentation," then a verification of the applicant's employment is the only requirement.   Mortgage loans originated under any program other than the "Full Documentation" program require less documentation and verification than do traditional "Full Documentation" programs.   The Full Doc/12-Months Personal Bank Statement Program allows self-employed or fixed income

76

> borrowers to substitute most recent consecutive 12-months bank statements for wage earner's W-2 forms and recent pay stubs.  Given that the sponsor primarily lends to non-conforming borrowers, it places great emphasis on the ability of collateral to protect against losses in the event of default by borrowers.

*Id.*, at S-78 (emphasis added).

176.   ***Omitted Information***: These statements contain material misstatements and omissions because, as stated herein, NMI materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation and inflated fees throughout the loan process.  Despite assurances that lesser documentation loans were limited to borrowers with excellent credit histories, NMI routinely extended these loans to borrowers with weak credit histories.  Moreover, NMI's debt-to-income ratios were misstated by the manipulation of reported income levels on loan applications, many times with the knowledge of the mortgage broker.  Brokers were compensated when loans were approved – even with false information – and denied compensation when they questioned obviously distorted income levels.  Because NMI was financially motivated to originate and securitize loans, it took no meaningful steps to prevent these practices regardless of the underlying risk profile.  As a result, stated income amounts far in excess of those reasonable for the borrowers' employment were regularly ignored in order to approve loans under the stated income and stated asset documentation programs. NMI offered stated income loans up to 100% loan-to-value until March 2007.

177.   The NFMT Series 2006-5 Prospectus Supplement also set forth guidelines for underwriting exceptions granted in cases where "compensating factors" were present:

> On a case-by-case basis, exceptions to the underwriting guidelines are made where the sponsor believes compensating factors exist.  Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception. All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor.  All loans over $650,000

> require the approval of the VP of Operations and Corporate Credit Department or its approved designees.  In addition, the President of the sponsor approves all loans in excess of $1,100,000.

*Id.*

178.   **Omitted Information**: As set forth above, NMI was very liberal in granting exceptions to its underwriting standards and was not nearly as thorough in getting documentation from or about borrowers as the underwriting guidelines set forth herein implied.  The emphasis was on getting loans done – meaning more volume led to higher fees and profits for NMI. Exceptions not only were granted in situations where compensating factors existed but also were extensively granted to maintain loan volume.

**B.      The Offering Documents Included Material Misstatements and Omitted Information Regarding Delinquencies as of the Cut-Off Dates**

179.   The Registration Statement contained a section which described the percentage of delinquencies at a cut-off date just prior to the Offering date.

> Such table sets forth certain information regarding the delinquency performance in the past twelve months as of the cut-off date for [ ] mortgage loans with an aggregate principal balance of approximately $[ ] representing approximately [ ]% of the aggregate pool. [For [ ] Mortgage Loans with an aggregate principal balance of approximately $[ ] representing approximately [ ]% of the aggregate pool, the delinquency information below is not available.]  No Mortgage Loan has been delinquent more than [___] days in the past twelve months.

NovaStar Mortgage Funding Corporation, Form S-3/A Registration Statement, filed June 16, 2006, at S-61.

180.    Each of the Prospectus Supplements contained the language set forth above or some variation of it, indicating, as of the "cut-off date" (defined differently in each Prospectus Supplement), the percentage of mortgage loan collateral that was 30-59 and 60 days delinquent. For example, the Prospectus Supplements for the NMFT Series 2006-5 and NMFT Series 2007-2 Certificate Offerings contained the following summary charts:

### Historical Delinquency of the Initial Mortgage Loans[1]

| | Number of Mortgage Loans | Principal Balance Outstanding as of Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of Cut-off Date |
|---|---|---|---|
| **30-59 Days (times)** | | | |
| 0 | 4,478 | 742,509,865.94 | 99.19 |
| 1 | 47 | 6,050,196.38 | 0.81 |
| 2 | 1 | 46,561.69 | 0.01 |
| Total | 4,526 | 748,606,624.01 | 100.00 |
| | | | |
| **60-89 Days (times)** | | | |
| 0 | 4,518 | 747,942,420.00 | 99.91 |
| 1 | 3 | 300,625.78 | 0.04 |
| 2 | 1 | 119,575.71 | 0.02 |
| 3 | 1 | 64,166.49 | 0.01 |
| 5 | 2 | 88,256.36 | 0.01 |
| 10 | 1 | 91,579.67 | 0.01 |
| Total | 4,526 | 748,606,624.01 | 100.00 |
| | | | |
| **90 Days or more (times)** | | | |
| 0 | 4,517 | 747,861,593.22 | 99.90 |
| 1 | 2 | 145,067.18 | 0.02 |
| 2 | 2 | 88,256.36 | 0.01 |
| 3 | 1 | 133,885.37 | 0.02 |
| 4 | 1 | 64,166.49 | 0.01 |
| 8 | 1 | 94,234.40 | 0.01 |
| 10 | 2 | 219,420.99 | 0.03 |
| Total | 4,526 | 748,606,624.01 | 100.00 |

_____
(1) Over the previous 12 months.

NMFT Series 2006-5 Prospectus Supplement, Form 424B5, filed September 22, 2006, at S-81 (emphasis added).

## Historical Delinquency of the Initial Mortgage Loans[1]

| 30-59 Days (times) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date |
|---|---|---|---|
| 0 | 5,834 | $934,492,828.94 | 99.03% |
| 1 | 41 | 8,965,084.55 | 0.95 |
| 2 | 2 | 149,866.32 | 0.02 |
| Total | 5,877 | $943,607,779.81 | 100.00% |

| 60-89 Days (times) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date |
|---|---|---|---|
| 0 | 5,846 | $938,125,575.05 | 99.42% |
| 1 | 29 | 5,252,922.44 | 0.56 |
| 2 | 1 | 122,015.50 | 0.01 |
| 4 | 1 | 107,266.82 | 0.01 |
| Total | 5,877 | $943,607,779.81 | 100.00% |

| 90 Plus Days (times) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date |
|---|---|---|---|
| 0 | 5,819 | $934,815,361.37 | 99.07% |
| 1 | 22 | 3,207,188.64 | 0.34 |
| 2 | 24 | 3,866,176.49 | 0.41 |
| 3 | 3 | 806,023.50 | 0.09 |
| 4 | 3 | 388,606.37 | 0.04 |
| 5 | 2 | 217,165.51 | 0.02 |
| 8 | 1 | 107,266.82 | 0.01 |
| 9 | 2 | 141,162.36 | 0.01 |
| 11 | 1 | 58,828.75 | 0.01 |
| Total | 5,877 | $943,607,779.81 | 100.00% |

NMFT Series 2007-2 Prospectus Supplement, Form 424B5, filed May 25, 2007, at S-92.

181.   *Omitted Information:* These statements masked the true impaired nature of the collateral since the delinquency rates for these loan pools followed the same pattern of skyrocketing delinquencies immediately following the Offering dates.  Specifically, within four months after the respective "cut-off dates, delinquencies and defaults increased by an average of 1,020%, from 0.76% to over 8% of the outstanding pool balances, and within six months that figure further rose to over 12% of the balances.  As of the date of the filing of this Complaint, borrower delinquency and defaults have increased to *over 51%* of the outstanding collateral balance.

C.    **The Offering Documents Included Material Misstatements**
      **and Omitted Information Regarding Credit Support**

182.   "Credit enhancement" refers to excess mortgage loan collateral which provides support to the mortgage collateral underlying the Offered Certificates and generates additional interest to protect security holders in the event of borrower default or other event which may impair the collateral underlying the certificates.

183.   With respect to credit enhancement, the Registration Statement provided explanations of the two methods used by NovaStar in the Certificate Offerings as follows:

> Either depositor may obtain credit enhancement, which may include overcollateralization, cross-collateralization, subordinated securities, an irrevocable letter of credit, surety bond or insurance policy, or combination thereof in favor of the trustee on behalf of the holders of a series or designated classes of a series. Either depositor may also obtain swap agreements and cap agreements to hedge against interest rate risks. The credit enhancement and hedge agreements will support the payment of principal and interest on the securities, and may be applied for other purposes to the extent and under the conditions described in the prospectus supplement. Credit enhancement and hedge agreements for a series may include one or more of the following forms, and may be structured so as to protect against losses relating to more than one trust fund.

> **Over-Collateralization**

> If specified in the prospectus supplement for a series, a portion of the interest payment on each loan may be applied as an additional distribution in respect of principal to reduce the principal balance of a particular class or classes of securities and, thus, accelerate the rate of principal payments on the specified class or classes. Reducing the principal balance of the securities without a corresponding reduction in the principal balance of the underlying loans will result in over-collateralization. In addition, if specified in the prospectus supplement for a series, the initial aggregate outstanding principal amount of the mortgage loans in a trust plus the principal amount in the pre-funded account for the series may exceed the aggregate principal amount of the securities issued in such series, resulting in initial principal over-collateralization.

> **Cross-Collateralization**

> If specified in the related prospectus supplement, the beneficial ownership of separate groups of assets included in a trust fund may be evidenced by separate

classes of the related series of securities.  In that case, credit support may be provided by a cross-collateralization feature requiring that distributions be made on securities evidencing a beneficial ownership interest in, or secured by, other asset groups within the same trust fund before distributions are made on subordinated securities evidencing a beneficial ownership interest in, or secured by, one or more other asset groups in that trust fund.  Cross-collateralization may be provided by:

• allocating specified excess amounts generated by one or more asset groups to one or more other asset groups in the same trust fund, or

• allocating losses with respect to one or more asset groups to one or more other asset groups in the same trust fund.

As described in the related prospectus supplement, these excess amounts or losses, as the case may be, will be allocated to the outstanding class or classes of subordinated securities of the related series having the lowest rating assigned by any rating agency or the lowest payment priority.  The prospectus supplement for a series that includes a cross-collateralization feature will describe the manner and conditions for applying the cross-collateralization feature.

                    *       *       *

**Subordination**

If specified in the related prospectus supplement, the rights of holders of one or more classes of subordinated securities will be subordinate to the rights of holders of one or more classes of senior securities of the series to distributions of scheduled principal, principal prepayments, interest or any combination of those distributions that otherwise would have been payable to holders of subordinated securities as specified in the related prospectus supplement.  If specified in the related prospectus supplement, holders of senior securities also may be protected by a reduction in the ownership interest of the related subordinated securities, or by other methods described in the related prospectus supplement.

If specified in the related prospectus supplement, delays in receiving scheduled payments on the loans and losses on defaulted loans will be borne first by the various classes of subordinated securities and thereafter by the various classes of senior securities, in each case as specified in the related prospectus supplement. The aggregate distributions of delinquent payments on the loans over the lives of the securities or at any time, the aggregate losses on defaulted loans which must be borne by the subordinated securities by virtue of subordination, and the amount of the distributions otherwise distributable to the subordinated securityholders that will be distributable to senior securityholders on any distribution date may be limited as specified in the related prospectus supplement.  If aggregate distributions of delinquent payments on the loans or aggregate losses on the loans

82

were to exceed the amount specified in the related prospectus supplement, holders of senior securities would experience losses on their securities.

*       *       *

**Insurance**

Credit enhancement for a series may include a pool insurance policy, private mortgage insurance policies on underlying loans, a special hazard insurance policy or bankruptcy bonds relating to the primary assets.

*Pool Insurance Policy.* A pool insurance policy covers, subject to the limitations described in a prospectus supplement, losses resulting from defaults, but generally will not cover the portion of the principal balance of any loan that is required to be covered by any primary mortgage insurance policy.

*Private Mortgage Insurance Policy.* Certain mortgage loans in the trust may be individually covered by a private mortgage insurance policy, which would insure the mortgage lender.  A private mortgage insurance policy insures a portion of the loss on a mortgage loan to the extent that the uninsured exposure of the related mortgage loan is reduced to an amount equal to a certain percentage of the original loan-to-value ratio of such mortgage loan.  Private mortgage insurance policies typically do not cover losses caused by physical damage to the mortgaged property, negligence, fraud and certain other risks.

*       *       *

**Reserve Funds**

Either depositor may deposit into one or more funds to be established with the trustee as part of the trust fund or for the benefit of any credit enhancer, cash, a letter or letters of credit, cash collateral accounts or eligible investments.  In the alternative or in addition to an initial deposit, a reserve fund may be funded over time through application of all or a portion of the excess cash flow from the primary assets, to the extent described in the prospectus supplement.

Amounts withdrawn from any reserve fund will be applied by the trustee to make payments on the securities of a series, to pay expenses or reimburse any credit enhancer.

The trustee will invest amounts deposited in a reserve fund in eligible investments.

*       *       *

**Hedge Agreements**

83

A trust may hold an interest rate swap agreement, an interest rate cap agreement or currency swap agreement providing limited protection against interest rate or currency exchange risks.  These derivative contracts may provide the trust with additional amounts which will be available to pay interest on the securities, to build up overcollateralization, or both.  In no event will the utilization of such hedge agreements result in creating a security that relied primarily on something other than the performance of the receivables or other financial assets in the pool.  All agreements related to the hedge agreements used for a particular series of securities will be filed as exhibits to the related prospectus supplement.

NovaStar Mortgage Funding Corporation, Form S-3/A Registration Statement, filed June 16, 2006, at 26.

184.     Each Prospectus Supplement set forth on the first page of the document a general description of the Credit Enhancement supporting the Offering.  The Prospectus Supplement for the NFMT Series 2006-5 Offering stated as follows:

The more senior classes of certificates will have the benefit of the subordination of the more subordinated classes.

All classes of Class A and Mezzanine Certificates will be supported by overcollateralization, which is available to absorb losses.

Certain mortgage loans are covered by mortgage insurance policies. Certain mortgage loans are covered by mortgage insurance policies.  Excess cashflow will be available to absorb losses and maintain or restore overcollateralization.

NMFT Series 2006-5 Prospectus Supplement, Form 424B5, filed September 22, 2006, at Cover.

185.     Furthermore, the Prospectus Supplements each contained further explanation of the credit enhancement specific to each of the Offerings.   For example, the Prospectus Supplement for the NMFT Series 2006-5 Offering provided that credit enhancement would include:

The credit enhancement provided to the holders of the Class A and Mezzanine Certificates will consist of subordination, overcollateralization, excess cashflow, mortgage insurance and limited cross-collateralization.

***Subordination***

*    *    *

Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates and to afford those certificates protection against losses.

### *Overcollateralization*

The issuing entity will have an initial level of overcollateralization of approximately 0.55% of the sum of (i) the aggregate principal balance of the initial mortgage loans as of the cut-off date and (ii) the original pre-funding amount. On any distribution date after the closing date, the issuing entity is required to maintain or restore overcollateralization to the required level as described herein.

*    *    *

### *Excess Cashflow*

Excess cashflow (which includes excess interest from the mortgage loans) will be paid as follows:

> (i)    to the holders of the class or classes of Class A and Mezzanine Certificates then entitled to receive distributions in respect of principal, in an amount equal to any Extra Principal Distribution Amount, distributable to such holders in the same order of priority as the Group I Principal Distribution Amount and the Group II Principal Distribution Amount as described under "Description of the Certificates—Principal Allocations" herein;
>
> (ii)    to the supplemental interest trust to be distributed as described under "Description of the Certificates — Supplemental Interest Trust" herein; and
>
> (iii)    any remaining amounts to the holders of the residual certificates, as provided in the pooling and servicing agreement.

### *Mortgage Insurance*

*    *    *

The mortgage insurance policies provided by MGIC, PMI and Radian insure a portion of the loss on the related mortgage loan to a level where the uninsured exposure of the mortgage loan is reduced to an amount equal to 55%, 51% and 50%, respectively, of the original loan-to-value ratio of such mortgage loan, as more fully described in the related mortgage insurance policy.

85

*Limited Cross-Collateralization*

\*        \*        \*

Distributions of collections from both groups of mortgage loans will be used to pay interest and principal to the Mezzanine Certificates, the Class I Certificates and the Class C Certificates.  To the extent that available funds representing interest from one group of mortgage loans are insufficient to make a required payment of interest to its related Class A Certificates, then any remaining available funds representing interest from the other group, after payment of interest to its related Class A Certificates, may be used to make such required payment as described in this prospectus supplement.  Likewise, remaining funds representing principal from a group after making the required distribution of principal to its related Class A Certificates may be used to make required principal distributions on the other classes of Class A Certificates as described in this prospectus supplement.

*Interest Rate Hedge Agreements*

\*        \*        \*

On each distribution date amounts received by the supplemental interest trust in respect of the interest rate hedge agreements will be available to restore the overcollateralization to the required level and to pay any available funds cap shortfall.

NMFT Series 2006-5 Prospectus Supplement, Form 424B5, filed September 22, 2006, at S-8-9.

186.     ***Omitted Information:*** The above statements failed to disclose that the Ratings Agencies largely determined the amount and kind of Credit Support or Credit Enhancement to be provided for each Certificate, both before and after Ratings Agencies were formally "engaged" by NovaStar, in order for the Certificates to be assigned predetermined ratings.  The above statements also failed to disclose that the amounts and kind of Credit Support the Ratings Agencies determined was appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, were faulty, erroneous and inaccurate since the Ratings Agency models had not been updated and failed to accurately or adequately reflect the performance of the Certificate mortgage loans.  Furthermore, as the statements purport to convey to the investor that

credit support levels are determined by the exposure to risk of default or delinquency by the underlying borrowers, this was far from the truth. In fact, credit enhancement levels were set at the absolute minimum level that was required not to protect investors, but rather to achieve and be awarded the highest possible credit rating by the Ratings Agency Underwriters.

### D. The Prospectus Supplements Misstated the True Loan-to-Value Ratios Associated with the Underlying Mortgages

187. Each of the Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts. In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range. The following chart, taken from the Prospectus Supplement for NMFT Series 2006-5, stated:

**Original Loan-to-Value Ratios of the Initial Mortgage Loans**

| Range of LTV Ratios*(%) | Number of Mortgage Loans | Aggregate Cut-off Date Principal Balance | Percentage of Aggregate Cut-off Date Principal Balance | Weighted Average Gross Coupon | Weighted Average Stated Remaining Term (Months) | Weighted Average Original LTV | Weighted Average FICO |
|---|---|---|---|---|---|---|---|
| 0.01  –  49.99 | 85 | $ 12,270,682.35 | 1.64% | 8.719% | 353 | 42.45% | 594 |
| 50.00  –  54.99 | 50 | 8,211,087.59 | 1.10 | 8.447 | 357 | 52.66 | 579 |
| 55.00  –  59.99 | 79 | 12,716,693.93 | 1.70 | 8.652 | 360 | 57.19 | 587 |
| 60.00  –  64.99 | 118 | 22,457,700.36 | 3.00 | 8.604 | 358 | 62.54 | 585 |
| 65.00  –  69.99 | 161 | 30,606,031.52 | 4.09 | 8.828 | 358 | 67.06 | 578 |
| 70.00  –  74.99 | 208 | 39,953,181.61 | 5.34 | 8.933 | 355 | 71.93 | 585 |
| 75.00  –  79.99 | 305 | 57,770,684.60 | 7.72 | 9.022 | 358 | 76.64 | 594 |
| 80.00 | 987 | 189,873,812.45 | 25.36 | 8.844 | 359 | 80.00 | 639 |
| 80.01  –  84.99 | 113 | 22,969,466.76 | 3.07 | 8.860 | 357 | 83.27 | 612 |
| 85.00  –  89.99 | 357 | 68,860,252.34 | 9.20 | 9.333 | 358 | 86.22 | 596 |
| 90.00  –  94.99 | 739 | 129,733,500.89 | 17.33 | 9.696 | 358 | 90.24 | 604 |
| 95.00  –  99.99 | 392 | 75,133,720.31 | 10.04 | 9.965 | 356 | 95.16 | 626 |
| 100.00 | 932 | 78,049,809.30 | 10.43 | 10.883 | 283 | 100.00 | 658 |
| Total | 4,526 | $ 748,606,624.01 | 100.00% | 9.363% | 350 | 83.01% | 616 |

*LTV Ratios calculated as of origination
Weighted Average: 83.01% (approximate)

NMFT Series 2006-5 Prospectus Supplement, Form 424B5, filed September 22, 2006, at S-28.

188. **Omitted Information**: As explained above, the appraisal value of the properties underlying the mortgage loans and borrower incomes and credit were grossly inaccurate and significantly inflated. Furthermore, due to hidden incentives, the stated sales price of properties

underlying the mortgage loans did not accurately reflect the true value of the properties.  These inflated appraisals and misleading sales price figures were used to form the LTV ratios set forth in the prospectus supplements.  Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio for a given loan.  For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

189.    Due to the inflated appraisals, the LTV ratios listed in the prospectus supplements were artificially low, making it appear that the loans underlying the trusts were less risky than they really were.  Due to the fact that such a large percentage of each pool of underlying mortgage loans contained mortgage loans on properties which had more than one mortgage (i.e., a first and second lien mortgage), understated and misleading LTV ratios had a direct correlation to the skyrocketing delinquency and default rates within the first six months of the Offerings.  Moreover, since many of the loans underlying the Certificates were ARM with biannual adjustments to interest rates and were made to subprime and Alt-A borrowers, the resulting payments would be considerably more than what they could have been able to afford.

190.    The Prospectus Supplement for the NMFT Series 2006-5 Certificates also stated that:

> ***Approximately 50.06% by principal balance of the initial mortgage loans have original loan-to-value ratios in excess of 80%.***

NMFT Series 2006-5 Prospectus Supplement, Form 424B5, filed September 22, 2006, at S-22 (emphasis added).

191.    ***Omitted Information***:  Due to the artificially inflated appraisals (as detailed above) mortgages were extended to borrowers whose true LTV ratio did not support the amount

of the mortgage loan.  Moreover, contrary to the statement that these many of the mortgages were in fact "limited documentation," or not "full documentation" loans, they were not extended to borrowers who have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion.  In fact, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the originators' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the originators' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

- Incentivizing their employees to approve borrowers under exceptions to the originators' underwriting policies.

- Failing to determine whether stated income or stated assets were reasonable.

**E.**     **The Prospectus Supplements Misstated**
      **the Certificates' True Investment Ratings**

192.    The Registration Statement and Prospectus Supplements contained statements regarding the ratings of the Certificates that were supported by the mortgage loans.  The

Registration Statement referred the investor to the Prospectus Supplements for specific information as to the ratings for each of the Certificates.

193.    Each of the Prospectus Supplements provided: (1) both S&P's and/or Moody's actual rating for each class of Offered Certificate within each Offering; or (2) stated that the Certificates in each class would not be offered unless they received ratings from both Moody's and/or S&P that were at least as high as those set forth in the Prospectus Supplement. All of the ratings set forth in all of the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB) and the majority of Offered Certificates, over 83% of the total Offering values, for each Moody's and S&P, received the highest rating of AAA.

194.    The following chart, taken from the Prospectus Supplement for NMFT Series 2007-2 is an example of this representation:

| Class | Ratings | |
|---|---|---|
| | S&P | Moody's |
| A-1A | AAA | Aaa |
| A-2A | AAA | Aaa |
| A-2B | AAA | Aaa |
| A-2C | AAA | Aaa |
| A-2D | AAA | Aaa |
| M-1 | AA+ | Aa1 |
| M-2 | AA | Aa2 |
| M-3 | AA | Aa3 |
| M-4 | AA- | A1 |
| M-5 | A+ | A2 |
| M-6 | A | A3 |
| M-7 | A- | Baa1 |
| M-8 | BBB+ | Baa2 |
| M-9 | BBB | Baa3 |
| M-10 | BBB- | NR |
| M-11 | BB+ | NR |
| M-12 | BB | NR |

NMFT Series 2006-5 Prospectus Supplement, Form 424B5, filed September 22, 2006, at S-11.

195. **Omitted Information:** The ratings stated in the Prospectus Supplements were based on outdated models, lowered ratings criteria, and inaccurate loan information as set forth in great detail above.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.

196. Furthermore, the Prospectus Supplements contained the following language or slight variation thereof pertaining to the Certificates' ratings:

> It is a condition to the issuance of the offered certificates that each of the offered certificates be rated the ratings listed on page S-11 of this prospectus supplement.

NMFT Series 2006-5 Prospectus Supplement, Form 424B5, filed September 22, 2006, at S-161-162.

197. **Omitted Information:** The ratings stated in the Prospectus Supplements were based on outdated models, lowered ratings criteria, and inaccurate loan information as set forth in great detail above.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.  As such, the ratings set forth in the Prospectus Supplements issued in connection with the Offerings did not accurately address the likelihood of receipt of any distributions, let alone "all distributions," as is apparent from the staggering percentage initially AAA rated Certificates which have since been downgraded to speculative or junk grades.

## VII.

## CLASS ACTION ALLEGATIONS

198. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Issuers, as set forth in ¶ 33, above, pursuant and/or traceable to the false and misleading Registration Statement and who were damaged thereby (the "Class").

199.    Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

200.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Defendants and/or Relevant Non-Parties, including, but not limited to, NMI, NMFC, GCM, DBS, Wachovia, or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the Registration Statement.

201.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

202.    The Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

203.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statement issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the

pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**VIII.**

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**For Violation of § 11 of the Securities Act
(Against NMFC, the Individual Defendants, the Underwriter Defendants
and the Ratings Agency Defendants)**

205.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

206.    This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf of Plaintiff and the Class, against the Issuer of the Registration Statement, the Individual Defendants, the Underwriters of the Offerings and the Ratings Agency Defendants.  This Cause of Action is predicated upon Defendants' strict liability for making material misleading statements and omitting material information from and in the Offering Documents.

207.    The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

208.    NMFC, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

209.    The Individual Defendants each signed the Registration Statement.

210.    The Underwriter Defendants acted as underwriters in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and

indirectly participated in drafting and disseminating the Offering Documents for the Certificates. Defendants GCM, DBS and Wachovia were Underwriters for the respective Issuing Trusts.

211.   The Ratings Agency Defendants acted as Underwriters in the sale of Certificates issued by the Issuing Trusts, directly participated in the formation and structuring so they would be marketable investments for sale to pension funds and insurance companies, and thereby indirectly solicited offers to purchase the Certificates.  The Ratings Agency Underwriters also directly participated in drafting and disseminating the Offering Documents for the Certificates.

212.   NMFC, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

213.   NMFC, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

214.   NMFC, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

215.    NMFC, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

216.    By reason of the conduct alleged herein, NMFC, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants violated § 11 of the Securities Act, and are liable to Plaintiff and the Class.

217.    Plaintiff and other Class members acquired the Certificates pursuant and/or traceable to the Registration Statement.  At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

218.    Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of NMFC, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants.  Specifically, as set forth herein, the delinquency, foreclosure, repossession and bankruptcy rates for the collateral underlying the Certificates - arising from defective collateral and faulty origination practices - triggered unprecedented downgrades of the Certificates' credit ratings by the Ratings Agencies and attendant declines in the value of the Certificates.

219.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the NMFC, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants, as set forth in § 11 of the Securities Act.

220.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### (Against the Underwriter Defendants)

221.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

222.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against the Underwriters of the Offerings - GCM, DBS and Wachovia.

223.    The Underwriter Defendants promoted and sold the Certificates pursuant to the defective and misleading Prospectus Supplements for theirown financial gain.  The Prospectus Supplements contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

224.    The Underwriter Defendants owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.  The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth herein.

225.     Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Offering Documents.  Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

226.     By reason of the conduct alleged herein, the Underwriter Defendants violated § 12(a)(2) of the Securities Act, and is liable to Plaintiff and other Class members who purchased Certificates pursuant to and/or traceable to the Offering Documents.

227.     Plaintiff and other Class members were damaged by the Underwriter Defendants' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in § 12(a)(2) of the Securities Act.  Specifically, as set forth herein, the delinquency, foreclosure, repossession and bankruptcy rates for the collateral underlying the Certificates - arising from defective collateral and faulty origination practices - triggered unprecedented downgrades of the Certificates' credit ratings by the Ratings Agency Underwriters and attendant declines in the value of the Certificates.

228.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

### THIRD CAUSE OF ACTION

### Violations of § 15 of the Securities Act
### (Against NMI, the Individual Defendants, the Underwriter Defendants and
### the Ratings Agency Defendants)

229.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

230.   This Cause of Action is brought pursuant to § 15 of the Securities Act against NMI, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants.

231.   Each of the Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of NMI, NMFC and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants had the power to influence, and exercised that power and influence, to cause NMI, NMFC and the Issuing Trusts to engage in violations of the Securities Act, as described above.

232.   The Underwriter Defendants, by virtue of their control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, a controlling person of NMI, NMFC and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  The Underwriter Defendants had the power to influence, and exercised that power and influence, to cause NMI, NMFC and the Issuing Trusts to engage in violations of the Securities Act, as described above.

233.   The Ratings Agency Defendants, by virtue of their control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, a controlling person of NMI, NMFC and

the Issuing Trusts within the meaning of Section 15 of the Securities Act.  The Underwriter Defendants had the power to influence, and exercised that power and influence, to cause NMI, NMFC and the Issuing Trusts to engage in violations of the Securities Act, as described above.

234.    NMI, the Individual Defendants, the Underwriter Defendants and Ratings Agency Defendants' control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiff and the other Class members.

235.    Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the Offerings detailed herein.  The Defendants named herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors.

236.    Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

237.    Since the Defendants named herein controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors, they controlled all material aspects relating to the acquisition, structure and sale of the Certificates and thus, the activities of the Issuing Trusts and Individual Defendants within the meaning of Section 15 of the Securities Act.

238.    By virtue of the wrongful conduct alleged herein, NMI, the Individual Defendants, the Underwriter Defendants and the Ratings Agency Defendants are liable to Plaintiff and the other Class members for the damages sustained.  Specifically, as set forth

herein, the delinquency, foreclosure, repossession and bankruptcy rates for the collateral underlying the Certificates - arising from defective collateral and faulty origination practices - triggered unprecedented downgrades of the Certificates' credit ratings by the Ratings Agencies and attendant declines in the value of the Certificates.

# IX.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as Class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury

Dated: New York, New York
June 16, 2009

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____
          Joel P. Laitman (JL-8177)
          Christopher Lometti (CL-9124)
          Daniel B. Rehns (DR-5506)
          Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstain.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*

          Avi Garbow
          S. Douglas Bunch
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*agarbow@cohenmilstein.com*
*dbunch@cohenmilstein.com*

*Counsel for Lead Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, counsel for the Plaintiff, hereby certify that on June 16, 2009, I filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all parties named herein and/or counsel of record in the within action by hand or first-class mail.

Daniel B. Rehns