

**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NEW JERSEY CARPENTERS HEALTH FUND,
*on Behalf of Itself and All Others Similarly*
*Situated,*

                 Plaintiff,

       v.

NOVASTAR MORTGAGE, INC., NOVASTAR
MORTGAGE FUNDING CORPORATION,
SCOTT F. HARTMAN, GREGORY S. METZ,
W. LANCE ANDERSON, MARK HERPICH,
RBS SECURITIES, INC. f/k/a GREENWICH
CAPITAL MARKETS, INC., d/b/a RBS
GREENWICH CAPITAL, DEUTSCHE BANK
SECURITIES, INC. and WELLS FARGO
ADVISORS, LLC f/k/a WACHOVIA
SECURITIES LLC,

                 Defendants.

---

Case No.: 08-CV-5310 (DAB)

**SECOND AMENDED CLASS**
**ACTION COMPLAINT**

<u>**ECF CASE**</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   SUMMARY OF THE ACTION ............................................................................ 1

II.   JURISDICTION AND VENUE .................................................................... 11

III.   PARTIES AND RELEVANT NON-PARTIES ........................................... 11

    A.   Plaintiff ......................................................................................... 11

    B.   NovaStar Defendants ..................................................................... 12

    C.   Underwriter Defendants ................................................................. 15

IV.   BACKGROUND ........................................................................................ 17

    A.   NovaStar and Investment Banking Defendants Sell Predominately the
        Highest Rated and Purportedly Safest Securities in the 2007-2 Offering .......... 17

    B.   The Underwriting Criteria Appeared to Support the High Investment
        Grade Ratings Assigned to the 2007-2 Certificates ............................................ 23

    C.   NovaStar Affirmatively Stated That By the Time of the 2007-2 Offering in
        May 2007 It Had Fortified its Mortgage Loan Underwriting Standards ........... 26

    D.   NovaStar's Undisclosed Systematic Disregard of Underwriting Standards ....... 28

        1.   By Late 2006 NovaStar Deviated Routinely From Adherence to Its
            Underwriting Guidelines In Order To Achieve Loan Volume Targets.. 32

        2.   Full Documentation Loans Lacked Requisite Documentation Or
            Documentation Produced Was Facially Deficient ................................. 34

        3.   Stated Income Loans Not Reasonably Related to Stated
            Employment ......................................................................................... 36

    E.   Clayton's Review of the NovaStar 2007-2 Mortgage Pool ............................... 38

    F.   Further Evidence Confirming that the Underwriting Guidelines Were
        Systematically Disregarded in 2007-2 Offering ................................................. 43

        1.   Ratings of 2007-2 Certificate Collapse To "Junk Bond" Levels
            Shortly After Issuance Due To Undisclosed Aggressive
            Underwriting......................................................................................... 43

i

2.      Exponential Increase In Delinquency And Default Rates
        Evidence Early Payment Default and Disregarded Guidelines ..............47

**V.      THE OFFERING DOCUMENTS CONTAINED MATERIAL
          MISSTATEMENTS AND OMISSIONS REGARDING STATED
          UNDERWRITING GUIDELINES**.............................................................. 48

**VI.     CLASS ACTION ALLEGATIONS** .......................................................... 51

**VII.    FIRST CLAIM FOR RELIEF** .................................................................. 52

**VIII.   SECOND CLAIM FOR RELIEF** ............................................................. 55

**IX.     THIRD CLAIM FOR RELIEF** ................................................................. 56

**X.      RELIEF REQUESTED** ............................................................................ 57

**JURY DEMAND** ............................................................................................... 58

Lead Plaintiff, the New Jersey Carpenters Health Fund ("Carpenters Health Fund," Lead Plaintiff" or "Plaintiff")   submits this Second Amended Class Action Complaint (the "Complaint" or "SAC") pursuant to the Court's order, dated March 31, 2011, which dismissed the First Consolidated Amended Securities Class Action Complaint, but granted Lead Plaintiff leave to replead certain claims.  The Complaint is alleged upon personal knowledge with respect to Lead Plaintiff, investigation of counsel, including interviews with former NovaStar Mortgage Inc. ("NMI") representatives responsible for underwriting mortgage loans, reviewing and approving underwriting and for quality control assessments during the period the 2007-2 mortgage loans were originated and securitized; and former representatives of Clayton Holdings, LLC or The Clayton Group ("Clayton"), a firm engaged to review NMI loans to determine the loans' compliance with NMI underwriting guidelines. The Complaint is made upon information and belief with respect to all other matters.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Plaintiff undertakes this amendment to comply with the Court's March 31, 2011 Decision and Order.  In so doing, Plaintiff does not waive and hereby preserves all previously asserted claims regarding all securities included in the Consolidated First Amended Securities Class Action Complaint filed June 16, 2009 ("FAC") in this action as if fully set forth herein.

## I.

## SUMMARY OF THE ACTION

1.     This action is brought pursuant to the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a, *et seq.*, by Court-appointed Lead Plaintiff on its own behalf and as a class action on behalf of all persons and entities (the "Class") who purchased or otherwise acquired publicly offered certificates representing interests in the NovaStar Mortgage Funding

Trust Series 2007-2 (the "NovaStar Trust" or "Issuing Trust") pursuant or traceable to a Shelf Registration Statement, dated June 16, 2006, accompanying Prospectus, and Prospectus Supplement filed with the Securities and Exchange Commission (the "SEC") by NovaStar Mortgage Funding Corporation a/k/a NovaStar Certificates Financing Corporation ("NMFC") (No. 333-134461) (the "Registration Statement").

2.      Pursuant to the Registration Statement, Prospectus and the Prospectus Supplement incorporated therein (collectively, the "Offering Documents"), RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc. d/b/a RBS Greenwich Capital ("RBS"), Deutsche Bank Securities, Inc. ("DBS") and Wachovia Securities LLC ("Wachovia") (collectively referred to herein as the "Underwriters" or "Underwriter Defendants") underwrote and sold to Plaintiff and the Class $1.32 billion of Home Equity Loan Asset-Backed Certificates (the "Certificates" or the "NovaStar Certificates").  The Certificates were sold in a single Offering on May 25, 2007 (the "NovaStar Offering," the "Certificate Offering," the "2007-2 Offering" or the "Offering") as interests in the Issuing Trust.

3.      As set forth below, the Offering Documents contained untrue statements of material fact or omitted material facts necessary to make the statements in the Offering Documents not misleading.  Defendants are strictly liable for these material misstatements and omissions under Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  This Complaint asserts no allegations or claims sounding in fraud and Plaintiff specifically disclaims any such allegations.

4.      Plaintiff seeks redress against Defendant NMFC, which prepared and filed the Registration Statement and was the Depositor of the underlying collateral into the Issuing Trust; Defendants Scott F. Hartman ("Hartman"), Gregory S. Metz ("Metz"), W. Lance Anderson

("Anderson") and Mark A. Herpich ("Herpich"), who were the individual signatories to the Registration Statement filed by NMFC; Defendant NovaStar Mortgage, Inc. ("NMI"), the Sponsor/Seller for the Offering, as well as the Originator and Servicer for all of the underlying mortgage loan collateral for the Offering; and Defendants RBS, DBS and Wachovia, the joint lead managers and joint book runners for the Offering.  NMI and NMFC, together with their affiliates and subsidiaries, are collectively referred to as "NovaStar" or the "NovaStar Entities."

5.     This action arises from the role of NovaStar and the Underwriter Defendants in acquiring and then converting approximately 5,877 first- and second-lien adjustable and fixed-rate mortgage loans (the "2007-2 collateral") into $1.32 billion of purportedly "investment grade" residential mortgage-backed securities ("RMBS" or "MBS"), which were then sold to Plaintiff and the Class pursuant to the Offering Documents.  The Certificates were 30 year bonds whose payment of interest and repayment of principal was supported by a pool of mortgage loans originated and "acquired" by NMI.[1]  The $1.32 billion 2007-2 Offering was composed of five senior and nine mezzanine tranches (with "M-1" being the highest mezzanine tranche).[2]  All of the tranches were sold pursuant to the same Prospectus Supplement and were subject to the same underwriting guidelines stated in the Offering Documents.[3]  As a result of the subordinate

---

[1]   As of mid-year 2001, NovaStar operated only 24 offices in the United States and originated less than $6 million in loans per month.  By 2004, NovaStar had become one of the largest originators of non-conforming mortgage loans in the country - with over 432 mortgage offices in 39 states, and mortgage loan origination of over $600 million per month.  By late 2004, the Company's assets under management eclipsed the $10 billion mark.  According to Inside Mortgage Finance ("IMF"), in 2005, NovaStar issued $8.01 billion of MBS.

[2]   There was one non-offered subordinate tranche designated M-10.

[3]   As noted, the Offering had nine mezzanine tranches with designations M-1 through M-9 and one non-offered mezzanine tranche designated M-10.  *See* note 2, *supra*.  These tranche designations reflect the position of the tranche in the subordination structure and the amount of protection provided to each tranche against realized losses.  Realized losses from defaulting

structure of the Offering, each lower tranche protected the tranche above from losses arising from borrower defaults in the mortgage pool.  If and when losses from the mortgage pool occurred, they would first be applied to eliminate principal of the subordinate tranches and then would climb the chain to the more senior tranches if losses continued. *See* NHEL Series 2007-2 Prospectus Supplement, dated May 25, 2007 ("Pro. Supp.") at S-121.

6.     Since the return of principal and payment of interest to Certificate investors was dependent on the strength of the underlying mortgage loans, the Prospectus Supplement detailed that the loans were underwritten pursuant to specific NovaStar underwriting guidelines "*intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan.*"  *See* Pro. Supp. at S-86-7.  The Prospectus Supplement further explained that NovaStar maintained six levels of loans that differed in terms of the amount of supportive borrower documentation required for approval of the loan.  The loan requiring the highest level of documentation was a "full

---

borrowers would first reduce the principal of M-10 Certificates and then proceed upward to investors who purchased M-9, M-8, etc., through the tranche structure.  *See* "Allocation of Losses," Pro. Supp. at S-10, S-120-22.  The Prospectus Supplement did *not* apply discrete underwriting standards to specific tranches.  The subordination structure of mezzanine tranches was completely unrelated to the Prospectus Supplement's analysis of the risk categories that comprised the mortgage pool.  In this regard the Prospectus Supplement delineated eight specific categories of underwriting characteristics.  *See* Pro. Supp. at S-88-9.  These eight categories of underwriting standards were designated "M1, M2, M3, M4, Alt A [NINA], Alt A [No Doc], Alt A [Full/Stated], Piggyback."  *Id.*   The underwriting standards set forth in the Prospectus Supplement were not tied to specific tranches in the Offering.  For example, the "M1" underwriting standards (*e.g.* "M1" loans had minimum credit score of 520 and permitted no 30 day late events within the prior 12 months S-88-9) were not tied to the "M-1" tranche – even though they used the same designation.  *See* Pro. Supp. at S-33.  Similarly, the "M2", "M3" and "M4" underwriting standards were not linked or otherwise specifically related to the "M-2", "M-3" or "M-4" tranches  even though, again, the  same alpha numeric designations were  used (*e.g.,* M1, M2, M3 and M4) giving rise to the suggestion in the Court's decision that there was such a connection between the tranches and underwriting standards.  *See N.J. Carpenters Health Fund v. Novastar Mortg., Inc.,* Civ. No. 08-5310 (DAB), 2011 U.S. Dist. LEXIS 36363 (S.D.N.Y. Mar. 31, 2011); *see also* Affidavit of Professor Anne Zissu PH.D., annexed hereto as Appendix A.

documentation" loan while the lowest level of documentation under the stated NovaStar guidelines was a "no documentation loan."  The Prospectus Supplement specifically stated that the majority of the Offering's mortgage pool was composed of full documentation loans (*i.e.,* 56.96%) while only 6.38% of the mortgage pool was composed of "no documentation" loans. ¶47.  The next largest category of loans in the 2007-2 collateral pool was described as "stated income loans" (comprising approximately 36% of the mortgage pool).  ¶48.  The NovaStar guidelines required that, in addition to completing the loan application, appraisal and credit check requirement, the stated income be reasonable in light of the borrower's employment set forth in the loan application.  ¶¶45-46, 90-91.  The Prospectus Supplement also explained that less than 6.4% of the mortgage pool was composed of the least rigorous no documentation loans and stated that NovaStar maintained a quality control system to monitor compliance with the underwriting guidelines and ensure that any exceptions to those guidelines were justified and reasonable.  ¶¶48, 50, 90-92.

7. Based on, *inter alia*, these above representations concerning the quality of the underlying collateral as well as the purported credit protections and enhancements[4] in the Offering, both Moody's Investors Services, Inc. ("Moody's") and McGraw-Hill Companies, Inc. through its division, Standard & Poor's ("S&P") (collectively, the "Rating Agencies")[5], assigned predominately the highest investment grade ratings to the Certificates, indicating maximum safety and minimal risk.  S&P and Moody's assigned their highest rating of "AAA" and "Aaa"

---

[4]   In addition to the subordination structure that provided investors with protection from losses, the Prospectus Supplement described certain credit enhancements to protect against losses including overcollateralization, excess cash flow and mortgage insurance policies.  *See* Pro. Supp. at S-8.

[5]   Moody's and S&P were Defendants in the First Amended Complaint but have been dismissed from this action with prejudice.

respectively to over 81%, or $928 million, of the Certificates.[6] Traditionally, bonds with AAA ratings have had less than 1% probability of default. S&P has "reported that its cumulative RMBS default rate[s] by original rating class (through September 15, 2007) was 0.04% for AAA initial ratings and 1.09% for BBB. *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse,* United States Senate Permanent Subcommittee on Investigations, April 13, 2011, p. 247. Approximately 94.8% of the $1.32 billion offering was assigned ratings of "A" or higher. The M-1 Certificates, the highest of the mezzanine tranches which were purchased by Lead Plaintiff, received a rating just one notch below AAA indicating near maximum safety. As a result of these extremely high ratings, all of the A-rated bonds including the M-1 Certificates purchased by Plaintiff were sold at par or $1.000 per unit on the Offering.

8. Unbeknownst to Plaintiff and the Class however, the Prospectus Supplement contained material misstatements and omissions concerning the mortgage loan collateral. When originating the mortgage loan collateral NovaStar systematically disregarded its own underwriting guidelines including specifically the guidelines for full documentation and stated income loans. ¶¶75-82. Further, the systems of quality control described in the Prospectus Supplement were routinely overridden by NovaStar management seeking to meet loan volume quotas. ¶¶70-75. Former NovaStar Vice Presidents, Senior Underwriters and Quality Control representatives, employed by NovaStar during the period the 2007-2 collateral was originated

---

[6] Moody's highest investment rating is "Aaa." S&P's highest rating is "AAA." These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk. Ratings of "AA (+/-)," "A (+/-)," and "BBB (+/-)" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. These ratings are all considered "investment-grade ratings" evidencing a very strong or strong capacity of the issuer to meet its financial commitments. Any instrument rated lower than Ba1 (for Moody's) or BB+ (for S&P) is considered below investment-grade. ¶38.

and securitized stated that the requirements for "full documentation" loans were either routinely disregarded or when found to not be satisfied by the loan underwriter were nevertheless approved without justification by Supervisors and Vice President-level NovaStar representatives. ¶¶57-82.  Also, stated income loans were repeatedly approved even though it was apparent from the face of the loan application that the stated income was not reasonable in light of the borrower's employment, a fact which, under the underwriting guidelines, should have disqualified the loans.  ¶¶80-82.  In addition, the Quality Assurance system described in the Prospectus was, in fact, ineffectual because Supervisors and Vice Presidents, financially incentivized to reach loan production quotas for immediate securitization, overrode quality assurance findings that loans were noncompliant with NovaStar guidelines. ¶¶70-75.

9.      Further, the Underwriter Defendants contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to an outside firm – Clayton – and then conducted limited oversight of these subcontractors' activities.  Defendant RBS regularly retained Clayton to review originator loans and regularly retained Clayton to review loans for securitizations of NovaStar loans.  In connection with his testimony before the Senate Permanent Subcommittee on Investigations, the former President of Clayton produced internal studies covering, in part, the period in which the 2007-2 Offering occurred showing that, Defendants RBS and DBS systematically directed the inclusion in mortgage backed securities offerings of 53% and 50% of mortgage loans that were found by Clayton loan underwriters not to comply with the stated underwriting guidelines.

10.     Accordingly, the material facts omitted from the 2007-2 Offering Prospectus Supplement included the following:

- NovaStar systematically disregarded the stated underwriting standards when issuing loans to borrowers including, the requirements for full

documentation loans (which composed 56.96% of the mortgage loan collateral) and the requirements for stated income loans (which composed 36.07% of the mortgage loan collateral) as described below, ¶¶57-82;

- Defendants had no adequate quality control process or review procedure to determine whether misrepresentations or fraud was occurring at the loan origination level, ¶¶57-82; and

- The Underwriter Defendants failed to conduct an adequate due diligence related to NovaStar's loan origination practices and compliance with the stated underwriting guidelines including permitting the inclusion of mortgage loans in the pool that Clayton had determined did not comply with the stated underwriting guidelines, ¶¶83-106.

11.     As a result of the untrue statements and omissions, Plaintiff and the Class purchased Certificates that were far riskier and therefore less valuable than represented and certainly not equivalent to other investments with the same investment grade credit ratings. Contrary to representations in the Offering Documents, the Certificates exposed all purchasers to substantial and increased risk with respect to the collateral pool's absolute cash flow and the timing of payments of principal and interest.  As the true risk profile of the loans has been revealed, the value of the Certificates has collapsed, and, as set forth below, at the time the Action was filed they were worth only a fraction of their initial original value.[7]  Plaintiff's M-1 Certificates collapsed in value by over 99% of their original value.  ¶20.

12.     Confirmation of the material misstatements and omissions contained in the 2007-2 Prospectus arises, in part, from the Rating Agencies' action regarding the 2007-2 Certificates subsequent to the Offering.  Several months after the completion of the Offering, Moody's and S&P revised their guidelines to account for mortgage loans that did not comply to the stated underwriting guidelines and to account for mortgage fraud in the loan pool.  When those revised

---

[7]     To date, the principal of the M-10 through M-8 tranche investors have been eliminated entirely with all of the remaining tranches (except one) having been downgraded to "C" default level bonds by both S&P and Moody's. Such default level ratings reflect that the rating agencies determined there is a high probability that the Issuer will default in repayment of principal.

guidelines were ultimately applied to the NovaStar 2007-2 Offering in 2008 and 2009, all of the tranches (except one) including the purported "A" level bonds were downgraded to "C" level junk bonds by both Moody's and S&P. This was an unprecedented collapse in ratings of as many as 20 ratings levels. It reflected not only the impaired quality of the collateral at the time of the Offering, but also the high likelihood of default in repayment of principal to 2007-2 Certificate investors. Indeed, to date, the principal of two of the Certificate classes – Certificates which were supposed to pay interest for thirty years – have been wiped out entirely. In fact, 42%, or $340 million, of the outstanding $806 million balance needed to repay Certificate investor's principal investment is in some stage of delinquency or default. ¶100.

13. Further factual confirmation of the misstatements and omissions in the Prospectus Supplement is derived from the exponential increase in delinquency and default rates in the 2007-2 mortgage loan pool six months and one year after the Offering to 18.1% and 32.0% respectively. Governmental studies confirm that such default rates immediately after the Offering are reflective of earlier payment default, mortgage fraud and other reckless underwriting practices. ¶104.

14. The systematic disregard of the stated underwriting guidelines is also supported by internal documentation compiled by Clayton and produced to the Senate Permanent Subcommittee on Investigations in 2009 pursuant to subpoena. The evidence produced by Clayton showed that Defendants RBS and DBS, during the period from January 2006 through June 2007, directed, respectively, the inclusion in collateral pools of 53% and 50% of mortgage loans that Clayton found to be non-compliant with stated underwriting guidelines applicable to the pool.

15.     Disclosures in the Prospectus Supplement regarding NovaStar's adverse financial condition (including its limited cash flow and being named as a defendant in certain class action litigation arising from the decline in NovaStar's common stock price) at the time of the Offering in May 2007 did not apprise Plaintiff or the Class of the material misstatements and omissions in the Prospectus Supplement as to these specific assets and did not, in fact, relate at all to the loan pool at issue in this case.  Thus, those disclosures did not adversely impact the sale, price or rating of the Certificates. ¶¶51-56.

16.     First, as noted in the Prospectus, repayment of Certificates was not based on the financial condition of NovaStar, but rather primarily on the mortgage loan pool.  Because investors relied on the performance of the mortgage pool and not NovaStar's financial condition, both Rating Agencies, as noted, were able to assign the highest safety ratings to the Certificates despite the disclosed adverse financial condition of NovaStar.  ¶¶97-106.  Further, the NovaStar Defendants advised Certificate investors that with respect to its operations relevant to the 2007-2 mortgage pool, NovaStar had "intensified" its "focus on asset quality" and "altered [its] proprietary modeling and underwriting guidelines and processes in an attempt to minimize losses and enhance asset quality in loan originations going forward."  NovaStar Financial, Inc. 2006 Annual Report and Proxy Statement, at 5.  ¶¶51-56.

17.     Finally, Individual Defendants Scott Hartman and Gregory Metz (as defined below) were both senior officers of the Defendant Issuer NovaStar Mortgage Funding Corporation ("NMFC") and the Sponsor NovaStar Mortgage Inc. ("NMI") at the time of the Offering.  As issuer, Defendant NMFC was responsible for preparing and filing the Offering Documents.  Defendant NMI, its senior officers Hartman and Metz and the Underwriter Defendants (as defined below) controlled NMFC with respect to the relevant aspects of the

Offering Documents concerning the quality of the mortgage loans since it was NMI that, together with the Underwriter Defendants was responsible for selecting the specific mortgages to be included in the 2007-2 mortgage pool; creating the Offering structure of senior and subordinate Certificate and credit enhancements; and pricing the Certificates for sale in the Offering, based in part on the credit quality of the underlying mortgage loans. *See* Pro. Supp. at S-96. As a result, the Individual Defendants Hartman and Metz (as defined below) as officers of both NMFC and NMI are additionally liable as control persons of the Issuer NFMC under Section 15 of the Securities Act.

## II.

## JURISDICTION AND VENUE

18.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act, and venue is proper pursuant to Section 22 of the Securities Act.

19.     The violations of law complained of herein, including the dissemination of materially false and misleading statements made in connection therewith, occurred in this District.  All of the Defendants named herein, as well as their affiliates and subsidiaries, conduct or conducted business in this District.

## III.

## PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiff

20.     Lead Plaintiff, New Jersey Carpenters, is a Taft-Hartley Pension Fund.  New Jersey Carpenters purchased the NovaStar Home-Equity Loan Trust, Series 2007-2 ("NHEL 2007-2") Class M1 Certificates, directly from Defendant RBS, in the Offering and has been

damaged thereby.  New Jersey Carpenters purchased 100,000 units of the M1 Certificates at par value of $1.0000 per unit on May 25, 2007.  As detailed herein as well as in its Amended Certification, filed via ECF on March 3, 2011 (ECF No. 114) and annexed hereto, New Jersey Carpenters was injured as a result of its Certificate investment.  At the time of the filing of the Complaint, the New Jersey Carpenters' custodian valued the Certificates at $1.0000 per unit.  Ultimately, Lead Plaintiff disposed of the full principal amount of the Certificates ($100,000) in a sale on March 26, 2010 at a price of $0.0035 per unit, resulting in an almost complete loss of its investment.

**B.**     **NovaStar Defendants**

21.     Defendant NMI, a wholly-owned subsidiary of NFI Holding Corporation, Inc., is a Virginia corporation and is principally located at 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114.  NMI acted as the Sponsor/Seller for the Certificates issued pursuant to the Registration Statement, originated or purchased all of the mortgage loan collateral underlying the Certificates and initially served as Servicer of the mortgage loans post-securitization.  Defendant NMI originated all of the underlying mortgage collateral for the 2007-2 Offering.  The principal offices for the Sponsor's lending operations were located in Lake Forest, California, Cleveland, Ohio and Salt Lake City, Utah.  NMI made certain misleading representations and warranties in connection with the loan pools collateralizing the Certificates.  ¶¶90-93.  As set forth in the Registration Statement, once originated, NMI conveyed the mortgages to a Special Purpose Entity ("SPE"), the Depositor, Defendant NMFC, created for the sole purpose of forming, collecting and thereafter depositing the collateral into, the Issuing Trust.  The Issuing Trust then issued the Certificates which were supported by the cash flows from the assets and were secured by those assets.  ¶¶34-44.

22.     Defendant NMFC is a wholly-owned subsidiary of Defendant NMI and is located at 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114.  Defendant NMFC filed the Registration Statement and Prospectus with the SEC in connection with the Offering on or about June 16, 2006.  Defendant NMFC served as the Depositor in connection with the Offering.  The role of the Depositor was to purchase the mortgage loans from the Seller, NMI, and then assign the mortgage loans and all of its rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the Certificate-holders.  NMFC, as Depositor, is considered the issuer of the Certificates under the Securities Act and was also responsible for preparing and filing any reports required under the Securities Exchange Act of 1934 pursuant to Reg. AB.

23.     Defendant NMFC filed the following Registration Statement and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|------------|-----------|-------------------|
| May 25, 2006 | S-3 | $ 1,000,000 |
| June 16, 2006 | S-3/A | $ 17,974,575,431[8] |

24.     Defendant Scott F. Hartman ("Hartman") was, at all relevant times, NFMC's President, Principal Executive Officer, as well as a Director of NFMC, and in those capacities signed the false and misleading Registration Statement for the Offering.  Defendant Hartman was also President, Principal Executive Officer, as well as a Director of NovaStar Certificates Financing Corporation ("NCFC") and in those capacities signed the Registration Statement for the Offering.  Pursuant to the Securities Act, Hartman also signed the certifications in the Registration Statement on behalf of NMFC and NCFC, dated May 25, 2006, representing that

---

[8]     The amount registered under the June 16, 2006 Registration Statement includes $622,501,431.00 of securities previously registered under Registration No. 333-131111 on January 19, 2006 which remained unissued as of June 16, 2006, in addition to $2,352,074,000.00 of securities previously registered under Registration No. 333-114297 on April 8, 2004 which remained unissued as of June 16, 2006.

each of those companies "has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3, reasonably believes that the [investment grade] security rating requirement contained in Transaction Requirement B.5 of Form S-3 will be met by the time of the sale of the securities registered…."  Furthermore, Defendant Hartman was NFI's Chief Executive Officer and was an Executive Vice President of NMI during the time that the 2007-2 mortgage pool was originated and securitized and the Offering was consummated.

25.   Defendant Gregory S. Metz ("Metz") was, at all relevant times, NFMC and NCFC's Secretary, Principal Financial Officer and Principal Accounting Officer.  Metz signed the false and misleading Registration Statement for the Offering in those capacities on behalf of NMFC and NCFC.  Metz was also a Senior Vice President and Chief Financial Officer of both NMI and NFI.  Metz held these positions at the time the 2007-2 mortgage pool was originated and securitized and the Offering was consummated.

26.   Defendant W. Lance Anderson ("Anderson") was, at all relevant times, a Director of NFMC and NCFC.  Anderson signed the false and misleading Registration Statement for the Offering as a Director of each of those companies.  Furthermore, Defendant Anderson served as NFI's President and Chief Operating Officer at the time of the 2007-2 Offering.

27.   Defendant Mark A. Herpich ("Herpich") was, at all relevant times, a Director of NFMC and NCFC.  Herpich signed the false and misleading Registration Statement for the Offering as a Director of each of those companies.

28.   The Defendants identified in ¶¶24-27 are referred to herein as the "Individual Defendants."  The Individual Defendants as officers and/or directors of NMFC and NCFC signed the Registration Statement for 2007-2 Certificates issued by the Issuing Trust and sold to Plaintiff and the Class.  Through its senior officers, Defendants Scott F. Hartman and Gregory S.

Metz, Defendant NMI originated of all the mortgage loans in the 2007-2 mortgage pool pursuant to NovaStar underwriting guidelines, selected the mortgages to be included in the 2007-2 pool and created – with the Underwriter Defendants – the structure of senior and subordinate Certificates and the credit enhancements in the Offering and priced the Certificates for sale. *See* Pro. Supp. at S-96.   In addition, Defendants Hartman, Metz and Anderson, as principal officers and/or directors of NFI and NMI, were responsible for the loan origination practices of those companies with respect to the mortgage loans underlying the Certificates.   The Individual Defendants as signatories to the Registration Statement had a duty to conduct adequate due diligence prior to offering the Certificates to investors which they failed to perform.   Under the Securities Act the Individual Defendants are liable to Plaintiff and the Class as persons who (i) signed the Registration Statement; (ii) were directors (or persons performing a similar function) of the issuer/depositor; and (iii) as persons who offered or sold the Certificates to Plaintiff and the Class.

**C.**   **Underwriter Defendants**

29.   Defendant RBS is an SEC-registered broker-dealer.   RBS is principally located at 600 Steamboat Road, Greenwich, Connecticut 06830 and is a wholly-owned subsidiary of Greenwich Capital Holdings, Inc.   RBS is one of the leading underwriters of mortgage-backed securities in the United States.   Since 1987, RBS has helped mortgage lenders issue more than $400 billion in asset-backed securities.   Defendant RBS served as an underwriter for the Certificate Offering and participated in the drafting and dissemination of the false and misleading Offering Documents.   As underwriter, RBS was responsible for conducting due diligence on the offering and was directly involved in the offer and sale of Certificates to investors.   Plaintiff purchased 2007-2 M-1 Certificates directly from RBS.   RBS failed to

perform the requisite level of due diligence in connection with the Offering complained of herein.

30.     DBS is an SEC registered broker-dealer, principally located at 60 Wall Street, New York, New York 10005.  DBS is one of the leading MBS underwriters in the United States. Defendant DBS was one of the underwriters for the Certificate Offering and participated in the drafting and dissemination of the false and misleading Offering Documents.  As an underwriter, DBS was responsible for conducting due diligence on the Offering and was directly involved in the offer and sale of Certificates to investors.  DBS failed to perform the requisite level of due diligence in connection with the NovaStar Offering complained of herein.

31.     Wachovia is an SEC registered broker-dealer, with executive offices located in Richmond, Virginia and Charlotte, North Carolina and its headquarters at 401 South Tryon Street, St. Louis, Missouri 28288.  Since January 1, 2009, Wachovia has operated as a non-bank affiliate of Wells Fargo & Company.[9]  Wachovia was one of the leading MBS underwriters in the United States.  Wachovia was one of the underwriters for the Offering and participated in the drafting and dissemination of the false and misleading Offering Documents.  As an underwriter, Wachovia was responsible for conducting due diligence on the Offering and was directly involved in the offer and sale of Certificates to investors.  Wachovia failed to perform the requisite level of due diligence in connection with the NovaStar Offering complained of herein.

---

[9]     The Initial Complaint filed in the within action on May 21, 2008, in New York State Supreme Court, New York County, Index No. 2008-601563, named Wachovia Securities LLC as a Defendant.  Pursuant to a Merger Agreement between Wachovia Corporation, the parent company of Wachovia Securities, LLC, and Wells Fargo & Company, on or about December 31, 2008 Wachovia Securities became a non-bank subsidiary of Wells Fargo & Company.  As of May 1, 2009, Wachovia was rebranded Wells Fargo Advisors, LLC.  Wells Fargo & Company maintains its principal offices at 420 Montgomery Street, San Francisco, California 94163.

Wells Fargo Advisors is a trade name used by three separate non-bank subsidiaries of Wells Fargo & Company: Wells Fargo Advisors, LLC, Wells Fargo Advisors Financial Network, LLC and Wells Fargo Investments, LLC.

32.    The Offering Documents disseminated in connection with the Offering contained material misstatements and omissions of material fact relating to the disregard of the "underwriting standards" employed in originating the underlying mortgage loans.    The Underwriter Defendants abdicated their duty to conduct due diligence on the underlying loan collateral, relying rather on the cursory and inadequate examination of the mortgage loans conducted by NovaStar and Clayton.

33.    The Issuing Trust was a common law trust formed for the sole purpose of holding and issuing the Certificates.  The Issuing Trust issued $1.32 billion of Certificates pursuant to a Prospectus Supplement, incorporated by reference into the Registration Statement, which listed numerous classes of offered Certificates.

## IV.

## BACKGROUND

**A.    NovaStar and Investment Banking Defendants Sell Predominately
the Highest Rated and Purportedly Safest Securities in the 2007-2 Offering**

34.    As illustrated below, a mortgage securitization occurs where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



35.     A "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity.  The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

36.     The depositor then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches."  Tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward.  Typically, any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority. As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA."  Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.  As the lowest tranches are designed to provide a cushion, diminished cash flow to the lower tranches will result in the value of the higher tranches

being reduced.   Certificate ratings and value are also based on the amount and type of credit enhancements that are embedded in the structure of the securitization including, for example, subordination, overcollateralization, cross-collateralization and excess cash flow.

37.     The NovaStar Defendants, together with the Underwriter Defendants, each played specific and significant roles in effectuating the 2007-2 Offering.   As alleged, Defendant NMI, as Sponsor/Seller, was responsible for originating all the underlying mortgage loans; selecting the mortgage loans to be included in the 2007-2 mortgage pool; and structuring and pricing the Certificates for sale in the Offering.   Defendant NMFC, as the Depositor and Issuer, was responsible for depositing the mortgages into the Issuing Trust, filing the Offering Documents with the Securities and Exchange Commission and selling the Certificates to the Underwriter Defendants.

38.     At the time of the 2007-2 Offering, the Rating Agencies deployed multileveled criteria for assessing the risk of default for debt securities.   The Rating Agencies rated the Certificates pursuant to the following twenty-two (22) level rating system:

| | | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

39.     The 2007-2 Certificates were all sold to investors as investment grade securities, but also with 94.8% of the Certificates having been assigned an "A" or higher investment grade ratings:

| Offered Class | Initial Aggregate Certificate Balance | Ratings S&P / Moody's |
|---|---|---|
| Class A-1A Certificates | $779,369,000 | AAA / Aaa |
| Class A-2A Certificates | $140,080,000 | AAA / Aaa |
| Class A-2B Certificates | $80,420,000 | AAA / Aaa |
| Class A-2C Certificates | $49,730,000 | AAA / Aaa |
| Class A-2D Certificates | $18,601,000 | AAA / Aaa |
| Class M-1 Certificates | $70,700,000 | AA+ / Aa1 |
| Class M-2 Certificates | $49,700,000 | AA / Aa2 |
| Class M-3 Certificates | $23,800,000 | AA- / Aa3 |
| Class M-4 Certificates | $21,700,000 | A+ / A1 |
| Class M-5 Certificates | $21,700,000 | A / A2 |
| Class M-6 Certificates | $18,900,000 | A- / A3 |
| Class M-7 Certificates | $18,900,000 | BBB+ / Baa1 |
| Class M-8 Certificates | $15,400,000 | BBB / Baa2 |
| Class M-9 Certificates | $15,400,000 | BBB- / Baa3 |
| Total | $1,324,400,000 | |

40.     The Rating Agencies initially assigned the highest ratings of AAA/maximum safety to 81%, or $1.07 billion, of the Certificates, as reflected below:

| Series | Offering Amount | AAA | % |
|---|---|---|---|
| NHEL 2007-2 | $1.32 billion | $1.07 billion | 81% |

41.     As noted above, the Class M1 Certificates, purchased by Lead Plaintiff, had an initial rating of Aa1 by Moody's and AA+ by S&P.  This initial rating indicated to investors that the M1 Certificates were considered to be of "very high grade/quality" by the Rating Agencies.

42.     NovaStar derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.  The goal for NovaStar was to sell the Certificates for a price above par, or $1.00 per unit.  For securitized Certificates to be marketable to investors, approximately 80% of the Certificates had to have the highest rating from the

21

Rating Agencies.  With that condition met, subprime securitizations – as opposed to prime or Alt-A securitizations – provided NovaStar with the largest fees and profits.

43.     According to the 2007-2 Prospectus Supplement NovaStar originated all the mortgage loans and then together with the Rating Agencies and the Underwriter Defendants, selected the loans to be securitized and agreed upon a structure for the Offering.  *See* Pro. Supp. at S-96 ("The sponsor [NMI] works with the underwriters and the rating agencies to select the pool of mortgage loans and structure the transaction.")  This structure included a series of senior and subordinate notes as well as the nature and extent of credit protections to be offered to investors.  *See* note 3, *supra.*  With the securitization structure in place, the Certificates were then issued through a NovaStar Trust designated with a "shelf" name – specifically, "NovaStar Mortgage Funding Trust" ("NMFT").  The shelf name reflected the types of mortgage collateral underlying the Offerings.

44.     NovaStar engaged Defendants RBS, DBS and Wachovia to serve as the Underwriters or Joint Book-Runners for the Offering.  Each of the Underwriters maintained a sales desk whose purpose was to assess the demand for certain securities from the clients of the investment bank and assist NovaStar in structuring the Offering of Certificates.  This attempt to "pre-sell" the Certificates was crucial to NovaStar in that the risk of holding the Certificates post-securitization subjected NovaStar to increased risk exposure due to the fact that they would then own the collateral and the Certificates.  Therefore, the Underwriter Defendants' role in assessing market demand and assuring NovaStar that sale of the Certificates to investors would be completed immediately after securitization was a key to the Offerings' success.

**B.      The Underwriting Criteria Appeared to Support the High
         Investment Grade Ratings Assigned to the 2007-2 Certificates**

45.      As reflected in the 2007-2 Prospectus Supplement, the underwriting criteria used

to originate the mortgage loan collateral appeared to justify these high investment grade ratings.

First, the Prospectus explained that all loans were subject to certain minimum underwriting

standards requiring a loan application, credit reports and appraisals as follows:

**Underwriting Standards for the Mortgage Loans**

The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan. ***Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history. Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date. An appraisal is also required on all loans and in many cases a review appraisal or second appraisal may be required depending on the value of the property and the underwriter's comfort with the original valuation. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae. The properties securing the mortgage loans are appraised by qualified independent appraisers who are generally approved by the related originator.*** A streamline appraisal program is offered by our Retention division for borrowers that currently have a mortgage loan with the sponsor. Under this program an AVM can be used to determine valuation if the full appraisal from the previous loan is less than two years old. The maximum increase in value that can be supported with an AVM is 10%. The mortgagor may also include information regarding verification of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been used for underwriting purposes.

*See* Pro. Supp. at S-86. (Emphasis added.)

46.      More specifically however the Prospectus Supplement explained that the 2007-2

mortgages were originated pursuant to six loan documentation programs in the NovaStar

underwriting guidelines.  "Full Documentation" loans were the most rigorous in terms of the

23

borrower documentation and required supporting documentation relating to the borrower's income, assets and employment.  In contrast "No Documentation loans" and No Income and No Asset were the least rigorous as follows:

> The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement." ***Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub***. Under the Limited Documentation program, no such verification is required, however, bank statements for the most recent consecutive 6-month period are required to evidence cash flow. Under the Stated Income program, an applicant may be qualified based on monthly income as stated in the loan application. Under the "No Documentation" program, an applicant provides no information as it relates to their income. Under the No Income/No Asset" program, the applicant's income and assets are not verified, however the applicant's employment is verified.

*Id*. at S-87. (Emphasis added.)

47.     The Prospectus Supplement then explained that most (56.9%*)* of the 2007-2 collateral was composed of the most rigorous "full documentation" loans and that these loans were required to meet the Fannie  Mae and Freddie Mac requirements:

> All of the initial Group I mortgage loans conform to certain agency guidelines with respect to the principal balance of such mortgage loans and certain representations made in respect of those mortgage loans, including the following: … each of the initial Group I mortgage loans complies in all material respects with applicable local, state and federal laws including, but not limited to, all applicable predatory and abusive lending laws; … (ix) the principal balance at origination for each Group I mortgage loan originated in most states may not exceed $417,000 for single-family residences, $533,850 for two-family residences, $645,300 for three-family residences and $801,950 for four-family residences and (x) with respect to the initial Group I mortgage loans originated on or after August 1, 2004 none of the related mortgages nor the related mortgage notes require the borrower to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction.

*Id*. at S-47.

48.     The Prospectus Supplement also specifically emphasized that only 6.38% of the mortgage pool was composed of "No Documentation" loans.  Further, the next largest category of mortgage loans after full documentation loans was the stated income/stated asset loan category where, at a minimum, the borrower's stated income was required to be reasonable in relation to the borrowers' employment.

49.     In addition, the Prospectus Supplement emphasized that there was a hierarchy of senior NMI representatives who reviewed any deviations or exceptions to the underwriting guidelines to ensure that they were reasonably related to the underlying goals of including creditworthy borrowers ready and able to repay the mortgage obligations as follows:

> On a case-by-case basis, exceptions to the underwriting guidelines are made where the sponsor believes compensating factors exist.  Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception. All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor.  All loans over $650,000 require the approval of the VP of Operations and Corporate Credit Department or its approved designees.  In addition, the President of the sponsor approves all loans in excess of $1,100,000.

*Id*. at S-87.

50.     Finally, the Prospectus Supplement described the existence of quality control reviewers who ensured that the mortgage loan collateral complied with the underwriting guidelines:

> ***Quality control reviews are conducted to ensure that all mortgage loans meet quality standards.***  The type and extent of the reviews depend on the production channel through which the mortgage loan was obtained and the characteristics of the mortgage loan.  The sponsor reviews, at a minimum, 7% of each month's production.   The random audit selection criteria includes a proportional representation of loan type, loan product, loan purpose, FICO score, LTV, underwriting grade, state and broker.

*Id*. at S-90.

**C.     NovaStar Affirmatively Stated That By the Time of the 2007-2 Offering in
May 2007 It Had Fortified its Mortgage Loan Underwriting Standards**

51.     In the period preceding the 2007-2 Offering the NovaStar Defendants provided

investors with assurances that in light of certain negative developments in the subprime area, its

more recently underwritten collateral was of higher quality than prior originations. In early

2007, just weeks before the Offering, NFI reported in its 2006 Annual Report on Form 10-K,

dated March 1, 2007 ("2006 Annual Report"), that it had "intensified" its "focus on asset

quality" and "altered [its] proprietary modeling and underwriting guidelines and processes in an

attempt to minimize losses and enhance asset quality in loan originations going forward."

Subsequently, just days before the Offering, on May 10, 2007, in its quarterly earnings

announcement, NFI reiterated the purported improved quality of the loan assets underwritten in

its most recent quarter stating:

> During the quarter, NovaStar implemented tighter underwriting guidelines and
> exception policies, enhanced appraisal reviews, and implemented a proprietary
> NovaStar Risk Assessment Score (NRAS) for evaluating credit risk in loan
> applications.

52.     In addition to certain negative developments in the subprime area that

were described by NovaStar in its 2006 Annual Report, NovaStar was also experiencing cash

flow difficulties in early 2007, which it addressed with new financing as described below. In

response to these events, the NovaStar Defendants made it clear to investors prior to the Offering

that they had taken affirmative steps to improve asset quality and its underwriting practices as

described in Defendant Hartman's Letter to Shareholders in the 2006 Annual Report:

> As credit performance deteriorated amid changes in the housing and financial
> markets, we have intensified our focus on asset quality. Our goal all along has
> been to underwrite loans with an eye on risk, but the credit challenges were
> greater than expected in 2006, primarily due to the slowdown in housing price
> appreciation. In response, we have significantly altered our proprietary modeling

and underwriting processes in an attempt to minimize losses and enhance asset quality in loan originations going forward.

53.     NovaStar's 2006 Annual Report further reassured investors regarding asset quality:

> ... our 2006 vintage loan originations performed below expectations. We intensified our focus on asset quality as a deterioration of credit performance became apparent in 2006. We underwrite loans with an eye on risk – adjusting guidelines to market changes, keeping a watch on geographic diversity, and maintaining loan coupons while competitors decrease their coupons.

NovaStar Financial, Inc. 2006 Annual Report at 37.

54.     NovaStar provided investors with these reassurances right up to the eve of the Offering, representing that the stricter guidelines had resulted in enhanced quality borrowers.  In its Form 10-Q dated May 10, 2007, for the quarter ended March 31, 2007, NovaStar stated:

> …The key area of focus for our mortgage lending segment is to ensure that the 2007 vintage performs better than 2006 and in line with our expectations. In this regard, we have significantly altered our proprietary model and underwriting guidelines and processes in an attempt to minimize losses and enhance asset quality in loan originations going forward.

*Id*. at 39.

55.     However, NovaStar's prior practices of permitting poor quality mortgage loans that violated the stated underwriting guidelines to become part of the collateral pool continued through the 2007-2 Offering as described below.

56.     The ratings assigned to 2007-2 Certificates further underscored that risk associated with the Certificates was substantially unconnected to the financial condition of NMI or conditions in the subprime market generally. The Rating Agencies, which closely followed NFI and provided ratings on the Servicer for this Offering, was fully aware of the ostensible risks related to NMI (as described the Prospectus Supplement), when it reviewed the structure of the Offering and provided ratings for the Certificates.  Thus, at the time of the Offering, regardless

of the publicly known financial issues at NovaStar, 81% of the 2007-2 Certificates were still assigned Moody's and S&P's highest ratings, AAA and Aaa, indicating maximum security. The M-1 tranche purchased by Plaintiff was assigned Aa1/AA+, indicating very low risk and high level of safety. In addition, notwithstanding the publicly disclosed information regarding developments in the subprime market during 2006 and 2007 and financial issues related to NovaStar prior to and after this Offering, Moody's did not abandon its investment grade rating of the M-1 Certificates until October 2008 and did not downgrade to default level Caa2 until March 2009. Similarly S&P did not abandon its investment grade rating on the M-1 Certificates until February 2009.

**D.     NovaStar's Undisclosed Systematic Disregard of Underwriting Standards**

57.     The vast majority, 95.9%, of the NovaStar mortgage loans were originated during the period December 2006 through May 2007. In fact, 72.3% of the loans were originated within two months of the Offering, from March 2007 through May 2007. Pro. Supp. at S-45. The following information is the result of a factual investigation by counsel, including interviews with a number of former NovaStar representatives including, but not limited to:

- A former Vice President of Operations with NovaStar from 2005 to March 2007 who worked in Kansas City, MO.
- A former Quality Control Auditor/Supervisor with NovaStar from August 2005 to September 2007 who worked in Kansas City, MO.
- A former Closing Supervisor with NovaStar from 2002 through May 2007 who worked in Ohio.
- A former Quality Control Auditor with NovaStar from 2004 to 2007 who worked in Ohio.
- A former Senior Underwriter with NovaStar from 2005 through 2007 who worked in Lake Forest, CA.
- A former Senior Underwriter with NovaStar from March 2006 to August 2006 who worked in Lake Forest, CA.
- A former Account Manager with NovaStar from 2004 to 2007 who worked in Ohio.
- A former Account Executive with NovaStar from February 2006 to May 2007 who worked in Ocala, FL.

28

58.     NovaStar's origination operations ("Originations") personnel included Account Executives, Account Managers, Underwriters, Auditors (Quality Control and Appraisal), Supervisors, Vice Presidents and Executives.

59.     NovaStar's Account Executives worked all over the country with smaller lending businesses, including mortgage brokers, to arrange for NovaStar loans to be offered to potential borrowers.  These smaller lending businesses were independent and not part of NovaStar, but they were compensated with a fee for every NovaStar mortgage they brokered.  In 2006 there were over 400 NovaStar Account Executives located around the country.

60.     NovaStar's Account Executives reported directly to NovaStar's Account Managers.  Each NovaStar Account Manager oversaw a territory covered by up to ten Account Executives.  Account Managers were responsible for obtaining completed loan applications and all supporting loan documentation from the Account Executives, reviewing the loan documentation and entering it into NovaStar's computer system.  NovaStar's Account Managers controlled the loan files and any developments or inquiries from underwriters or Quality Control ("QC") went first to the Account Manager before being disseminated back to the appropriate person for handling.

61.     NovaStar's Account Managers worked in NovaStar's regional operations offices – Lake Forest, CA; Richfield, Ohio; Independence, Ohio; Kansas City, Missouri and Detroit, Michigan.   By the end of 2006, the Detroit, Michigan office had been closed and the Independence, Ohio and Richfield, Ohio regional operations offices had merged into one regional operations center.

62.     Once the loan application was in NovaStar's computer system, the Account Manager would send the loan file to an Underwriter for approval.  According to a former Senior

Underwriter, subprime loans were underwritten in accordance with a specific matrix designed by NovaStar's upper management – including Supervisors, Vice Presidents and Executives.   In 2006 and 2007, NovaStar's Underwriters manually reviewed subprime loan applications for compliance with NovaStar's underwriting guidelines; there was no automated underwriting system.  Whereas most mortgage originators utilized systems like "DU" (the Fannie Mae system) or "LP" (the Freddie Mac system) by 2006, NovaStar did not employ either in underwriting subprime loans.

63.     Underwriters would determine, based on the loan file they received from the Account Manager, which of the six types of loan documentation programs a borrower qualified for. The six documentation programs included "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement."   The Underwriters' determination of the appropriate documentation program was based, in part, on the FICO score of the borrower.   Each documentation program had different requirements. For example, under the "Full Documentation" program, applicants generally were required to submit their most recent pay stub and either verification of their employment or up to two prior years of W-2 forms.  Under the "Stated Income" program, an applicant may be qualified based on monthly income as stated in the loan application, but this stated income had to be reasonable in view of the borrowers stated employment.

64.     The Underwriter determined if the loan file met the requirements of the applicable program. If there were deficiencies in the loan file the Underwriter would only approve the loan "with conditions" – meaning that the deficiencies must be cured prior to closing the loan.

65.     Underwriters were concentrated for the most part in NovaStar's Regional Offices in California and Ohio, but NovaStar also employed "remote underwriters" at other locations as well. Underwriters reported directly to Supervisors in California, Ohio and Kansas City. The Underwriting Supervisor of the Lake Forest office was Jeff Davis.

66.     NovaStar also had Auditors working in a large Quality Control/Auditing ("QC") Department in the California, Ohio and Kansas City locations. The QC Department was responsible for monitoring approved loan applications for fraud or deficiencies in documentation. In addition, if a loan was denied by an Underwriter, it would go to the QC Auditors for further review. Auditors including George Wheeler, Bernard Murphy and Mayaguez Beligan worked at NovaStar during the relevant period. The QC Department also handled periodic due diligence on the loans in NovaStar's portfolio. According to a former QC Auditor, each month the QC Department would sample at least 7% of the NovaStar's monthly loan production. These loans were rated using NovaStar's internal scaling system, which rated the loans "acceptable," "marginal" or "deficient."

67.     As mentioned above, NovaStar's Underwriters reported to Supervisors. Supervisors had the most underwriting training, knowledge and experience in NovaStar's Origination operations and made the ultimate decision as to whether a mortgage loan would be approved and funded. Whereas there were approximately 11 Supervisors in 2005 and early 2006 at NovaStar, by the beginning of 2007 there were only a handful remaining in the Lake Forest and Richfield Locations. In Lake Forest, Donna Delmonte served as one of the Supervisors during the relevant period before she took on the responsibilities of a Vice President of Operations in March 2007.

68.     Supervisors reported to Vice Presidents of Operations ("VPO").   VPOs were focused more on NovaStar's business and sales operations than with underwriting processes and origination.   Each VPO was responsible for a group of Supervisors, Underwriters, Auditors, Account Managers and Account Executives.   According to several NovaStar employees in California and Ohio, VPOs, while technically senior to Supervisors, were not as familiar with the underwriting process which, accordingly, created tension between Supervisors and Vice Presidents.   Generally, Supervisors had signing authority for loans up to $650,000, but loans above that amount needed approval by a VPO.   Ultimately, the company cut the number of VPOs to four, down from eleven, by the end of 2006.   During the relevant time period, NovaStar's VPO's included Patrick Rider, Emilio Soli and Larry Braga.   The VPO position was eliminated completely in early 2007, with Supervisors, including Donna Delmonte in Lake Forest, taking control of the sales and underwriting businesses completely by March 2007.

69.     Vice Presidents (including VPOs)[10] reported to Executive Vice Presidents and Executives in Kansas City, Missouri daily, including to Dan Pasgan, Defendants Lance Anderson and Scott Hartman.

**1.     By Late 2006  NovaStar Deviated Routinely From Adherence to It Underwriting Guidelines In Order To Achieve Loan Volume Targets**

70.     Beginning in late 2006, there was increased pressure on Account Managers, Underwriters and QC Auditors at NovaStar to "close" (make) loans.   According to former Underwriters, Account Managers and Supervisors at NovaStar, this pressure to achieve loan production resulted in a systematic loosening of NovaStar's adherence to its underwriting

---

[10]   NovaStar also had additional "Vice Presidents" ("VPs") who worked outside of Operations at NovaStar's Kansas City, Missouri Headquarters.   These VPs included the VP of Default, Jenifer Ingilali; the VP of Loss Mitigation, Meagan Devlin; and the VP of Credit Risk, Serene Richardson.

guidelines.  According to a former NovaStar Supervisor who worked at the Company during this period, NovaStar gave increased financial incentives to its Account Managers, Underwriters, Supervisors and VPOs for reaching volume-based performance targets.  These incentives helped cause the approval of loans that did not comply with NovaStar guidelines.

71.     One former NovaStar QC Auditor confirmed that, starting in October 2006, NovaStar Underwriters and QC Auditors began routinely alerting their Supervisors about loans that were rejected due to suspicious or fraudulent documentation, only to learn that the rejection of the suspicious or fraudulent loan by the Underwriter and QC Auditor had been overridden by Supervisors and VPOs and the loan had been approved.  Underwriters would consistently make notations in the file regarding deficiencies which they believed warranted denial of applications because of failure to adhere to NovaStar's underwriting guidelines.  One former Underwriter stated that these notations were made "because we did not want to get in trouble when something ever came back."

72.     In 2007, NovaStar eliminated the VPO position at the Company, and vested all of the authority of underwriting approvals and exception granting to the Supervisors in Lake Forest and Ohio.  According to one former Vice President, this is when things got really bad at the Company and the guidelines were just "tossed out the window" as volume became the primary goal.

73.     General overriding of denials of full documentation loan applications by QC and Underwriters became commonplace by 2007 at NovaStar.  In many cases, when senior Underwriters refused to sign off on an override, VPOs (until they were let go in March 2007) or

Supervisors would approach more junior Underwriters and direct them to sign off on an application.[11]

74.     Once NovaStar underwrote a loan, it would go into its "warehouse."  Every month or so, according to a NovaStar QC Auditor, NovaStar would offer a group of loans for sale to outside investors or securitize a pool of loans with the help of the investment banks.  A NovaStar Vice President who worked at the company until March 2007 stated that NovaStar was "not keeping the crap – it was selling it for securitization."  According to a former QC Auditor at NovaStar, the loans that were being sold off were not the "best quality."[12]

### 2.     Full Documentation Loans Lacked Requisite Documentation Or Documentation Produced Was Facially Deficient

75.     NovaStar's Full Documentation loan program had serious, undisclosed problems. One former NovaStar Account Manager stated that NovaStar was approving loans as Full Documentation loans even though they had severe deficiencies.  The main source of verification on a Full Document loan was the employment of the borrower.  If the employment could not be verified, the loan should be denied.  However, a former NovaStar QC Auditor reported that NovaStar would routinely override rejections of denials of loans to self-employed borrowers who presented highly questionable employment documentation.  This former NovaStar QC Auditor recalled that in one instance the employment verification documentation consisted of a piece of paper that stated the borrower "cleans this house."  The loan was denied and it was recorded in

---

[11]   While Supervisors and VPOs could override a denial based on a failure to follow the underwriting guidelines, every loan still need the signature of an Underwriter before it was approved.

[12]   It appears NovaStar cherry-picked and kept the "best" loans for its own portfolio while selling lesser quality loans to the public in the Offering.  Shortly after the Offering, in the third quarter of 2007, NFI sold to Defendant Wachovia, $668.8 million of "mortgage loans held-for-sale which were not, and had never been, delinquent, for a price of 91.5% of par."  NFI 2007 Annual Report and Form 10-K at 49.

the notes of the file there was insufficient documentation and employment verification. Nevertheless, that loan application denial was overridden and the borrower who "cleans this house" was approved for a loan.

76.     A former Senior Underwriter confirmed that this practice of overriding rejections resulted in many loan applications improperly being classified as Full Document loans. According to a former QC Auditor "deficient income history, rental history and a lot of that stuff all the time would be just let go.  Account Managers, VPs and [Supervisors] were pretty much the people running the show."

77.     According to NovaStar's guidelines as of May 2007, letters of verification of employment were required from borrowers, and the letters had to be from employers.  However, more often than not this requirement was not satisfied at NovaStar.  For example, a former QC Auditor once came across a letter on a post-it note that said "Mrs. X cleans my house and I pay her three thousand a week."  In another instance, employment verification for a masseuse was absent, but when this deficiency was brought to the Supervisor's attention, the Supervisor overrode the denial of the application because there was a record in the file of the borrower having a license to massage and that was enough.  Many loan application files were from housekeepers from South Florida who allegedly made $200,000 a year.  Even in instances as egregious as this application denials would be overridden by NovaStar employees at levels above the Underwriters in order to increase volume. While these are only some examples, the Auditor said that this was the general practice with respect to loans that NovaStar securitized and sold to outside investors (as opposed to those it kept on its own books).

78.     To qualify for a Full Document loan program the Underwriter is supposed to have, in the loan file, full documentation of the borrowers' financial status, credit history, and

employment status.  By 2006 and 2007, the employment verification by the Originator, which was supposed to occur within three days, was rarely completed by the deadline.  Similarly, in 2006 and 2007, credit score verifications and research also were completed after the supposed deadlines.

79.     These delays resulted in repeated and consistent violation of the underwriting guidelines.  For instance, Underwriters and QC Auditors at NovaStar noticed that more often than not additional credit was being acquired by the borrower during the loan process.  When a NovaStar Underwriter receives a loan file, that file contains a credit report.  According to a former Senior Underwriter at NovaStar, many times it took two or three months to get a loan processed through from start to finish.  In many cases, borrowers had acquired additional debt during that interim period.  In 2006 and 2007 it was not customary for NovaStar to account for that additional debt when underwriting and closing subprime loans.  Because that debt was not counted, the loan should not have been cleared and underwritten as this additional debt gave the borrower, and thus the loan, significantly higher default risk than would be in the original loan application file.

**3.     Stated Income Loans Not Reasonably
        Related to Stated Employment**

80.     According to a NovaStar Underwriter, under NovaStar guidelines, Stated Income loans had to pass a "reasonableness test, end of story."  A former Account Manager at NovaStar confirmed that that the income levels borrowers were providing for NovaStar's Stated Income loans were a far cry from "reasonable."  This former NovaStar Account Manager confirmed that the underwriting guidelines at his level were strictly applied and were followed by Quality Control and Underwriting people at the Company.  As a result, a large number of loan applications were being denied throughout 2006.  A former Underwriter was aware that this

made Account Executives, who depended solely on volume based compensation, and Account Managers, who also had a volume based component of their compensation, very upset. The underwriter commented that if Account Executives were unable to get their borrowers into NovaStar loans, they would go elsewhere. Some Account Executives were not surprised that the loans were not going through because, according to one former loan officer who strictly dealt with NovaStar's ARM loans, a common theme was that "incomes were too low to sustain the payments" on the mortgages NovaStar was underwriting.

81.     The Company reacted quickly, and beginning in late 2006 and into 2007, denials of applications for having unreasonable stated income, were being overridden and deficiencies were "swept under the rug" in order to push a loan through. This confirmed, according to a NovaStar Underwriter, that there were definitely exceptions being made to "income guidelines." On many occasions there was no reasonable basis to take the income at face value. Even when unreasonable stated incomes were the reason to deny an application or were questioned, the denials were constantly overridden by Supervisors, QC Auditors and VPOs at NovaStar. For example, one former Senior Underwriter at NovaStar recalled an application that claimed $10,000 monthly income for a Walmart employee. Soon after denying the application for approval on those ground, the application had disappeared from the system, meaning that someone at the Company had contacted the loan officer on behalf of the originator and overridden the denial of that Stated Income loan.

82.     Ultimately, there was no verification for stated income and, contrary to the guidelines, whatever the borrower claimed was taken at face value regardless of the reasonableness of the amount. It was not uncommon to come across applications stating the borrower worked at McDonalds and made $50,000 a year. The common sense view was that

there is no way that person is making that much in salary unless they are in upper management at McDonald's. However, without any way to verify income under those circumstances, Underwriters were forced to assume that the borrower made that money because it theoretically could be true. These loans would be approved constantly. According to one former NovaStar QC Auditor, "these were the loans that were getting sold to investors."

E. **Clayton's Review of the NovaStar 2007-2 Mortgage Pool**

83.     Typically, once the Rating Agencies' analysis was complete, the investment bank or underwriters on the securitization submitted their bid. If the mortgage originator such as NovaStar accepted a bid, the underwriters usually had a short period of time prior to the settlement date (when cash was paid to the mortgage originator for the loans) to conduct due diligence on the loans. The Underwriter Defendants often hired third-party due diligence firms such as Clayton to conduct this review which was performed on a small percentage of loans in the pool (5-10%). Defendants RBS, DBS and Wachovia were underwriters for all six NovaStar publicly offered MBS during 2006 and 2007.

84.     Although the ostensible purpose of the review was to eliminate from the pools loans that did not meet the stated underwriting standards, executives at Clayton and another due diligence firm, the Bohan Group ("Bohan"), stated that at the time the Offering occurred, banks such as Defendants RBS, DBS and Wachovia, were performing increasingly cursory due diligence on smaller and smaller percentages of loans. Frank P. Filipps, Clayton's chairman and CEO, stated that "[e]arly in the decade, a securities firm might have asked Clayton to review 25% to 40% of the sub-prime loans in a pool, compared with typically 10% in 2006." Bohan President Mark Hughes stated, "[b]y contrast, loan buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans

examined." E. Scott Reckard, *Sub-Prime Mortgage Watchdogs Kept On Leash*, Los Angeles Times, March 17, 2008.

85.     Additionally, as Clayton only reviewed a small cross-section of the loans in each pool – often less than 10% – there were many loans which were never reviewed for compliance with applicable underwriting standards. During sworn testimony before the FCIC, the following exchange occurred between the Chairman of the FCIC, Phil Angelides, and Senior Vice President at Clayton, Vicki Beal:

> Mr. Angelides: Secondly, it appears as though you did a sample of 5 to 10 percent, but it looks like the other 90 percent were never fixed. So I am thinking if I am a securitizer … what is happening here is that [I] got a sample of 10 percent [of the loans]. I know 11 percent of those fail. I kick those out. But as to the other 90 percent, I [] do nothing?
>
> MS. BEAL: Right.

86.     For each loan pool examined, including Series 2007-2, Clayton reviewed the percentage of loans designated for: (1) adherence to the seller's credit underwriting guidelines and client risk tolerances; (2) compliance with federal, state and local regulatory laws; and (3) the integrity of loan data provided by the seller to the prospective buyer. This review was commonly referred to as a "credit and compliance review." Clayton's contract underwriters reviewed the loan files, compared tape data with hard copy or scanned file data to verify loan information, identified discrepancies of key data points, and graded loans based on seller guidelines and client tolerances.  For its review of NovaStar loans, Clayton's review team generally consisted of a team leader, a quality control person and the underwriters or reviewers. The team leader was the liaison to clients – the investment banks.

87.     Clayton's quality control reviewer generated daily reports for the Underwriter Defendants and the loan seller (*e.g.,* NovaStar) that summarized Clayton's findings, including

summaries of the loan files that suffered from exceptions to the relevant underwriting standards. Some exceptions were benign, such as a credit score slightly below acceptable range (*i.e.*, 680 score required, 670 actual). Others, such as lack of an appraisal, stated income not being reasonable for the job stated or missing critical documents in a HUD-1 file, were more severe. Once Clayton identified exceptions, the seller (*e.g.,* NovaStar) had the option to attempt to cure them by providing missing documentation or otherwise explaining to Clayton why the loan complied with underwriting standards. If NovaStar provided additional information, Clayton re-graded the loan. Once this process was complete, Clayton provided the Underwriter Defendants with final reports.

88.     Clayton's final reports categorized loans into one of three categories. First, loans that complied with the underwriting standards were categorized as "Accept." Second, loans that did not comply with underwriting standards were categorized as "Reject." Finally, loans that were initially categorized as "Reject," but were waived by the client were categorized as "Waiver."

89.     According to a former QC Auditor at NovaStar, a representative of the Underwriter Defendants and NovaStar would have conference calls discussing the loans which Clayton identified issues with, and whether those loans would be waived into the pool being purchased. Donna Delmonte was the NovaStar Supervisor responsible for representing NovaStar on these conference calls leading up to the 2007-2 Securitization. Prior to Ms. Delmonte, Serene Richardson performed those duties.

90.     During hearings before the Financial Crisis Inquiry Commission in 2010, Clayton, the third-party due diligence firm which reviewed compliance with underwriting guidelines for MBS offerings, submitted a study it conducted in 2007 regarding the underwriting

and due diligence practices of originators and investment banks that were selling MBS during 2006 and 2007 including Defendants RBS and DBS.  For the period from 2006 through the first two quarters of 2007, Clayton prepared "Trending Reports" which it shared with major investment banks analyzing the "Reject" and "Waiver" statistics for approximately 911,000 loans it had reviewed, representing about 10% of the pools Clayton had been contracted to review.

91.     The "Trending Report" submitted to the FCIC shows that during this period Defendants RBS and DBS, both of which were underwriters for all NovaStar Offerings in 2006 and 2007, routinely ignored loans categorized as "rejected" by Clayton and granted waivers or exceptions for such loans to be admitted into the mortgage pool.  Specifically, for 2006 and the first two quarters of 2007 Clayton reviewed 66,379 loans for Defendant DBS and waived the exceptions related to 50% of the loans rejected by Clayton.  Similarly, during this period Clayton reviewed 67,257 loans for RBS (Greenwich) and waived the exceptions related to 53% of the loans rejected by Clayton.  Based on the significant number of rejected loans due to serious underwriting defects, Defendants DBS and RBS should have recognized that non-compliance with underwriting guidelines was a serious "red flag" to Defendants such that the entire collateral pool or a substantial portion should have been examined for underwriting defects, rather than just a very small percentage, particularly with respect to NovaStar, which was issuing subprime loans.

92.     Additional regulatory investigations have focused on whether Wall Street banks including the Underwriter Defendants failed to adequately disclose the warnings they received regarding the number of loans that failed to meet lending guidelines.  On January 12, 2008, in an

article entitled "Inquiry Focuses on Withholding of  Data on Loans," the *New York Times* reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans. Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. ***But the banks did not disclose the details of these reports to credit-rating agencies or investors.*** The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments (emphasis added).

93.     On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in New York in exchange for providing documents and testimony regarding its due diligence reports. That same day, in an article entitled "Loan Reviewer Aiding Inquiry Into Big Banks," the *New York Times* reported that a person familiar with the NYAG's investigation stated that as demand for loans surged, mortgage originators were in a superior bargaining position and required that Wall Street banks have Clayton and other consultants review fewer loans. Incredibly, "investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

94.     On March 17, 2008, the *Los Angeles Times* reported that Clayton and Bohan employees (including eight former loan reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports."

95.     Clayton quality control personnel have indicated that Stated Income loans reviewed by Clayton were identified as a significant problem to their clients.  In particular, loans were being granted that made no sense in light of the applicants' stated position and income yet

they were still getting waived into mortgage pools.  One quality control person stated that because these loans were of such poor quality they eventually began to reject them on principle alone.

96.     In addition, the Underwriter Defendants were incentivized to "kick-out" as few loans as possible because (1) mortgage originators would not invite a bank that consistently kicked out large numbers of loans to future auctions; and (2) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fee.  In many instances, instead of kicking loans with underwriting exceptions out of the pools, Defendants RBS, DBS and Wachovia simply included the loans and used the reports which Clayton generated to negotiate a lower purchase price for the loan pool.

**F.     Further Evidence Confirming that the Underwriting Guidelines Were Systematically Disregarded in 2007-2 Offering**

**1.     Ratings of 2007-2 Certificate Collapse To "Junk Bond" Levels Shortly After Issuance Due To Undisclosed Aggressive Underwriting**

97.     Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  In this regard, the Rating Agencies played an important role in assessing the structure and credit quality of the Certificates and in the sale of such securities to investors.

98.     In June 2007, S&P revised the methodologies used to rate mortgage-backed securities because the performance of the underlying collateral "called into question" the accuracy of the loan data.  Specifically, S&P increased "credit protection" for rated transactions. S&P stated that it would also seek to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination,

misrepresentation and speculative borrower behavior reported for the 2006 ratings."  Moody's also revised its ratings methodology, citing previously undisclosed "aggressive underwriting" used in the origination of the collateral. Had these aggressive underwriting practices been disclosed they obviously would have been reflected in the initial ratings of both Moody's and S&P and no revision would be required.

99.     When the rating agencies applied the new methodology to the 2007-2 Certificates the ratings collapsed as many as 20 levels with, for example, 87%, or $928 million, of the total $1.07 billion of Certificates initially rated AAA/maximum safety now having been downgraded from AAA to "Ba1" or below, meaning these Certificates were not only designated "junk bonds," but were assessed to be in danger of "imminent default."   All of the remaining Certificate tranches have now been downgraded, with 90%, or $1.2 billion, of the total Certificates having been downgraded to speculative "junk" status[13] as follows:

---

[13]   Even the A-2A tranche, the only Certificate not downgraded below investment grade levels, was dropped five notches by each of the Rating Agencies because of the increased risk to repayment of principal.

| Tranche | Initial Rating | Definition | Current Rating | Definition |
|---|---|---|---|---|
| **A-1A** Moody's S&P | Aaa AAA | | Caa2 CCC | **Vulnerable to Default – Very Poor Financial Condition** |
| **A-2A** Moody's S&P | Aaa AAA | **Extremely Strong Capacity to Meet Financial Commitments. Highest Rating** | A2 A | **Excellent Financial Security – Strong Capacity to Meet Financial Commitments** |
| **A-2B** Moody's S&P | Aaa AAA | | Caa3 CCC | **Vulnerable to Default – Very Poor Financial Condition** |
| **A-2C** Moody's S&P | Aaa AAA | | C CCC | **Likely in Default or Vulnerable to Default** |
| **A-2D** Moody's S&P | Aaa AAA | | C CCC | |
| **M-1** Moody's S&P | Aa1 AA+ | **Very Strong Capacity To Meet Financial Commitments** | C CCC | **Likely in Default or Highly Vulnerable to Default** |
| **M-2** Moody's S&P | Aa2 AA | **Very Strong Capacity To Meet Financial Commitments** | C CCC | |
| **M-3** Moody's S&P | Aa3 AA- | | C CCC | |
| **M-4** Moody's S&P | A1 A+ | **Strong Capacity To Meet Financial Commitments** | C CCC | **Likely in Default or Vulnerable to Default** |
| **M-5** Moody's S&P | A2 A | | C CCC | |
| **M-6** Moody's S&P | A3 A- | | C CC | |
| **M-7** Moody's S&P | Baa1 BBB+ | **Adequate Capacity To Meet Financial Commitments** | C CC | |
| **M-8** Moody's S&P | Baa2 BBB | | C D | **Default** |
| **M-9** Moody's S&P | Baa3 BBB- | | C D | |

100.     Specifically, the Class M1 Certificates which were initially awarded the second highest rating of Aa1 and AA+ by both Moody's and S&P have now been downgraded to junk levels to C and CCC, respectively.   These default level junk bond ratings reflect the rating agencies independent assessment that it is likely or highly likely that the bonds will default prior to investors receiving their principal. It is for that reason that the price and value of the Certificates collapsed commensurate with the downgrades as investors recognized the fact that they would likely not receive back their principal investment. This likelihood of default (for virtually all Certificates) is supported by the fact that $806.45 million in principal is still owed to investors, yet $341.02 million of the mortgage loan collateral is presently either delinquent, in foreclosure or repossessed as follows:

| Offering | Current Remaining Principal | Current Collateral Balance | Current $ Delinquent/ Default/ Bankruptcy/ Foreclosure/ REO | Current % Delinquent/ Default/ Bankruptcy/ REO/ Foreclosure |
|---|---|---|---|---|
| *NHEL 2007-2* | *$806.45 million* | *$806.45 million* | *$341.02 million* | *42.29%* |

101.     In addition, as of March 2011, only $221.7 million remains in credit support in the mezzanine tranches and overcollateralization account as a result of the realized losses in the collateral pool to date (over $255 million in collateral realized losses already recognized).   Those previously realized losses have wiped out the overcollateralization feature, the M-9 and M-8 offered tranches and have started eroding the M-7 tranche.   Given the amount of additional collateral currently delinquent or in default ($341.02 million), which exceeds by 54% the principal balances in the remaining mezzanine tranches and overcollateralization account, losses will continue to erode the credit support and move up the Offering's structure to the senior tranches.

102.    Since the downgrades occurred in material part because of Rating Agencies' determinations of previously undisclosed improper underwriting practices, these downgrades provide factual support for the systematic disregard of the stated underwriting guidelines in the Prospectus Supplement.  NovaStar's systematic disregard for the stated underwriting guidelines led directly to dramatic downgrades of the Certificates as set forth above.

### 2.    Exponential Increase In Delinquency And Default Rates Evidence Early Payment Default and Disregarded Guidelines

103.    NovaStar and correspondent mortgage originators routinely allowed misstatements in loan applications and systematically ignored stated underwriting standards. Unsurprisingly, this has resulted in dismal performance of the loans.  Just six months after the Offering borrower delinquency and default rates had increased from 2.63% at issuance to over 18% of the mortgage loan balance.  One year out from the Offering, on or about the filing of the Initial Complaint, borrower delinquency and default rates had increased to over 32% of the mortgage loan balance.  These skyrocketing delinquency and default rates forced the Rating Agencies to downgrade substantially all of the Certificates to at or near junk bond status (as set forth below).  Moreover, as of the filing of the First Consolidated Amended Complaint in June 2009, borrower delinquency and default rates on the underlying mortgage collateral had increased to a shocking 47% of the mortgage loan balance.  This resulted in further downgrades by the Rating Agencies.  As of the date of the filing of this Complaint, ***68.67%*** of the mortgage collateral was considered to be in some form of delinquency or default.

104.    These early payment defaults and delinquency rates are reflective of a disregard for underwriting guidelines.  As reported by the Federal Bureau of Investigation (the "FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant

misrepresentations in the original loan applications.  The study, cited by the FBI and conducted by Base Point Analytics, found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., concluding that the same top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the same top states with the highest percentage of early payment defaults.

105.    Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to the loan originators which further evidenced that they had engaged in underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statement and Prospectus Supplement.

**V.**

**THE OFFERING DOCUMENTS CONTAINED MATERIAL
MISSTATEMENTS AND OMISSIONS REGARDING
STATED UNDERWRITING GUIDELINES**

90.    The Prospectus Supplement described the underwriting guidelines used by NMI in originating the Certificates' underlying collateral. NMI's underwriting guidelines generally required a description of the borrower's income, employment documentation and a credit report. For example, the Series 2007-2 Prospectus Supplement stated:

> The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan.  Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history.  Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or

pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date.

*       *       *

**Quality control reviews are conducted to ensure that all mortgage loans meet quality standards.**  The type and extent of the reviews depend on the production channel through which the mortgage loan was obtained and the characteristics of the mortgage loan.  The sponsor reviews, at a minimum, 7% of each month's production.  The random audit selection criteria includes a proportional representation of loan type, loan product, loan purpose, FICO score, LTV, underwriting grade, state and broker.

*See* Pro. Supp. at S-86. (Emphasis added.)

91.     The Prospectus Supplement also detailed NMI's programs for issuing mortgage loans where less than full documentation was required.  However, even those programs were subject to underwriting procedures and required appraisals (as set forth in ¶¶45-50, herein).  For example, the Series 2007-2 Prospectus Supplement stated that:

The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement."  Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub.  Under the Limited Documentation program, no such verification is required however, bank statements for the most recent consecutive 6-month period are required to evidence cash flow.  Under the Stated Income program, an applicant may be qualified based on monthly income as stated in the loan application. Under the "No Documentation" program, an applicant provides no information as it relates to their income.  Under the "No Income/No Asset" program, the applicant's income and assets are not verified, however the applicant's employment is verified.  Under the Streamline program, this is allowed only for our Retention division for borrowers that currently have a mortgage with the sponsor.  The documentation required for this loan is based on previous documentation type. If a "Streamline loan's original documentation type was "Full Documentation," then a verification of the applicant's employment is the only requirement.  Mortgage loans originated under any program other than the "Full Documentation" program require less documentation and verification than do traditional "Full Documentation" programs.  The Full Doc/12-Months

49

Personal Bank Statement Program allows self-employed or fixed income borrowers to substitute most recent consecutive 12-months bank statements for wage earner's W-2 forms and recent pay stubs. Given that the sponsor primarily lends to non-conforming borrowers, it places great emphasis on the ability of collateral to protect against losses in the event of default by borrowers.

*Id.* at S-87.

92.    The Series 2007-2 Prospectus Supplement also set forth guidelines for underwriting exceptions granted in cases where "compensating factors" were present:

On a case-by-case basis, exceptions to the underwriting guidelines are made where the sponsor believes compensating factors exist. Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception. All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor. All loans over $650,000 require the approval of the VP of Operations and Corporate Credit Department or its approved designees. In addition, the President of the sponsor approves all loans in excess of $1,100,000.

*Id.*

93.    The aforementioned statements in the Offering Documents related to NovaStar's underwriting standards were materially untrue and omitted material facts necessary to make them not misleading because, as described herein at ¶¶57-106, Defendants failed to disclose that NovaStar routinely disregarded its underwriting guidelines as follows:

-    NovaStar improperly granted exceptions by approving loans that did not have appropriate compensating factors;
-    NovaStar failed to obtain proper documentation from borrowers required under its underwriting guidelines;
-    NovaStar failed to determine reasonableness of borrowers' representations in Stated Income/Stated Asset and low documentation loans;
-    Defendants failed to disclose that NovaStar's quality control systems did not adequately monitor compliance with underwriting standards; and
-    Defendants failed to conduct proper due diligence regarding the quality of the loans in the collateral pool.

**VI.**

**CLASS ACTION ALLEGATIONS**

106.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Certificates, as set forth in ¶1, above, pursuant and/or traceable to the materially false and misleading Offering Documents and who were damaged thereby (the "Class").

107.    Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

108.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class who are geographically dispersed.  Record owners and other members of the Class may be identified from records maintained by the Defendants and/or relevant non-parties or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

109.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

110.    The Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

111.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statement and Offering Documents disseminated by Defendants to the investing public omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; whether certain Defendants performed and adequate due diligence; and to what extent the members of the Class have sustained damages and the proper measure of damages.

112.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.

## FIRST CLAIM FOR RELIEF

### For Violation of § 11 of the Securities Act
### (Against NMFC, the Individual Defendants and the Underwriter Defendants)

113.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This Claim for Relief is based solely on claims of strict liability and/or negligence under the 1933 Act.

114.   Plaintiff brings this Claim pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against NMFC, the Individual Defendants and the Underwriter

Defendants.  This Claim for Relief is predicated upon strict liability of Defendants for making materially false and misleading statements in the Offering Documents.

115.    The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

116.    NMFC, the Individual Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

117.    The Individual Defendants each signed the Registration Statement.

118.    Defendants RBS, DBS and Wachovia acted as underwriters in the sale of Certificates, participated in the distribution of the Certificates and participated in drafting and disseminating the Offering Documents for the Certificates.

119.    NFMC, the Individual Defendants and the Underwriter Defendants owed the Plaintiff and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

120.    NFMC, the Individual Defendants and the Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

121.    NMFC, the Individual Defendants and the Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and

dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

122.    By reason of the conduct alleged herein, the NMFC, the Individual Defendants and the Underwriter Defendants violated Section 11 of the Securities Act, and are liable to Plaintiff and the Class.

123.    Plaintiff and other Class members acquired the Certificates, set forth herein at ¶1, pursuant and traceable to the Offering Documents.  At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

124.    Plaintiff and other Class members have been injured and have sustained damages as a result of the wrongful conduct alleged against NMFC, the Individual Defendants and the Underwriter Defendants.

125.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally, from the NMFC, the Individual Defendants and the Underwriter Defendants, as set forth in Section 11 of the Securities Act.

126.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

**VIII.**

**SECOND CLAIM FOR RELIEF**

**For Violation of § 12(a)(2) of the Securities Act**
**(Against Defendant RBS)**

127.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  Plaintiff brings this claim based solely on claims of strict liability and/or negligence under the 1933 Act.

128.    This Claim for Relief is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against Defendant RBS.

129.    The Prospectus Supplement contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

130.    Defendant RBS owed to Plaintiff, and the other Class members who purchased Certificates pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.

131.    Plaintiff purchased their Certificates in the 2007-2 Offering directly from Defendant RBS in the initial public offering:

| Trust | Pro. Supp. Date | Purchase Date | Purchased From |
|---|---|---|---|
| NovaStar Home-Equity Loan Trust, Series 2007-2, Class M1 | 5/25/07 | 5/25/07 | RBS |

Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

55

132.    By reason of the conduct alleged herein, Defendant RBS, violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant to the Offering Documents.

133.    Plaintiff and other Class members were damaged by Defendant RBS's wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

134.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements in the Offering Documents at an earlier time.

## IX.

### THIRD CLAIM FOR RELIEF

**Violations of § 15 of the Securities Act**
**(Against NMI and Hartman and Metz)**

135.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This Claim for Relief is based solely on claims of strict liability and/or negligence under the 1933 Act.

136.    Plaintiff brings this Claim against NMI and Defendants Hartman and Metz as controlling persons of the Issuer NMFC, pursuant to Section 15 of the Securities Act.  Hartman

and Metz as senior officers of NMFC (*i.e.,* the Issuer) were responsible for preparing and filing the Offering Documents and as senior officers of NMI (*i.e.,* the Sponsor) were responsible for selecting the mortgages to be included in the 2007-2 pool, structuring the Offering and pricing the sale of the Certificates on the Offering. *See* Pro. Supp. at S-96.  The Issuer NMFC was a wholly-owned subsidiary of NMI.  As a result of their specific responsibilities with respect to the Offering, Hartman and Metz had control of the material misstatement and omissions in the Prospectus Supplement concerning the underwriting and quality of the mortgage loan collateral. As a result, of NMI's ownership of the Issuer and direct responsibilities in selecting the mortgages in the pool, structuring the Offering and pricing the Certificates it also had the power to exercise control over the Issuer.  The Individual Defendants and NMI had the power to influence, and exercised that power and influence, to cause NMFC to engage in violations of the Securities Act, as described above. Metz, Hartman and NMI's control, ownership and position made them privy to the material facts concealed from Plaintiff and other Class members.

137.    By virtue of their wrongful conduct, Plaintiff and the Class have been damaged. Defendants NMI, Hartman and Metz, are liable to Plaintiff and other Class members for their sustained damages.

## X.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action properly maintainable as a class action and certifying Plaintiff as Class representative;

B.    Awarding compensatory and/or rescissory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained

as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

        C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

        D.     Such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 16, 2011
       New York, New York

                       **COHEN MILSTEIN SELLERS & TOLL PLLC**

               By: _____
                        Joel P. Laitman
                        Christopher Lometti
                        Richard A. Speirs
                        Michael B. Eisenkraft
                        Daniel B. Rehns
                        Kenneth M. Rehns
               88 Pine Street
               New York, New York 10005
               Telephone: (212) 838-7797
               Facsimile: (212) 838-7745
               *jlaitman@cohenmilstein.com*
               *clometti@cohenmilstein.com*
               *rspeirs@cohemilstein.com*
               *meisenkraft@cohenmilstein.com*
               *drehns@cohenmilstein.com*
               *krehns@cohenmilstein.com*

                       Steven J. Toll
                       Julie Goldsmith Reiser
                       Joshua S. Devore
                       S. Douglas Bunch
              1100 New York Avenue, NW, Suite 500 West
               Washington, D.C. 20005
               Telephone: (202) 408-4600
               Facsimile: (202) 408-4699

*stoll@cohenmilstein.com*
*jreiser@cohenmilstein.com*
*jdevore@cohenmilstein.com*
*dbunch@cohenmilstein.com*

*Counsel for Lead Plaintiff and the Proposed Class*

# APPENDIX A

**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND, *on Behalf of Itself and All Others Similarly Situated,* | Case No.: 08-CV-5310 (DAB) |
| Plaintiff, | **CLASS ACTION** |
| *v.* | |
| NOVASTAR MORTGAGE, INC., NOVASTAR MORTGAGE FUNDING CORPORATION, SCOTT F. HARTMAN, GREGORY S. METZ, W. LANCE ANDERSON, MARK HERPICH, RBS SECURITIES, INC. f/k/a GREENWICH CAPITAL MARKETS, INC., d/b/a RBS GREENWICH CAPITAL, DEUTSCHE BANK SECURITIES, INC., WELLS FARGO ADVISOR, LLC f/k/a WACHOVIA SECURITIES LLC, MOODY/S INVESTORS SERVICES, INC. and THE MCGRAW-HILL COMPANIES, INC., | |
| Defendants. | |

**AFFIDAVIT OF PROFESSOR ANNE ZISSU, PH.D.**

**MAY 16, 2011**

Affidavit of Professor Anne Zissu, Ph.D.

## SCOPE OF PROJECT AND REPORT

1.    I was asked by Cohen Milstein Sellers & Toll PLLC, lead counsel for the Plaintiff, to

evaluate the Prospectus Supplement of the mortgage-backed security at issue in these legal

proceedings, NovaStar Mortgage Funding Trust, Series 2007-2 ("Series 2007-2") and

determine if the different classes of risk and underwriting standards presented in the

Prospectus Supplement are tied to specific tranches.[1, 2]   Toward these ends, I read and

analyzed the relevant information in the Prospectus Supplement of this mortgage-backed

security for which NovaStar Mortgage, Inc., served as the sponsor, originator, and

servicer.[3]   This affidavit presents my findings and conclusions.   I relied on the following

three (3) documents:

- NovaStar Mortgage Funding Trust, Form 424B5 (*File No. 333-134461-07*), filed with the
  U.S. Securities Exchange Commission on June 1, 2007.

- New Jersey Carpenters Health Fund, on Behalf of Itself and All Others Similarly
  Situated, First Amended Complaint For Violations of Sections 11, 12 And 15 of the
  Securities Act of 1933, dated  June 16, 2009.

- In Re NovaStar Mortgage, Inc., et al, Order and Memorandum, dated March 31, 2011.

## CREDENTIALS

2.    I, Anne Zissu, am a Professor of Finance and Chairperson of the Department of Business at

Citytech, City University of New York.  I am also a Research Fellow at the POLY-NYU, in

the Department of Financial Engineering.

---

[1] For the remainder of this Affidavit I will refer to the offered certificates of Series 2007-2 as "tranches".

[2] The different classes of risk are presented in page S-33 of Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.  The different underwriting standards are presented in page S-88 of Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.

[3] Page S-2, Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.

Affidavit of Professor Anne Zissu, Ph.D.

3.    I have a Ph.D. in Economics from The Graduate Center at The City University of New
York, a Master of Econometrics and a Bachelor of Arts in Economics from Paris X,
University of Nanterre.

4.    Since I obtained my Ph.D. in 1988,  I have taught undergraduate and MBA courses in
finance, economics, and econometrics which have intensively covered such issues as
valuation, investments, equity analysis, fixed-income securities, financial management, risk
management, portfolio theory, and quantitative methods.  I have also taught finance and
economics at Bard College, Baruch College, Rutgers University, and Temple University.  I
am also a visiting professor of Finance at University Paris-Dauphine.

5.    I have designed and taught executive courses on securitization and fixed-income valuation
modeling for the Securities and Exchange Commission in Washington, D.C., the ISMA
Centre, Reading University, in England; HEC in Paris; ESSEC in Paris; the Graduate
School of Science Po. (Institut d'etudes des Sciences Politiques); The Fletcher School of
Law and Diplomacy at Tufts University; Euromoney, in New York.

6.    I am currently writing the second edition of "*The Securitization Markets Handbook:
Structures and Dynamics of Mortgage- and Asset-Backed Securities,*" by Charles Austin
Stone and Anne Zissu, published by Bloomberg Press in 2005.  I have edited several books
on asset-backed securities, asset securitizations, capital adequacy and regulations.   I have
written numerous academic articles, such as: "The Risks of Mortgage Backed Securities
and Their Derivatives," with Charles A Stone, in *Journal of Applied Corporate Finance*,
Fall 1994., "Choosing Credit Enhancement for ABS," in *Capital Market Strategies*
(formerly *The Journal of International Securities Markets*), November 1995.,
"Securitization: The Transformation of Illiquid Assets into Liquid Capital Market
Securities with Examples from the European Market", with Charles A. Stone, *Financial
Markets, Institutions and Instruments*, Vol. 9, No. 3&4, 2000 (Monograph)., "Can ARMs'
Mortgage Servicing Portfolios be Delta Hedged under Gamma Constraints?" co-authored
with Carlos Ortiz and Charles A. Stone in *The Journal of Financial Transformation*, Issue
28, 2010, pp 77-86., "Delta Hedging a Portfolio of Servicing Rights under Gamma and
Vega Constraints with Optimal Fixed Income Securities" co-authored with Carlos Ortiz
and Charles A. Stone in *Journal of Risk Finance*, Vol. 11 No.4, 2010.

Affidavit of Professor Anne Zissu, Ph.D.

7.   I have also made several contributions to edited books, such as: "Capital Requirements for Subordinated Tranches of Asset-Backed Securities: An Opportunity for Regulatory Arbitrage", with Charles A. Stone, *Recent Developments in the Fixed Income Market*, edited by John D. Finnerty, and Martin S. Fridson. Sponsored by Fixed Income Analysts Society (FIASI), 1996. "The French Secondary Mortgage Market", with Charles A. Stone, *Secondary Mortgage Markets: International Perspectives*, edited by Michael Lea, Housing Finance, 1995 (reprinted from *Housing Finance International*, 1994). "AAA Senior Mortgage Backed Securities versus AAA Insured Mortgage Backed Securities", with Charles Austin Stone and Jess Lederman, *The Global Asset Backed Securities Market: Structuring, Managing and Allocating Risk*, edited by Charles A. Stone, Anne Zissu, and Jess Lederman, Probus Publishing, 1993.


## FACTUAL BACKGROUND ABOUT SERIES 2007-2

8.   This mortgage-backed security is designed with a senior / subordinate structure with fourteen (14) offered tranches; five (5) senior and nine (9) mezzanine or subordinate tranches.[4]   All fourteen (14) tranches are backed by 5,877 residential, subprime mortgage loans that comprise the collateral pool.[5]


## There Are Eight (8) Different Classes of Risk Presented in the Prospectus Supplement of Series 2007-2

9.   The Prospectus Supplement classifies the mortgage loans in the collateral pool according to eight (8) different classes of risk: *M1*, *M2*, *M3*, *M4*, *Alt A*, *Fico Enhanced*, *AA*, and *A*.[6]   The

---

[4] Page S-1, Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.

[5] Page S-2, Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.

[6] Page S-33, Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.

Affidavit of Professor Anne Zissu, Ph.D.

collateral pool of Series 2007-2 is made up of mortgage loans that correspond to all eight (8) different classes of risk.[7]  (*See* Table 1 below).

| Table 1: Risk Categories of Series 2007-2 Mortgage Loans ||
|---|---|
| **Risk Classification** | **Number of Mortgage Loans** |
| *M1* | 3,277 |
| *M2* | 1,258 |
| *M3* | 323 |
| *M4* | 176 |
| *Alt A* | 840 |
| *Fico Enhanced* | 1 |
| *AA* | 1 |
| *A* | 1 |
| **Total:** | **5,877** |

Source: Page S-33, Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.

## There Are Eight (8) Different Types of Underwriting Standards Presented in the Prospectus Supplement of Series 2007-2

10.   The Prospectus Supplement of Series 2007-2 makes reference to (8) different types of underwriting standards: *M1*, *M2*, *M3*, *M4*, *Alt-A (NINA)*, *Alt-A (NoDoc)*, *Alt-A (Full/Stated)*, and *Piggybacks*.[8]  (*See* Table 2 below).

| Table 2: Underwriting Standards of Series 2007-2 Mortgage Loans |
|---|
| *M1* |
| *M2* |
| *M3* |
| *M4* |
| *Alt-A (NINA)* |
| *Alt-A (NoDoc)* |
| *Alt-A (Full/Stated)* |
| *Piggybacks* |

Source: Page S-88, Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.

---

[7] *Ibid.*

[8] Page S-88, Form 424B5, NovaStar Mortgage Funding Trust, Series 2007-2, Prospectus Supplement, dated May 25, 2007.

Affidavit of Professor Anne Zissu, Ph.D.

**The Constituent Tranches of Series 2007-2  are Not Linked to the Different Classes of Risk and Underwriting Standards Presented in the Prospectus Supplement**

11.   Based on my expertise in mortgage-backed securities and an evaluation of relevant information found in the Prospectus Supplement, I conclude that the different classes of risk and underwriting standards presented in pages S-33 and S-88 are not associated with a specific tranche of Series 2007-2.  In other words, neither of the *M1*, *M2*, *M3*, *M4* classes of risk or underwriting standards are associated with any of the M-1, M-2, M-3, and M-4 mezzanine tranches.  The only association between these mezzanine tranches and the different classes of risk and underwriting standards is that they both carry a similar alphanumeric designation, with the only difference being the inclusion of a dash in the labeling convention of the mezzanine tranches.

Affidavit of Professor Anne Zissu, Ph.D.

## **SIGNATURE**

This affidavit regarding Series 2007-2 is furnished solely for the purpose of the court proceeding in the above named matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.


_____

Anne Zissu, Ph.D.

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, counsel for the Plaintiff, hereby certify that on May 16, 2011, I filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all parties named herein and/or counsel of record in the within action by electronic mail.

Daniel B. Rehns