12-1707
New Jersey Carpenters v. Royal Bank of Scotland

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

———————

August Term, 2012

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __March 01, 2013__

(Argued: December 12, 2012)　　　　　　　　　　　　(Decided: March 1, 2013)

———————

Docket No. 12-1707-cv

———————

NEW JERSEY CARPENTERS HEALTH FUND, on behalf of itself and all others similarly situated,

*Plaintiff-Appellant,*

—v.—

THE ROYAL BANK OF SCOTLAND GROUP, PLC, GREENWICH CAPITAL HOLDINGS, INC.,
GREENWICH CAPITAL MARKETS, INC., dba RBS Greenwich Capital, WACHOVIA CAPITAL
MARKETS, LLC, sued herein as Wachovia Securities, LLC, DEUTSCHE BANK SECURITIES, INC.,
NOVASTAR MORTGAGE FUNDING TRUST, SERIES 2006-3, NOVASTAR MORTGAGE FUNDING
TRUST, SERIES 2006-4, NOVASTAR MORTGAGE FUNDING TRUST, SERIES 2006-5, NOVASTAR
MORTGAGE FUNDING TRUST, SERIES 2006-6, NOVASTAR MORTGAGE FUNDING TRUST, SERIES
2007-1, NOVASTAR MORTGAGE FUNDING TRUST, SERIES 2007-2, NOVASTAR MORTGAGE
FUNDING CORPORATION, SCOTT F. HARTMAN, GREGORY S. METZ, W. LANCE ANDERSON, MARK
A. HERPICH, NOVASTAR MORTGAGE INC., RBS SECURITIES, INC., WELLS FARGO ADVISORS,
LLC, fka Wachovia Securities LLC,

*Defendants-Appellees,*

MOODYS INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC.,

*Defendants.*

———————

CERTIFIED COPY ISSUED ON 03/01/2013

B e f o r e :

KATZMANN, PARKER, and WESLEY, *Circuit Judges*.

————————

Appeal from a judgment of the United States District Court for the Southern District of New York (Batts, *J.*), which dismissed the Plaintiff-Appellant's complaint for failure to state a claim. We hold that the allegations in the complaint—principally, that a disproportionately high number of the mortgages in a security defaulted, that rating agencies downgraded the security's ratings after changing their methodologies to account for lax underwriting, and that prior employees of the relevant underwriter had attested to systematic disregard of underwriting standards—state a plausible claim that the offering documents for the security misstated the applicable underwriting standards in violation of §§ 11, 12(a)(2), & 15 of the Securities Act of 1933. We further hold that the alleged misstatements were not immaterial as a matter of law. Finally, we vacate the district court's holding that the Plaintiff-Appellant, even as the representative of a proposed class, lacked standing to pursue claims based on securities in which it had not invested. Rather than addressing this issue, we instruct the district court to reconsider it in light of our intervening opinion in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012). For the reasons stated below, the judgment of the district court is **REVERSED** in part, **VACATED** in part, and **REMANDED** for further proceedings consistent with this Opinion.

————————

JOEL P. LAITMAN (Michael Eisenkraft, Christopher Lometti, *on the brief*),
Cohen Milstein Sellers & Toll, New York, N.Y., *for Plaintiff-Appellant*.

THOMAS C. RICE (Alan C. Turner, *on the brief*), Simpson Thacher & Bartlett LLP, New York, N.Y., *for Defendants-Appellees The Royal Bank of Scotland Group, PLC, Greenwich Capital Holdings, Inc., Greenwich Capital Markets, Inc., Wachovia Capital Markets, LLC, Deutsche Bank Securities, Inc., RBS Securities, Inc., Wells Fargo Advisors, LLC.*

WILLIAM F. ALDERMAN (Steven J. Fink, *on the brief*), Orrick, Herrington & Sutcliffe LLP, San Francisco, Cal., *for Defendants-Appellees Novastar Mortgage Funding Trust, Series 2006-3, Novastar Mortgage Funding Trust, Series 2006-4, Novastar Mortgage Funding Trust, Series 2006-5, Novastar Mortgage Funding Trust, Series 2006-6, Novastar Mortgage Funding Trust, Series 2007-1, Novastar Mortgage Funding Trust, Series 2007-2, Novastar Mortgage Funding Corporation, Scott F. Hartman, Gregory S. Metz, W. Lance Anderson, Mark A. Herpich, Novastar Mortgage Inc.*

David R. Stickney, Ann M. Lipton, Bernstein Litowitz Berger & Grossman LLP, San Diego, Cal., *for* Amicus Curiae *National Association of Shareholder and Consumer Attorneys*, in support of Plaintiff-Appellant.

David C. Frederick, Wan J. Kim, Gregory G. Rapawy, Kellogg Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., *for* Amicus Curiae *National Credit Union Administration Board*, in support of Plaintiff-Appellant.

Steven R. Paradise, Michael V. Rella, Lauren E. Leahy, Vinson & Elkins L.L.P., New York, N.Y., *for* Amicus Curiae *Securities Industry and Financial Markets Association*, in support of Defendants-Appellees.

———————

KATZMANN, *Circuit Judge*:

This case requires us to determine whether the Plaintiff-Appellant, New Jersey Carpenters Health Fund ("the Fund"), has stated plausible claims under §§ 11 & 12(a)(2) of the Securities Act of 1933 ("the '33 Act"), 15 U.S.C. §§ 77a *et seq.* Subject to certain enumerated exceptions, §§ 11 & 12(a)(2) of the '33 Act impose liability whenever a security's registration statement or prospectus contains a material misrepresentation or omission. *Id.* §§ 77k & 77l(a)(2). Here, the Fund claims that the registration statement and the prospectus (collectively,

the "offering documents") for a mortgage-backed security contained material misstatements and omissions because those documents reported standards for underwriting mortgages that the relevant underwriter had supposedly abandoned. The Fund bases its conclusion about abandonment on three factual allegations: (1) that a disproportionately high number of the mortgages included in the security defaulted; (2) that rating agencies downgraded the security's ratings after changing their methodologies to account for lax underwriting; and (3) that prior employees of the relevant underwriter have attested to systematic disregard of the reported underwriting standards during the relevant time periods.

The United States District Court for the Southern District of New York (Batts, *J.*) concluded that these allegations failed to state a claim under §§ 11 & 12(a)(2) of the '33 Act. It also held that, even as the representative for a putative class, the Fund lacked standing to pursue claims based on securities in which it had not invested. Thus, the district court dismissed the Fund's complaint in its entirety, entering judgment in favor of the Defendants-Appellees. The Fund now appeals from that judgment. For the reasons set forth below, we hold that the Fund's factual allegations permit us to draw the reasonable inference that the Defendants-Appellees are liable under §§ 11 & 12(a)(2) of the '33 Act. Furthermore, we vacate the district court's holding that the Fund, as the representative of a proposed class, lacked standing to assert claims based on securities in which it had not invested. After the district court entered its judgment, this Court issued an opinion that addressed the issue of class-standing. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012). Thus, we instruct the district court to reconsider the issue of standing presented here in light of that recent opinion. In sum, we reverse the district court's judgment in part, vacate it in part, and remand the case for further proceedings consistent with this Opinion.

4

# BACKGROUND

A.  The Underlying Securities

According to the Fund's Consolidated First Amended Securities Class Action Complaint ("FAC"), on May 25, 2006, Defendant-Appellee NovaStar Mortgage Funding Corporation ("NMFC") filed a registration statement and prospectus with the Securities and Exchange Commission ("SEC") on Form S-3. On June 16, 2006, NMFC amended the registration statement and prospectus, using Form S-3/A. Issuers like NMFC may register and offer securities on "a continuous or delayed basis in the future" for up to "three years" after the "initial effective date of the registration statement." 17 C.F.R. § 230.415(a)(1) & (a)(5).[1] Typically, an issuer commences a "continuous or delayed" offering by filing an initial "shelf" registration statement, which "includes a 'base' or 'core' prospectus that . . . contains general information, including the types of securities to be offered and a description of the risk factors of the offering." *NECA-IBEW*, 693 F.3d at 150. The core prospectus may omit otherwise required information if, because the issuer will offer the securities in the future, such information is "unknown or not reasonably available." 17 C.F.R. § 230.430B(a). In the amended prospectus filed on June 16, 2006, NMFC indicated that it would offer interests in trusts that principally contained residential mortgages.

After an issuer files its shelf registration statement, it may issue securities under that statement by filing a supplemental prospectus that discloses "information previously omitted from the prospectus filed as part of [the] effective registration statement." *Id.* § 230.424(b)(2);

---

[1] NMFC qualifies as an issuer under the '33 Act because it acted as a depositor for the relevant offerings. *See* 15 U.S.C. § 77b(a)(4) (defining issuer to include "the person or persons performing the acts and assuming the duties of depositor or manager" of "collateral-trust certificates").

*see also id.* § 229.512(a)(1)(ii) (requiring a supplemental prospectus to disclose "any facts or events arising after the effective date of the registration statement . . . which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement"). Information disclosed in a supplemental prospectus "shall be deemed to be part of and included in the registration statement." *Id.* § 230.430B(f)(1); *see also id.* § 229.512(a)(2) (deeming each supplemental prospectus to be "a new registration statement" for the "purpose of determining any liability" under the '33 Act.).[2]

According to the FAC, NMFC issued six securities under the June 16, 2006 shelf registration statement: (1) the NovaStar Mortgage Funding Trust, Series 2006-3, which had assets worth approximately $1,089,000,000, and which NMFC offered on June 22, 2006; (2) the NovaStar Mortgage Funding Trust, Series 2006-4, which had approximately $1,004,851,000 in assets, and which NMFC offered on August 18, 2006; (3) the NovaStar Mortgage Funding Trust, Series 2006-5, which had approximately $1,279,850,000 in assets, and which NMFC offered on September 22, 2006; (4) the NovaStar Mortgage Funding Trust, Series 2006-6, which had approximately $1,233,750,000 in assets, and which NMFC offered on November 20, 2006;  (5) the NovaStar Mortgage Funding Trust, Series 2007-1, which had approximately $1,813,274,000 in assets, and which NMFC offered on February 23, 2007; and (6) the NovaStar Mortgage Funding Trust, Series 2007-2 (the "Series 2007-2 Trust"), which had approximately $1,324,400,000 in assets, and which NMFC offered on May 25, 2007. Defendant-Appellee NovaStar Mortgage Inc. ("NMI"), NMFC's parent company, originated or purchased all of the

---

[2] Because § 230.430B(f)(1) deems newly disclosed information to be included in the registration statement, plaintiffs may base claims under § 11 of the '33 Act on a supplemental prospectus's material misstatements or omissions. 15 U.S.C. § 77k.

mortgages contained in each of the six trusts.[3] After NMI originated or purchased the relevant

loans, it sold them to NMFC, which assigned them, in turn, to the trusts described above.

Defendants-Appellees Greenwich Capital Markets, Inc., Deutsche Bank Securities, Inc., and

Wachovia Capital Markets, LLC (collectively, the "Underwriter Defendants") underwrote and

sold each of the six trusts that NMFC offered.

The amended prospectus filed on June 16, 2006 indicated that the supplemental

prospectuses accompanying each offering would describe "the underwriting standards used to

underwrite the mortgage loans." J. App'x at 202. The supplemental prospectus filed in

conjunction with the Series 2007-2 Trust (the "2007-2 Prospectus") described NMI's

underwriting guidelines at length. According to the 2007-2 Prospectus, NMI adopted its

underwriting guidelines in order to "evaluate the credit history of the potential borrower, the

capacity and willingness of the borrower to repay the loan[,] and the adequacy of the collateral

securing the loan." *Id.* at 370. To this end, NMI required each potential borrower to file an

application and to provide documentation according to one of "six levels of applicant

documentation," which ranged from "Full Documentation" to "Stated Income" to "No

Documentation." *Id.* at 370-71. Under the Full Documentation program, applicants would

"generally . . . submit verification of employment and most recent pay stub or up to prior two

years W-2 forms and most recent pay stub." *Id.* at 371. The Stated Income program, in contrast,

permitted an applicant to "qualif[y] based on monthly income as stated in the loan application."

*Id.* According to the 2007-2 Prospectus, NMI originated 56.96% of the loans in the Series 2007-

---

[3] The supplemental prospectus that accompanied the Series 2007-2 Trust identified only NMI as an originator of the mortgages contained in the trust. If any other originator or group of affiliated originators had originated ten percent or more of the Series 2007-2 Trust's assets, then 17 C.F.R. § 229.1110(a) would have required NMFC to identify that originator in the supplemental prospectus.

2 Trust under the Full Documentation program, 36.07% under the Stated Income program, and 6.38% under the No Documentation program.

The 2007-2 Prospectus also notified investors that, "[o]n a case-by-case basis, exceptions to the underwriting guidelines are made where [NMI] believes compensating factors exist." *Id.* Compensating factors could include the "length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception." *Id.* Finally, the 2007-2 Prospectus assured investors that "[q]uality control reviews [were] conducted to ensure that all mortgage loans [met] quality standards." *Id.* at 374.

In addition to describing NMI's underwriting guidelines, the Series 2007-2 Trust's offering documents warned potential investors about certain risks. The amended prospectus filed on June 16, 2006 advised readers in bold to "**read the section entitled 'Risk Factors' starting on page 5 of this prospectus before making a decision to invest**." *Id.* at 183. Certain risks resulted from the characteristics of the loans composing the Series 2007-2 Trust, and others were caused by changes that might occur in the housing market.

First, the 2007-2 Prospectus warned that the loans composing the Series 2007-2 Trust "would be ineligible for direct purchase by Fannie Mae due to credit characteristics that do not meet the Fannie Mae underwriting guidelines." *Id.* at 297. As a result, the loans were "likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae underwriting guidelines." *Id.* The 2007-2 Prospectus also identified other characteristics of the loans that might increase the likelihood of default. Specifically, it disclosed that a small percentage of the loans were "secured by second-liens on the related mortgaged properties," *id.* at 299, and that

8

another portion of the loans did "not provide for any required payments of principal during the first five or ten years of their term," which significantly increased the amount of later monthly payments, *id.* at 299-300.

The 2007-2 Prospectus also warned investors about systemic risks. According to the 2007-2 Prospectus, "[i]f the residential real estate market should experience an overall decline in property values such that the outstanding balances of the mortgage loans . . . become equal to or greater than the value of the mortgaged properties [serving as collateral for the loans], the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced." *Id.* at 297. Nine pages later, the 2007-2 Prospectus disclosed that, "in recent months[,] residential property values in many states have declined or remained stable, after extended periods during which those values appreciated." *Id.* at 306.

On May 25, 2007, the Fund invested $100,000 in the Series 2007-2 Trust. Nearly three years later, on March 26, 2010, the Fund sold its interest in the trust for $350.

B.    The FAC

On June 16, 2009, the Fund filed the FAC, which brought claims under §§ 11, 12(a)(2), & 15 of the '33 Act based on all six of the trusts that NMFC issued in connection with the June 16, 2006 registration statement. In the FAC, the Fund alleged that the initial prospectus and each of the supplemental prospectuses all misstated and omitted material facts, most notably, the fact that NMI, in an effort to increase the number of mortgages it originated, had abandoned its disclosed underwriting guidelines.

The FAC based its assertion that NMI had abandoned its underwriting guidelines on two factual allegations. First, the Fund alleged that, although Moody's and S & P, the two rating agencies who had evaluated the six trusts, had initially given the trusts some of their highest

9

ratings, they had later dramatically downgraded the trusts, categorizing them as either "speculative" or at "substantial risk of default." Second, the Fund alleged that an unusually large percentage of the mortgages in each trust had entered default. According to the FAC, 8.5% of the mortgages had defaulted within four months of their trust's offering, 12.6% had defaulted within six months, and over 51% had defaulted by June 16, 2009. The FAC then referenced the 2007 Mortgage Fraud Report by the Federal Bureau of Investigation ("FBI"), which was based on a study of three million residential mortgages and which indicated that between thirty and seventy percent of "early payment defaults" resulted at least in part from "significant misrepresentations in the original loan applications." J. App'x at 75.

C.     The District Court's 2011 Decision

       On August 31, 2009, the Defendants-Appellees moved to dismiss the FAC in its entirety. On March 31, 2011, the district court granted the motion in principal part, but permitted the Fund to amend the claims based on the Series 2007-2 Trust. *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, No. 08 Civ. 5310(DAB), 2011 WL 1338195, at *1 (S.D.N.Y. Mar. 31, 2011). First, the district court held that, because the Fund had not invested in any of the first five trusts that NMFC had issued under the June 16, 2006 registration statement, it lacked standing, even as the representative of a proposed class, to assert any claim based on those trusts. *Id.* at *6. Turning to the Series 2007-2 Trust, the district court concluded that the Fund had not plausibly alleged that the registration statement, as amended by the 2007-2 Prospectus, contained any material misstatement or omission. *Id.* at *10-*11. In the view of the district court, rather than making "allegations specific to the . . . origination practices that relate to the" Series 2007-2 Trust, the FAC offered "102 pages of 'the subprime market melted down and Defendants were market participants, so they must be liable for my losses in my risky investment.'" *Id.* at *11.

10

D.     The Second Amended Class Action Complaint (the "SAC")

On May 18, 2011, the Fund filed the SAC, which asserted claims under §§ 11, 12(a)(2), & 15 of the '33 Act based solely on the Series 2007-2 Trust. The SAC again alleged that the June 16, 2006 registration statement and prospectus, as supplemented by the 2007-2 Prospectus, misstated NMI's underwriting guidelines and failed to disclose that NMI had, in fact, abandoned its published guidelines. In support of its allegation that NMI had abandoned its guidelines, the SAC again relied on the two factual allegations presented in the FAC, but it also alleged that several unnamed prior employees of NMI and NMFC had attested to NMI's systematic disregard of its underwriting standards.

First, the SAC repeated its allegation that the rating agencies had severely downgraded the Series 2007-2 Trust's ratings. Unlike the FAC, however, the SAC attributed these downgrades to the rating agencies' increased awareness of underwriting practices. Specifically, the SAC alleged that, in June of 2007, approximately one month after NMFC had issued the Series 2007-2 Trust, S & P revised its rating methodology in response to "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings." J. App'x at 1786-87. Moody's allegedly also revised its methodology to account for previously undisclosed "aggressive underwriting." *Id.* According to the SAC, the application of these new methodologies to the Series 2007-2 Trust caused the rating agencies to downgrade the majority of the trust's ratings by "as many as 20 levels." *Id.* at 1787.

Next, the SAC again alleged that the Series 2007-2 Trust experienced unusually high default rates. According to the SAC, 18% of the loans in the Series 2007-2 Trust defaulted within six months of the offering, 32% defaulted within one year, 47% defaulted before June 16, 2009, and 68.6% defaulted before June 30, 2011. Like the FAC, the SAC referenced the FBI's

11

2007 Mortgage Fraud Report. According to that report, between thirty and seventy percent of "early payment defaults" resulted at least in part from "significant misrepresentations in the original loan applications," and loans containing "egregious misrepresentations were five times more likely to default in the first six months than loans that did not." *Id.* at 1790-91.

Finally, the SAC relayed statements from no fewer than eight unnamed former employees of NMI and NMFC. According to the SAC, seven of the eight employees the Fund interviewed had worked at NMI or NMFC during the six months preceding May 1, 2007, when over ninety percent of the mortgages in the Series 2007-2 Trust had been originated. Specifically, the Fund had interviewed: (1) a former Vice President of Operations, who worked in Kansas City from 2005 until March 2007; (2) a former Quality Control Auditor/Supervisor, who worked in Kansas City from August 2005 until September 2007; (3) a former Closing Supervisor, who worked in Ohio from 2002 through May 2007; (4) a former Quality Control Auditor, who worked in Ohio from 2004 until 2007; (5) a former Senior Underwriter, who worked in Lake Forest, California from 2005 through 2007; (6) a former Account Manager, who worked in Ohio from 2004 until 2007; and (7) a former Account Executive, who worked in Ocala, Florida from February 2006 until May 2007.

Many of the former employees' alleged statements contradicted the 2007-2 Prospectus's description of NMI's underwriting standards. According to several former employees, although the underwriting guidelines prioritized "evaluat[ing] the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan[,] and the adequacy of the collateral securing the loan," *id.* at 370, the "pressure" NMI employees allegedly felt to "achieve loan production" and hit "volume-based performance targets" overshadowed the need for such evaluations, resulting in the guidelines' "systematic loosening," *id.* at 1775-76. The former Vice

President allegedly said that, as a result of the emphasis on volume, the guidelines were "tossed

out the window." *Id.* at 1776. According to that Vice President, employees did not worry about

the consequences of disregarding the underwriting guidelines because NMI and NMFC were

"not keeping the crap," but instead "selling it for securitization." *Id.* at 1777.

 The alleged "systematic loosening" of the underwriting standards took many forms. For

example, although the underwriting guidelines disclosed that NMI might make "exceptions"

where "compensating factors exist[ed]," *id.* at 371, former employees allegedly told the Fund

that vice presidents and supervisors at NMI and NMFC would routinely grant exceptions, even

where underwriters had rejected an application because they regarded the accompanying

documentation as suspicious or fraudulent. As a result of NMI's alleged willingness to overlook

questionable or insufficient documentation, NMI purportedly originated many loans under its

Full Documentation program even though it had not actually obtained the documentation its

underwriting guidelines required. For example, according to a former Quality Control Auditor,

one borrower had verified her employment by submitting a post-it note that said, "Mrs. X cleans

my house and I pay her three thousand a week." *Id.* at 1778.

 NMI also allegedly disregarded the requirements described in its Stated Income program.

According to the SAC, prior to late 2006, statements of income helped NMI determine a

borrower's "capacity . . . to repay," *id.* at 370, and applicants were rejected where their stated

"incomes were too low to sustain the payments" that a mortgage required, *id.* at 1779-80. In late

2006 and 2007, however, as NMI employees sought to increase the number of mortgages they

originated, they allegedly began to make exceptions to the income guidelines and to accept

apparently unreasonable statements of income at face value. For example, one former Senior

Underwriter stated that, although she had denied an application from a department store

employee who claimed to make $10,000 per month, she later discovered that others at NMI had overridden her denial. Based on these accounts, the Fund alleges that, during the relevant time periods, NMI "systematically disregarded" its underwriting guidelines. J. App'x at 1786.

E.     The District Court's 2012 Decision

The Defendants-Appellees moved to dismiss the SAC on July 8, 2011. On March 29, 2012, the district court held that the SAC failed to state a plausible claim under §§ 11 & 12(a)(2) of the '33 Act. *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, No. 08 Civ. 5310(DAB), 2012 WL 1076143, at *1 (S.D.N.Y. Mar. 29, 2012). The district court identified two bases for its holding. First, quoting its 2011 decision, it again found that the Fund had failed "to make allegations specific to the . . . origination practices that relate to the only offer that is relevant here," the Series 2007-2 Trust. *Id.* at *5. According to the district court, to state a plausible claim under the '33 Act, the Fund needed either to "cite an[] example of a loan that failed to meet the underwriting guidelines and ended up in the 2007-2 loan pool" or to otherwise "provide details that would tie its claim of loosened underwriting guidelines to the specific loans" at issue. *Id.* at *4-*5. Second, the district court found that the SAC had failed to allege that any "misstatements and omissions would have been material in light of the extensive risk disclosures and information [the Fund] received, as well as events generally known about [NMI, NMFC,] and the subprime market in the months preceding" the offering of the Series 2007-2 Trust. *Id.* at *5-*6. Because the district court had dismissed all of the Fund's claims in its 2011 and 2012 decisions, it entered final judgment in favor of the Defendants-Appellees.

The Fund now appeals from that judgment.

## DISCUSSION

"We review *de novo* the dismissal of a complaint under [Federal] Rule [of Civil

Procedure] 12(b)(6), accepting all factual allegations as true and drawing all reasonable

inferences in favor of the plaintiff." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir.

2011) (internal quotation marks omitted). On a motion to dismiss under Rule 12(b)(6), a court

must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a court must accept

the truth of factual allegations, it need not credit "a legal conclusion couched as a factual

allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Thus, a "pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

(quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.*

### A. <u>Misstatements or Omissions</u>

Section 11 of the '33 Act provides:

> In case any part of [a] registration statement . . . contained an untrue statement of
> a material fact or omitted to state a material fact required to be stated therein or
> necessary to make the statements therein not misleading, any person acquiring
> such security (unless it is proved that at the time of such acquisition he knew of
> such untruth or omission) may . . . sue—(1) every person who signed the
> registration statement; (2) every person who was a director of . . . or partner in the
> issuer at the time of the filing[;] . . . [and] (5) every underwriter with respect to
> such security.

15 U.S.C. § 77k(a). Section 12(a)(2), in turn, permits a plaintiff to sue "[a]ny person" who

"offers or sells a security . . . by means of a prospectus . . . which includes an untrue statement of

a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2).

"Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). "So long as a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, the general rule is that an issuer's liability . . . is absolute." *Litwin*, 634 F.3d at 715-16 (citation and internal quotation marks omitted). "[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." *Morgan Stanley Info. Fund*, 592 F.3d at 359 (citation omitted).[4]

Because claims under §§ 11 & 12(a)(2) of the '33 Act need not include allegations of fraud, "this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a)." *Litwin*, 634 F.3d at 715. Thus, as described above, to prevail on appeal, the Fund must have alleged "factual content that allows the court to draw the reasonable inference that the [Defendants-Appellees are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Here, the Fund's general claim that NMI abandoned

---

[4] The Fund also asserted a claim based on § 15 of the '33 Act. That sections imposes liability on anyone who "controls any person liable under" §§ 11 & 12(a)(2). *See* 15 U.S.C. § 77o(a). Because the district court held that the Fund had failed to state a claim under §§ 11 & 12(a)(2), it further dismissed the Fund's claim under § 15. *N.J. Carpenters*, 2012 WL 1076143, at *7. As described below, we reverse the district court's decision with respect to the claims under §§ 11 & 12(a)(2). Accordingly, we also vacate its decision to dismiss the claims under § 15.

its underwriting guidelines is the functional equivalent of an allegation that the 2007-2 Prospectus contained material misstatements and omissions. We need not accept such a "legal conclusion" merely because the Fund has "couched" it as a "factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). In contrast, however, the Fund's allegations concerning default rates, credit ratings, and NMI's specific practices—as described by its former employees—all contain "factual content," which we must accept as true. *Id.* The question, then, is whether this factual content permits us to draw the "reasonable inference" that NMI abandoned its underwriting guidelines, rendering the statements in the 2007-2 Prospectus misleading and incomplete. *Id.*

The Supreme Court has offered considerable guidance on what qualifies as a "reasonable inference." For example, in *Twombly*, the Supreme Court clarified that factual content that is "merely consistent with," rather than suggestive of, a finding of liability will not support a reasonable inference. 550 U.S. at 556. Thus, where the antitrust laws required a plaintiff to plead that the defendants had agreed not to compete, the plaintiff could not simply rely on allegations that the defendants had acted *as if* they had agreed. *Id.* at 566-68. As the Supreme Court explained, the conditions of the relevant market provided an "obvious alternative explanation" for the conduct alleged, specifically, that the defendants had more to lose by competing with one another than they had to gain. *Id.* The factual content at issue, then, would not support a reasonable inference of liability because it was "just as much in line with a wide swath of rational and competitive business strategy." *Id.* at 554.

The Supreme Court has also implicitly contrasted the reasonable inference standard with the higher standard that applies under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. When construing the PSLRA's requirement that plaintiffs in securities fraud cases allege facts that support a "strong inference" of scienter, *id.* § 78u-4(b)(2)(A), the Supreme

17

Court emphasized that a strong inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The Supreme Court further held that an inference qualifies as strong "only if a reasonable person would deem [it] . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* By implication, then, a reasonable inference need not be "as compelling as any opposing inference" one might draw from the same factual allegations.

Thus, courts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct. Moreover, the existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable unless at least one of those competing inference rises to the level of an "obvious alternative explanation."[5]

The United States Court of Appeals for the First Circuit has applied this standard to a similar set of allegations. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011). In *Nomura*, as here, the plaintiff brought claims under §§ 11, 12(a)(2), & 15 of the '33 Act, alleging that the offering documents of certain mortgage-backed securities misstated the relevant underwriter's guidelines. *Id.* at 766, 772. Specifically, the plaintiff alleged that "First National Bank of Nevada ('FNBN'), one of the 'key'

---

[5] The Supreme Court has not defined the phrase "obvious alternative explanation." *See generally Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567. Whatever the phrase means, the standard under Rule 8(a) undoubtedly remains less stringent than the "heightened" pleading standard imposed by the PSLRA. *See Tellabs*, 551 U.S. at 321. The resolution of this appeal, however, does not depend on a precise definition of "obvious alternative explanation" because no argument advanced by the Defendants-Appellants even comes close to identifying such an explanation. As described below, the Defendants-Appellants' explanations for the SAC's factual content do not impugn the inference of liability that the Fund asks us to draw. In other words, even crediting the Defendants-Appellants' explanations, the Fund's inference of liability remains reasonable.

loan originators" for the relevant securities, had "'routinely violated' its lending guidelines," approving "as many loans as possible" and "even 'scrub[bing]' loan applications of potentially disqualifying material." *Id.* at 772 (alteration in original). These practices allegedly contradicted the registration statement's claim that borrowers had "demonstrate[d] an established ability to repay" and that FNBN had "verified" their employment history. *Id.* at 772-73. Finally, the complaint asserted that, in 2007, Moody's had "downgraded the rating of all of the" securities. *Id.* at 766. Considering "whether enough ha[d] been said in the complaint . . . to link [FNBN's] practices with . . . the mortgages that underpinned" the securities at issue, the First Circuit, with Judge Michael Boudin writing for the Court, held that, although a "judgment call, the sharp drop in the credit ratings after the sales and the *specific* allegations as to FNBN offer enough basis to warrant some initial discovery aimed at these precise allegations." *Id.* at 773-74. In passing, the First Circuit commented that "[s]imilar complaints in other cases have cited to more substantial sources, including statements from confidential witnesses, former employees and internal emails." *Id.* at 773.

A majority of district courts in this Circuit have agreed with the First Circuit, permitting claims under §§ 11 & 12(a)(2) of the '33 Act to proceed where the plaintiff has provided a "fairly specific" account of how the relevant underwriters had systematically disregarded the guidelines disclosed in a security's registration statement. *Id.*; *see In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 672 (S.D.N.Y. 2011); *Emps.' Ret. Sys. of the Gov't of the V.I. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152-53 (S.D.N.Y. 2011); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 509-10 (S.D.N.Y. 2010); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010); *N.J. Carpenters Health Fund v. Residential Capital LLC*, No. 08 Civ 8781(HB), 2010 WL

19

1257528, at *6 (S.D.N.Y. Mar. 31, 2010); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ 5653(PAC), 2010 WL 1473288, at *6-*7 (S.D.N.Y. Mar. 29, 2010).[6]

We also agree. Here, the SAC incorporates one of the "more substantial sources" identified by the First Circuit. *Nomura*, 632 F.3d at 773. The statements from prior NMFC and NMI employees suggest that NMI—throughout the relevant time period and at different locations across the country—disregarded its underwriting guidelines, approving loan applications despite deficiencies in an effort to generate a large volume of mortgages that it could sell to third parties. These allegations are suggestive of, rather than merely consistent with, a finding of liability. To connect its specific description of NMI's conduct with the Series 2007-2 Trust, the Fund has alleged that the loans in the trust had exceedingly high rates of early payment default. Had NMI in fact disregarded its underwriting guidelines, which helped it to "evaluate" each borrower's "capacity and willingness . . . to repay," J. App'x at 370, it would have become more vulnerable to mortgage fraud. Thus, according to the FBI's 2007 Mortgage Fraud Report, which the SAC referenced, one would reasonably expect higher rates of early payment default, like those allegedly experienced by the Series 2007-2 Trust, to be a consequence of loosened underwriting. Finally, the Fund has alleged that the credit rating agencies, after becoming

---

[6] In support of its contrary holding, the district court cited two cases. First, it relied on a case in which a court concluded that allegations that a mortgage originator had "abandoned" its "guidelines and issued Mortgage Loans with little or no consideration for borrowers' ability to repay" failed to state a securities fraud claim under the heightened standard set forth in the PSLRA. *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050(PKC), 2010 WL 3790810, at *12-*13 (S.D.N.Y. Sept. 28, 2010). The district court also cited a case that held that, although the "strong nature of the cautionary language contained in . . . disclosure materials brings this case very close to the dismissal line," plaintiffs were nonetheless entitled to replead in order to "put the court in a better position from which to evaluate the merits of the claims alleged." *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, 703 F. Supp. 2d 253, 263-64 (E.D.N.Y. 2010). To support its claim that the complaint was "very close to the dismissal line," the court in *City of Ann Arbor* cited *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299 (D. Mass. 2009), the district court decision that the First Circuit later reversed on this issue.

concerned about "loose" and "aggressive" underwriting, expressed greater and greater

skepticism about the Series 2007-2 Trust. J. App'x at 1786-88. In sum, the Fund has alleged that

NMI disregarded its underwriting guidelines in specific ways, that the signs of disregard

materialized for the Series 2007-2 Trust, and that those charged with evaluating the security

looked for disregard and apparently found it. These allegations, taken together, permit us to draw

the reasonable inference that the 2007-2 Prospectus's description of NMI's underwriting

standards misstated NMI's actual practices, and the district court erred in concluding that

something more was required.[7]

The Defendants-Appellees resist this conclusion, challenging the capacity of the Fund's

allegations to support any inference of liability. First, the Defendants-Appellees argue that we

should distrust the unnamed prior employees' purported statements and that, in any event, those

few employees could have conceivably described NMI's practices at only a tiny fraction of its

432 offices. Even under the higher standard imposed by the PSLRA, however, we have

permitted plaintiffs to rely on unnamed sources so long as "they are described in the complaint

with sufficient particularity to support the probability that a person in the position occupied by

the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.

2000). Here, the SAC describes its sources as employees who would have participated in

different aspects of NMI's origination process during part or all of the relevant time period.

These descriptions easily "support the probability" that the unnamed prior employees would

---

[7] We do not attempt to identify any "minimum" that a plaintiff must plead in order to state a claim under §§ 11 & 12(a)(2) of the '33 Act based on offering documents' description of an underwriter's guidelines. As the Supreme Court has observed, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Nonetheless, we note that, both here and in *Nomura*, the plaintiff gave a "fairly specific" account of a "key" underwriter's practices and alleged facts that tied the purported practices to the specific securities at issue. 632 F.3d at 772-74.

have the alleged knowledge of NMI's underwriting practices. *Id.*; *see also New Orleans Emps.'*

*Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13-14 (2d Cir. 2011) (summary order). Moreover,

although the unnamed employees apparently worked at only a few of NMI's many offices, the

SAC alleges that those offices were "regional operations offices" and that they were spread

across the country. J. App'x at 1771-72. Finally, the statements relayed in the SAC provide no

basis for believing that factors unique to the relevant offices, rather than company-wide

practices, resulted in the "pressure to achieve loan production" that these employees allegedly

experienced. *Id.* at 1775. Thus, we must draw the reasonable inference that these factual

allegations support, namely, that the unnamed employees described widespread practices at

NMI. *Litwin*, 634 F.3d at 715.

Second, the Defendants-Appellees argue that the 2007-2 Prospectus disclosed that the

loans in the Series 2007-2 Trust might default at rates "higher," and perhaps even "substantially

higher," than those experienced by loans that conformed to different standards. J. App'x at 297.

According to the Defendants-Appellees, the materialization of the very risks described in the

2007-2 Prospectus, including the risk that the housing market would collapse, explains the

default rates alleged by the SAC, rendering the inferences the Fund attempts to draw

unreasonable. But this argument does not provide an "obvious alternative explanation."

*Twombly*, 550 U.S. at 556. The fact that the risks described in the 2007-2 Prospectus may have

caused many of the defaults that occurred does not impugn the Fund's central allegation, namely,

that unconstrained underwriting increased the number of defaults, causing the ultimate rate of

default to "skyrocket[]" to 68.6%. J. App'x at 1790.[8] Moreover, the SAC relies not only on the

---

[8] If, after discovery, the Fund successfully proves that the 2007-2 Prospectus in fact misstated
NMI's underwriting practices, then evidence that other risks caused the defaults that occurred would

number of defaults that occurred, but also on the timing of those defaults. Given the findings set forth in the FBI's 2007 Mortgage Fraud Report, the frequency of early defaults suggests that mortgage fraud contaminated a significant portion of the loans in the Series 2007-2 Trust.[9] Because anyone evaluating a borrower's "capacity and willingness" to repay a loan would want to detect fraud, J. App'x at 370, the apparent portion of the Series 2007-2 Trust that was affected by fraud provides additional support for the Fund's conclusion that NMI employees did not conduct the evaluations that the company's disclosed underwriting guidelines required.

Third, the Defendants-Appellees argue that the rating agencies reduced the Series 2007-2 Trust's ratings not because they had discovered NMI's underwriting practices, but instead because the trust's credit quality had deteriorated. Once again, however, the deterioration of the trust's credit quality is wholly consistent with the Fund's allegation that NMI had abandoned its underwriting guidelines. Indeed, the rating agencies' decisions to amend their methodologies to account for instances of loosened or aggressive underwriting indicates that adherence to published underwriting guidelines constituted one component of the credit quality that the agencies sought to assess. Thus, the SAC's claim that the rating agencies significantly reduced the Series 2007-2 Trust's ratings after amending their methodologies to account for aggressive underwriting again provides further support for the inference that the Fund asks us to draw.

---

pertain only to the calculation of damages. Under § 11(e), for example, the Defendants-Appellees may prove "that any portion or all of [the Fund's] damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which . . . liability is asserted, not being true or omitting to state a material fact." 15 U.S.C. § 77k(e).

[9] The SAC alleges that 18% of the loans defaulted within six months of the Series 2007-2 Trust's offering. The 2007-2 Prospectus disclosed that 91.9% of the loans in the Series 2007-2 Trust had been originated within six months of the offering. While we cannot know exactly what percentage of the loans that defaulted no later than six months after the offering had been originated more than six months before the offering, at least 9.9% of the loans in the trust defaulted within a year of their origination.

23

Finally, the Defendants-Appellees argue that the 2007-2 Prospectus did not misstate NMI's origination practices because it disclosed that NMI could make "exceptions to [its] underwriting guidelines" based on any "criteria" that "the loan underwriter" found persuasive. J. App'x at 371. As the First Circuit has explained, however, "saying that exceptions occur" does not reveal what the Fund alleges, "namely, a wholesale abandonment of underwriting standards." *Nomura*, 632 F.3d at 773. Thus, because the factual content set forth in the SAC allows us to draw the reasonable inference that NMI disregarded the underwriting standards described in the 2007-2 Prospectus, the acknowledgment that those standards permitted exceptions does not cure the misstatements and omissions that the Fund alleges.[10]

Discovery may reveal that the actual facts support the inferences drawn by the Defendants-Appellees, rather than those drawn by the Fund. But that has no bearing on the question before us. As the Supreme Court explained in *Twombly*, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." 550 U.S. at 556 (internal quotation marks omitted). Thus, we ask only whether the facts alleged in the SAC, taken as true, allow us to draw the "reasonable inference" that the Series 2007-2 Trust's offering documents contained misstatements and omissions. *Iqbal*, 556 U.S. at 678. For the reasons set forth above, we find the SAC's factual allegations support such an inference.

---

[10] We do not consider the SAC's allegations that the underwriters of the Series 2007-2 Trust failed to reasonably investigate the 2007-2 Prospectus's description of NMI's underwriting standards. Whether the underwriters conducted a reasonable investigation pertains only to an affirmative defense that the Defendants-Appellees may raise in future proceedings. *See* 15 U.S.C. § 77k(b)(3); *cf. Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint.").

B. Materiality

Even though the Fund has plausibly alleged that the 2007-2 Prospectus contained misstatements and omissions, its claims under §§ 11 & 12(a)(2) of the '33 Act may nonetheless fail if the alleged misstatements and omissions are not material. For a misstatement or omission to qualify as material, "there must be a substantial likelihood that" a complete and truthful disclosure "would have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Because questions of materiality are "inherently fact-specific," *id.* at 236, we have previously held that "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizen Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)) (internal quotation marks omitted).

Applying these standards, numerous courts, including the First Circuit in *Nomura*, have concluded that misstatements of an underwriter's guidelines are not "so obviously unimportant" that they are immaterial as a matter of law. *Id.* at 162; *see Nomura*, 632 F.3d at 773; *J.P. Morgan*, 804 F. Supp. 2d at 154; *IndyMac*, 718 F. Supp. 2d at 510; *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392-93 (S.D.N.Y. 2010). We agree. The Series 2007-2 Trust consisted primarily of a pool of mortgage loans and interests in the properties that secured those loans. Investors would profit from their interests in the Series 2007-2 Trust only if the trust could recoup a sufficient portion of the balance of those loans. Thus, a "substantial likelihood" exists that a reasonable investor would want to know whether those

25

underwriting the loans had adhered to the procedures in place for evaluating "the capacity and willingness of the borrower[s] to repay the loan[s] and the adequacy of the collateral securing the loan[s]." J. App'x at 370. Given the apparent importance of this information, we conclude that, at this stage of the proceedings, the alleged misstatements and omissions are not immaterial as a matter of law.

Once again, the Defendants-Appellees resist this conclusion. First, they argue that the 2007-2 Prospectus's risk disclosures made it clear that the Fund invested in an uncertain security at a particularly precarious time. Nonetheless, such risk disclosures do not rectify the defect that the Fund purports to identify. As the First Circuit explained, "[n]either being 'less stringent' than Fannie Mae" nor "warning that less verification may be employed for 'certain limited documentation programs'" alerts investors to an alleged "wholesale abandonment of underwriting standards." *Nomura*, 632 F.3d at 773. In general, disclosures about why a security, as described, might perform poorly cannot overcome an allegation that the registration statement's description of that security was materially inaccurate. A reasonable investor can independently analyze how a security will perform in the market, but she cannot compensate for the fact that she has not received what she was told to expect. Accordingly, the 2007-2 Prospectus's disclosure of other, distinct risks cannot render the alleged misstatement of NMI's underwriting standards immaterial as a matter of law.

Second, the Defendants-Appellees argue that two newspaper articles would have informed the Fund of the very information it claims that the 2007-2 Prospectus withheld.[11] While

---

[11] Generally, courts considering a motion to dismiss may "take judicial notice of the *fact* that press coverage . . . contained certain information" so long as they do not rely on the "truth" of that information. *Staehr v. Hartford Fin. Servs. Grp., Inc.* 547 F.3d 406, 425 (2d Cir. 2008).

the "total mix" of information relevant to the question of materiality can include publicly

available information, "case law does not support the sweeping proposition that an issuer of

securities is never required to disclose publicly available information." *Litwin*, 634 F.3d at 718.

Indeed, we have previously stated that "[t]here are serious limitations on a corporation's ability

to charge its stockholders with knowledge of information omitted from a document such as a . . .

prospectus on the basis that the information is public knowledge and otherwise available to

them." *Kronfeld v. Trans World Airlines, Inc*., 832 F.2d 726, 736 (2d Cir. 1987).[12] Thus, in the

context of allegedly false or incomplete proxy solicitations, we have held that "sporadic news

reports . . . should not be considered part of the total mix of information that would clarify or

place in proper context . . . representations" that were contained in materials that the company

provided "directly." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199

(2d Cir. 1993).[13]

    Here, the Defendants-Appellees cite an April 1, 2007 *New York Times* article that stated

that NMI had "eased up on the required documentation of a borrower's income," J. App'x at

591, and an April 23, 2007 article in *Forbes* that imputed "loose underwriting standards" to

NMI, among other "subprime lenders," *id.* at 596. These articles, however, are only "sporadic

---

[12] The '33 Act itself implicitly limits the impact of public information on materiality determinations. Section 11 creates an affirmative defense where a defendant can prove that "at the time of . . . acquisition," the purchaser "knew" of the alleged "untruth or omission." 15 U.S.C. § 77k(a); *see also N.J. Carpenters Health Fund v. Rali Series 2006-QO1 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012) (summary order). If courts held that merely available, as opposed to widely known, public information exposed an untruth or omission, thereby rendering it immaterial, they would effectively shift the burden of proof on § 11's affirmative defense, presuming that the plaintiff *should* have known the relevant information rather than requiring the defendant to prove actual knowledge.

[13] NMFC had an obligation to provide the 2007-2 Prospectus directly to investors. Section 5(b)(2) of the '33 Act requires a prospectus to "accompan[y] or precede[]" the sale of any security. 15 U.S.C. § 77e(b)(2); *see also SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1098 (2d Cir. 1972).

news reports," which do not alone clarify or contextualize the alleged misstatements in the 2007-2 Prospectus. *Paperworkers Int'l*, 985 F.2d at 1199. Moreover, neither article discloses what the fund alleges, namely, that NMI had abandoned its published underwriting guidelines. Instead, the claim that NMI had "eased up on the required documentation" might only have referred to the number of loans it issued under its "No Documentation" and "Stated Income" programs. Similarly, the *Forbes* article might plausibly have characterized NMI's standards as "loose" simply because they did not conform to "the Fannie Mae underwriting guidelines." J. App'x at 297. Thus, rather than revealing what the Series 2007-2 Prospectus omitted, these articles could be interpreted as criticisms of NMI for what that prospectus disclosed. Such vague criticisms of NMI did not render the alleged abandonment of its underwriting guidelines "public knowledge." *See Litwin*, 634 F.3d at 718-19.

Finally, the Defendants-Appellees argue that, because the 2007-2 Prospectus disclosed an extensive amount of information about the loans contained in the Series 2007-2 Trust, including the borrowers' credit scores and the loan-to-value ratios, no reasonable investor could have cared about the procedures by which NMI originated the loans. We think, however, that knowledge that the borrowers had low credit scores and that many of the mortgages had high loan-to-value ratios would make a reasonable investor more, rather than less, interested in whether NMI had adhered to its processes for evaluating "the capacity and willingness of the borrower[s] to repay." J. App'x at 370. Accordingly, for the reasons described above, we conclude that the alleged misstatements and omissions are not immaterial as a matter of law.

C. <u>Standing</u>

Finally, the Fund appeals from the district court's dismissal of its claims based on the other five trusts that NMFC issued in connection with the June 16, 2006 registration statement.

*See N.J. Carpenters*, 2011 WL 1338195, at *6. After the district court entered judgment, this Court issued an opinion that addressed the issue of whether the representative for a proposed class could bring claims under the '33 Act based on securities in which it had not invested. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012). Specifically, the Court held that, where an issuer had issued multiple securities under the same shelf registration statement, a plaintiff who had invested in at least some of those securities could, as the representative of a putative class, bring claims based on securities in which it had not invested so long as all of the relevant claims implicated "the same set of concerns." *Id.* at 162-64. Because the claims at issue in *NECA-IBEW* alleged that the securities' offering documents contained "nearly identical misrepresentations" concerning "origination guidelines," the Court clarified that those claims would raise "the same set of concerns" to the extent that the securities "were backed by loans originated by [common] originators." *Id.* (emphasis removed).

Here, we vacate the district court's decision and remand for reconsideration under the standard set forth in *NECA-IBEW*. Because the district court may, in its sound discretion, conduct evidentiary proceedings on the issue of standing, *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006), we think that it is better positioned to resolve the factual issues that pertain to the analysis required by *NECA-IBEW*. Such factual questions may include whether the relevant prospectuses contained "similar if not identical" descriptions of the underwriting standards, whether the trusts "were backed by loans originated by [common] originators," and whether any differences among the originators of the mortgages in each trust prevent the Fund's claims based on the different securities from raising "the same set of concerns." *NECA-IBEW*, 693 F.3d at 162-64. Nonetheless, we list these issues only by way of example, leaving it to the district court to undertake the full analysis required by *NECA-IBEW* in the first instance.

## CONCLUSION

For the reasons stated above, the district court's judgment is **REVERSED** in part,

**VACATED** in part, and **REMANDED** for further proceedings consistent with this Opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit