**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND, *on Behalf of Itself and All Others Similarly Situated,*<br><br>                    Plaintiff,<br><br>         *v.*<br><br>NOVASTAR MORTGAGE, INC., NOVASTAR MORTGAGE FUNDING CORPORATION, SCOTT F. HARTMAN, GREGORY S. METZ, W. LANCE ANDERSON, MARK HERPICH, RBS SECURITIES, INC. f/k/a GREENWICH CAPITAL MARKETS, INC., d/b/a RBS GREENWICH CAPITAL, DEUTSCHE BANK SECURITIES, INC. and WELLS FARGO ADVISORS, LLC f/k/a WACHOVIA SECURITIES LLC,<br><br>                  Defendants. | **Case No.: 08-CV-5310 (DAB)**<br><br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><br><u>**ECF CASE**</u> |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     **SUMMARY OF THE ACTION** ......................................................................... 1

II.    **JURISDICTION AND VENUE** ................................................................. 12

III.   **PARTIES AND RELEVANT NON-PARTIES** ........................................ 12

      A.     Plaintiff ............................................................................................ 12

      B.     NovaStar Defendants ....................................................................... 13

      C.     Underwriter Defendants ................................................................... 16

IV.   **THE SECURITIES ACT VIOLATIONS FOR ALL SIX  NOVASTAR OFFERINGS ARISE FROM IDENTICAL MATERIAL MISSTATEMENTS AND OMISSIONS AND ARE SUBJECT TO COMMON PROOF** ..................................................................................... 18

V.    **BACKGROUND** ......................................................................................... 20

      A.     NovaStar and Investment Banking Defendants Sell Predominately the Highest Rated and Purportedly Safest Securities in the 2007-2 Offering .......... 20

      B.     The Identical Underwriting Statements and Criteria in Each of the Prospectus Supplements ................................................................... 25

      C.     Each of the Prospectus Supplements Contains an Identical Description of the Certificate Mortgages ................................................................... 29

      D.     Each of the Prospectus Supplements Contains an Identical Description of Defendant NMI ............................................................................... 29

      E.     Each of the Prospectus Supplements Contains Identical Language Describing the Role of Underwriter Defendants' ....................................................... 30

      F.     Each of the Prospectus Supplements Identically Describes the Use of the Underwriter-Defendant Affiliates as "Hedge Providers" .................................... 30

      G.     Five of the Six Prospectus Supplements Identify Deutsche Bank National Trust Company as the Trustee for the Offerings ........................................... 30

      H.     The Prospectus Supplements for Each of the Offerings Disclose the Same 17 Risk Factors in a Substantially Similar Manner ................................................. 31

i

I.      Each of the Prospectus Supplements Set Forth Common and Nearly Identical
        Credit Enhancement Features for Each Offering...................................................32

J.      Each of the Prospectus Supplements Identify Common Mortgage Insurance
        Providers and Policies.........................................................................................33

K.      The Prospectus Supplements for All Six of the Offerings Describe the
        Subordination Provisions in an Identical Manner................................................34

L.      The Prospectus Supplements for All Six of the Offerings Describe the Limited
        Cross-Collateralization Provisions in an Identical Manner ................................35

M.      The Prospectus Supplements for All Six of the Offerings Describe the Allocation
        of Losses Provisions in an Identical Manner ......................................................35

N.      Each of the Prospectus Supplements Set Forth a Common and Nearly Identical
        Method of Distribution of the Certificates in Each Offering by the Underwriting
        Defendants ...........................................................................................................36

O.      NovaStar Affirmatively Stated That By the Time of the 2007-2 Offering in
        May 2007 It Had Fortified its Mortgage Loan Underwriting Standards ............36

P.      NovaStar's Undisclosed Systematic Disregard of Underwriting Standards.......38

        1.      By Late 2006 NovaStar Deviated Routinely From Adherence to Its
                Underwriting Guidelines In Order To Achieve Loan Volume Targets.. 42

        2.      Full Documentation Loans Lacked Requisite Documentation Or
                Documentation Produced Was Facially Deficient ................................44

        3.      Stated Income Loans Not Reasonably Related to Stated
                Employment .........................................................................................46

E.      Clayton's Review of the NovaStar 2007-2 Mortgage Pool ................................48

F.      Further Evidence Confirming that the Underwriting Guidelines Were
        Systematically Disregarded in 2007-2 Offering .................................................53

        1.      Ratings of 2007-2 Certificate Collapse To "Junk Bond" Levels
                Shortly After Issuance Due To Undisclosed Aggressive
                Underwriting.........................................................................................53

        2.      Exponential Increase In Delinquency And Default Rates
                Evidence Early Payment Default and Disregarded Guidelines..............57

ii

**VI.**   **THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING GUIDELINES** ................................................................ 58

**VII.**   **CLASS ACTION ALLEGATIONS** ................................................ 61

**VIII.**   **FIRST CLAIM FOR RELIEF** ...................................................... 65

**IX.**   **SECOND CLAIM FOR RELIEF** .................................................. 67

**X.**   **THIRD CLAIM FOR RELIEF** ...................................................... 69

**XI.**   **RELIEF REQUESTED** .................................................................. 70

**JURY DEMAND** ........................................................................................ 71

iii

Lead Plaintiff, the New Jersey Carpenters Health Fund ("Carpenters Health Fund," "Lead Plaintiff" or "Plaintiff") submits this Third Amended Class Action Complaint (the "Complaint" or "TAC") pursuant to the Court's order, dated February 5, 2015, which granted Plaintiff's motion for reconsideration of the March 31, 2011 Order, dismissing five of the six mortgage-backed securities offerings at issue in this matter, and directing the filing of an amended pleading within 30 days of that Order. *See* ECF No. 155.  The Complaint is alleged based upon personal knowledge with respect to Lead Plaintiff, the review of news articles, public filings with the SEC, and other publicly available sources of information as well as the investigation of counsel, including interviews with former NovaStar Mortgage Inc. ("NMI") representatives responsible for underwriting mortgage loans, reviewing and approving underwriting and for quality control assessments during the period the mortgage loans were originated and securitized; and former representatives of Clayton Holdings, LLC or The Clayton Group ("Clayton"), a firm engaged to review NMI loans to determine the loans' compliance with NMI underwriting guidelines. The Complaint is made upon information and belief with respect to all other matters.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.

## SUMMARY OF THE ACTION

1.      This action is brought pursuant to the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a, *et seq*., by Court-appointed Lead Plaintiff on its own behalf and as a class action on behalf of all persons and entities (the "Class") who purchased or otherwise acquired publicly offered certificates representing interests in six NovaStar Mortgage Funding Trusts, NovaStar Home Equity Loan ("NHEL") Series 2006-3, Series 2006-4, Series 2006-5, Series 2006-6, Series 2007-1 and Series 2007-2 (the "NovaStar Trusts" or "Issuing Trusts") prior

to May 21, 2008, pursuant or traceable to a single Shelf Registration Statement, dated June 16, 2006, accompanying Prospectus, and Prospectus Supplement filed with the Securities and Exchange Commission (the "SEC") by NovaStar Mortgage Funding Corporation a/k/a NovaStar Certificates Financing Corporation ("NMFC") (No. 333-134461) (the "Registration Statement").

2.     Pursuant to the Registration Statement, Prospectus and the Prospectus Supplement incorporated therein (collectively, the "Offering Documents"), RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc. d/b/a RBS Greenwich Capital ("RBS"), Deutsche Bank Securities, Inc. ("DBS") and Wachovia Securities LLC ("Wachovia") (collectively referred to herein as the "Underwriters" or "Underwriter Defendants") underwrote and sold to Plaintiff and the Class $7.75 billion of Home Equity Loan Asset-Backed Certificates (the "Certificates" or the "NovaStar Certificates").  The Certificates were issued in six (6) Offerings which took place between June 22, 2006 and May 25, 2007 (collectively, the "NovaStar Offerings," the "Certificate Offerings" or the "Offerings") as interests in the Issuing Trusts.  Besides emanating from a common registration statement and being underwriting by the same investment banking defendants, the six Offerings were unified by numerous additional commonalities including, identical descriptions of NovaStar underwriting guidelines, the same types of underlying mortgages, overcollateralization structure, credit enhancements and risk factors.  ¶¶ 34, 52-64.

3.     As set forth below, the Offering Documents contained untrue statements of material fact or omitted material facts necessary to make the statements in the Offering Documents not misleading.  Defendants are strictly liable for these material misstatements and omissions under Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  This Complaint asserts no allegations or claims sounding in fraud and Plaintiff specifically disclaims any such allegations.

4.      Plaintiff seeks redress against Defendant NMFC, which prepared and filed the Registration Statement and was the Depositor of the underlying collateral into the Issuing Trusts; Defendants Scott F. Hartman ("Hartman"), Gregory S. Metz ("Metz"), W. Lance Anderson ("Anderson") and Mark A. Herpich ("Herpich"), who were the individual signatories to the Registration Statement filed by NMFC; Defendant NMI, the Sponsor/Seller for the Offerings, as well as the Originator and Servicer for all of the underlying mortgage loan collateral for the Offerings; and Defendants RBS, DBS and Wachovia, the joint lead managers, underwriters, and joint book-runners for the Offerings.   NMI and NMFC, together with their affiliates and subsidiaries, are collectively referred to as "NovaStar" or the "NovaStar Entities."

5.      This action arises from the role of NovaStar and the Underwriter Defendants in acquiring and then converting approximately 36,987 non-conforming first- and second-lien adjustable and fixed-rate mortgage loans (the "Mortgages") into $7.75 billion of purportedly "investment grade" residential mortgage-backed securities ("RMBS" or "MBS"), which were then sold to Plaintiff and the Class pursuant to the Offering Documents.  The Certificates were 30 year bonds whose payment of interest and repayment of principal was supported solely by pools of mortgage loans originated and acquired by NMI.[1]  All of the tranches in each of the six Offerings were sold pursuant to the same Registration Statement and subsequently filed Prospectus Supplements and were subject to the same underwriting guidelines stated in the

---

[1]    As of mid-year 2001, NovaStar operated only 24 offices in the United States and originated less than $6 million in loans per month.  By 2004, NovaStar had become one of the largest originators of non-conforming mortgage loans in the country - with over 432 mortgage offices in 39 states, and mortgage loan origination of over $600 million per month.  By late 2004, the Company's assets under management eclipsed the $10 billion mark.  According to Inside Mortgage Finance ("IMF"), in 2005, NovaStar issued $8.01 billion of MBS.

Offering Documents.[2]   As a result of the subordinate structure of each Offering, each lower tranche protected the tranche above from losses arising from borrower defaults in the mortgage pools.   If and when losses from the mortgage pool occurred, they would first be applied to eliminate principal of the subordinate tranches and then would climb the chain to the more senior tranches if losses continued.   *See* NHEL Series 2006-3 Prospectus Supplement, dated June 22, 2006 ("Series 2006-3 Pro. Supp.") at 107; NHEL Series 2006-4 Prospectus Supplement, dated August 18, 2006 ("Series 2006-4 Pro. Supp.") at 102; NHEL Series 2006-5 Prospectus Supplement, dated September 22, 2006 ("Series 2006-5 Pro. Supp.") at 107; NHEL Series 2006-6 Prospectus Supplement, dated November 20, 2006 ("Series 2006-6 Pro. Supp.") at 103; NHEL Series 2007-1 Prospectus Supplement, dated February 23, 2007 ("Series 2007-1 Pro. Supp.") at 114; NHEL Series 2007-2 Prospectus Supplement, dated May 25, 2007 ("Series 2007-2 Pro. Supp.") at S-121.

---

[2]  These tranche designations reflect the position of the tranche in the subordination structure and the amount of protection provided to each tranche against realized losses.  Realized losses from defaulting borrowers would first reduce the principal of most subordinate Certificates and then proceed upward to investors who purchased more senior tranches through the tranche structure. *See id.*   The Prospectus Supplements did *not* apply discrete underwriting standards to specific tranches.  The subordination structure of mezzanine tranches was completely unrelated to the Prospectus Supplements' analysis of the risk categories that comprised the mortgage pool.  In this regard the Prospectus Supplements delineated eight specific categories of underwriting characteristics.   *See, e.g.,* Series 2007-2 Pro. Supp. at S-88-9.   These eight categories of underwriting standards, which appeared in identical fashion in each of the six Prospectus Supplements, were designated "M1, M2, M3, M4, Alt A [NINA], Alt A [No Doc], Alt A [Full/Stated], Piggyback."   *Id.*   The underwriting standards set forth in the Prospectus Supplements were not tied to specific tranches in the Offering.  For example, the "M1" underwriting standards (*e.g.* "M1" loans had minimum credit score of 520 and permitted no 30 day late events within the prior 12 months) were not tied to the "M-1" tranche of any specific offering – even though they used the same designation. *See, e.g.,* Series 2007-2 Pro. Supp. at S-33.  Similarly, the "M2", "M3" and "M4" underwriting standards were not linked or otherwise specifically related to the "M-2", "M-3" or "M-4" tranches  even though, again, the  same alpha numeric designations were  used (*e.g.,* M1, M2, M3 and M4).

6.      Since the return of principal and payment of interest to Certificate investors was wholly dependent on the strength of the underlying mortgage loans, the Prospectus Supplements each detailed that the loans were underwritten pursuant to specific NovaStar underwriting guidelines "*intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan.*" *See* Series 2007-2 Pro. Supp. at S-86-7.[3]  The Prospectus Supplements further explained that NovaStar maintained six levels of loans that differed in terms of the amount of supportive borrower documentation required for approval of the loan.  The loan requiring the highest level of documentation was a "full documentation" loan while the lowest level of documentation under the stated NovaStar guidelines was a "no documentation loan." *See* Series 2007-2 Pro. Supp. at S-87.[4]  The Prospectus Supplements specifically made clear that, on average, the largest percentage of each mortgage pool for the Offerings at issue was full documentation loans (*i.e.,* 47.52%).  ¶48.  The next largest category of loans in each collateral pools was described as "stated income loans" (comprising approximately 44.11% of the mortgage pools).  ¶48.  The NovaStar guidelines required that, in addition to completing the loan application, appraisal and credit check requirement, the stated income be reasonable in light of the borrower's employment set forth in the loan application.  ¶¶46-47,104-15.  The Prospectus Supplements also represented that less than 6.84% of the mortgage pools were composed of the least rigorous no documentation loans and also stated that NovaStar maintained a quality control system to monitor compliance with the underwriting guidelines and ensure that any exceptions to those guidelines were justified and reasonable.  ¶¶49, 51,104-106.

---

[3]     *See also,* Series 2006-3 Pro. Supp. at S-78; Series 2006-4 Pro. Supp. at S-73; Series 2006-5 Pro. Supp. at S-77; Series 2006-6 Pro. Supp. at S-71; Series 2007-1 Pro. Supp. at S-79.
[4]     *See also,* Series 2006-3 Pro. Supp. at S-79; Series 2006-4 Pro. Supp. at S-73; Series 2006-5 Pro. Supp. at S-78; Series 2006-6 Pro. Supp. at S-72; Series 2007-1 Pro. Supp. at S-79.

7.     Based on, *inter alia*, these above representations concerning the quality of the underlying Mortgages as well as the purported credit protections and enhancements[5] built into each securitization, both Moody's Investors Services, Inc. ("Moody's") and McGraw-Hill Companies, Inc. through its division, Standard & Poor's ("S&P") (collectively, the "Rating Agencies")[6] assigned predominately the highest investment grade ratings to the Certificates, indicating maximum safety and minimal risk.  S&P and Moody's assigned their highest rating of "AAA" and "Aaa" respectively to over 83%, or $6.41 billion, of the Certificates.[7]  Traditionally, bonds with AAA ratings have had less than 1% probability of default. S&P has "reported that its cumulative RMBS default rate[s] by original rating class (through September 15, 2007) was 0.04% for AAA initial ratings and 1.09% for BBB.  *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse,* United States Senate Permanent Subcommittee on Investigations, April 13, 2011, p. 247.  Approximately ***96.6%*** of the $7.75 billion Certificates were assigned ratings of "A" or higher.

8.     Unbeknownst to Plaintiff and the Class however, the Prospectus Supplements contained material misstatements and omissions concerning the Mortgages.  When originating

---

[5]    In addition to the subordination structure that provided investors with protection from losses, the Prospectus Supplements described certain credit enhancements to protect against losses including overcollateralization, excess cash flow and mortgage insurance policies.

[6]    Moody's and S&P were Defendants in the First Amended Complaint but have been dismissed from this action with prejudice.

[7]    Moody's highest investment rating is "Aaa."  S&P's highest rating is "AAA."  These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk.  Ratings of "AA (+/-)," "A (+/-)," and "BBB (+/-)" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  These ratings are all considered "investment-grade ratings" evidencing a very strong or strong capacity of the issuer to meet its financial commitments. Any instrument rated lower than Ba1 (for Moody's) or BB+ (for S&P) is considered below investment-grade.  ¶39.

the Mortgages, NovaStar systematically disregarded its own underwriting guidelines including the guidelines for full documentation and stated income loans.  ¶¶89-96.  Further, the systems of quality control described in the Prospectus Supplements were routinely overridden by NovaStar management seeking to meet loan volume quotas.  ¶¶84-88.  Former NovaStar Vice Presidents, Senior Underwriters and Quality Control representatives, employed by NovaStar during the period most of the collateral was originated and securitized stated that the requirements for "full documentation" loans were either routinely disregarded, or when found to not be satisfied by the loan underwriter, were nevertheless approved without justification by Supervisors and Vice President-level NovaStar representatives.  ¶¶71-96.  Also, stated income loans were routinely approved even though it was apparent from the face of the loan application that the stated income was not reasonable in light of the borrower's employment, a fact which, under the underwriting guidelines, should have disqualified the loans.  ¶¶94-96.  In addition, the quality assurance system described in the Prospectus Supplements was, in fact, ineffective because Supervisors and Vice Presidents, financially incentivized to reach loan production quotas for immediate securitization, overrode quality assurance findings that loans were noncompliant with NovaStar guidelines. ¶¶84-88.

9.     Further, the Underwriter Defendants contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to an outside firm – Clayton – and then conducted limited oversight of these subcontractors' activities.  Defendant RBS regularly retained Clayton to review originator loans and regularly retained Clayton to review loans for securitizations of NovaStar loans.  In connection with his testimony before the Senate Permanent Subcommittee on Investigations, the former President of Clayton produced internal studies covering, in part, the period in which the Offerings occurred showing that, Defendants RBS and

7

DBS systematically directed the inclusion in mortgage backed securities offerings of 53% and 50% of mortgage loans that were found by Clayton loan underwriters not to comply with the stated underwriting guidelines.  *See The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States*, 166-167, (2011), The Fin. Crisis Inquiry Comm'n (hereinafter the "FCIC Report").

      10.    Accordingly, the material facts omitted from the Prospectus Supplements included the following:

- NovaStar systematically disregarded the stated underwriting standards when issuing loans to borrowers including, the requirements for full documentation loans and the requirements for stated income loans as described below, ¶¶71-96;

- Defendants had no adequate quality control process or review procedure to determine whether misrepresentations or fraud was occurring at the loan origination level, ¶¶71-96; and

- The Underwriter Defendants failed to conduct an adequate due diligence related to NovaStar's loan origination practices and compliance with the stated underwriting guidelines including permitting the inclusion of mortgage loans in the pool that Clayton had determined did not comply with the stated underwriting guidelines, ¶¶97-119.

      11.    As a result of the untrue statements and omissions, Plaintiff and the Class purchased Certificates that were far riskier and therefore less valuable than represented and certainly not equivalent to other investments with the same investment grade credit ratings. Contrary to representations in the Offering Documents, the Certificates exposed all purchasers to substantial and increased risk with respect to the collateral pool's absolute cash flow and the timing of payments of principal and interest.  As the true risk profile of the loans has been revealed over time, the value of the Certificates has collapsed, and, as set forth below, at the time the Action was filed they were worth only a fraction of their initial original value.  Specifically,

Plaintiff's investment in the Certificates collapsed in value by over 99% when compared to its original value. ¶20.

12.     Confirmation of the material misstatements and omissions contained in the Prospectus Supplements arise, in part, from the Rating Agencies' action regarding the Certificates subsequent to the Offerings.  Several months after the completion of the Offerings, Moody's and S&P revised their guidelines to account for mortgage loans that did not comply with the stated underwriting guidelines and to account for mortgage fraud in the loan pool. When those revised guidelines were ultimately applied to the NovaStar Offerings after-the-fact in 2008 and 2009, all of the tranches, including the purported "A"-rated Certificates, were downgraded to "below investment grade" levels by both Moody's and S&P.  This was an unprecedented collapse in ratings of as many as 20 ratings levels that reflected not only the impaired quality of the collateral at the time of the Offering, but also the high likelihood of default in repayment of principal to Certificate investors.  Indeed, to date, the principal amount of a significant number of the Certificate classes across all six Offerings – Certificates which were supposed to pay interest for thirty years – have been wiped out entirely.  To illustrate, 47%, or approximately $1.02 billion, of the currently outstanding $2.24 billion principal balance needed to repay the Certificate investors principal investment is in some stage of delinquency or default.  ¶114.  Moreover, the realized loss figures for these six NovaStar trusts are staggering. To date, the Trusts have suffered over *$2.6 billion* in realized losses – over 34% of the original $7.75 billion initial balance.  *Id.*

13.     Further factual confirmation of the misstatements and omissions in the Prospectus Supplements is derived from the exponential increase in delinquency and default rates in the mortgage loan pools six months and one year after the Offerings – averaging approximately

12.5% and 24.10%, respectively.  Governmental studies confirm that such default rates immediately after the Offering are reflective of mortgage fraud and other results of reckless underwriting practices.  ¶118.

14.     The alleged systematic disregard of the stated underwriting guidelines is also supported by internal documentation compiled by Clayton and produced to the Senate Permanent Subcommittee on Investigations in 2009 pursuant to subpoena.  The evidence produced by Clayton showed that Defendants RBS and DBS, during the period from January 2006 through June 2007, directed, respectively, the inclusion in collateral pools of 53% and 50% of mortgage loans that Clayton found to be non-compliant with stated underwriting guidelines applicable to the pool.

15.     Disclosures in the Series 2007-2 Prospectus Supplement regarding NovaStar's adverse financial condition (including its limited cash flow and being named as a defendant in certain class action litigation arising from the decline in NovaStar's common stock price) at the time of the 2007-2 Offering in May 2007 did not apprise Plaintiff or the Class of the material misstatements and omissions in the Series 2007-2 Prospectus Supplement or any other Prospectus Supplement as to these specific mortgages and did not, in fact, relate at all to the loan pool at issue in this case upon which payment to the bondholders depended.  Thus, those disclosures did not adversely impact the sale, price or rating of the Certificates.  ¶¶65-70.

16.     As universally noted in the Prospectus Supplements, repayment of Certificates was not based on the financial condition of NovaStar, but rather on the mortgage loan pools. Because investors relied on the performance of the mortgage pools and not NovaStar's financial condition, both Rating Agencies, as noted, were able to assign the ***highest*** safety ratings to the Certificates despite the public financial condition of NovaStar.  ¶¶111-119.  Further, the

NovaStar Defendants advised Certificate investors that with respect to its operations in 2006 and 2007, NovaStar had "intensified" its "focus on asset quality" and "altered [its] proprietary modeling and underwriting guidelines and processes in an attempt to minimize losses and enhance asset quality in loan originations going forward."  NovaStar Financial, Inc. 2006 Annual Report and Proxy Statement, at 5.  ¶¶65-70.

17.    Finally, Individual Defendants Scott Hartman and Gregory Metz (as defined below) were both senior officers of the Defendant Issuer NovaStar Mortgage Funding Corporation ("NMFC") and the Sponsor NovaStar Mortgage Inc. ("NMI") at the time of the Offering.  As issuer, Defendant NMFC was responsible for preparing and filing the Offering Documents.   Defendant NMI, its senior officers Hartman and Metz and the Underwriter Defendants (as defined below) controlled NMFC with respect to the relevant aspects of the Offering Documents concerning the quality of the mortgage loans since it was NMI that, together with the Underwriter Defendants was responsible for selecting the specific mortgages to be included in the mortgage pools; creating the Offering structures of senior and subordinate Certificates and credit enhancements; and pricing the Certificates for sale in the Offerings, based in part on the credit quality of the underlying mortgage loans.  *See* Series 2006-3 Pro. Supp. at S-86; Series 2006-4 Pro. Supp. at S-82; Series 2006-5 Pro. Supp. at S-87; Series 2006-6 Pro. Supp. at S-82; Series 2007-1 Pro. Supp. at S-90; and Series 2007-2 Pro. Supp. at S-96.  As a result, the Individual Defendants Hartman and Metz (as defined below) as officers of both NMFC and NMI are additionally liable as control persons of the Issuer NMFC under Section 15 of the Securities Act.

## II.

## JURISDICTION AND VENUE

18.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act, and venue is proper pursuant to Section 22 of the Securities Act.

19.     The violations of law complained of herein, including the dissemination of materially false and misleading statements made in connection therewith, occurred in this District.  All of the Defendants named herein, as well as their affiliates and subsidiaries, conduct or conducted business in this District.

## III.

## PARTIES AND RELEVANT NON-PARTIES

**A.**     **Plaintiff**

20.     Lead Plaintiff, New Jersey Carpenters, is a Taft-Hartley Pension Fund.  New Jersey Carpenters purchased the NovaStar Home-Equity Loan Trust, Series 2007-2, Class M1 Certificates, directly from Defendant RBS, in the Offering and has been damaged thereby.  New Jersey Carpenters purchased 100,000 units of the M1 Certificates at par value of $1.0000 per unit on May 25, 2007.  As detailed herein as well as in its Amended Certification, filed via ECF on March 3, 2011 (ECF No. 114), New Jersey Carpenters was injured as a result of its Certificate investment.  At the time of the filing of the Complaint, the New Jersey Carpenters' custodian valued the Certificates at $1.0000 per unit.  Ultimately, Lead Plaintiff disposed of the full principal amount of the Certificates ($100,000) in a sale on March 26, 2010 at a price of $0.0035 per unit, resulting in an almost complete loss of its investment.

1975268.1

B.   **NovaStar Defendants**

21.   Defendant NMI, a wholly-owned subsidiary of NFI Holding Corporation, Inc., is a Virginia corporation and is principally located at 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114.   NMI acted as the Sponsor/Seller for the Certificates issued pursuant to the Registration Statement, originated or purchased all of the mortgage loan collateral underlying the Certificates and initially served as Servicer of the mortgage loans post-securitization.   Defendant NMI originated all of the underlying mortgage collateral for the Offerings.   The principal offices for the Sponsor's lending operations were located in Lake Forest, California, Cleveland, Ohio and Salt Lake City, Utah.   NMI made certain misleading representations and warranties in connection with the loan pools collateralizing the Certificates.   ¶¶104-107.   As set forth in the Registration Statement, once originated, NMI conveyed the mortgages to a Special Purpose Entity ("SPE"), the Depositor, Defendant NMFC, created for the sole purpose of forming, collecting and thereafter depositing the collateral into, the Issuing Trusts.   The Issuing Trusts then issued the Certificates which were supported by the cash flows from the Mortgages and were secured by those Mortgages.   ¶¶35-45.

22.   Defendant NMFC is a wholly-owned subsidiary of Defendant NMI and is located at 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114.   Defendant NMFC filed the Registration Statement and Prospectus with the SEC in connection with the Offering on or about June 16, 2006.   Defendant NMFC served as the Depositor in connection with the Offerings.   The role of the Depositor was to purchase the mortgage loans from the Seller, NMI, and then assign the mortgage loans and all of its rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the Certificate-holders.   NMFC, as Depositor, is considered the issuer of the Certificates under the Securities Act and was also responsible for preparing and

filing any reports required under the Securities Exchange Act of 1934 pursuant to Regulation AB.

23.    Defendant NMFC filed the following Registration Statement and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| May 25, 2006 | S-3 | $ 1,000,000 |
| June 16, 2006 | S-3/A | $ 17,974,575,431[8] |

24.    Defendant Scott F. Hartman ("Hartman") was, at all relevant times, NMFC's President, Principal Executive Officer, as well as a Director of NMFC, and in those capacities signed the false and misleading Registration Statement for the Offerings.  Defendant Hartman was also President, Principal Executive Officer, as well as a Director of NovaStar Certificates Financing Corporation ("NCFC") and in those capacities signed the Registration Statement for the Offerings.  Pursuant to the Securities Act, Hartman also signed the certifications in the Registration Statement on behalf of NMFC and NCFC, dated May 25, 2006, representing that each of those companies "has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3, reasonably believes that the [investment grade] security rating requirement contained in Transaction Requirement B.5 of Form S-3 will be met by the time of the sale of the securities registered…."   Furthermore, Defendant Hartman was NFI's Chief Executive Officer and was an Executive Vice President of NMI during the time that the Mortgages were originated and subsequently securitized and the Offerings were consummated.

---

[8]     The amount registered under the June 16, 2006 Registration Statement includes $622,501,431.00 of securities previously registered under Registration No. 333-131111 on January 19, 2006 which remained unissued as of June 16, 2006, in addition to $2,352,074,000.00 of securities previously registered under Registration No. 333-114297 on April 8, 2004 which remained unissued as of June 16, 2006.

25.     Defendant Gregory S. Metz ("Metz") was, at all relevant times, NMFC and NCFC's Secretary, Principal Financial Officer and Principal Accounting Officer.  Metz signed the false and misleading Registration Statement for the Offerings in those capacities on behalf of NMFC and NCFC.  Metz was also a Senior Vice President and Chief Financial Officer of both NMI and NFI.  Metz held these positions at the time the Mortgages were originated and securitized, and the Offerings consummated.

26.     Defendant W. Lance Anderson ("Anderson") was, at all relevant times, a Director of NMFC and NCFC.  Anderson signed the false and misleading Registration Statement for the Offerings as a Director of each of those companies.  Furthermore, Defendant Anderson served as NFI's President and Chief Operating Officer at the time of the Offerings.

27.     Defendant Mark A. Herpich ("Herpich") was, at all relevant times, a Director of NMFC and NCFC.  Herpich signed the false and misleading Registration Statement for the Offerings as a Director of each of those companies.

28.     The Defendants identified in ¶¶24-27 are referred to herein as the "Individual Defendants."  The Individual Defendants as officers and/or directors of NMFC and NCFC signed the Registration Statement for Certificates issued by the Issuing Trusts and sold to Plaintiff and the Class.  Through its senior officers, Defendants Scott F. Hartman and Gregory S. Metz, Defendant NMI originated of all the mortgage loans underlying the six Offerings pursuant to NovaStar underwriting guidelines, selected the mortgages to be included in the pools and created – with the Underwriter Defendants – the structure of senior and subordinate Certificates and the credit enhancements in the Offerings and priced the Certificates for sale.  *See* Series 2006-3 Pro. Supp. at S-86; Series 2006-4 Pro. Supp. at S-82; Series 2006-5 Pro. Supp. at S-87; Series 2006-6 Pro. Supp. at S-82; Series 2007-1 Pro. Supp. at S-90; and Series 2007-2 Pro. Supp. at S-96.  In

addition, Defendants Hartman, Metz and Anderson, as principal officers and/or directors of NFI and NMI, were responsible for the loan origination practices of those companies with respect to the mortgage loans underlying the Certificates.  The Individual Defendants as signatories to the Registration Statement had a duty to conduct adequate due diligence prior to offering the Certificates to investors which they failed to perform.  Under the Securities Act the Individual Defendants are liable to Plaintiff and the Class as persons who (i) signed the Registration Statement; (ii) were directors (or persons performing a similar function) of the issuer/depositor; and (iii) as persons who offered or sold the Certificates to Plaintiff and the Class.

## C.    Underwriter Defendants

29.    Defendant RBS is an SEC-registered broker-dealer.  RBS is principally located at 600 Steamboat Road, Greenwich, Connecticut 06830 and is a wholly-owned subsidiary of Greenwich Capital Holdings, Inc.  RBS is one of the leading underwriters of mortgage-backed securities in the United States.  Since 1987, RBS has helped mortgage lenders issue more than $400 billion in asset-backed securities.  Defendant RBS served as an underwriter for the Offerings and participated in the drafting and dissemination of the false and misleading Offering Documents.  As underwriter, RBS was responsible for conducting due diligence on the offering and was directly involved in the offer and sale of Certificates to investors.  Plaintiff purchased the Series 2007-2 M1 Certificates directly from RBS.  RBS failed to perform the requisite level of due diligence in connection with the Offerings complained of herein.  RBS also served as a Hedge Provider in each of the Offerings and was entitled to receive additional fees as a result thereof.

30.    DBS is an SEC registered broker-dealer, principally located at 60 Wall Street, New York, New York 10005.  DBS was one of the leading MBS underwriters in the United

States.  Defendant DBS was one of the underwriters for the Certificate Offerings and participated in the drafting and dissemination of the false and misleading Offering Documents.  As an underwriter, DBS was responsible for conducting due diligence on the Offerings and was directly involved in the offer and sale of Certificates to investors.  DBS failed to perform the requisite level of due diligence in connection with the NovaStar Offerings complained of herein. DBS also served as a Hedge Provider in each of the Offerings and as the Trustee in five of the six Offerings (NHEL Series 2006-4, Series 2006-5, Series 2006-6, Series 2007-1 and Series 2007-2) and  was entitled to additional fees as a result thereof.

31.    Wachovia is an SEC registered broker-dealer, with executive offices located in Richmond, Virginia and Charlotte, North Carolina and its headquarters at 401 South Tryon Street, St. Louis, Missouri 28288.  Since January 1, 2009, Wachovia has operated as a non-bank affiliate of Wells Fargo & Company.[9]  Wachovia was one of the leading MBS underwriters in the United States.  Wachovia was one of the underwriters for the Offerings and participated in the drafting and dissemination of the false and misleading Offering Documents.  As an underwriter, Wachovia was responsible for conducting due diligence on the Offerings and was directly involved in the offer and sale of Certificates to investors.  Wachovia failed to perform the requisite level of due diligence in connection with the NovaStar Offerings complained of

---

[9]    The Initial Complaint filed in the within action on May 21, 2008, in New York State Supreme Court, New York County, Index No. 2008-601563, named Wachovia Securities LLC as a Defendant.  Pursuant to a Merger Agreement between Wachovia Corporation, the parent company of Wachovia Securities, LLC, and Wells Fargo & Company, on or about December 31, 2008 Wachovia Securities became a non-bank subsidiary of Wells Fargo & Company.  As of May 1, 2009, Wachovia was rebranded Wells Fargo Advisors, LLC.  Wells Fargo & Company maintains its principal offices at 420 Montgomery Street, San Francisco, California 94163.  Wells Fargo Advisors is a trade name used by three separate non-bank subsidiaries of Wells Fargo & Company: Wells Fargo Advisors, LLC, Wells Fargo Advisors Financial Network, LLC and Wells Fargo Investments, LLC.

herein. Wachovia also served as a Hedge Provider in each of the Offerings and was entitled to receive additional fees as a result thereof.

32.     The Offering Documents disseminated in connection with the Offerings contained material misstatements and omissions of material fact relating to the disregard of the "underwriting standards" employed in originating the underlying mortgage loans.     The Underwriter Defendants abdicated their duty to conduct due diligence on the underlying loan collateral, relying rather on the cursory and inadequate examination of the mortgage loans conducted by NovaStar and Clayton.

33.     The Issuing Trusts were common law trusts formed for the sole purpose of holding and issuing the Certificates.    The Issuing Trusts issued $7.75 billion of Certificates pursuant to the Registration Statement, and the six Prospectus Supplements, each incorporated by reference into the Registration Statement, which listed numerous classes of offered Certificates.

**IV.**

**THE SECURITIES ACT VIOLATIONS FOR ALL SIX NOVASTAR OFFERINGS ARISE FROM IDENTICAL MATERIAL MISSTATEMENTS AND OMISSIONS AND ARE SUBJECT TO COMMON PROOF**

34.     The six NovaStar Offerings are subject to common proof because of numerous commonalities  directly relevant to the claims being asserted including:

>    a.     all six Offerings contain *identical* alleged NovaStar underwriting misstatements and omissions in the common Registration Statement and in each of the Prospectus Supplements, ¶¶46-51, 120-125;
>
>    b.     all six Offerings securitize the same type of mortgages with each Prospectus Supplement identically stating the "Certificates will represent ownership interests in…a pool of subprime mortgage loans consisting of two groups -- a group of residential first-lien and second-lien, fixed and adjustable rate mortgage loans designated as Group I…and a group of residential first-lien and second-lien, fixed and adjustable rate mortgage loans designated as Group II," ¶52;

18

c.      all six Offerings were underwritten by the same investment banks, Defendants Wachovia, RBS and Deutsche such that the same witnesses will be able to testify about due diligence activities for multiple Offerings, ¶¶2, 54;

d.      all six Offerings contain identical descriptions of the roles of the Defendants – including Defendant NMI and the Underwriter Defendants. ¶¶53-54;

e.      all six Offerings describe the Defendant underwriters performing multiple roles with all three underwriters also acting as a Hedge Provider (entitling them to additional fees) and with Deutsche Bank-affiliated entities serving as the Trustee in five of the six Offerings (entitling Deutsche Bank-affiliated entities to additional fees), ¶¶55-56;

f.      all six Offerings describe the same 17 Risk Factors in a substantially similar manner, ¶57;

g.      all six Offerings contain identical descriptions of credit enhancement features, including the use of insurance as a part of credit enhancement including from common insurers such as Mortgage Guaranty Insurance Corp ("MGIC") PMI Mortgage Company ("PMI") and Radian Guaranty Inc. ("Radian"), ¶¶58-60;

h.      all six Offerings identically describe applicable subordination, limited cross-collateralization, and allocation of losses provisions, ¶¶61-63;

i.      all six Offerings use virtually identical language in describing the tranche by tranche  "Method of Distribution" for the Certificates among and by the Underwriter Defendants, ¶64;

j.      the process for originating, packaging, and selling the loans -- including the manual review of subprime loan applications, overriding denials of full documentation loan applications by quality control, and the failure to receive employment and credit score verifications by the deadline was substantially the same for all six Offerings, ¶¶71-96;

k.      the personnel at NovaStar responsible for originating, packaging, and selling the loans remained substantially the same for all six Offerings meaning that there is extensive if not complete witness overlap from the NovaStar Defendants, ¶¶71-96;

l.      the due diligence process employed by NovaStar and the Underwriters was the substantially the same for all six Offerings, ¶¶97-110;

m.      there are overlapping witnesses knowledgeable about multiple Offerings at DBNTC, an affiliate of Defendant DBS which served as Trustee on five of the Offerings, ¶56;

19

n.     there are overlapping witnesses with knowledge about multiple Offerings at the third party due diligence firms (*e.g.,* Clayton) engaged on the NovaStar securitizations at issue, ¶¶97-110.

**V.**

**BACKGROUND**

**A.    NovaStar and the Underwriter Defendants Sell Predominately the Highest Rated and Purportedly Safest Securities in the Offerings**

35.    As illustrated below, a mortgage securitization occurs where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



36.    A "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity.  The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

37.     The depositor then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches."  Tranches are related MBS offered as part of the same pass-through certificate offering, each with a different theoretical level of risk and reward.  Typically, any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority. As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA."   Junior tranches, which usually receive lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.  As the lowest tranches are designed to provide a cushion, diminished cash flow to the lower tranches will result in the value of the higher tranches being reduced.  Certificate ratings and value are also based on the amount and type of credit enhancements embedded in the structure of the securitization including, for example, subordination, overcollateralization, cross-collateralization and excess cash flow.

38.     The NovaStar Defendants, together with the Underwriter Defendants, each played specific and significant roles in effectuating the Offerings at issue herein.  As alleged, Defendant NMI, as Sponsor/Seller, was responsible for originating all the underlying mortgage loans; selecting the mortgage loans to be included in the mortgage pools; and assisted in structuring and pricing the Certificates for sale in the Offerings.  Defendant NMFC, as the Depositor and Issuer, was responsible for depositing the mortgages into the Issuing Trust, filing the Offering Documents with the Securities and Exchange Commission and selling the Certificates to the Underwriter Defendants.

39.     At the time of each of the Offerings, the Rating Agencies deployed multileveled criteria for assessing the risk of default for debt securities.   The Rating Agencies rated the Certificates pursuant to the following twenty-two (22) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

40.     All of the Certificates were sold to investors as investment grade securities.  In fact, over 96% of the Certificates in the Offerings were assigned a rating of "A" or higher.  For example, as set forth in the chart below, 95% of the Series 2007-2 Offering was rated "A" or better by the Ratings Agencies:

| Offered Class | Initial Aggregate Certificate Balance | Ratings S&P / Moody's |
|---|---|---|
| Class A-1A Certificates | $779,369,000 | AAA / Aaa |
| Class A-2A Certificates | $140,080,000 | AAA / Aaa |
| Class A-2B Certificates | $80,420,000 | AAA / Aaa |
| Class A-2C Certificates | $49,730,000 | AAA / Aaa |
| Class A-2D Certificates | $18,601,000 | AAA / Aaa |
| Class M-1 Certificates | $70,700,000 | AA+ / Aa1 |
| Class M-2 Certificates | $49,700,000 | AA / Aa2 |
| Class M-3 Certificates | $23,800,000 | AA- / Aa3 |
| Class M-4 Certificates | $21,700,000 | A+ / A1 |
| Class M-5 Certificates | $21,700,000 | A / A2 |
| Class M-6 Certificates | $18,900,000 | A- / A3 |
| Class M-7 Certificates | $18,900,000 | BBB+ / Baa1 |
| Class M-8 Certificates | $15,400,000 | BBB / Baa2 |
| Class M-9 Certificates | $15,400,000 | BBB- / Baa3 |
| Total | $1,324,400,000 | |

41.     Furthermore, the Rating Agencies initially assigned the highest ratings of AAA/maximum safety to 83%, or $6.4 billion, of the Certificates, as reflected below:

| Series | Offering Amount Rated | AAA | % |
|---|---|---|---|
| NHEL 2006-3 | $1.09 billion | $921.8 million | 85% |
| NHEL 2006-4 | $1.00 billion | $856.7 million | 85% |
| NHEL 2006-5 | $1.28 billion | $1.05 billion | 83% |
| NHEL 2006-6 | $1.22 billion[10] | $1.05 billion | 86% |
| NHEL 2007-1 | $1.81 billion | $1.46 billion | 80% |
| NHEL 2007-2 | $1.32 billion | $1.07 billion | 81% |

---

[10]     The total offering amount for the NHEL 2006-6 is approximately $1.23 billion according to the Prospectus Supplement.  *See* Series 2006-6 Pro. Supp. at Cover.  However, two classes (M-10 and M-11), with an initial principal balance of $16,775,000, were not rated and not purchased by the Underwriters for sale to the public. Instead, they were transferred to an affiliate of the sponsor and servicer as partial consideration for the sale of mortgages to the depositor.  *See id.*

42.     As noted above, the Series 2007-2, Class M1 Certificates, purchased by Lead Plaintiff, had an initial rating of Aa1 by Moody's and AA+ by S&P.  This initial rating indicated to investors that the M1 Certificates were considered to be of "very high grade/quality" by the Rating Agencies.  ¶40.

43.     NovaStar derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.  For securitized Certificates to be marketable to investors, approximately 80% of the Certificates had to have the highest rating from the Rating Agencies.  With that condition met, subprime securitizations – as opposed to prime or Alt-A securitizations – provided NovaStar with the largest fees and profits.

44.     According to all six Prospectus Supplements, NovaStar originated all the mortgage loans and then together with the Rating Agencies and the Underwriter Defendants, selected the loans to be securitized and agreed upon a structure for the Offering.  *See* Series 2006-3 Pro. Supp. at S-86; Series 2006-4 Pro. Supp. at S-82, Series 2006-5 Pro. Supp. at S-87, Series 2006-6 Pro. Supp. at S-82, Series 2007-1 Pro. Supp. at S-90; and Series 2007-2 Pro. Supp. at S-96 ("The sponsor [NMI] works with the underwriters and the rating agencies to select the pool of mortgage loans and structure the transaction.").  This structure included a series of senior and subordinate notes as well as the nature and extent of credit protections to be offered to investors.  *See* note 2, *supra*.  With the securitization structure in place, the Certificates were issued through the Issuing Trusts that were designated a "shelf" name – specifically, "NovaStar Mortgage Funding Trust" ("NMFT").  The shelf name reflected the types of mortgage collateral underlying the Offerings – in this case, adjustable and fixed rate, subprime residential mortgages. See Series 2006-3 Pro. Supp. at Cover; Series 2006-4 Pro. Supp. at Cover, Series 2006-5 Pro.

Supp. at Cover, Series 2006-6 Pro. Supp. at Cover, Series 2007-1 Pro. Supp. at Cover; and Series 2007-2 Pro. Supp. at Cover.

45.     NovaStar engaged Defendants RBS, DBS and Wachovia to serve as the Underwriters, or Joint Book-Runners, for all six Offerings.  Each of the Underwriters maintained a sales desk whose purpose was to assess the demand for certain securities from the clients of the investment bank prior to issuance and assist NovaStar in structuring the Offerings of Certificates. This attempt to assess demand and "pre-sell" the Certificates was crucial to NovaStar and the Underwriters in that the risk of holding the Certificates post-securitization subjected NovaStar and the Underwriters to increased risk exposure due to the fact that they would then own the Mortgages and the Certificates.  Therefore, the Underwriter Defendants' role in assessing market demand and assuring NovaStar that sale of the Certificates to investors would be completed immediately after securitization was key to the Offerings' success.

**B.      The Identical Underwriting Statements and
         Criteria in Each of the Prospectus Supplements**

46.     Each Offering and their related Prospectus Supplements were issued pursuant and subject to the common Registration Statement.  As reflected in the Prospectus Supplements, the underwriting criteria used to originate the mortgage loan collateral appeared to justify the high investment grade ratings the Rating Agencies awarded the Certificates.  First, each Prospectus Supplement explained, in an identical manner, that all loans were subject to certain minimum underwriting standards requiring a loan application, credit reports and appraisals as follows:

**Underwriting Standards for the Mortgage Loans**

The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan. ***Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history. Prior to issuing an approval on the loan, the loan underwriter runs an independent***

25

*credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date. An appraisal is also required on all loans and in many cases a review appraisal or second appraisal may be required depending on the value of the property and the underwriter's comfort with the original valuation. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae. The properties securing the mortgage loans are appraised by qualified independent appraisers who are generally approved by the related originator.* A streamline appraisal program is offered by our Retention division for borrowers that currently have a mortgage loan with the sponsor. Under this program an AVM can be used to determine valuation if the full appraisal from the previous loan is less than two years old. The maximum increase in value that can be supported with an AVM is 10%. The mortgagor may also include information regarding verification of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been used for underwriting purposes.

*See* 2006-3 Pro. Supp. at S-78; Series 2006-4 Pro. Supp. at S-73; Series 2006-5 Pro. Supp. at S-77; Series 2006-6 Pro. Supp. at S-71; Series 2007-1 Pro. Supp. at S-79 and Series 2007-2 Pro. Supp. at S-86. (Emphasis added.)

47.     More specifically however the Prospectus Supplements explained, in the identical manner, that the underlying mortgages were originated pursuant to six loan documentation programs in the NovaStar underwriting guidelines.  "Full Documentation" loans were the most rigorous in terms of the borrower documentation and required supporting documentation relating to the borrower's income, assets and employment.  In contrast "No Documentation loans" and No Income and No Asset were the least rigorous as follows:

The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement." ***Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub***. Under the Limited Documentation program, no such verification is required, however, bank statements for the most recent consecutive 6-month period are required to evidence cash flow. Under the Stated Income program, an

> applicant may be qualified based on monthly income as stated in the loan application. Under the "No Documentation" program, an applicant provides no information as it relates to their income. Under the No Income/No Asset" program, the applicant's income and assets are not verified, however the applicant's employment is verified.

*See* 2006-3 Pro. Supp. at S-79; Series 2006-4 Pro. Supp. at S-73; Series 2006-5 Pro. Supp. at S-78; Series 2006-6 Pro. Supp. at S-72; Series 2007-1 Pro. Supp. at S-79 and Series 2007-2 Pro. Supp. at S-87. (Emphasis added.)

48.     The Prospectus Supplements also explained that a majority of the collateral among the six Offerings (approximately 48%*)* was composed of the most rigorous "full documentation" loans.   The Prospectus Supplements each make clear that for any loan underwritten pursuant to the full documentation program "applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub."   *See* Series 2006-3 Pro. Supp. at S-79; Series 2006-4 Pro. Supp. at S-73; Series 2006-5 Pro. Supp. at S-78; Series 2006-6 Pro. Supp. at S-72; and Series 2007-1 Pro. Supp. at S-79; Series 2007-2 Pro. Supp. at S-87.   Further, the next largest category of mortgage loans after full documentation loans was the stated income/stated asset loan category where, at a minimum, the borrower's stated income was required to be reasonable in relation to the borrowers' employment.   Stated Income loans accounted for approximately 44% of the mortgages underlying the Offerings.

49.     The Prospectus Supplements also specifically emphasized that relatively small percentages of the underlying pools of mortgages were "No Documentation Loans."   For example, for the Series 2007-2 Offering, the Prospectus Supplement states that only 6.38% of the mortgage pool was composed of "No Documentation" loans.  See Series 2007-2 Pro. Supp. at S-32; see also, 2006-3 Pro. Supp. at S-28 (9.15% No Documentation Loans); Series 2006-4 Pro. Supp. at S-27 (6.41% No Documentation Loans); Series 2006-5 Pro. Supp. at S-27 (7.26% No

Documentation Loans); Series 2006-6 Pro. Supp. at S-27 (7.15% No Documentation Loans); and

Series 2007-1 Pro. Supp. at S-28 (4.69% No Documentation Loans).

       50.     In addition, the Prospectus Supplements emphasized that there was a hierarchy of

senior NMI representatives who reviewed any deviations or exceptions to the underwriting

guidelines to ensure that they were reasonably related to the underlying goals of including

creditworthy borrowers ready and able to repay the mortgage obligations as follows:

> On a case-by-case basis, exceptions to the underwriting guidelines are made
> where the sponsor believes compensating factors exist. Compensating factors
> may consist of factors like length of time in residence, lowering of the borrower's
> monthly debt service payments, the loan-to-value ratio on the loan, as applicable,
> or other criteria that in the judgment of the loan underwriter warrant an exception.
> All loans in excess of $350,000 currently require the approval of the underwriting
> supervisor or designee approved by the supervisor. All loans over $650,000
> require the approval of the VP of Operations and Corporate Credit Department or
> its approved designees. In addition, the President of the sponsor approves all
> loans in excess of $1,100,000.

*See* 2006-3 Pro. Supp. at S-79; Series 2006-4 Pro. Supp. at S-74; Series 2006-5 Pro. Supp. at S-
78; Series 2006-6 Pro. Supp. at S-72; Series 2007-1 Pro. Supp. at S-80; and Series 2007-2 Pro.
Supp. at S-87.

       51.     Finally, the Prospectus Supplements described the existence of quality control

reviewers who ensured that the mortgage loan collateral complied with the underwriting

guidelines:

> ***Quality control reviews are conducted to ensure that all mortgage loans meet
> quality standards.*** The type and extent of the reviews depend on the production
> channel through which the mortgage loan was obtained and the characteristics of
> the mortgage loan. The sponsor reviews, at a minimum, 7% of each month's
> production. The random audit selection criteria includes a proportional
> representation of loan type, loan product, loan purpose, FICO score, LTV,
> underwriting grade, state and broker.

*See* 2006-3 Pro. Supp. at S-82; Series 2006-4 Pro. Supp. at S-77; Series 2006-5 Pro. Supp. at S-
81; Series 2006-6 Pro. Supp. at S-75; Series 2007-1 Pro. Supp. at S-83; and Series 2007-2 Pro.
Supp. at S-90.

C.    **Each of the Prospectus Supplements Contains**
      **an Identical Description of the Certificate Mortgages**

52.    Each Prospectus Supplement for the six Offerings contains identical language

describing the mortgage loans included in each Offering, stating:

> The Certificates will represent ownership interests in…a pool of subprime
> mortgage loans consisting of two groups -- a group of residential first-lien and
> second-lien, fixed and adjustable rate mortgage loans designated as Group I…and
> a group of residential first-lien and second-lien, fixed and adjustable rate
> mortgage loans designated as Group II…

*See* Series 2006-3 Pro. Supp. at S-2; Series 2006-4 Pro. Supp. at S-2; Series 2006-5 Pro. Supp. at
S-2; Series 2006-6 Pro. Supp. at S-2; Series 2007-1 Pro. Supp. at S-2; and Series 2007-2 Pro.
Supp. at S-2.

D.    **Each of the Prospectus Supplements**
      **Contains an Identical Description of Defendant NMI**

53.    Each Prospectus Supplement for the six Offerings contains identical language

describing the originator of the collateral, Defendant NMI:

> All of the mortgage loans were originated or purchased by NovaStar Mortgage,
> Inc., a Virginia corporation and a wholly-owned subsidiary of NFI Holding
> Corporation, Inc., a Delaware corporation, in the ordinary course of business on a
> loan-by-loan basis directly from mortgage brokers and mortgage loan originators.
> NovaStar Mortgage, Inc. also acts as the sponsor and servicer, as described
> herein.
>
> The sponsor originates non-conforming residential mortgage loans through a
> network of unaffiliated wholesale loan brokers. The sponsor utilizes a network of
> approximately 10,800 wholesale loan brokers in 50 different states. In addition,
> the sponsor services loans nationwide, and is licensed to do business as a foreign
> corporation in 50 states. The sponsor's principal executive offices are located at
> 8140 Ward Parkway, Suite 300, Kansas City, Missouri 64114. The principal
> offices for the sponsor's mortgage lending operations are in Lake Forest,
> California, Cleveland, Ohio and Salt Lake City, Utah. The sponsor is an approved
> HUD lender. The sponsor has operated as an originator of mortgage loans since
> 1997.

*See* Series 2006-3 Pro. Supp. at S-78; Series 2006-4 Pro. Supp. at S-73; Series 2006-5 Pro. Supp.
at S-77; Series 2006-6 Pro. Supp. at S-71; Series 2007-1 Pro. Supp. at S-79; and Series 2007-2
Pro. Supp. at S-86.

**E.    Each of the Prospectus Supplements Contains Identical
<u>Language Describing the Role of the Underwriter Defendants'</u>**

54.    In each Prospectus Supplement, the role of the Underwriting Defendants is

described in an identical manner on the first page of the document as follows:

> Deutsche Bank Securities Inc., Greenwich Capital Markets, Inc. and Wachovia
> Capital Markets, LLC as underwriters, will offer the underwritten certificates only
> after the underwritten certificates have been issued, delivered to and accepted by
> the underwriters. The underwriters have the right to reject any order.

*See* Series 2006-3 Pro. Supp. at Cover; Series 2006-4 Pro. Supp. at Cover; Series 2006-5 Pro.
Supp. at Cover; Series 2006-6 Pro. Supp. at Cover; Series 2007-1 Pro. Supp. at Cover; and Series
2007-2 Pro. Supp. at Cover.

**F.    Each of the Prospectus Supplements Identically Describes the
<u>Use of the Underwriter-Defendant Affiliates as "Hedge Providers"</u>**

55.    The Prospectus Supplements for all six Offerings set forth that the same three

affiliates of the Underwriter Defendants – Wachovia Bank, National Association, The Royal

Bank of Scotland plc, and Deutsche Bank AG – are acting as the Hedge Providers.  *See* Series

2006-3 Pro. Supp. at S-91-92; Series 2006-4 Pro. Supp. at S-86-87; Series 2006-5 Pro. Supp. at

S-91-92; Series 2006-6 Pro. Supp. at S-86-87; Series 2007-1 Pro. Supp. at S-98-99; and Series

2007-2 Pro. Supp. at S-105-106.

**G.    Five of the Six Prospectus Supplements Identify Deutsche
<u>Bank National Trust Company as the Trustee for the Offerings</u>**

56.    With the exception of the Series 2006-3 Offering, the Prospectus Supplements for

each of the five remaining Offerings contains an identical disclosure concerning DBNTC's role

as Trustee:

> Deutsche Bank National Trust Company ("DBNTC"), will act as trustee and as
> successor servicer.  A copy of the pooling and servicing agreement, without
> certain exhibits, will be provided by the trustee upon written request.  Requests
> should be addressed to the trustee at 1761 East St. Andrew Place, Santa Ana, CA
> 92705.  As the successor servicer, the trustee will assume the function of the
> servicer if NovaStar Mortgage, Inc. has been removed as such and another

30

successor servicer has not been appointed under the pooling and servicing agreement. The trustee will also act as the initial certificate registrar and initial paying agent. The trustee may appoint a co-trustee as described in the pooling and servicing agreement.

*See* Series 2006-4 Pro. Supp. at S-85-86; Series 2006-5 Pro. Supp. at S-90; Series 2006-6 Pro. Supp. at S-85; Series 2007-1 Pro. Supp. at S-93; and Series 2007-2 Pro. Supp. at S-99-100.

**H.      The Prospectus Supplements for Each of the Offerings
        Disclose the Same 17 Risk Factors in a Substantially Similar Manner**

57.      Further evidence that each of the six Offerings will be susceptible to common proof is drawn from the fact that Defendants disclose to investors, in a substantially similar manner, that each of these individual Offerings is subject to the following same 17 Risk Factors:

a.      Loans in the mortgage pool were underwritten to non-conforming standards and may experience higher delinquency and loss rates;

b.      The mortgage pool contains high original loan-to-value loans which could cause losses to holders of the Class A and Mezzanine Certificates;

c.      Potential inadequacy of credit enhancement;

d.      Pledge of servicing rights;

e.      The mortgage pool includes balloon loans, which can create increased risk of losses;

f.      The mortgage pool includes mortgage loans secured by second-liens on the related mortgaged property;

g.      The mortgage pool includes interest-only mortgage loans, which may have an increased risk of loss;

h.      The mortgage loans have geographic concentrations which could cause losses to the holders if certain events occur in such regions;

i.      The rate and timing of principal prepayments on the mortgage loans could adversely affect the yield on the Class A and Mezzanine Certificates;

j.      Effect of mortgage rates on the pass-through rates;

k.      Prepayment interest shortfalls and Relief Act shortfalls;

l.      The assignment of certain of the mortgages in the name of MERS may result in delays and additional costs in commencing, prosecuting and

31

completing foreclosure proceedings;

m.    The Mezzanine Certificates are particularly sensitive to the timing and amount of losses and prepayments on the mortgage loans;

n.    Ratings on the offered certificates are dependent upon the creditworthiness of the Mortgage Insurance Providers;

o.    The call of soldiers into active duty could limit the servicer's ability to collect on the loans;

p.    NovaStar Financial, Inc. is subject to certain class action litigation;

q.    Violation of various federal and state laws may result in losses on the mortgage loans.

*See* Series 2006-3 Pro. Supp. at S-12-21; Series 2006-4 Pro. Supp. at S-12-21; Series 2006-5 Pro. Supp. at S-12-21; Series 2006-6 Pro. Supp. at S-12-21; Series 2007-1 Pro. Supp. at S-12-21; and Series 2007-2 Pro. Supp. at S-13-26.

**I.    Each of the Prospectus Supplements Set Forth Common and Nearly Identical Credit Enhancement Features for Each Offering**

58.    In addition, the Prospectus Supplements for each of the Offerings set forth nearly identical credit enhancement features and overcollateralization structure as follows:

**Credit Enhancement**

The credit enhancement provided for the benefit of the holders of the Class I Certificates and Class A Certificates consists of subordination, as described below, Excess Cashflow and overcollateralization, as described under "Description of the Certificates—Overcollateralization Provisions, Allocation of Losses and Subsequent Recoveries", mortgage insurance, as described in "Description of the Mortgage Pool--Private Mortgage Insurance Policies" and cross collateralization, as described under "Description of the Certificates - Cross-Collateralization Provisions."

The rights of the holders of the Class I Certificates to receive distributions are senior to all other certificates. The rights of the holders of the subordinate certificates to receive distributions will be subordinated, to the extent described herein, to the rights of the holders of the Class A Certificates and the Class I Certificates. The subordinate certificates include the mezzanine and Class C Certificates. This subordination is intended to enhance the likelihood of regular receipt by the holders of the Class A Certificates and the Class I Certificates of the full amount of their scheduled monthly distributions of interest and principal, as applicable, and to afford such holders protection against realized losses.

32

The protection afforded to the holders of the Class A Certificates, and Class I Certificates by means of the subordination of the subordinate certificates will be accomplished by (i) the preferential right of the holders of the Class A Certificates and Class I Certificates to receive on any distribution date, prior to distribution on the subordinate certificates, distributions in respect of interest and principal, as applicable, subject to funds available for such distributions and (ii) if necessary, the right of the holders of the Class A Certificates and Class I Certificates to future distributions of amounts that would otherwise be payable to the holders of the subordinate certificates.

The rights of the holders of Mezzanine Certificates with lower numerical class designations will be senior to the rights of the holders of Mezzanine Certificates with higher numerical class designations, and the rights of the holders of the Mezzanine Certificates to receive distributions in respect of the mortgage loans (other than any prepayment penalties collected, which will be paid to the Class C Certificates) will be senior to the rights of the holders of the Class C Certificates. This subordination is intended to enhance the likelihood of regular receipt by the holders of more senior certificates of distributions in respect of interest and principal and to afford such holders protection against realized losses.

*See* Series 2006-3 Pro. Supp. at 106; Series 2006-4 Pro. Supp. at S-101; Series 2006-5 Pro. Supp. at S-106; Series 2006-6 Pro. Supp. at S-101; Series 2007-1 Pro. Supp. at S-113; and Series 2007-2 Pro. Supp. at S-120.

**J.      Each of the Prospectus Supplements Identify
        Common Mortgage Insurance Providers and Policies**

59.      Each of the Prospectus Supplements for the Offerings identifies the three identical

mortgage insurance companies who may provide lender paid mortgage insurance for the loans

underlying each of the Offerings:

*Mortgage Insurance Providers*

Mortgage Guaranty Insurance Corporation
PMI Mortgage Insurance, Inc.
Radian Guaranty, Inc.

*See* Series 2006-3 Pro. Supp. at S-1; Series 2006-4 Pro. Supp. at S-1; Series 2006-5 Pro. Supp. at S-1; Series 2006-6 Pro. Supp. at S-1; Series 2007-1 Pro. Supp. at S-1; and Series 2007-2 Pro. Supp. at S-1.

60.     Furthermore, each Prospectus Supplement identifies, using identical language, the applicable insurance policy provided by Mortgage Guaranty Insurance Corporation ("MGIC") intended to provide coverage for a large percentage of the collateral of each Offering (the "MGIC Policy").  The Prospectus Supplements each stated, in part:

> ***The MGIC Policy.*** The MGIC Policy does not cover any mortgage loans 60 days or more delinquent in payment as of the Cut-off Date. Each mortgage loan covered by the MGIC Policy is covered for losses up to the policy limits; provided, however, that the MGIC Policy will not cover special hazard, bankruptcy or fraud losses or certain other types of losses as provided in the MGIC Policy.  Claims on an insured mortgage loan generally will reduce uninsured exposure to an amount equal to 55% of the lesser of the appraised value as of the origination date or the purchase price, as the case may be, of the related mortgaged property, subject to conditions, exceptions and exclusions and assuming that any pre-existing primary mortgage insurance policy covering the mortgage loan remains in effect and a full claim settlement is made thereunder.
>
> The MGIC Policy is required to remain in force with respect to each mortgage loan covered thereunder until: (i) the principal balance of the mortgage loan is paid in full or (ii) the principal balance of the mortgage loan has amortized down to a level that results in a loan-to-value ratio for the mortgage loan of 50% or less (provided, however, that no coverage of any mortgage loan under the MGIC Policy is required where prohibited by applicable law); or (iii) any event specified in the MGIC Policy occurs that allows for the termination of the MGIC Policy by MGIC or cancellation of the MGIC Policy by the servicer on behalf of the insured.
>
> The MGIC Policy may not be assigned or transferred without the prior written consent of MGIC; provided, however, that MGIC has previously provided written consent to the assignment of coverage on all mortgage loans from the seller to the issuing entity.

*See* Series 2006-3 Pro. Supp. at S-83-84; Series 2006-4 Pro. Supp. at S-79; Series 2006-5 Pro. Supp. at S-83-84; Series 2006-6 Pro. Supp. at S-78-79; Series 2007-1 Pro. Supp. at S-86-87; and Series 2007-2 Pro. Supp. at S-92-93.

**K.      The Prospectus Supplements for All Six of the Offerings**
        <u>**Describe the Subordination Provisions in an Identical Manner**</u>

61.     The Prospectus Supplement for each of the Offerings set forth identical language concerning subordination as follows:

Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates and to afford those certificates protection against losses.

*See* Series 2006-3 Pro. Supp. at S-8; Series 2006-4 Pro. Supp. at S-7; Series 2006-5 Pro. Supp. at S-9; Series 2006-6 Pro. Supp. at S-8; Series 2007-1 Pro. Supp. at S-8; and Series 2007-2 Pro. Supp. at S-9.

L.   **The Prospectus Supplements for All Six of the Offerings Describe the Limited Cross-Collateralization Provisions in an Identical Manner**

62.   The Prospectus Supplement for each of the Offerings set forth identical language

concerning limited cross-collateralization as follows:

> Distributions of collections from both groups of mortgage loans will be used to pay interest and principal to the Mezzanine Certificates, the Class I Certificates and the Class C Certificates. To the extent that available funds representing interest from one group of mortgage loans are insufficient to make a required payment of interest to its related Class A Certificates, then any remaining available funds representing interest from the other group, after payment of interest to its related Class A Certificates, may be used to make such required payment as described in this prospectus supplement. Likewise, remaining funds representing principal from a group after making the required distribution of principal to its related Class A Certificates may be used to make required principal distributions on the other classes of Class A Certificates as described in this prospectus supplement.

*See* Series 2006-3 Pro. Supp. at S-9; Series 2006-4 Pro. Supp. at S-8; Series 2006-5 Pro. Supp. at S-9; Series 2006-6 Pro. Supp. at S-9; Series 2007-1 Pro. Supp. at S-9; and Series 2007-2 Pro. Supp. at S-10.

M.   **The Prospectus Supplements for All Six of the Offerings Describe the Allocation of Losses Provisions in an Identical Manner**

63.   The Prospectus Supplement for each of the Offerings set forth identical language

concerning the allocation of losses as follows:

> All realized losses on the mortgage loans will be allocated on each distribution date, sequentially as follows: first to the excess cash flow, second in reduction of the overcollateralization amount and third to the reduction of the principal balance of the classes of Mezzanine Certificates, in inverse order of priority.

*See* Series 2006-3 Pro. Supp. at S-9; Series 2006-4 Pro. Supp. at S-9; Series 2006-5 Pro. Supp. at S-9; Series 2006-6 Pro. Supp. at S-9; Series 2007-1 Pro. Supp. at S-9; and Series 2007-2 Pro. Supp. at S-10.

**N.    Each of the Prospectus Supplements Set Forth a Common and Nearly Identical Method of Distribution of the Certificates in Each Offering by the Underwriter Defendants**

64.    Lastly, each Prospectus Supplement contains common language regarding the "Method of Distribution" of the Certificates for by and among the Underwriter Defendants.  *See* Series 2006-3 Pro. Supp. at S-158-159; Series 2006-4 Pro. Supp. at S-154-155; Series 2006-5 Pro. Supp. at S-158-159; Series 2006-6 Pro. Supp. at S-156-157; Series 2007-1 Pro. Supp. at S-167-168; and Series 2007-2 Pro. Supp. at S-175-176.

**O.    NovaStar Affirmatively Stated That Throughout 2006 and into 2007 It Fortified its Mortgage Loan Underwriting Standards**

65.    Prior to and during the period in which the Offerings were consummated, the NovaStar Defendants provided investors with assurances that, despite certain negative developments in certain subprime areas, the Company's underwriting quality was unaffected.  In early 2007, just weeks after the Series 2007-1 Offering, NFI reported in its 2006 Annual Report on Form 10-K, dated March 1, 2007 ("2006 Annual Report"), that it had "intensified" its "focus on asset quality" in 2006 and "altered [its] proprietary modeling and underwriting guidelines and processes in an attempt to minimize losses and enhance asset quality in loan originations going forward."  Subsequently, just days before the Series 2007-2 Offering, on May 10, 2007, in its quarterly earnings announcement, NFI reiterated the purported improved quality of the loan assets underwritten in its most recent quarter stating:

> During the quarter, NovaStar implemented tighter underwriting guidelines and exception policies, enhanced appraisal reviews, and implemented a proprietary NovaStar Risk Assessment Score (NRAS) for evaluating credit risk in loan applications.

66.     In addition to certain negative developments in the subprime area that were described by NovaStar in its 2006 Annual Report, NovaStar was also experiencing cash flow difficulties in early 2007, which it addressed with new financing as described below.  In response to these events, the NovaStar Defendants made it clear to investors prior to the Offering that they had taken affirmative steps to improve asset quality and its underwriting practices as described in Defendant Hartman's Letter to Shareholders in the 2006 Annual Report:

> As credit performance deteriorated amid changes in the housing and financial markets, we have intensified our focus on asset quality. Our goal all along has been to underwrite loans with an eye on risk, but the credit challenges were greater than expected in 2006, primarily due to the slowdown in housing price appreciation. In response, we have significantly altered our proprietary modeling and underwriting processes in an attempt to minimize losses and enhance asset quality in loan originations going forward.

67.     NovaStar's 2006 Annual Report further reassured investors regarding asset quality:

> ... our 2006 vintage loan originations performed below expectations. We intensified our focus on asset quality as a deterioration of credit performance became apparent in 2006. We underwrite loans with an eye on risk – adjusting guidelines to market changes, keeping a watch on geographic diversity, and maintaining loan coupons while competitors decrease their coupons.

NovaStar Financial, Inc. 2006 Annual Report at 37.

68.     NovaStar provided investors with these reassurances right up to the eve of the final Offering in May 2007

69.     However, despite NovaStar's protestations, NovaStar's practices of permitting poor quality mortgage loans that violated the stated underwriting guidelines to become part of the collateral pool continued to infect its mortgage originations as described below.

70.     The ratings assigned to the Certificates further underscored that risk associated with the Certificates was substantially unconnected to the financial condition of NMI or conditions in the subprime market generally. The Rating Agencies, which closely followed NFI

and provided ratings on the Servicer for this Offering, were fully aware of the ostensible risks related to NMI's business in 2006 and 2007, when it reviewed the structure of the Offering and provided ratings for the Certificates.   Thus, at the time of the Offerings, regardless of the publicly known financial issues at NovaStar, 83% of the Certificates were still assigned Moody's and S&P's highest ratings, AAA and Aaa, indicating maximum security.   In addition, notwithstanding the publicly disclosed information regarding developments in the subprime market during 2006 and 2007 and financial issues related to NovaStar prior to and after this Offering, Moody's did not abandon its investment grade ratings of the Certificates until 2008-09, and even into 2010 for some of the more senior tranches.

**P.**   **NovaStar's Undisclosed Systematic Disregard of Underwriting Standards**

71.   The vast majority of the Mortgages at issue was originated in 2006 and the first five months of 2007.   In fact, 94.7% of the loans were originated within six months of being securitized and sold.   *See* 2006-3 Pro. Supp. at S-40; Series 2006-4 Pro. Supp. at S-38; Series 2006-5 Pro. Supp. at S-39; Series 2006-6 Pro. Supp. at S-37; Series 2007-1 Pro. Supp. at S-41; and Series 2007-2 Pro. Supp. at S-45.   The following information is the result of a factual investigation by counsel, including interviews with a number of former NovaStar representatives including, but not limited to:

- A former Vice President of Operations with NovaStar from 2005 to March 2007 who worked in Kansas City, MO.
- A former Quality Control Auditor/Supervisor with NovaStar from August 2005 to September 2007 who worked in Kansas City, MO.
- A former Closing Supervisor with NovaStar from 2002 through May 2007 who worked in Ohio.
- A former Quality Control Auditor with NovaStar from 2004 to 2007 who worked in Ohio.
- A former Senior Underwriter with NovaStar from 2005 through 2007 who worked in Lake Forest, CA.
- A former Senior Underwriter with NovaStar from March 2006 to August 2006 who worked in Lake Forest, CA.

- A former Account Manager with NovaStar from 2004 to 2007 who worked in Ohio.
- A former Account Executive with NovaStar from February 2006 to May 2007 who worked in Ocala, FL.

72.     NovaStar's origination operations personnel included Account Executives, Account Managers, Underwriters, Auditors (Quality Control and Appraisal), Supervisors, Vice Presidents and Executives.

73.     NovaStar's Account Executives worked all over the country with smaller lending businesses, including mortgage brokers, to arrange for NovaStar loans to be offered to potential borrowers.  These smaller lending businesses were independent and not part of NovaStar, but they were compensated with a fee for every NovaStar mortgage they brokered.  In 2006 there were over 400 NovaStar Account Executives located around the country.

74.     NovaStar's Account Executives reported directly to NovaStar's Account Managers.  Each NovaStar Account Manager oversaw a territory covered by up to ten Account Executives.  Account Managers were responsible for obtaining completed loan applications and all supporting loan documentation from the Account Executives, reviewing the loan documentation and entering it into NovaStar's computer system.  NovaStar's Account Managers controlled the loan files and any developments or inquiries from loan underwriters or Quality Control ("QC") went first to the Account Manager before being disseminated back to the appropriate person for handling.

75.     NovaStar's Account Managers worked in NovaStar's regional operations offices – Lake Forest, CA; Richfield, Ohio; Independence, Ohio; Kansas City, Missouri and Detroit, Michigan.  By the end of 2006, the Detroit, Michigan office had been closed and the Independence, Ohio and Richfield, Ohio regional operations offices had merged into one regional operations center.

76.     Once the loan application was in NovaStar's computer system, the Account Manager would send the loan file to an Underwriter for approval.  According to a former Senior Underwriter, subprime loans were underwritten in accordance with a specific matrix designed by NovaStar's upper management – including Supervisors, Vice Presidents and Executives.   In 2006 and 2007, NovaStar's Underwriters manually reviewed subprime loan applications for compliance with NovaStar's underwriting guidelines; there was no automated underwriting system.  Whereas most mortgage originators utilized systems like "DU" (the Fannie Mae system) or "LP" (the Freddie Mac system) by 2006, NovaStar did not employ either in underwriting subprime loans.

77.     Underwriters would determine, based on the loan file they received from the Account Manager, which of the six types of loan documentation programs a borrower qualified for. The six documentation programs included "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement."   The Underwriters' determination of the appropriate documentation program was based, in part, on the FICO score of the borrower.   Each documentation program had different requirements. For example, under the "Full Documentation" program, applicants generally were required to submit their most recent pay stub and either verification of their employment or up to two prior years of W-2 forms.  Under the "Stated Income" program, an applicant may be qualified based on monthly income as stated in the loan application, but this stated income had to be reasonable in view of the borrowers stated employment.

78.     The Underwriter determined if the loan file met the requirements of the applicable program. If there were deficiencies in the loan file the Underwriter would only approve the loan "with conditions" – meaning that the deficiencies must be cured prior to closing the loan.

79.     Underwriters were concentrated for the most part in NovaStar's Regional Offices in California and Ohio, but NovaStar also employed "remote underwriters" at other locations as well.  Underwriters reported directly to Supervisors in California, Ohio and Kansas City.  The Underwriting Supervisor of the Lake Forest office was Jeff Davis.

80.     NovaStar also had Auditors working in a large Quality Control/Auditing ("QC") Department in the California, Ohio and Kansas City locations.  The QC Department was responsible for monitoring approved loan applications for fraud or deficiencies in documentation.  In addition, if a loan was denied by an Underwriter, it would go to the QC Auditors for further review.  Auditors including George Wheeler, Bernard Murphy and Mayaguez Beligan worked at NovaStar during the relevant period.  The QC Department also handled periodic due diligence on the loans in NovaStar's portfolio.  According to a former QC Auditor, each month the QC Department would sample at least 7% of the NovaStar's monthly loan production.  These loans were rated using NovaStar's internal scaling system, which rated the loans "acceptable," "marginal" or "deficient."

81.     As mentioned above, NovaStar's Underwriters reported to Supervisors. Supervisors had the most underwriting training, knowledge and experience in NovaStar's Origination operations and made the ultimate decision as to whether a mortgage loan would be approved and funded.  Whereas there were approximately 11 Supervisors in 2005 and early 2006 at NovaStar, by the beginning of 2007 there were only a handful remaining in the Lake Forest and Richfield Locations. In Lake Forest, Donna Delmonte served as one of the Supervisors

during the relevant period before she took on the responsibilities of a Vice President of Operations in March 2007.

82.     Supervisors reported to Vice Presidents of Operations ("VPO").   VPOs were focused more on NovaStar's business and sales operations than with underwriting processes and origination.   Each VPO was responsible for a group of Supervisors, Underwriters, Auditors, Account Managers and Account Executives.   According to several NovaStar employees in California and Ohio, VPOs, while technically senior to Supervisors, were not as familiar with the underwriting process which, accordingly, created tension between Supervisors and Vice Presidents.   Generally, Supervisors had signing authority for loans up to $650,000, but loans above that amount needed approval by a VPO.   Ultimately, the company cut the number of VPOs to four, down from eleven, by the end of 2006.   During the relevant time period, NovaStar's VPO's included Patrick Rider, Emilio Soli and Larry Braga.   The VPO position was eliminated completely in early 2007, with Supervisors, including Donna Delmonte in Lake Forest, taking control of the sales and underwriting businesses completely by March 2007.

83.     Vice Presidents (including VPOs)[11] reported to Executive Vice Presidents and Executives in Kansas City, Missouri daily, including to Dan Pasgan, Defendants Lance Anderson and Scott Hartman.

**1.      In 2006  NovaStar Deviated Routinely From Adherence to It Underwriting Guidelines In Order To Achieve Loan Volume Targets**

84.     In 2006 there was increased pressure on Account Managers, Underwriters and QC Auditors at NovaStar to "close" (make) loans.   According to former Underwriters, Account Managers and Supervisors at NovaStar, this pressure to achieve loan production resulted in a

---

[11] NovaStar also had additional "Vice Presidents" ("VPs") who worked outside of Operations at NovaStar's Kansas City, Missouri Headquarters.  These VPs included the VP of Default, Jenifer Ingilali; the VP of Loss Mitigation, Meagan Devlin; and the VP of Credit Risk, Serene Richardson.

systematic loosening of NovaStar's adherence to its underwriting guidelines.  According to a former NovaStar Supervisor who worked at the Company during this period, NovaStar gave increased financial incentives to its Account Managers, Underwriters, Supervisors and VPOs for reaching volume-based performance targets.  These incentives helped cause the approval of loans that did not comply with NovaStar guidelines.

85.     One former NovaStar QC Auditor confirmed that, starting in October 2006, NovaStar Underwriters and QC Auditors began routinely alerting their Supervisors about loans rejected due to suspicious or fraudulent documentation, only to learn that the rejection of the suspicious or fraudulent loan by the Underwriter and QC Auditor had been overridden by Supervisors and VPOs and the loan had been approved.  Underwriters would consistently make notations in the file regarding deficiencies which they believed warranted denial of applications because of failure to adhere to NovaStar's underwriting guidelines.  One former Underwriter stated that these notations were made "because we did not want to get in trouble when something ever came back."

86.     In 2007, NovaStar eliminated the VPO position at the Company, and vested all of the authority of underwriting approvals and exception granting to the Supervisors in Lake Forest and Ohio.  According to one former Vice President, this is when things got really bad at the Company and the guidelines were just "tossed out the window" as volume became the primary goal.

87.     General overriding of denials of full documentation loan applications by QC and Underwriters became commonplace by 2007 at NovaStar.  In many cases, when senior Underwriters refused to sign off on an override, VPOs (until they were let go in March 2007) or

Supervisors would approach more junior Underwriters and direct them to sign off on an application.[12]

88.     Once NovaStar underwrote a loan, it would go into its "warehouse."  Every month or so, according to a NovaStar QC Auditor, NovaStar would offer a group of loans for sale to outside investors or securitize a pool of loans with the help of the investment banks.  A NovaStar Vice President who worked at the company until March 2007 stated that NovaStar was "not keeping the crap – it was selling it for securitization."  According to a former QC Auditor at NovaStar, the loans that were being sold off were not the "best quality."[13]

### 2.     Full Documentation Loans Lacked Requisite Documentation Or Documentation Produced Was Facially Deficient

89.     NovaStar's Full Documentation loan program had serious, undisclosed problems. One former NovaStar Account Manager stated that NovaStar was approving loans as Full Documentation loans even though they had severe deficiencies.  The main source of verification on a Full Document loan was the employment of the borrower.  If the employment could not be verified, the loan should be denied.  However, a former NovaStar QC Auditor reported that NovaStar would routinely override rejections of denials of loans to self-employed borrowers who presented highly questionable employment documentation.  This former NovaStar QC Auditor recalled that in one instance the employment verification documentation consisted of a piece of paper that stated the borrower "cleans this house."  The loan was denied and it was recorded in

---

[12]   While Supervisors and VPOs could override a denial based on a failure to follow the underwriting guidelines, every loan still need the signature of an Underwriter before it was approved.

[13]   It appears NovaStar cherry-picked and kept the "best" loans for its own portfolio while selling lesser quality loans to the public in the Offering.  Shortly after the Offering, in the third quarter of 2007, NFI sold to Defendant Wachovia, $668.8 million of "mortgage loans held-for-sale which were not, and had never been, delinquent, for a price of 91.5% of par."  NFI 2007 Annual Report and Form 10-K at 49.

the notes of the file that there was insufficient documentation and employment verification. Nevertheless, that loan application denial was overridden and the borrower who "cleans this house" was approved for a full documentation loan.

90.     A former Senior Underwriter confirmed that this practice of overriding rejections resulted in many loan applications improperly being classified as Full Document loans. According to a former QC Auditor "deficient income history, rental history and a lot of that stuff all the time would be just let go.  Account Managers, VPs and [Supervisors] were pretty much the people running the show."

91.     According to NovaStar's guidelines as of May 2007, letters of verification of employment were required from borrowers, and the letters had to be from employers.  However, more often than not this requirement was not satisfied at NovaStar.  For example, a former QC Auditor once came across a letter on a post-it note that said "Mrs. X cleans my house and I pay her three thousand a week."  In another instance, employment verification for a masseuse was absent, but when this deficiency was brought to the Supervisor's attention, the Supervisor overrode the denial of the application because there was a record in the file of the borrower having a license to massage and that was enough.  Many loan application files were from housekeepers from South Florida who allegedly made $200,000 a year.  Even in instances as egregious as this application, denials would be overridden by NovaStar employees at levels above the Underwriters in order to increase volume. While these are only some examples, the Auditor said that this was the general practice with respect to loans that NovaStar securitized and sold to outside investors (as opposed to those it kept on its own books).

92.     To qualify for a Full Document loan program the Underwriter is supposed to have, in the loan file, full documentation of the borrowers' financial status, credit history, and

employment status.  By 2006 and 2007, the employment verification by the Originator, which was supposed to occur within three days, was rarely completed by the deadline.  Similarly, in 2006 and 2007, credit score verifications and research also were completed after the supposed deadlines.

93.     These delays resulted in repeated and consistent violation of the underwriting guidelines.  For instance, Underwriters and QC Auditors at NovaStar noticed that, more often than not, additional credit was acquired by the borrower during the loan process.  When a NovaStar Underwriter receives a loan file, that file contains a credit report.  According to a former Senior Underwriter at NovaStar, many times it took two or three months to get a loan processed through from start to finish.  In many cases, borrowers had acquired additional debt during that interim period.  In 2006 and 2007 it was not customary for NovaStar to account for that additional debt when underwriting and closing subprime loans.  Because that debt was not counted, the loan should not have been cleared and underwritten as this additional debt gave the borrower, and thus the loan, significantly higher default risk than would be in the original loan application file.

### 3.     Stated Income Loans Not Reasonably Related to Stated Employment

94.     According to a NovaStar Underwriter, under NovaStar guidelines, Stated Income loans had to pass a "reasonableness test, end of story."  A former Account Manager at NovaStar confirmed that that the income levels borrowers were providing for NovaStar's Stated Income loans were a far cry from "reasonable."  This former NovaStar Account Manager confirmed that the underwriting guidelines at his level were strictly applied and were followed by Quality Control and Underwriting people at the Company.  As a result, a large number of loan applications were being denied throughout 2006.  A former Underwriter was aware that this

made Account Executives, who depended solely on volume based compensation, and Account Managers, who also had a volume based component of their compensation, very upset. The underwriter commented that if Account Executives were unable to get their borrowers into NovaStar loans, they would go elsewhere. Some Account Executives were not surprised that the loans were not going through because, according to one former loan officer who strictly dealt with NovaStar's ARM loans, a common theme was that "incomes were too low to sustain the payments" on the mortgages NovaStar was underwriting.

95.     The Company reacted quickly, and in late 2006 and into 2007, denials of applications for having unreasonable stated income, were being overridden and deficiencies were "swept under the rug" in order to push a loan through. This confirmed, according to a NovaStar Underwriter, that there were definitely exceptions being made to "income guidelines." On many occasions there was no reasonable basis to take the income at face value. Even when unreasonable stated incomes were the reason to deny an application or were questioned, the denials were constantly overridden by Supervisors, QC Auditors and VPOs at NovaStar. For example, one former Senior Underwriter at NovaStar recalled an application that claimed $10,000 monthly income for a Walmart employee. Soon after denying the application for approval on those ground, the application had disappeared from the system, meaning that someone at the Company had contacted the loan officer on behalf of the originator and overridden the denial of that Stated Income loan.

96.     Ultimately, there was no verification for stated income and, contrary to the guidelines, whatever the borrower claimed was taken at face value regardless of the reasonableness of the amount. It was not uncommon to come across applications stating the borrower worked at McDonalds and made $50,000 a year. The common sense view was that

47

there is no way that person is making that much in salary unless they are in upper management at McDonald's.   However, without any way to verify income under those circumstances, Underwriters were forced to assume that the borrower made that money because it theoretically could be true.   These loans would be approved constantly.   According to one former NovaStar QC Auditor, "these were the loans that were getting sold to investors."

Q.    **Clayton's Review of the NovaStar Mortgage Pools**

97.    Typically, once the Rating Agencies' analysis was complete, the investment bank or underwriters on the securitization submitted their bid.   If the mortgage originator such as NovaStar accepted a bid, the underwriters usually had a short period of time prior to the settlement date (when cash was paid to the mortgage originator for the loans) to conduct due diligence on the loans.   The Underwriter Defendants often hired third-party due diligence firms such as Clayton to conduct this review which was performed on a small percentage of loans in the pool (5-10%).   Defendants RBS, DBS and Wachovia were underwriters for all six NovaStar Offerings at issue herein.

98.    Although the ostensible purpose of the review was to eliminate from the pools loans that did not meet the stated underwriting standards, executives at Clayton and another due diligence firm, the Bohan Group ("Bohan"), stated that at the time the Offering occurred, banks such as Defendants RBS, DBS and Wachovia, were performing increasingly cursory due diligence on smaller and smaller percentages of loans.   Frank P. Filipps, Clayton's chairman and CEO, stated that "[e]arly in the decade, a securities firm might have asked Clayton to review 25% to 40% of the sub-prime loans in a pool, compared with typically 10% in 2006." Bohan President Mark Hughes stated, "[b]y contrast, loan buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans

examined." E. Scott Reckard, Sub-Prime Mortgage Watchdogs Kept On Leash, Los Angeles

Times, March 17, 2008.

99.     Additionally, as Clayton only reviewed a small cross-section of the loans in each

pool – often less than 10% – there were many loans which were never reviewed for compliance

with applicable underwriting standards. During sworn testimony before the FCIC, the following

exchange occurred between the Chairman of the FCIC, Phil Angelides, and Senior Vice

President at Clayton, Vicki Beal:

> MR. ANGELIDES: Secondly, it appears as though you did a sample of 5 to 10
> percent, but it looks like the other 90 percent were never fixed. So I am thinking if
> I am a securitizer … what is happening here is that [I] got a sample of 10 percent
> [of the loans]. I know 11 percent of those fail. I kick those out. But as to the other
> 90 percent, I [] do nothing?
>
> MS. BEAL: Right.

100.    For each loan pool examined, including the NovaStar pools at issue herein,

Clayton reviewed the percentage of loans designated for: (1) adherence to the seller's credit

underwriting guidelines and client risk tolerances; (2) compliance with federal, state and local

regulatory laws; and (3) the integrity of loan data provided by the seller to the prospective buyer.

This review was commonly referred to as a "credit and compliance review." Clayton's contract

underwriters reviewed the loan files, compared tape data with hard copy or scanned file data to

verify loan information, identified discrepancies of key data points, and graded loans based on

seller guidelines and client tolerances.  For its review of NovaStar loans, Clayton's review team

generally consisted of a team leader, a quality control person and the underwriters or reviewers.

The team leader was the liaison to clients – the investment banks.

101.    Clayton's quality control reviewer generated daily reports for the Underwriter

Defendants and the loan seller (e.g., NovaStar) that summarized Clayton's findings, including

summaries of the loan files that suffered from exceptions to the relevant underwriting standards. Some exceptions were benign, while others, such as lack of an appraisal, stated income not being reasonable for the job stated or missing critical documents in a HUD-1 file, were more severe. Once Clayton identified exceptions, the seller (*e.g.,* NovaStar) had the option to attempt to cure them by providing missing documentation or otherwise explaining to Clayton why the loan complied with underwriting standards by identifying factors which would compensate for the exceptions. If NovaStar provided additional information, Clayton re-graded the loan. Once this process was complete, Clayton provided the Underwriter Defendants with final reports.

102.    Clayton's final reports categorized loans into one of three categories. First, loans that complied with the underwriting standards were categorized as "Accept." Second, loans that did not comply with underwriting standards were categorized as "Reject." Finally, loans that were initially categorized as "Reject," but were waived by the client were categorized as "Waiver."

103.    According to a former QC Auditor at NovaStar, a representative of the Underwriter Defendants and NovaStar would have conference calls discussing the loans which Clayton identified issues with, and whether those loans would be waived into the pool being purchased. Donna Delmonte was the NovaStar Supervisor responsible for representing NovaStar on these conference calls leading up to the 2007-2 Securitization. Prior to Ms. Delmonte, Serene Richardson performed those duties.

104.    During hearings before the Financial Crisis Inquiry Commission in 2010, Clayton, the third-party due diligence firm which reviewed compliance with underwriting guidelines for MBS offerings, submitted a study it conducted in 2007 regarding the underwriting and due diligence practices of originators and investment banks that were selling MBS during 2006 and

2007 including Defendants RBS and DBS.  For the period from 2006 through the first two quarters of 2007, Clayton prepared "Trending Reports" which it shared with major investment banks analyzing the "Reject" and "Waiver" statistics for approximately 911,000 loans it had reviewed, representing about 10% of the pools Clayton had been contracted to review.

105.    The "Trending Report" submitted to the FCIC shows that during this period Defendants RBS and DBS, both of which were underwriters for all NovaStar Offerings in 2006 and 2007, routinely ignored loans categorized as "rejected" by Clayton and granted waivers or exceptions for such loans to be admitted into the mortgage pool.  Specifically, for 2006 and the first two quarters of 2007 Clayton reviewed 66,379 loans for Defendant DBS and waived the exceptions related to 50% of the loans rejected by Clayton.  Similarly, during this period Clayton reviewed 67,257 loans for RBS (Greenwich) and waived the exceptions related to 53% of the loans rejected by Clayton.  Based on the significant number of rejected loans due to serious underwriting defects, Defendants DBS and RBS should have recognized that non-compliance with underwriting guidelines was a serious "red flag" to Defendants such that the entire collateral pool should have been examined for underwriting defects, rather than just a very small percentage, particularly with respect to NovaStar, which was issuing subprime loans.

106.    Additional regulatory investigations have focused on whether Wall Street banks including the Underwriter Defendants failed to adequately disclose the warnings they received regarding the number of loans that failed to meet lending guidelines.  On January 12, 2008, in an article entitled "Inquiry Focuses on Withholding of  Data on Loans," the New York Times reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans. Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed

to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. ***But the banks did not disclose the details of these reports to credit-rating agencies or investors.*** The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments (emphasis added).

107.    On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in New York in exchange for providing documents and testimony regarding its due diligence reports. That same day, in an article entitled "*Loan Reviewer Aiding Inquiry Into Big Banks,*" the New York Times reported that a person familiar with the NYAG's investigation stated that as demand for loans surged, mortgage originators were in a superior bargaining position and required that Wall Street banks have Clayton and other consultants review fewer loans. Incredibly, "investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

108.    On March 17, 2008, the Los Angeles Times reported that Clayton and Bohan employees (including eight former loan reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports."

109.    Clayton quality control personnel have indicated that Stated Income loans reviewed by Clayton were identified as a significant problem to their clients.  In particular, loans were being granted that made no sense in light of the applicants' stated position and income yet they were still getting waived into mortgage pools.  One quality control person stated that because these loans were of such poor quality they eventually began to reject them on principle alone.

110.    In addition, the Underwriter Defendants were incentivized to "kick-out" as few loans as possible because (1) mortgage originators would not invite a bank that consistently kicked out large numbers of loans to future auctions; and (2) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fee.  In many instances, instead of kicking loans with underwriting exceptions out of the pools, Defendants RBS, DBS and Wachovia simply included the loans and used the reports which Clayton generated to negotiate a lower purchase price for the loan pool.

**R.    Further Evidence Confirming that the Underwriting Guidelines
Were Systematically Disregarded For the Loans Underlying the Offerings**

**1.    Ratings of Certificates Collapse To "Junk Bond" Levels
Shortly After Issuance Due To Undisclosed Aggressive Underwriting**

111.    Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  In this regard, the Rating Agencies played an important role in assessing the structure and credit quality of the Certificates and in the sale of such securities to investors.

112.    In June 2007, S&P revised the methodologies used to rate mortgage-backed securities because the performance of the underlying collateral "called into question" the accuracy of the loan data.   Specifically, S&P increased "credit protection" for rated transactions.  S&P stated that it would also seek to review and minimize the incidence of potential underwriting abuse given "the level of loosened underwriting at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."  Moody's also revised its ratings methodology, citing previously undisclosed "aggressive underwriting" used in the origination of the collateral. Had these aggressive

underwriting practices been disclosed they obviously would have been reflected in the initial ratings of both Moody's and S&P and no revision would be required.

113.    When the rating agencies applied the new methodology to the Certificates the ratings collapsed as many as 20 levels with, for example, 100%, of the total $6.4 billion of Certificates initially rated AAA/maximum safety now having been downgraded from AAA to "Ba1" or below.  In most cases, the Certificates have now been downgraded to Caa1 or CCC and below, meaning these Certificates are not only designated "junk bonds," but are assessed to be in danger of "imminent default."   For example, for the Series 2007-2 Offering, 100% of the collateral has been downgraded to "junk" status or the Rating Agencies have withdrawn their ratings in certain instances, as follows:

| Tranche | Initial Rating | Definition | Current Rating | Definition |
|---|---|---|---|---|
| **A-1A** Moody's S&P | Aaa AAA | Extremely Strong Capacity to Meet Financial Commitments. Highest Rating | Caa2 CCC | **Vulnerable to Default – Very Poor Financial Condition** |
| **A-2A** Moody's S&P | Aaa AAA | | WRNR | **Agency Withdrew and/or No Longer Rates Tranche** |
| **A-2B** Moody's S&P | Aaa AAA | | Caa3 CCC | **Vulnerable to Default – Very Poor Financial Condition** |
| **A-2C** Moody's S&P | Aaa AAA | | C CCC | **Likely in Default or Vulnerable to Default** |
| **A-2D** Moody's S&P | Aaa AAA | | C CCC | |
| **M-1** Moody's S&P | Aa1 AA+ | **Very Strong Capacity To Meet Financial Commitments** | C CCC | **Likely in Default or Highly Vulnerable to Default** |
| **M-2** Moody's S&P | Aa2 AA | Very Strong Capacity To Meet Financial Commitments | C CCC | Likely in Default or Vulnerable to Default |
| **M-3** Moody's S&P | Aa3 AA- | | C CCC | |
| **M-4** Moody's S&P | A1 A+ | Strong Capacity To Meet Financial Commitments | C CCC | |
| **M-5** Moody's S&P | A2 A | | C CCC | |
| **M-6** Moody's S&P | A3 A- | | C CC | |
| **M-7** Moody's S&P | Baa1 BBB+ | Adequate Capacity To Meet Financial Commitments | C CC | |
| **M-8** Moody's S&P | Baa2 BBB | | C D | **Default** |
| **M-9** Moody's S&P | Baa3 BBB- | | C D | |

114.    These default level junk bond ratings reflect the rating agencies independent

assessment that it is likely or highly likely that the bonds will default prior to investors receiving

their principal. It is for that reason that the price and value of the Certificates collapsed commensurate with the downgrades as investors recognized the fact that they would likely not receive back their principal investment. This likelihood of default (for virtually all Certificates) is supported by the fact that $2.24 billion in principal is still owed to investors, yet $1.02 billion of the mortgage loan collateral is presently either delinquent, defaulted on, in foreclosure or repossessed as follows:

| Offering | Current Remaining Principal | Current $ Delinquent/ Default/ Bankruptcy/ Foreclosure/ REO | Current % Delinquent/ Default/ Bankruptcy/ REO/ Foreclosure |
|---|---|---|---|
| *NHEL 2006-3* | *$228.21 million* | *$209.67 million* | *91.88%* |
| *NHEL 2007-2* | *$221.26 million* | *$85.85 million* | *38.80%* |
| *NHEL 2007-2* | *$338.21 million* | *$119.04 million* | *35.20%* |
| *NHEL 2007-2* | *$384.07 million* | *$149.48 million* | *38.92%* |
| *NHEL 2007-2* | *$574.99 million* | *$218.15 million* | *37.94%* |
| *NHEL 2007-2* | *$490.59 million* | *$154.14 million* | *31.42%* |

115.    In addition, as of January 2015, very little if any credit support exists in the mezzanine tranches and overcollateralization accounts as a result of the realized losses in the collateral pools to date (over $2.67 billion in collateral realized losses already recognized and continue to grow each month).  Those previously realized losses have almost wiped out the overcollateralization features in each Offering.  Given the amount of additional collateral currently delinquent or in default ($1.02 billion), losses will continue to erode the credit support and move up the Offerings' structures through the senior tranches.

116.    Since the downgrades occurred in material part because of Rating Agencies' determinations of previously undisclosed improper underwriting practices, these downgrades provide factual support for the systematic disregard of the stated underwriting guidelines in the Prospectus Supplements.  NovaStar's systematic disregard for the stated underwriting guidelines led directly to dramatic downgrades of the Certificates as set forth above.

**2.    Exponential Increase In Delinquency And Default Rates Evidence Early Payment Default and Disregarded Guidelines**

117.    NovaStar and correspondent mortgage originators routinely allowed misstatements in loan applications and systematically ignored stated underwriting standards. Unsurprisingly, this has resulted in dismal performance of the loans.  Just six months after the Offerings, borrower delinquency and default rates had increased from 0.76% at issuance to over 12.5% of the mortgage loan balance.  One year out from the Offerings, on or about the filing of the Initial Complaint, borrower delinquency and default rates had increased to over 24.1% of the current principal balance.  These skyrocketing delinquency and default rates forced the Rating Agencies to downgrade substantially all of the Certificates to at or near junk bond status (as set forth below).  Moreover, as of the filing of the First Consolidated Amended Complaint in June 2009, borrower delinquency and default rates on the underlying mortgage collateral had increased to a shocking 51% of the mortgage loan balance.  This resulted in further downgrades by the Rating Agencies.  As of the date of the filing of this Complaint, 46% of the mortgage collateral was considered to be in some form of delinquency or default, while realized losses have soared to over $2.5 billion.

118.    These early payment defaults and delinquency rates are reflective of a disregard for underwriting guidelines.  As reported by the Federal Bureau of Investigation (the "FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans

found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications. The study, cited by the FBI and conducted by Base Point Analytics, found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not. The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, fictitious employers and falsified tax returns. The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., concluding that the same top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the same top states with the highest percentage of early payment defaults.

119.    Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to the loan originators which further evidenced that they had engaged in underwriting practices wholly inconsistent with the guidelines set forth in the Registration Statement and Prospectus Supplements.

## VI.

### THE OFFERING DOCUMENTS CONTAINED IDENTICAL MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING GUIDELINES

120.    The Prospectus Supplements described the underwriting guidelines used by NMI in originating the Certificates' underlying collateral. NMI's underwriting guidelines generally required a description of the borrower's income, employment documentation and a credit report. For example, the Prospectus Supplements all stated:

> The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan. Each loan applicant completes an application that includes information with respect to the

applicant's income, liabilities and employment history.  Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date.

\*       \*       \*

***Quality control reviews are conducted to ensure that all mortgage loans meet quality standards.***  The type and extent of the reviews depend on the production channel through which the mortgage loan was obtained and the characteristics of the mortgage loan.  The sponsor reviews, at a minimum, 7% of each month's production.   The random audit selection criteria includes a proportional representation of loan type, loan product, loan purpose, FICO score, LTV, underwriting grade, state and broker.

*See* 2006-3 Pro. Supp. at S-78, 82; Series 2006-4 Pro. Supp. at S-73, 77; Series 2006-5 Pro. Supp. at S-77, 81; Series 2006-6 Pro. Supp. at S-71, 75; Series 2007-1 Pro. Supp. at S-79, 83; and Series 2007-2 Pro. Supp. at S-86, 90.

121.   The Prospectus Supplements also detailed NMI's programs for issuing mortgage loans where less than full documentation was required.   However, even those programs were subject to underwriting procedures and required appraisals, as set forth in ¶¶46-51, herein.   For example, the Prospectus Supplements all stated that:

The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement."   Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub.   Under the Limited Documentation program, no such verification is required however, bank statements for the most recent consecutive 6-month period are required to evidence cash flow.   Under the Stated Income program, an applicant may be qualified based on monthly income as stated in the loan application. Under the "No Documentation" program, an applicant provides no information as it relates to their income.   Under the "No Income/No Asset" program, the applicant's income and assets are not verified, however the applicant's employment is verified.   Under the Streamline program, this is allowed only for our Retention division for borrowers that currently have a mortgage with the sponsor.  The documentation required for this loan is based on previous documentation type. If a "Streamline loan's original documentation type

was "Full Documentation," then a verification of the applicant's employment is the only requirement. Mortgage loans originated under any program other than the "Full Documentation" program require less documentation and verification than do traditional "Full Documentation" programs. The Full Doc/12-Months Personal Bank Statement Program allows self-employed or fixed income borrowers to substitute most recent consecutive 12-months bank statements for wage earner's W-2 forms and recent pay stubs. Given that the sponsor primarily lends to non-conforming borrowers, it places great emphasis on the ability of collateral to protect against losses in the event of default by borrowers.

*See* 2006-3 Pro. Supp. at S-79; Series 2006-4 Pro. Supp. at S-73; Series 2006-5 Pro. Supp. at S-78; Series 2006-6 Pro. Supp. at S-72; Series 2007-1 Pro. Supp. at S-79; and Series 2007-2 Pro. Supp. at S-87.

122.   The Prospectus Supplements also all set forth guidelines for underwriting

exceptions granted in cases where "compensating factors" were present:

On a case-by-case basis, exceptions to the underwriting guidelines are made where the sponsor believes compensating factors exist. Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception. All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor. All loans over $650,000 require the approval of the VP of Operations and Corporate Credit Department or its approved designees. In addition, the President of the sponsor approves all loans in excess of $1,100,000.

*See* 2006-3 Pro. Supp. at S-79; Series 2006-4 Pro. Supp. at S-73; Series 2006-5 Pro. Supp. at S-78; Series 2006-6 Pro. Supp. at S-72; Series 2007-1 Pro. Supp. at S-79; and Series 2007-2 Pro. Supp. at S-87.

123.   The Prospectus Supplements all represented that loans in which made up Group I

of each Offering complied "in all material respects" with local, state and federal laws, as follows:

All of the initial Group I mortgage loans conform to certain agency guidelines with respect to the principal balance of such mortgage loans and certain representations made in respect of those mortgage loans, including the following: … (v) each of the initial Group I mortgage loans complies in all material respects with applicable local, state and federal laws including, but not limited to, all applicable predatory and abusive lending laws,…

*See* 2006-3 Pro. Supp. at S-42; Series 2006-4 Pro. Supp. at S-41; Series 2006-5 Pro. Supp. at S-41; Series 2006-6 Pro. Supp. at S-39; Series 2007-1 Pro. Supp. at S-43; and Series 2007-2 Pro. Supp. at S-47.

124.    The Prospectus Supplements also all  represented that all of the loans in Group II

of each Offering complied "in all material respects" with local, state and federal laws, as follows:

> None of the initial Group II mortgage loans are subject to HOEPA and each of the Group II mortgage loans complies in all material respects with applicable local, state and federal laws, including but not limited to, all applicable predatory and abusive lending laws.

*See* 2006-3 Pro. Supp. at S-60; Series 2006-4 Pro. Supp. at S-56; Series 2006-5 Pro. Supp. at S-59; Series 2006-6 Pro. Supp. at S-55; Series 2007-1 Pro. Supp. at S-61; and Series 2007-2 Pro. Supp. at S-67.

125.    The aforementioned statements in all the Offering Documents related to

NovaStar's underwriting standards, were materially untrue and omitted material facts necessary

to make them not misleading because, as described herein at ¶¶71-119, Defendants failed to

disclose that NovaStar systematically disregarded its underwriting guidelines as follows:

-   NovaStar included in the securitizations large amounts of loans that failed to meet the applicable underwriting guidelines;
-   NovaStar improperly granted exceptions by approving loans that did not have appropriate compensating factors;
-   NovaStar failed to obtain proper documentation from borrowers required under its underwriting guidelines;
-   NovaStar failed to determine reasonableness of borrowers' representations in Stated Income/Stated Asset and low documentation loans;
-   Defendants failed to disclose that NovaStar's quality control systems did not adequately monitor compliance with underwriting standards; and
-   Defendants failed to conduct proper due diligence regarding the quality of the loans in the collateral pools.

## VII.

## CLASS ACTION ALLEGATIONS

126.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired

the Certificates prior to May 21, 2008, as set forth in ¶1, above, pursuant and/or traceable to the materially false and misleading Offering Documents and who were damaged thereby (the "Class").

127.    Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

128.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class who are geographically dispersed.  Record owners and other members of the Class may be identified from records maintained by the Defendants and/or relevant non-parties or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

129.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

130.    The Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

131.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities

Act; whether the Registration Statement and Offering Documents disseminated by Defendants to the investing public omitted and/or misstated material facts about the underlying mortgage loans comprising the pools; whether certain Defendants performed and adequate due diligence; and to what extent the members of the Class have sustained damages and the proper measure of damages.

132.    Common questions of law and fact predominate and render the class action device superior to any other method of adjudication because of, *inter alia*, the following shared facts:

a.      all six Offerings contain ***identical*** alleged NovaStar underwriting misstatements and omissions in the common Registration Statement and in each of the Prospectus Supplements, ¶¶46-51, 120-125;

b.      all six Offerings securitize the same type of mortgages with each Prospectus Supplement identically stating the "Certificates will represent ownership interests in…a pool of subprime mortgage loans consisting of two groups -- a group of residential first-lien and second-lien, fixed and adjustable rate mortgage loans designated as Group I…and a group of residential first-lien and second-lien, fixed and adjustable rate mortgage loans designated as Group II, ¶52;

c.      all six Offerings were underwritten by the same investment banks, Defendants Wachovia, RBS and Deutsche such that the same witnesses will be able to testify about due diligence activities for multiple Offerings, ¶¶2, 54;

d.      all six Offerings contain identical descriptions of the roles of the Defendants – including Defendant NMI and the Underwriter Defendants, ¶¶53-54;

e.      all six Offerings describe the Defendant underwriters performing multiple roles with all three underwriters also acting as a Hedge Provider (entitling them to additional fees) and with Deutsche Bank-affiliated entities serving as the Trustee in five of the six Offerings (entitling Deutsche Bank-affiliated entities to additional fees), ¶¶55-56;

f.      all six Offerings describe the same 17 Risk Factors in a substantially similar manner, ¶57;

g.      all six Offerings contain identical descriptions of credit enhancement features , including the use of insurance as a part of credit enhancement including from common insurers such as Mortgage Guaranty Insurance

Corp ("MGIC") PMI Mortgage Company ("PMI") and Radian Guaranty Inc. ("Radian"), ¶¶58-60;

h.      all six Offerings identically describe applicable subordination, limited cross-collateralization, and allocation of losses provisions, ¶¶61-63;

i.      all six Offerings use virtually identical language in describing the tranche by tranche "Method of Distribution" for the Certificates among and by the Underwriter Defendants, ¶64;

j.      the process for originating, packaging, and selling the loans -- including the manual review of subprime loan applications, overriding denials of full documentation loan applications by quality control, and the failure to receive employment and credit score verifications by the deadline was substantially the same for all six Offerings, ¶¶71-96;

k.      the personnel at NovaStar responsible for originating, packaging, and selling the loans remained substantially the same for all six Offerings meaning that there is extensive if not complete witness overlap from the NovaStar Defendants, ¶¶71-96;

l.      the due diligence process employed by NovaStar and the Underwriters was the substantially the same for all six Offerings, ¶¶97-110;

m.      there are overlapping witnesses knowledgeable about multiple Offerings at DBNTC, an affiliate of Defendant DBS which served as Trustee on five of the Offerings, ¶56;

n.      there are overlapping witnesses knowledge about multiple Offerings at the third party due diligence firms (e.g. Clayton) engaged on the NovaStar securitizations at issue, ¶¶97-110.

133.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.

## FIRST CLAIM FOR RELIEF

## For Violation of § 11 of the Securities Act
### (Against NMFC, the Individual Defendants and the Underwriter Defendants)

134.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This Claim for Relief is based solely on claims of strict liability and/or negligence under the 1933 Act.

135.    Plaintiff brings this Claim pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against NMFC, the Individual Defendants and the Underwriter Defendants.  This Claim for Relief is predicated upon strict liability of Defendants for making materially false and misleading statements in the Offering Documents.

136.    The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

137.    NMFC, the Individual Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

138.    The Individual Defendants each signed the Registration Statement.

139.    Defendants RBS, DBS and Wachovia acted as underwriters in the sale of Certificates, participated in the distribution of the Certificates and participated in drafting and disseminating the Offering Documents for the Certificates.

140.    NMFC, the Individual Defendants and the Underwriter Defendants owed the Plaintiff and other Class members a duty to make a reasonable and diligent investigation of the

statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

141.    NMFC, the Individual Defendants and the Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

142.    NMFC, the Individual Defendants and the Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

143.    By reason of the conduct alleged herein, the NMFC, the Individual Defendants and the Underwriter Defendants violated Section 11 of the Securities Act, and are liable to Plaintiff and the Class.

144.    Plaintiff and other Class members acquired the Certificates, set forth herein at ¶1, pursuant and traceable to the Offering Documents.  At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

145.    Plaintiff and other Class members have been injured and have sustained damages as a result of the wrongful conduct alleged against NMFC, the Individual Defendants and the Underwriter Defendants.

146.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally, from the NMFC, the Individual Defendants and the Underwriter Defendants, as set forth in Section 11 of the Securities Act.

147.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## IX.

### SECOND CLAIM FOR RELIEF

**For Violation of § 12(a)(2) of the Securities Act
(Against Defendant RBS)**

148.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  Plaintiff brings this claim based solely on claims of strict liability and/or negligence under the 1933 Act.

149.    This Claim for Relief is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against Defendant RBS.

150.    The Prospectus Supplements contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

151.    Defendant RBS owed to Plaintiff, and the other Class members who purchased Certificates pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such

statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.

152.    Plaintiff purchased their Certificates in the Series 2007-2 Offering directly from Defendant RBS in the initial public offering:

| Trust | Pro. Supp. Date | Purchase Date | Purchased From |
|---|---|---|---|
| NovaStar Home-Equity Loan Trust, Series 2007-2, Class M1 | 5/25/07 | 5/25/07 | RBS |

Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions contained in the Offering Documents.

153.    By reason of the conduct alleged herein, Defendant RBS, violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant to the Offering Documents.

154.    Plaintiff and other Class members were damaged by Defendant RBS's wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

155.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements in the Offering Documents at an earlier time.

## X.

## THIRD CLAIM FOR RELIEF

### Violations of § 15 of the Securities Act
### (Against NMI and Hartman and Metz)

156.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This Claim for Relief is based solely on claims of strict liability and/or negligence under the 1933 Act.

157.    Plaintiff brings this Claim against NMI and Defendants Hartman and Metz as controlling persons of the Issuer NMFC, pursuant to Section 15 of the Securities Act.  Hartman and Metz as senior officers of NMFC (i.e., the Issuer) were responsible for preparing and filing the Offering Documents and as senior officers of NMI (i.e., the Sponsor) were responsible for selecting the mortgages to be included in the underlying mortgages pools, structuring the Offerings and pricing the sale of the Certificates on the Offering.  *See infra*, ¶17.  The Issuer NMFC was a wholly-owned subsidiary of NMI.  As a result of their specific responsibilities with respect to the Offerings, Hartman and Metz had control of the material misstatement and omissions in the Prospectus Supplements concerning the underwriting and quality of the Mortgages. As a result, of NMI's ownership of the Issuer and direct responsibilities in selecting the mortgages in the pool, structuring the Offerings and pricing the Certificates it also had the power to exercise control over the Issuer.  The Individual Defendants and NMI had the power to influence, and exercised that power and influence, to cause NMFC to engage in violations of the Securities Act, as described above. Metz, Hartman and NMI's control, ownership and position made them privy to the material facts concealed from Plaintiff and other Class members.

69

158.    By virtue of their wrongful conduct, Plaintiff and the Class have been damaged. Defendants NMI, Hartman and Metz, are liable to Plaintiff and other Class members for their sustained damages.

## XI.

## <u>RELIEF REQUESTED</u>

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action properly maintainable as a class action and certifying Plaintiff as Class representative;

B.    Awarding compensatory and/or rescissory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  March 9, 2015
        New York, New York

                        COHEN MILSTEIN SELLERS & TOLL PLLC


                        By:  ___/s/  Joel P. Laitman_____
                                Joel P. Laitman
                                Christopher Lometti
                                Michael B. Eisenkraft
                                Daniel B. Rehns
                                Robert Dumas
                        88 Pine Street
                        New York, New York 10005
                        Telephone: (212) 838-7797
                        Facsimile: (212) 838-7745
                        *jlaitman@cohenmilstein.com*
                        *clometti@cohenmilstein.com*
                        *meisenkraft@cohenmilstein.com*
                        *drehns@cohenmilstein.com*
                        *rdumas@cohenmilstein.com*


                                Steven J. Toll
                                Julie Goldsmith Reiser
                                Joshua S. Devore
                        1100 New York Avenue, NW, Suite 500 West
                        Washington, D.C. 20005
                        Telephone: (202) 408-4600
                        Facsimile: (202) 408-4699
                        *stoll@cohenmilstein.com*
                        *jreiser@cohenmilstein.com*
                        *jdevore@cohenmilstein.com*


                        *Counsel for Lead Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, counsel for the Plaintiff, hereby certify that on March 9, 2015, I filed the foregoing Third Amended Class Action Complaint via the Court's electronic filing system which delivered a copy to all parties named herein and/or counsel of record in the within action by electronic mail.

 /s/  *Daniel B. Rehns*
Daniel B. Rehns

1975268.1