**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ x

| | |
|---|---|
| New Jersey Carpenters Health Fund, *on Behalf of Itself and all Others Similarly Situated*, | : |
| | : |
| Plaintiff, | : 08-CV-5310 (DAB) |
| | : ECF Case |
| -against- | : |
| | : |
| NovaStar Mortgage, Inc., NovaStar Mortgage Funding Corporation, Scott F. Hartman, Gregory S. Metz, W. Lance Anderson, Mark Herpich, RBS Securities, Inc. f/k/a Greenwich Capital Markets, Inc., d/b/a RBS Greenwich Capital, Deutsche Bank Securities, Inc., Wells Fargo Advisors, LLC f/k/a Wachovia Securities LLC, | : <u>FILED UNDER SEAL</u> |
| | : |
| Defendants. | : |

------------------------------------------------------------------ x

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFF NEW JERSEY CARPENTERS HEALTH FUND'S
MOTION FOR CLASS CERTIFICATION**

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendants RBS Securities Inc. f/k/a
Greenwich Capital Markets, Inc., Deutsche Bank
Securities Inc., and Wells Fargo Securities, LLC
f/k/a Wachovia Capital Markets, LLC, sued herein
as Wells Fargo Advisors, LLC f/k/a Wachovia
Securities LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................3

ARGUMENT ..............................................................................................................7

    I.      Common Issues Do Not Predominate ...................................................7

           A.      The 2006 and 2007 Offerings Substantially Differ From One Another, Precluding Certification Of A Class Covering All Offerings .................................................................................7

           B.      The Proposed Class Is A Diverse Group of Investors With Widely Varying RMBS-Related Knowledge .........................................11

           C.      Plaintiff's Proposed Damages Methodology Is Inadequate Under *Comcast* ...................................................................................13

    II.      NJCHF and IPERS's Claims Are Not Typical Of The Putative Class .................15

           A.      NJCHF And IPERS Did Not Purchase Certificates In The Secondary Market, But Seek To Represent Those Investors...................15

           B.      NJCHF And IPERS Did Not Purchase Certificates In The 2006 Offerings, But Seek To Represent Those Investors .................................16

    III.     NJCHF and IPERS Cannot Adequately Represent the Proposed Class ...............17

           A.      NJCHF Is Disqualified From Serving As Lead Plaintiff Under the PSLRA.................................................................................17

           B.      ██████████████████████████████████████████████████ ██████████████████████████████ .................................................19

           C.      IPERS Was Not Properly Joined To The Action ....................................20

    IV.     Plaintiff Has Not Shown Superiority ...................................................20

           A.      ████████████████████████████████████ .................................20

           B.      Concentrating Litigation In This District Is Not Superior.......................22

C.     Proceeding As A Single Class Action Will Cause Manageability Issues ................................................................................................22

V.     Plaintiff Has Not Established Numerosity ...........................................................23

A.     Plaintiff's Numerosity Analysis Suffers From Obvious Over-Counting....................................................................................................23

B.     Plaintiff's Numerosity Analysis Erroneously Includes Certain Investors.................................................................................................25

CONCLUSION..........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ................................................................................ 17, 21, 22

*Anwar v. Fairfield Greenwich, Ltd.,*
289 F.R.D. 105 (S.D.N.Y. 2013).......................................................................22

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
222 F.3d 52 (2d Cir. 2000).................................................................................19

*Comcast Corp. v. Behrend,*
133 S. Ct. 1426 (2013)..................................................................................2, 13

*Cortigiano v. Oceanview Manor Home For Adults,*
227 F.R.D. 194 (E.D.N.Y. 2005) ......................................................................20

*Cunha v. Hansen Natural Corp.,*
No. EDCV 08-01249-SGLJCX, 2009 WL 2029797 (C.D. Cal. July
13, 2009) ...........................................................................................................18

*Denney v. Deutsche Bank AG,*
443 F.3d 253 (2d Cir. 2006)...............................................................................25

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156 (1974) ..........................................................................................23

*Falcon v. Philips Electronics N. Am. Corp.,*
304 F. App'x 896 (2d Cir. 2008)........................................................................17

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.,*
301 F.R.D. 116 (S.D.N.Y. 2014).................................................................14, 15

*In re Alstom SA Sec. Litig.,*
253 F.R.D. 266 (S.D.N.Y. 2008)........................................................................22

*In re IAC/InterActive Corp. Sec. Litig.,*
695 F. Supp. 2d 109 (S.D.N.Y. 2010) ..................................................................7

*In re Initial Pub. Offering Sec. Litig.,*
No. 21 MC 92 (SAS), 2008 WL 2050781 (S.D.N.Y. May 13,
2008)...................................................................................................................20

*In re Livent, Inc. Noteholders Sec. Litig.,*
211 F.R.D. 219 (S.D.N.Y. 2002)........................................................................11

iii

*In re Superior Offshore Int'l, Inc. Sec. Litig.*,
    2010 WL 2305742 (S.D. Tex. June 8, 2010) ................................................................7

*In re Telxon Corp. Sec. Litig.*,
    67 F. Supp. 2d 803 (N.D. Ohio 1999) ....................................................................18, 19

*Kleinman v. Elan Corp., plc*,
    706 F.3d 145 (2d Cir. 2013)..................................................................................7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................25

*Marisol v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997).................................................................................17

*N.J. Carpenters Health Fund v. RALI Series 2006-QO1 Trust*,
    477 F. App'x 809 (2d Cir. 2012)..................................................................7, 16

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    288 F.R.D. 290 (S.D.N.Y. 2013)....................................................15, 16, 25

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    272 F.R.D. 160 (S.D.N.Y. 2011)..............................................................11

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    Nos. 08 CV 8781, 08 CV 5093, 2012 WL 4865174 (S.D.N.Y. Oct.
    15, 2012) ............................................................................................................16

*NECA-IBEW Health Fund & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)..................................................................................6

*Seijas v. Argentina*,
    606 F.3d 53 (2d Cir. 2010)...................................................................................22

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006)..................................................................................7

**Statutes**

15 U.S.C. § 77k(a) .......................................................................................................11

15 U.S.C. § 77k(e) .......................................................................................................14

15 U.S.C. § 77*l*(a)(2).....................................................................................................11

15 U.S.C. § 77*l*(b) ........................................................................................................14

15 U.S.C. § 77m............................................................................................................8

15 U.S.C. § 77z–1(a)(3)(B)(iv)..................................................................................................19

**Rules**

Fed. R. Civ. P. 15(a)................................................................................................................22

Fed. R. Civ. P. 20...................................................................................................................22

Fed. R. Civ. P. 21...................................................................................................................22

Fed. R. Civ. P. 23.....................................................................................................................1

Defendants RBS Securities Inc. f/k/a Greenwich Capital Markets, Inc., Deutsche Bank Securities Inc., and Wells Fargo Securities, LLC f/k/a Wachovia Capital Markets, LLC, (collectively, "Defendants") respectfully submit this memorandum of law, and the accompanying declaration of Christopher G. Lee, in opposition to the Motion for Class Certification filed by Lead Plaintiff New Jersey Carpenters Health Fund ("NJCHF") on June 16, 2015.

## PRELIMINARY STATEMENT

Plaintiff seeks to certify a class that consists of purchasers in six distinct residential mortgage-backed securities ("RMBS") offerings.[1]  Because Plaintiff cannot satisfy the requirements of Rule 23, this Court should deny certification.

*Predominance.*  Plaintiff has not shown that common issues predominate.  The six Offerings were issued by different trusts, pursuant to separate offering materials, and were backed by unique loan pools.  They were issued during a turbulent 11-month period in which the housing and mortgage markets underwent significant changes, and NovaStar went from being a major loan originator to leaving the mortgage business shortly thereafter.  Given the flurry of new information that emerged in late 2006 and early 2007 about the housing and RMBS markets as well as NovaStar's financial condition and loan origination practices, the two 2007 Offerings—issued on February 28 and June 1, 2007—are materially different from the four 2006 Offerings, issued between June 29 and November 30, 2006.  Each Offering raises unique, individualized issues regarding whether any of the Offering Documents contained misstatements, whether such misstatements were material to a reasonable investor, and whether any putative class member had knowledge of such misstatements.  Indeed, this Court previously suggested

---

[1] The six offerings are NovaStar Mortgage Funding Trust, NovaStar Home Equity Loan ("NHEL") Series 2006-3 (issued June 29, 2006), 2006-4 (issued August 29, 2006), 2006-5 (issued September 28, 2006), 2006-6 (issued November 30, 2006), 2007-1 (issued February 28, 2007), and 2007-2 (issued June 1, 2007) (the "Offerings").

that such differences among the Offerings "may ultimately prove significant enough to preclude the certification of a class based on Plaintiff's claims." Dkt. No. 155 at 4.

The need for individualized inquiry is all the greater when one considers the dramatic variances in sophistication and knowledge among the putative class, which includes ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████. Plaintiff asks the Court to ignore these differences and certify a diverse class of investors whose disparate knowledge—which is critical to claims and defenses under Sections 11 and 12—is clearly not subject to common proof.

Further defeating predominance, Plaintiff's proposed damages methodology cannot be applied on a class-wide basis and thus is insufficient for class certification purposes. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

**Typicality.** Plaintiff has also failed to demonstrate that its claims are typical of the proposed class. Plaintiff and the Iowa Public Employees' Retirement System ("IPERS") purchased Certificates only in the 2007 Offerings (NHEL 2007-1 and 2007-2), both of which were issued in a vastly different environment than the 2006 Offerings. And although NJCHF and IPERS allegedly bought Certificates directly from Defendants in the Offerings, they also seek to represent investors who bought certificates much later in the secondary market and had access to vastly more information about NovaStar, the RMBS market, and the performance of the Certificates themselves.

**Adequacy.** Neither NJCHF nor IPERS is an adequate class representative. NJCHF is disqualified because it has violated the PSLRA's prohibition on serving as lead plaintiff in more than 5 securities class actions in any 3-year period. ██████████████████████

2

███████████████████████████   And IPERS is disqualified from serving as a class representative because it was not properly joined to this action.

  *Superiority.* Plaintiff has not demonstrated that the class action mechanism is the superior method for adjudicating these claims.  Among other things, Plaintiff has not shown (nor could it) that other putative class members are unable or unwilling to bring their own individual actions.  ████████████████████████

██████████████████████████████

██████████████████████████████

████████

  *Numerosity.* Plaintiff also cannot satisfy the numerosity requirement, ██████████

██████████████████████████████

████████████████████████████

██████████████████████████

████████████████████████

  For the foregoing reasons, and as explained in further detail below, Defendants respectfully request that the Court deny Plaintiff's motion for class certification.

## BACKGROUND

**The Six Offerings at Issue**

  Plaintiff seeks to certify a class of investors who purchased Certificates in any one of six separate NHEL offerings.  Mot. at 1.  Each Offering was issued by a separate trust, pursuant to a separate prospectus supplement, and occurred at a distinct point in time over an 11-month period[2] that coincided with one of the worst financial meltdowns in American history and NovaStar's exit from the mortgage business.  Each Offering was backed by a unique pool of

---

[2]  The earliest Offering (2006-3) was issued June 29, 2006.  The latest Offering (2007-2) was issued June 1, 2007.

subprime residential mortgage loans, each with a different mix of loans and borrower characteristics.

Mortgage-backed securities, like the six Offerings at issue here, are structured to include a number of unique tranches. Each tranche is a separate security, and investors purchased Certificates in a particular tranche. The tranches were designed to be quite different from each other. Senior tranches, for instance, generally receive payments before subordinated tranches and are more protected from losses. The more senior the tranche, the lower the risk. Some of the tranches are backed by different loan groups, each of which has unique characteristics.[3] Accordingly, each tranche has different investment characteristics and different risk profiles that are reflected in different interest rates, credit ratings, and payment priority.

The NHEL 2006-5 Offering, for instance, was split into 15 tranches. Five tranches were senior Class A Certificates, backed in part by Group I loans, which consisted "exclusively of mortgage loans that conform to certain [Fannie Mae and Freddie Mac] guidelines." Ex. 2 (2006-5 P.S.) at S-41. These Class A Certificates have either been fully paid off or continue to receive cash flows. Ex. 4 (8/25/15 Rep.) at 4. By contrast, the remaining ten tranches in the 2006-5 offering were subordinated, mezzanine Certificates (Classes M-1 through M-10) with higher rates of return and higher risk. These junior Certificates were primarily backed by Group II loans "that may *not* conform to such agency guidelines." Ex. 2 (2006-5 P.S.) at S-41 (emphasis added). These Certificates have suffered losses. Ex. 4 (8/25/15 Rep.) at 4.

---

[3] For instance, while some loan groups contain loans that meet standards established by Fannie Mae and Freddie Mac, others do not. These risks were disclosed to investors. *E.g.*, Ex. 3 (2006-3 P.S.) at S-12 (some loans were underwritten to "non-conforming standards and may experience higher delinquency and loss rates"). All citations to "Ex. ___" refer to the exhibits to the Declaration of Christopher G. Lee, submitted herewith.

**NJCHF and IPERS Purchased Certificates Only in the 2007 Offerings**

NJCHF purchased a single Certificate in the M-1 tranche of the 2007-2 Offering.  TAC ¶ 20.  NJCHF alleges it sold this Certificate on March 26, 2010.  *Id.*

Plaintiff seeks to add IPERS as a class representative.  Mot. at 14.  IPERS purchased Certificates only in the 2007-1 and 2007-2 Offerings (Classes A2A1 and A2A, respectively).  Mot. Ex. 9.  IPERS alleges that it sold some of its Certificates in 2008 and 2009.  *Id.*  The 2007-2 A2A Certificates fully performed and have since been completely paid off, and the 2007-1 A2A1 Certificates continue to perform and have been 98.9% paid off.  Exs. 5, 6 (8/25/15 Reps.) at 3.

**The Court Dismisses Plaintiff's Suit Twice, But the Second Circuit Reverses and Vacates**

In May 2008, Plaintiff filed its original complaint in New York state court, and the case was removed to this Court in June 2008.  Dkt. No. 1.  In June 2009, Plaintiff filed its First Amended Complaint, Dkt. No. 56, which Defendants moved to dismiss.  Dkt. No. 73.  On March 31, 2011, the Court dismissed all of Plaintiff's claims without prejudice, finding that Plaintiff had not adequately made allegations "*specific to the M-1 Certificates it bought.*"  Dkt. No. 116 at 26, 29 (emphasis added).  The Court further found that Plaintiff lacked standing to sue for the five Offerings in which it had not purchased any Certificates.  *Id.* at 14-15.

A few months later, Plaintiff filed its Second Amended Complaint ("SAC"), limiting the proposed class to investors in the 2007-2 offering.  Dkt. No. 120.  On March 29, 2012, the Court granted Defendants' motion to dismiss the SAC, this time with prejudice.  Dkt. No. 135.  The Court found that Plaintiff did not "tie its claim of loosened underwriting guidelines to the specific loans that secured the Class M-1 Certificates that Plaintiff bought.  Instead, Plaintiff relies on general allegations of alleged underwriting lapses *without tying any of them to the loans that secured Plaintiff's investment in the M-1 Certificates.*"  *Id.* at 13 (emphasis added).  The Court further ruled that a reasonable investor would not have found the alleged misstatements

5

and omissions material "in light of the extensive risk disclosures and information Plaintiff received, as well as events generally known about the NovaStar Defendants and the subprime market in the months preceding the 2007-2 Offering." *Id.* Plaintiff appealed. Dkt. No. 137.

On March 1, 2013, the Second Circuit reversed in part and vacated in part the Court's prior rulings, and remanded the case for further proceedings. Dkt. No. 138. The Second Circuit found that the SAC sufficiently pled that the 2007-2 Offering Documents contained material misstatements and omissions. *Id.* at 25-28. With respect to standing, the Second Circuit remanded the case for reconsideration in light of its decision in *NECA-IBEW Health Fund & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012).[4] *Id.* at 29.

**The Court Reinstates Case But Notes Significant Differences Among Offerings**

Plaintiff then filed a motion for reconsideration of the Court's March 31, 2011 ruling, Dkt. No. 142, which the Court granted on February 5, 2015, Dkt. No. 155. In its ruling, however, the Court noted the many differences among the six Offerings[5] and suggested that "the distinctions that Defendants raise *may ultimately prove significant enough to preclude the certification of a class based on Plaintiff's claims.*" *Id.* at 4 (emphasis added). Defendants respectfully submit that the record on this motion supports such a finding, and the Court should accordingly deny certification of the broad and disparate class Plaintiff proposes.

---

[4] Notably, *NECA* specifically "emphasize[d] that it is by no means a foregone conclusion that, because plaintiff has standing to assert §§ 11 and 12(a)(2) claims on behalf of Certificate-holders from different tranches of Offerings (or within Offerings) backed by loans originated by the same originators, a putative class comprised of such Certificate-holders should be certified. *The district court, after reviewing all of the Rule 23 factors, retains broad discretion to make that determination.*" *Id.* at 165 (emphasis added).

[5] Those distinctions included "variance in the proportion of loans originated through [NovaStar] agents versus independent brokers or third-party lenders; differences in the types of loans within each offering and their subsequent performance; and changes regarding stated underwriting standards, the disclosure of risk to investors, and prevailing economic and market conditions." Dkt. No. 155 at 4.

# ARGUMENT

## I.   Common Issues Do Not Predominate

### A.   The 2006 and 2007 Offerings Substantially Differ From One Another, Precluding Certification Of A Class Covering All Offerings

Whether a statement is misleading depends on the "context and manner of [its] presentation," *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013), and whether a misleading statement is material is "fact-specific," "turns on context," and depends on the "total mix of information" available to the market. *In re IAC/InterActive Corp. Sec. Litig.*, 695 F. Supp. 2d 109, 117 (S.D.N.Y. 2010). In short, context matters when assessing the claims and defenses for each Offering.

Here, the context shows that the claims and defenses as to the 2007 Offerings are fundamentally different than the claims and defenses as to the four 2006 Offerings. Investors in 2007 had access to drastically different information about NovaStar, its alleged disregard of underwriting guidelines, and the state of the housing and mortgage markets. They also received materially different offering documents. Accordingly, whether and to what extent a class member was aware of these various pieces of information will depend in significant part on the timing of its purchases and thus cannot be addressed on a class-wide basis. These inquiries— which must be conducted on an investor-by-investor basis—would overwhelm any inquiries common to the proposed class. Class certification is precluded under such circumstances. *NJCHF v. RALI Series 2006-QO1 Trust*, 477 F. App'x 809, 814 (2d Cir. 2012) ("public information could constitute circumstantial evidence of individual purchaser knowledge"); *In re Superior Offshore Int'l, Inc. Sec. Litig.*, 2010 WL 2305742, at *4-5 (S.D. Tex. June 8, 2010).[6]

---

[6] There are also individualized issues concerning statute of limitations defenses. Section 11 claims are barred if made more than a year after the "discovery of the untrue statement" or "after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. This typically requires individualized inquiries and cannot be determined by generalized proof, thereby precluding certification. *See, e.g., Thorn v. Jefferson-Pilot Life*

*(footnote cont. next page)*

     1.   *Compared to 2006 investors, 2007 investors had substantially different information about the market and NovaStar*

In the 11 months between the end of June 2006 and early June 2007, the financial crisis set in and the housing and mortgage markets underwent major changes.  By 2007, reports about the housing and mortgage market meltdown, particularly in the subprime sector, reached levels unseen in 2006 and included news of federal and state investigations,[7] widespread credit ratings downgrades for RMBS securitizations,[8] and bankruptcies of prominent mortgage companies.[9] One after another, articles reported *rising* delinquency and foreclosure rates,[10] a "continuing spate of bad news around loans to home buyers with shaky or inadequate credit histories,"[11] an *increasing* incidence of borrower fraud,[12] and *increasing* concerns by regulators about the lending practices of subprime lenders.[13]  The number of private lawsuits by RMBS investors also increased.[14]  Appendix A is a timeline that shows some of the key developments over this period.

As the turmoil in the mortgage market increased from late 2006 into 2007, so too did reports about NovaStar's worsening financial condition.  In February 2007, Moody's placed

---

*Ins. Co.*, 445 F.3d 311, 320-21 (4th Cir. 2006) (issues of inquiry or actual notice "focus[] on the contents of the plaintiff's mind" and are "not readily susceptible to class-wide determination").  As this Court previously ruled, the only Offering that does not raise statute of limitations issues is the 2007-2 Offering.  *See* Dkt. No. 116 at 23 n.8. This means that individual inquiries would be required to resolve statute of limitations issues with respect to the five other Offerings, and also demonstrates the extent to which the 2007-2 Offering—the only Offering in which NJCHF purchased Certificates—differs from the other Offerings.

[7]  *E.g.*, Ex. 7 (F.B.I., *Mortgage Fraud Report 2006*, May 2007); Ex. 8 (*Cuomo Expands Probe as Appraisers Attest to Pressure (Update 2)*, Bloomberg, June 20, 2007); Ex. 9 (*Ratings Firms' Practices Get Rated—SEC Probes if Conflicts Fueled Subprime Troubles*, Wall St. J., Sept. 7, 2007).

[8]  *E.g.*, Ex. 10 (*Debt Markets: Another Pounding*, The Economist, July 12, 2007).

[9]  *E.g.*, Ex. 11 (*Lehman Shuts Unit; Toll of Lenders Tops 100.*  Subprime Scorecard, Bloomberg, Aug. 23, 2007).

[10]  Ex. 12 (*More Borrowers With Risky Loans Are Falling Behind*, Wall St. J., Dec. 5, 2006); Ex. 13 (*Calm Returns to Market, but Worries Persist Over Subprime Loans*, N.Y. Times, Mar. 1, 2007).

[11]  Ex. 14 (*Risky Slice of ABX Index Widens Sharply on Novastar*, Dow Jones, Feb. 21, 2007).

[12]  Ex. 7 (F.B.I., *Mortgage Fraud Report 2006*, May 2007) (reporting that "mortgage fraud is on the rise").

[13]  Ex. 15 (*Tremors at the Door*, N.Y. Times, Jan. 26, 2007).

[14]  Ex. 16 (*Subprime Mortgage Debacle Leading to Cascade of Lawsuits*, Associated Press, July 12, 2007) (reporting "flurry of litigation" by RMBS investors); Ex. 17 (*Mortgage Mess Unleashes Chain of Lawsuits*, Wash. Post, Sept. 11, 2007) (regarding lawsuits "unleashed" by "mortgage mess").

NovaStar on review for a possible ratings downgrade.[15]  In March 2007, NovaStar told investors that its nonconforming loans were conducive to borrower fraud and that there was an increase in repurchase demands due to "fraudulently obtained loans."[16]  By March 2007, NovaStar's condition had so substantially deteriorated that it announced significant workforce cuts and the cessation of all new funding activity by its warehouse lending subsidiary.[17]  In May 2007, NovaStar announced it would cease operating as a real estate investment trust by year's end[18] and attributed its cash declines to investor concerns over credit quality in the subprime market, citing the "challenging environment in the mortgage industry."[19]  Appendix B is a timeline that shows some of the key developments at NovaStar over this period.  It is in this stark context that investors purchased Certificates in the 2007-1 and 2007-2 Offerings.[20]

2.    *The 2007 Offering loans, and the guidelines to which they were underwritten, substantially differ from the 2006 Offering loans*

In response to a deteriorating credit environment and its own financial distress, NovaStar took steps to tighten its lending practices at the end of 2006 and into 2007.  Citing the poor performance of loans originated in 2006, NovaStar disclosed in an SEC filing that the "key area of focus for our mortgage banking operation is to ensure that the 2007 originations perform

---

[15]  Ex. 18 (*Rating Action – Servicer: Moody's Places NovaStar's SQ Rating on Review for Possible Downgrade*, Moody's, Feb. 21, 2007).

[16]  Ex. 19 (10-K 2006) at 15, 18.

[17]  Ex. 20 (8-K Mar. 14, 2007); Ex. 21 (*Warehouse Lender Exits*, Mortgage Daily, Apr. 5, 2007); By August, NovaStar cut 500 employees--more than one-third of its workforce. Ex. 22 (*NovaStar Nixes Wholesale, Employees*, Mortgage Daily, Aug. 17, 2007).

[18]  Ex. 23 (E. Schatzker & J. Shen, *NovaStar Can't Pay Dividend, Forfeits REIT Status (Update3)*, Bloomberg, Sept. 17, 2007).

[19]  Ex. 24 (10-Q 1Q2007) at 6, 30-31.

[20]  *Compare* Ex. 25 (10-Q 3Q2006) at 7 (stating that, in spite of reductions in cash flows, "The Company believes its liquidity, and ability to pay a dividend would be unchanged, and it does not believe . . . [its] status as a REIT would be affected") *with* Ex. 24 (10-Q 1Q2007) at 6-8 (describing factors adding to NovaStar's liquidity problems such as investor concerns over credit quality in the subprime market, cash margin calls, and increased repurchases).

better than 2006 and in line with our expectations."[21]  NovaStar disclosed that it had taken the

following steps: "(1) Tightening of our underwriting guidelines; (2) Limiting the number of

exceptions to our underwriting guidelines policy; (3) Enhancing our appraisal review process; (4)

Implementing the use of NovaStar's Risk Assessment Score (NRAS) to identify loans with

unacceptable levels of risk."[22]

       Reflecting the changed market conditions and changes to NovaStar's lending business,

the prospectus supplements for the 2007 Offerings contained extensive disclosures that were not

included in the 2006 prospectus supplements.  For example, the 2007-2 prospectus supplement

disclosed significant lawsuits against NovaStar and its affiliates; negative first-quarter financial

results, including a 60% decline in liquidity and a $40 million net loss; various ratings

downgrades; $82 million in first-quarter expenses to repurchase loans sold to third parties; and a

determination to explore strategic alternatives such as the potential sale of the company.[23]

       Such substantial differences in the offering material disclosures and the loan underwriting

guidelines applicable to the 2007 Offerings, compared to the 2006 Offerings, preclude any

attempt to create a hodge-podge class that covers both.  In such a class, common issues clearly

will not predominate, and instead will be overtaken by individualized inquiries that are specific

to each Offering—including, for example, inquiries as to whether NovaStar systematically

---

[21]  Ex. 26 (8-K Feb. 20, 2007).

[22]  *Id.*  Similarly, on December 28, 2006, NovaStar announced that it had "reexamined various loan criteria" and made significant changes to its underwriting guidelines, including: restricting the use of "no housing history" loans; raising disposable income requirements; eliminating loans with debt-to-income ratios above 55%; refusing to lend to borrowers buying too many properties; restricting loans to borrowers with seller subordinate financing; seeking to limit property flips and heavy appreciation after six months; and reducing the maximum LTV on borrowers with lower credit scores.  Dkt. No. 148 (Kaltenrieder Decl.) ¶ 10, Ex. D.  Additionally, on January 18, 2007, NovaStar announced a new "High Risk Exclusion Policy" and the use of its proprietary risk model to evaluate inherent default risks and project credit losses as part of the loan underwriting process.  *Id.* ¶ 12, Ex. F.  Also on January 18, 2007, NovaStar announced that it was continuing to "refine and tighten program requirements" and described higher FICO requirements for full documentation, limited documentation and stated income loans.  *Id.* ¶ 13, Ex. G.

[23]  Ex. 27 (2007-2 P.S.) at S-22 to S-26.  *See also* Ex. 28 (2007-1 P.S.) at S-20 to S-21.

abandoned its loan underwriting guidelines, whether investors had knowledge of the lending

practices Plaintiff alleges, and whether such claims are time barred.  Class certification will not

homogenize these Offering-specific and time period-specific issues.

**B.      The Proposed Class Is A Diverse Group of Investors With Widely Varying
         RMBS-Related Knowledge**

Sections 11 and 12 of the Securities Act bar claims by any investor who purchased

Certificates knowing about the misstatements or omissions alleged in the TAC.  15 U.S.C.

§ 77k(a); 15 U.S.C. § 77*l*(a)(2).  To evaluate Defendants' knowledge defense, the finder of fact

would need to conduct individualized inquiries at trial into each putative class member's

knowledge of the misstatements and omissions alleged by Plaintiff.  This includes assessing each

class member's sophistication and expertise in RMBS and the housing market.  *See, e.g.*, *In re*

*Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 223-224 (S.D.N.Y. 2002) (retail purchasers

were atypical of class consisting of sophisticated, research-driven institutional investors).

However, Plaintiff's proposed class is a highly diverse group of investors with widely

different levels of sophistication and experience with RMBS.





What these putative class members knew about the lending practices alleged in this action cannot be determined on a class-wide basis.  It is an individualized inquiry that, when multiplied over all of the putative class members Plaintiff tries to corral into this unwieldy proposed class, would overwhelm any trial with individualized investor-specific mini-trials. That is exactly what the predominance requirement protects against, and it is why that element of Rule 23(b)(3) is not met here.



C.      **Plaintiff's Proposed Damages Methodology Is Inadequate Under** *Comcast*

1.      *Plaintiff's damages methodology cannot be applied on a class-wide basis*

Under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), damages must be calculable on a class-wide basis to satisfy the predominance requirement.  In this regard, Plaintiff's proposed damages methodology must "measure *only those damages attributable to*" Plaintiff's theory of liability and "must be consistent with" that theory.  *Id.* at 1433.  "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.* █████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

Under Sections 11 and 12 of the Securities Act, damages are reduced to the extent an investor's losses are caused by factors other than the alleged misrepresentations.  *See* 15 U.S.C. § 77k(e); 15 U.S.C. § 77*l*(b).  ████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████████████

███

_____

█ ████████████████████████████████████████████████████

███████████████████████

2.  *Plaintiff's Damages Methodology Is Too Imprecise*

To calculate damages under Sections 11 and 12, Plaintiff must demonstrate that it can accurately determine the value of the Certificates.  To pass muster, Plaintiff's valuation methodology must be precise enough "to assure that the model is in fact linked with the theory of liability."  *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

## II.     NJCHF and IPERS's Claims Are Not Typical Of The Putative Class

### A.     NJCHF And IPERS Did Not Purchase Certificates In The Secondary Market, But Seek To Represent Those Investors

Plaintiff seeks to certify a putative class that consists of not only purchasers who (like itself) allegedly acquired Certificates directly from a Defendant in the initial Offerings, but also all investors who acquired Certificates in the *secondary market* up to the date of filing of the original complaint.  But, as detailed in Section I above, an investor's knowledge depends on when it made its purchase.  *See NJCHF v. Residential Capital, LLC*, 288 F.R.D. 290, 295-96 (S.D.N.Y. 2013) *on reconsideration in part*, No. 08 CV 5093 HB, 2013 WL 6669966 (S.D.N.Y. Dec. 18, 2013).  For one, secondary market purchasers had additional information available to them at the time of purchase, including performance data about the Certificates and the underlying loans.  Indeed, Plaintiff alleges in its Motion that each of the Offerings "collapsed in value to 'junk bonds' *soon after issuance when it became apparent that the underlying residential mortgage loans were impaired*."  Mot. at 1 (emphasis added).  Plaintiff's proposed class includes investors who bought with full knowledge of this alleged "impairment."

This is particularly important where, as here, substantial information relating to NovaStar's origination practices and financial condition became publicly available over the

---

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

course of the proposed class period.  *See supra* § I.A.  During the first half of 2008, dozens of classes of NovaStar's RMBS certificates were downgraded.[35]  In January 2008, an involuntary Chapter 7 bankruptcy petition was filed against NovaStar,[36] and in March 2008, a class action was filed against NovaStar and others alleging violations of Sections 11 and 15 of the Securities Act.[37]  In the first quarter of 2008, NovaStar disclosed its "substantial doubts" that it would "continue as a going concern."  Ex. 37 (10-K 2007) at 2, 7.

Facing similar facts, a court in this District narrowed the class proposed by this very same Plaintiff, cutting out secondary market purchasers and certifying a class of "initial purchasers who bought the securities directly from the underwriters or their agents no later than ten trading days after the offering date."  *NJCHF v. Residential Capital*, 288 F.R.D. at 296.[38]  The court heeded the Second Circuit's observation that "'defendants would have stronger or weaker evidence of purchaser knowledge depending on purchase timing. . . . Furthermore, because of the differences in purchase timing, the chosen class definition also removed the possibility that the knowledge defense could be adjudicated on a class basis using common publicly available evidence.'"  *NJCHF v. Residential Capital, LLC*, 2012 WL 4865174, at *4 (S.D.N.Y. Oct. 15, 2012) (quoting *NJCHF v. RALI Series 2006-Q01 Trust*, 477 Fed. App'x. at 814).

### B.    NJCHF And IPERS Did Not Purchase Certificates In The 2006 Offerings, But Seek To Represent Those Investors

Although seeking to represent investors in the 2006 Offerings, NJCHF and IPERS made purchases in only the 2007 Offerings.  Mot. at 15.  As noted above, *supra* § I.A.2, the offering

---

[35] Ex. 35 (*Roundup: Fitch Downgrades Hundreds More B&C Classes*, Nat'l Mortgage News, Feb. 25, 2008).

[36] Ex. 36 (*NovaStar Unit Hit With Involuntary Bankruptcy Petition*, Kansas City Bus. J., Jan. 23, 2008).

[37] *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. JP Morgan Acceptance Corp.*, No. 08-01713 (N.Y. Sup. Ct., filed Mar. 26, 2008).

[38] Both NJCHF and IPERS purchased Certificates in the 2007-2 Offering directly from an underwriter at the time of the initial offering.  IPERS also purchased 2007-1 Certificates directly from an underwriter, but its purchase occurred nearly four months after the date of the initial offering.

documents for the 2007 Offerings included new and extensive risk disclosures that reflected the rapidly deteriorating financial condition of NovaStar, and the Certificates in those Offerings were backed by loans that had been underwritten to different guidelines.

Given these differences, NJCHF and IPERS's claims are not typical of the class they seek to represent. They and other purchasers in the 2007 Offerings are likely to have had greater knowledge of the alleged misrepresentations and are thus subject to unique defenses, defeating typicality. *See, e.g., Falcon v. Philips Electronics N. Am. Corp.*, 304 F. App'x 896, 897 (2d Cir. 2008) ("When a putative class representative is subject to unique defenses which threaten to become the focus of the litigation, she cannot serve as a class representative . . . because of the danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.").[39]

## III.   NJCHF and IPERS Cannot Adequately Represent the Proposed Class

### A.   NJCHF Is Disqualified From Serving As Lead Plaintiff Under the PSLRA

NJCHF is disqualified from serving as Lead Plaintiff under the Private Securities Litigation Reform Act (the "PSLRA") and therefore would be an improper and inadequate class representative. Under the PSLRA's "5-in-3" rule, unless the Court grants an exception, "a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period." 15 U.S.C. § 77z–1(a)(3)(B)(vi). NJCHF and other

---

[39] For substantially the same reasons, NJCHF and IPERS are also inadequate to represent investors in the 2006 Offerings. Their appointment would be at odds with settled law prohibiting a putative class representative from representing a subclass of which it is not a member, and is contrary to clear authority that a putative class representative cannot adequately represent a class composed of members with disparate claims that depend on different evidence to prove liability. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626-27 (1997); *Marisol v. Giuliani*, 126 F.3d 372, 378-79 (2d Cir. 1997). As both *Amchem* and *Marisol* instruct, the Court must "identify . . . the named plaintiffs who are aggrieved" under each claim and "weed out, and, if necessary, dismiss those claims for which no named plaintiff is an adequate representative," *Marisol*, 126 F.3d at 379, rather than ignore the significant differences among the claims as to each Offering and appoint representatives of a single, unwieldy class as a matter of administrative convenience. *See Amchem*, 521 U.S. at 627.

N.J. Carpenters funds (the "NJC Funds")—which, for PSLRA purposes, are the same entity[40]—have served as lead plaintiff in at least seven federal securities class actions in the past three years.[41]   Therefore, NJCHF is disqualified from continuing to serve as Lead Plaintiff here.

This is not the first time the NJC Funds have violated the 5-in-3 rule.  In *Cunha*, the Court refused to grant an exception to the rule to the NJC Pension Fund ("NJCPF"), finding:

> The large number of cases in which NJCPF, and its sub-funds, has been involved in over the past 3 years (totaling over 21) gives the Court great pause in deciding to deviate from the rule in this instance. Although only the number of times a prospective lead plaintiff has in fact been appointed lead plaintiff is used in deciding whether the 5–in–3 rule is violated, once that threshold has been exceeded courts are free to also consider the general litigious history of the prospective lead plaintiff. . . . [G]iven the degree to which NJCPF has exceeded the 5-in-3 rule, and given the degree to which NJCPF has sought to be appointed lead plaintiff, the Court declines to exercise its discretion to permit deviation from the 5-in-3 rule in this instance.

2009 WL 2029797, at *7.

The burden is on NJCHF to demonstrate why the Court should exercise its discretion not to enforce the 5-in-3 rule, which NJCHF has failed to do.  *See In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 820 (N.D. Ohio 1999) (the PSLRA "impose[s] a *presumptive* bar against" the appointment of a person who is in violation of the 5-in-3 rule and "places the burden on" such a person to "demonstrate why the bar should not be applied in this instance").

---

[40]  The NJC Funds are a single entity for purposes of compliance with the PSLRA, since they share the same board of trustees, website, and "function essentially as a single unit." *Cunha v. Hansen Natural Corp.*, No. EDCV 08-01249-SGLJCX, 2009 WL 2029797, at *5 (C.D. Cal. July 13, 2009); ███████████████████████████

██████████████████████████████████████████████████████████████

███████████   The "5–in–3 rule itself makes clear that it applies not only to the person itself, but also to the officers, directors, and fiduciaries of the proposed lead plaintiff." *Cunha*, 2009 WL 2029797, at *5.  Indeed, the *Cunha* court described as "spurious" the NJC Funds' contention that each fund should be considered separately. *Id.*

[41]  *See NJCHF v. DLJ Mortgage Capital, Inc.*, No. 08-CV-5653-PAC (S.D.N.Y.); *NJCHF v. RALI Series 2006-QO1 Trust et al.*, No. 08-CV-08781-KPF-DCF (S.D.N.Y.); *In Re: Bear Stearns Mortg. Pass-Through Certificates Litig.*, No. 08-CV-08093-LTS (S.D.N.Y.) (NJCHF lead plaintiff); *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group PLC, et al.*, No. 08-CV-5093 (S.D.N.Y.); *In re NVIDIA Corp. Sec. Litig.*, No. 08-cv-04260-RS (N.D. Cal.) (N.J. Carpenters Pension & Annuity Fund lead plaintiff); *HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, No. 07-CV-02245-MMA-NLS (S.D. Cal.) (N.J. Carpenters Pension and Benefit Funds lead plaintiff). There has been a filing in each of these cases (including this Action) within the past 3 years; accordingly, each counts towards the PSLRA's "5-in-3" limitation. *See Cunha*, 2009 WL 2029797, at *4.



██████████████████████████████████████████████████████████

███████████████████████████████████████████

### C.    IPERS Was Not Properly Joined To The Action

In violation of the Federal Rules, the very first appearance of IPERS as a putative party

was in this motion.  Mot. at 14.  But when a putative class representative wishes to add another

such representative to a lawsuit, it must either amend its complaint pursuant to Fed. R. Civ. P.

15(a) or seek to add the party to the action pursuant to the rules governing joinder of parties,

namely Rules 20 and 21.  *See In re Initial Pub. Offering Sec. Litig.*, No. 21 MC 92 (SAS), 2008

WL 2050781, at *2 (S.D.N.Y. May 13, 2008); *Cortigiano v. Oceanview Manor Home For

Adults*, 227 F.R.D. 194, 200-01 (E.D.N.Y. 2005).  NJCHF's improper attempt to add IPERS as a

putative class representative through its motion to certify the class is therefore a nullity, and

renders IPERS ineligible to serve as a class representative.[48]

## IV.    Plaintiff Has Not Shown Superiority

### A.    ████████████████████████████████████████████████

Plaintiff fails to establish that a class action is the superior vehicle for adjudicating these

claims because the evidence does not show that putative class members are unable or unwilling

to sue Defendants individually.  ███████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

───────────────────────

██ ████████████████████

██ ████████████████████████████████████████████████

██████████████████████████████████████████



In drafting Rule 23(b)(3)'s superiority requirement, "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem*, 521 U.S. at 617. Indeed, the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action



prosecuting his or her rights." *Id.* ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

**B.  Concentrating Litigation In This District Is Not Superior**

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

**C.  Proceeding As A Single Class Action Will Cause Manageability Issues**

Courts have broad discretion to determine whether to certify a class action, including

determining whether a class action is manageable under Rule 23(b)(3).  *See Seijas v. Argentina*,

606 F.3d 53, 58 (2d Cir. 2010) ("[M]anageability is an issue peculiarly within a district court's discretion[.]").  This consideration "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  As shown above, *supra* §I, individualized inquiries of knowledge, damages, and other key issues will overwhelm any purportedly common issues.  If the proposed class were certified, the Court would bear the burden of conducting numerous mini-trials, an unmanageable undertaking.

## V.    Plaintiff Has Not Established Numerosity

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

### A.    Plaintiff's Numerosity Analysis Suffers From Obvious Over-Counting

███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████



**B.**    **Plaintiff's Numerosity Analysis Erroneously Includes Certain Investors**

████████████████████████████████████████████████

████████████████████████████████████████████

███████ █ ████████████████████████████████████████

████████████████████████████████ █ ███████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny Plaintiff's motion.

---

█ ███████████████████████

█ ████████████████████████████████████████████

Dated: New York, New York
September 30, 2015

**SIMPSON THACHER & BARTLETT LLP**

/s/ _____*Alan Turner*_____

Thomas C. Rice (trice@stblaw.com)
Alan C. Turner (aturner@stblaw.com)
Christopher G. Lee (cglee@stblaw.com)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendants RBS Securities Inc. f/k/a Greenwich Capital Markets, Inc., Deutsche Bank Securities Inc., and Wells Fargo Securities, LLC f/k/a Wachovia Capital Markets, LLC, sued herein as Wells Fargo Advisors, LLC f/k/a Wachovia Securities LLC*

# Appendix A: NovaStar-Specific Developments
## During the Proposed Class Period



**Jan. 18, 2007.** NovaStar announces new "High Risk Exclusion Policy" and higher FICO requirements.

**May 10, 2007.** NovaStar announces it will lose REIT status. Announces cash decline of $87m.

**Oct. 17, 2007.** The NYSE announces it will delist NovaStar.

**Feb. 25, 2008.** Fitch downgrades dozens of NovaStar certificates.

**Dec. 28, 2006.** NovaStar announces changes to loan underwriting guidelines.

**Mar. 2007.** NovaStar announces major layoffs for its wholesale loan origination group.

**Aug. 22, 2007.** Moody's places NovaStar on review for downgrade. Downgrades NovaStar's servicing arm.

**Nov. 15, 2007.** NovaStar reports loss of $64.05 per share and shareholder loss of $598m.

Lawsuit filed by NJCHF (May 21)

| June 2006 | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. 2007 | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. 2008 | Feb. | Mar. | Apr. | May |

**2006-3** Offering *(June 29)*

**2006-4** Offering *(Aug. 29)*

**2006-5** Offering *(Sept. 28)*

**2006-6** Offering *(Nov. 30)*

**2007-1** Offering *(Feb. 28)*

**2007-2** Offering *(June 1)*

**Feb. 21, 2007.** Moody's announces possible downgrade of NovaStar's servicing arm.

**Apr. 5, 2007.** NovaStar shuts down its warehouse lending subsidiary.

**Dec. 22, 2007.** NovaStar's CEO and CFO are terminated by Board.

**Apr.1, 2008.** NovaStar says there are "substantial doubts" it will "continue as a going concern."

**Jan. 23, 2008.** Involuntary Chapter 7 bankruptcy petition is filed against NovaStar.

## <u>Appendix B</u>: Housing Market Developments
## During the Proposed Class Period



**Dec. 5, 2006.** *WSJ* reports rising delinquency and foreclosure rates.

**April 21, 2007.** *Wash. Post* reports that subprime lenders have often been guilty of "systematic inattention" to accuracy of appraisals.

**Aug. 23, 2007.** *Bloomberg* reports sales or shutdowns of over 100 home lenders.

**Feb. 25, 2008.** Fitch downgrades more than 750 classes of subprime RMBS.

**July 22, 2006.** *WSJ* reports on widespread appraisal inflation.

**Sept. 28, 2006.** *WSJ* reports that mortgage fraud has "mushroomed."

**Mar. 2, 2007.** *WSJ* attributes "[h]igher delinquencies on subprime mortgages" to "sharp deterioration of underwriting standards."

**June 5, 2007.** Ben Bernanke states that subprime problems are likely the result of an "earlier loosening of underwriting standards."

**Oct. 9, 2007.** S&P acknowledges that it underestimated the extent of fraud in the subprime market.

Lawsuit filed by NJCHF (May 21)

June **2006** | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. **2007** | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. **2008** | Feb. | Mar. | Apr. | May

**2006-3** Offering *(June 29)*

**2006-4** Offering *(Aug. 29)*

**2006-5** Offering *(Sept. 28)*

**2006-6** Offering *(Nov. 30)*

**2007-1** Offering *(Feb. 28)*

**2007-2** Offering *(June 1)*

**Sept. 29, 2006.** Federal banking regulators issue new guidelines for non-traditional mortgages.

**Feb. 18, 2007.** *NYT* reports on "wreckage in the subprime market."

**July 12, 2007.** Ratings agencies initiate widespread downgrade of RMBS certificates.

**Nov. 12, 2007.** *USA Today* reports that "the storm unleashed by the collapse of subprime mortgages seems to be gathering strength, not abating."

**July 18, 2006.** Mortgage Asset Research Institute reports that almost 60% of stated income loans were exaggerated by 50% or more.

**Jan. 26, 2007.** *NYT* reports increasing regulatory concerns about subprime lenders.

**May 2007.** FBI releases Mortgage Fraud Report warning about increasing incidence of borrower fraud.

**July 2007.** S&P changes its subprime ratings methodology due to increased loan delinquencies, defaults.

**Mar. 3, 2008.** The *L.A. Times* reports a nationwide wave of private subprime mortgage lawsuits.

# SOURCES[1]

## Appendix A

1. Dkt. No. 148, Kaltenrieder Decl.¶ 10, Ex. D (*Wholesale Weekly*, Dec. 28, 2006).
2. Dkt. No. 148, Kaltenrieder Decl. ¶ 12, Ex. F (*Wholesale Weekly*, dated Jan. 18, 2006); Kaltenrieder Decl. ¶ 13, Ex. G (*Wholesale Weekly*, dated Jan. 18, 2006).
3. Ex. 18 (*Rating Action – Servicer: Moody's Places NovaStar's SQ Rating on Review for Possible Downgrade*, Moody's, Feb. 22, 2007).
4. Ex. 20 (8-K Mar. 14, 2007).
5. Ex. 21 (*Warehouse Lender Exits*, Mortgage Daily, Apr. 5, 2007).
6. Ex. 39 (*Moody's Downgrades the Servicer Quality Rating of NovaStar from SQ3+ to SQ4+ and Places on Review*, Moody's, Aug. 22, 2007).
7. Ex. 40 (Ex. 99.2 to 8-K Oct. 17, 2007).
8. Ex. 41 (Ex. 99.2 to 8-K Nov. 14, 2007).
9. Ex. 42 (*NovaStar Says Top Executives Were Fired*, Kansas City Star, Dec. 22, 2007).
10. Ex. 36 (*NovaStar Unit Hit With Involuntary Bankruptcy Petition*, Kansas City Bus. J., Jan. 23, 2008).
11. Ex. 37 (10-K 2007).

## Appendix B

1. Ex. 43 (*MARI:  Stated-Income Loans Invite Fraud*, Nat'l Mortg. News, July 18, 2006).
2. Ex. 44 (*New Headache for Homeowners: Inflated Appraisals*, Wall Street J., July 22, 2006).
3. Ex. 45 (*Town's Residents Say They Were Targets of Big Mortgage Fraud*, Wall Street J., September 28, 2006).
4. Ex. 46 (Interagency Guidance on Nontraditional Mortgage Product Risks, Office of the Comptroller of the Currency, et al., September 29, 2006).
5. Ex. 12 (*More Borrowers With Risky Loans Are Falling Behind*, Wall St. J., Dec. 5, 2006).
6. Ex. 15 (*Tremors at the Door*, N.Y. Times, Jan. 26, 2007).
7. Ex. 47 (*Will Other Mortgage Dominoes Fall?*, N.Y. Times, Feb. 18, 2007).
8. Ex. 48 (*GM Delays Filing, Stoking Doubts*, Wall Street J., Mar. 2, 2007).
9. Ex. 49 (*Appraisal Inflation*, Wash. Post, Apr. 21, 2007).
10. Ex. 7 (F.B.I., *Mortgage Fraud Report 2006*, May 2007).
11. Ex. 50 (Speech, Chairman Ben S. Bernanke, 2007 International Monetary Conference in Cape Town, June 5, 2007).
12. Ex. 51 (*S&P Changes Subprime Ratings Methodology*, July 10, 2007).
13. Ex. 10 (*Debt Markets: Another Pounding*, The Economist, July 12, 2007).
14. Ex. 11 (*Lehman Shuts Unit; Toll of Lenders Tops 100*, Bloomberg, Aug. 23, 2007).
15. Ex. 52 (*Subprime Crisis Far From Over: S&P*, Reuters, Oct. 9, 2007).
16. Ex. 53 (*More Banks Brace for Subprime Spanking; JPMorgan, Bank of America, Wachovia, E-Trade Line Up*, USA Today, Nov. 12, 2007).
17. Ex. 35 (*Roundup: Fitch Downgrades Hundreds More B&C Classes*, Nat'l Mortgage News, Feb. 25, 2008).
18. Ex. 54 (*Loan Blame Game Now In Court*, L.A. Times, Mar. 3, 2008).

---

[1]    All citations to "Ex. __" refer to the exhibits to the Declaration of Christopher G. Lee, submitted herewith.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing on September 30, 2015.

Dated: September 30, 2015

/s/ _____*Alan Turner*_____
Alan Turner