UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND, *on Behalf of Itself and All Others Similarly Situated*, | Case No. 08-CV-5310 (DAB) |
| Plaintiff, | ECF CASE |
| -against- | Oral Argument Requested |
| NOVASTAR MORTGAGE, INC., NOVASTAR MORTGAGE FUNDING CORPORATION, SCOTT F. HARTMAN, GREGORY S. METZ, W. LANCE ANDERSON, MARK HERPICH, RBS SECURITIES, INC., f/k/a GREENWICH CAPITAL MARKETS, INC., d/b/a RBS GREENWICH CAPITAL, DEUTSCHE BANK SECURITIES, INC., WELLS FARGO ADVISORS, LLC f/k/a WACHOVIA SECURITIES LLC | **Redacted public version. Original filed under seal.** |
| Defendants. | |

**NOVASTAR DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 2

    I.     NJCHF CANNOT ESTABLISH THAT RULE 23(b)(3)'S
           PREDOMINANCE REQUIREMENT IS SATISFIED ........................................ 2

         A.     NovaStar's Underwriting Guidelines Changed Significantly Over
                the Course of the Offerings ....................................................................... 3

         B.     The Loans Backing the Offerings Were Originated Through
                Distinct Channels ..................................................................................... 7

         C.     The 2007-1 and 2007-2 Loan Pools Had Substantially Different
                Characteristics From the Loan Pools Backing the 2006 Offerings ........... 7

         D.     The Offerings Closed at Different Times During a Turbulent
                Period ....................................................................................................... 9

         E.     The Offerings Had Different Structures and Experienced Varying
                Actual Performance ................................................................................ 12

    II.    NJCHF IS NOT AN ADEQUATE CLASS REPRESENTATIVE (AND
          NEITHER IS IPERS) .......................................................................................... 15

         A.     NJCHF's Theory of Liability Favors Investors in the 2007
                Offerings at the Expense of Investors in the 2006 Offerings ................. 16

         B.     NJCHF's Proposed "Common Methodology" for Calculating
                Classwide Damages Creates Intra-Class Conflicts ................................ 17

    III.    EVEN IF A CLASS WERE OTHERWISE APPROPRIATE, IT WOULD
          HAVE TO EXCLUDE MANY OF THE DISPARATE PUTATIVE
          CLASS MEMBERS .......................................................................................... 18

CONCLUSION ......................................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Amchem Prods., Inc. v. Windsor,*
　　521 U.S. 591 (1997)...............................................................................................16

*Comcast Corp. v. Behrend,*
　　133 S. Ct. 1426 (2013)............................................................................................2

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
　　574 F.3d 29 (2d Cir. 2009)................................................................................15, 16

*Kamean v. Local 363, Int'l Brotherhood of Teamsters,*
　　109 F.R.D. 391 (S.D.N.Y. 1986) ......................................................................16, 17

*Madison v. Chalmette Ref., LLC,*
　　637 F.3d 551 (5th Cir. 2011) ..................................................................................3

*Myers v. Hertz Corp.,*
　　624 F.3d 537 (2d Cir. 2010)................................................................................2, 3

**Rules**

Fed. R. Civ. P. 23 .......................................................................................................2, 17

Defendants NovaStar Mortgage, Inc., NovaStar Mortgage Funding Corporation, Scott F. Hartman, Gregory S. Metz, W. Lance Anderson and Mark Herpich (collectively, the "NovaStar Defendants") respectfully submit this memorandum of law in opposition to the Motion for Class Certification filed by plaintiff New Jersey Carpenters Health Fund ("NJCHF") on June 16, 2015. Factual statements in this memorandum are established in the accompanying Declaration of William F. Alderman ("Alderman").

## INTRODUCTION

NJCHF asks the Court to certify a class of investors spanning six separate securitizations, the first of which closed at the height of the housing boom in June 2006, and the last of which closed in May 2007—after the residential mortgage and securitization markets had begun to fray, and after NovaStar Financial, Inc. ("NovaStar") had disclosed to investors its tenuous financial condition and the significant lawsuits it was facing.

The Court should decline to certify such a sprawling, heterogeneous class. Not only was the information available to investors at the time of the six Offerings materially different, but the loans backing the securitizations varied significantly as well—they were originated through different channels, pursuant to different underwriting guidelines, and had materially different characteristics—such as loan-to-value ("LTV") ratios, FICO scores, proportions of loans requiring mortgage insurance, loans with fixed interest rates, full documentation loans, second liens, interest-only loans and loans on a primary residence, among others. Indeed, the Court has already recognized that "the distinctions that Defendants raise may ultimately prove significant enough to preclude the certification of a class based on Plaintiff's claims. . . ." Dkt. No. 155 at 4.

The NovaStar Defendants join in the arguments made by the Underwriter Defendants[1] in their separate opposition to NJCHF's motion for class certification ("Underwriter Defs.' Opp."). The NovaStar Defendants further establish below why Rule 23's critical "predominance" and "adequacy of representation" requirements cannot be satisfied here.

## ARGUMENT

To maintain a class action, a plaintiff "must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Rule 23 "does not set forth a mere pleading standard"; rather, a plaintiff must prove that all of the requirements of Rule 23(a) are met, and "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* The Court should "probe behind the pleadings" and conduct "a rigorous analysis" to ensure "that the prerequisites of Rule 23(a) have been satisfied. Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim." *Id.* (internal citations and quotation marks omitted). "The same analytical principles govern Rule 23(b)." *Id.* In making a class certification determination, "courts must consider potential defenses," and not merely the elements of the plaintiff's claims. *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010).

## I.

## NJCHF CANNOT ESTABLISH THAT RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT IS SATISFIED

Rule 23(b)(3)'s predominance requirement "is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432. It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. The requirement's purpose is to ensure that the class will

---

[1] RBS Securities Inc. f/k/a Greenwich Capital Markets, Inc., d/b/a RBS Greenwich Capital, Deutsche Bank Securities, Inc., and Wells Fargo Securities, LLC f/k/a Wachovia Capital Markets, LLC, sued herein as Wells Fargo Advisors, LLC f/k/a Wachovia Securities LLC.

be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Myers*, 624 F.3d at 547 (citations, quotation marks and alterations omitted).   In other words, the predominance requirement tests whether the defendants' liability to each class member can be determined without the case "degenerating into a series of individual trials." *Madison v. Chalmette Ref., LLC*, 637 F.3d 551, 555 (5th Cir. 2011) (citation and quotation marks omitted).

Here, the rapidly changing market environments—leading to disparate states of investor knowledge—that prevailed when the various Offerings closed, as well as the significant differences in the collateral pools backing the securitizations, preclude satisfaction of the predominance requirement.

### A.   NovaStar's Underwriting Guidelines Changed Significantly Over the Course of the Offerings

Fundamentally, this case is about NJCHF's allegation that "NovaStar systematically disregarded its own underwriting guidelines"—*i.e.*, the guidelines that were used in determining whether or not to make a particular mortgage loan.  Third Amended Class Action Complaint ("TAC") ¶ 8; *see also, e.g.*, *id.* ¶¶ 10, 14, 125.  Indeed, ***all*** of NJCHF's "confidential witness" allegations—the core of its complaint, upon which the Second Circuit permitted NJCHF to proceed—appear under a heading titled "NovaStar's Undisclosed Systematic Disregard of Underwriting Standards." [2]  TAC ¶¶ 71-96.

---

[2] Each of the three confidential witnesses whose depositions Defendants have succeeded in scheduling and taking to date have repudiated the key allegations that NJCHF has attributed to them. ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

Those underwriting standards were constantly evolving, with the most significant changes coming in late 2006 and early 2007 as NovaStar tightened its guidelines in response to the changes in the mortgage and securitization markets described above.[3]  For example, NovaStar's February 20, 2007 press release announcing 2006 financial results, filed with the SEC on Form 8-K, noted that the credit performance of NovaStar's portfolio, and specifically 2006 originations, had deteriorated during the fourth quarter of 2006, leading to impairments on mortgage securities, additional loss provisions for loans held in the portfolio, and a greater level of loan repurchase requests due to early payment defaults than experienced historically.  Dkt. No. 80-4 at S-22.  As a consequence, NovaStar reported:  "The key area of focus for our mortgage banking operation is to ensure that our 2007 originations perform better than 2006 and in line with our expectations.  In this regard, we have taken several steps which include:



The fact that multiple "confidential witnesses" are disclaiming under oath the statements NJCHF attributes to them may invite appropriate consequences beyond denial of class certification.

[3] *See* Alderman Exs. D-I, which summarize certain of the key metrics for evaluating mortgage loans appearing in NovaStar's underwriting guidelines at the time of each securitization.

(1) Tightening of our underwriting guidelines; (2) Limiting the number of exceptions to our underwriting guidelines policy; (3) Enhancing the appraisal review process; (4) Implementing the use of NovaStar's Risk Assessment Score (NRAS) to identify loans with unacceptable levels of risk." *Id.* at S-24.

Some aspects of NovaStar's tightening of guidelines are evident from the underwriting standards published in the Prospectus Supplements ("ProSupps"). For example, between the filings of the 2006-3 and 2007-2 ProSupps, NovaStar raised the required FICO scores at given LTV ratios across various risk classifications.[4] *Compare* Alderman Ex. D at S-81 *with* Ex. I at S-89. In other cases, it lowered the maximum LTV ratios at given FICO scores. *Id.* And in still others, it reduced the maximum combined LTV ratios by up to 10% for certain risk classifications. *Id.*

Other aspects of NovaStar's tightening of its underwriting guidelines are described in the declaration of Matt Kaltenrieder, NovaStar's Vice President of Securitization at the time ("Kaltenrieder," re-submitted here as Alderman Exhibit J). These include:

> - On December 28, 2006, NovaStar Mortgage, Inc. ("NMI," the NovaStar entity that originated and serviced mortgage loans) announced, "Over the years, NovaStar has succeeded by taking steps to control risk in our portfolio. Based on economic conditions and the difficulties being experienced by the mortgage industry, we have re-examined various loan criteria and have determined to make the guideline changes outlined below." The changes included restricting the use of "[n]o housing history" loans; raising disposable income requirements; eliminating loans with debt-to-income ratios above 55%; refusing to lend to borrowers buying too many properties; restricting loans to

---

[4] The Certificates at issue were offered by six different NovaStar Mortgage Funding Trusts (the "Trusts"), NovaStar Home Equity Loan Series 2006-3, Series 2006-4, Series 2006-5, Series 2006-6, Series 2007-1 and Series 2007-2. The securitizations will be referred to herein by Series number—*i.e.*, "2006-3," *etc.*

borrowers with seller subordinate financing; seeking to limit property flips and heavy appreciation after six months; and reducing the maximum LTV on lower credit scores. Kaltenrieder ¶ 10, Ex. D.

- On January 9, 2007, NMI highlighted some of the specific changes announced the prior week. Kaltenrieder ¶ 11, Ex. E.

- On January 18, 2007, NMI announced a new "high risk exclusion policy" and the use of its proprietary risk model to evaluate inherent default risks and project credit losses as part of the loan underwriting process. Kaltenrieder ¶ 12, Ex. F.

- Also on January 18, 2007, NMI announced that it was continuing to "refine and tighten program requirements" and described higher FICO requirements for full documentation, limited documentation and stated income loans. Kaltenrieder ¶ 13, Ex. G.

- On April 19, 2007, NovaStar announced at a securitization conference that underwriting guidelines had become outdated for a changing housing market; that delinquencies appeared to have peaked in December 2006; that early stage delinquencies were showing month-over-month improvement throughout the first quarter of 2007; that NovaStar's 2006 vintage loans appeared to be in line with or better than most issuers; that its tighter guidelines had eliminated 80/20 loans and increased minimum FICOs in higher LTV buckets; and that it expected its retail channel to represent a higher percentage of its production. Alderman Ex. K at 5, 9.

While the ProSupps reveal an evolution of enhanced underwriting standards even before late 2006, the steps NovaStar took in late 2006 and early 2007 created a substantially tighter process that significantly affected the underwriting of the 2007-vintage loans populating the 2007-1 Trust and, to a materially greater degree, the 2007-2 Trust. Particularly given that compliance with underwriting guidelines is at the heart of this case, the significant evolution of those guidelines over the course of the securities offerings at issue demonstrates why common issues do not predominate.

**B.    The Loans Backing the Offerings Were Originated Through Distinct Channels**

As explained by Mr. Kaltenrieder, NMI obtained the loans collateralizing the Trusts in three ways:  (a) originating loans through its own network of retail agents; (b) obtaining loans originated by a network of over 10,000 independent wholesale brokers and then closing those loans with NMI as the lender; and (c) purchasing loans originated by a network of independent third-party correspondent lenders.  Kaltenrieder ¶ 6.  The mix of loans obtained through each of these channels varied considerably among the six Offerings—with the 2007-2 Offering in particular being distinct from all that came before it.  In each of the 2006-3, 2006-4, 2006-5 and 2006-6 Trusts, between 7.22% and 8.57% of the loans were originated by NMI's own retail agents; but that percentage increased to 12.87% in the 2007-1 Trust and to ***32.19%*** in the 2007-2 Trust.  Kaltenrieder ¶ 7, Ex. A.  At the same time, the percentage of loans originated by independent correspondent lenders and purchased by NMI increased from 21.54% in the 2007-1 Trust to 31.90% in the 2007-2 Trust.  *Id.*  The net result was that the percentage of loans originated by wholesale brokers fell from a range of ***65.58-69.31%*** in the earlier securitizations to ***35.91%*** in the 2007-2 Offering.  *Id.*  This material variation again disproves predominance.

**C.    The 2007-1 and 2007-2 Loan Pools Had Substantially Different Characteristics From the Loan Pools Backing the 2006 Offerings**

The loan pools described in the ProSupps also differ in significant ways.  While each of the six Trusts is unique, the most dramatic changes occurred after NMI tightened its underwriting guidelines in late 2006 and early 2007.  For example, while the loans in ***all six*** Trusts had substantially ***higher*** FICO scores than the minimum permitted by NMI's underwriting standards and substantially ***lower*** LTV ratios than the maximum permitted by those standards, the safety margin in the 2007-2 loan pool was even greater than in earlier pools—despite the

tightened standards.  In other words, not only did the actual weighted average LTV in the 2007-2 pool drop significantly as the standards were tightened; the amount by which the actual LTV ratio fell below the maximum permitted by the tightened standards *grew* in every risk classification between the 2007-1 and the 2007-2 Offerings.  Alderman Exs. H, I.

The mix of initial loans in the loan pools also changed substantially over time.  The percentage of loans for purposes of refinancing an existing loan (where the borrower had already demonstrated an ability to repay) climbed from a range of 50.16-60.97% for the 2006 securitizations to 67.46% for 2007-1 to *80.31%* for 2007-2; the percentage of loans for primary residences grew from 90.58% for 2007-1 to 93.06% for 2007-2; the percentage of full documentation loans grew from 48.75% to 57.40%; the percentage of fixed rate loans grew from 24.74% to 35.53%; the percentage of interest-only loans dropped from 11.38% to 7.32%; and the percentage of second liens dropped from 4.61% to 2.67%.  Kaltenrieder ¶ 9, Ex. C.  Each of these changes reflects the tightening of underwriting guidelines that occurred in late 2006 and early 2007.

The percentage of loans that required the purchase of mortgage insurance for the benefit of the Trusts also changed dramatically as underwriting standards tightened.  Whereas prior Trusts had insured between 53.66% and 63.84% of the aggregate loan balance, that percentage dropped to 43.61% for the 2007-1 Trust and *11.33%* for the 2007-2 Trust.  Kaltenrieder ¶ 8, Ex. B.  The percentage of mortgage loans with an LTV ratio under 60% (for which mortgage insurance was never bought or required because of the borrower's significant equity stake in the mortgaged property) also climbed in the 2007-2 Trust, almost doubling the 2007-1 number.  *Id.* These changes occurred in tandem with substantial increases in the amount of overcollateralization supporting successive Trusts, from 50 basis points in the 2006-3 Trust to

230 basis points in the 2007-1 Trust and 425 basis points in the 2007-2 Trust.  Alderman Ex. L at S-8, Ex. M at S-8, Ex. N at S-9.

Taken together, these facts clearly establish the substantial change in loan characteristics that resulted from a declining housing and economic environment and NMI's tightening of underwriting guidelines.

### D.    The Offerings Closed at Different Times During a Turbulent Period

The first of the securitizations at issue—the 2006-3 Offering—closed in June 2006.  This was at the very height of the housing bubble,[5] when residential mortgage backed securitizations ("RMBS") were in full swing.[6]  By the time the 2007-2 Offering closed in May 2007, in contrast, the housing market had begun to unravel, as exemplified by the bankruptcy filing of the second-largest subprime mortgage originator by volume, New Century, on April 2, 2007.[7]

NovaStar was directly and significantly impacted by these developments in the mortgage and securitization markets, as it fully disclosed to its investors.  Among the most telling of the risks and other facts known to NJCHF and other investors in the 2007-2 Offering are the following:

> • The Prospectus Supplement for the 2007-2 Offering detailed in its discussion of risk factors numerous recent developments unknown to investors in earlier Trusts but uniquely cautionary to investors like NJCHF, including significant lawsuits against NovaStar and its affiliates; negative first-quarter financial results, including a $40 million net loss and a 60% decline in liquidity; ratings downgrades; $82 million of first-quarter expense to

---

[5] *See* Alderman Ex. X.

[6] *See* Alderman Ex. Y at 4 (showing quarterly residential ABS, MBS & CDO volume from 2003 through 2008)).

[7] *See* Alderman Ex. Z.

repurchase loans sold to third parties;[8] and a determination to explore strategic alternatives such as a potential sale of the company.  Alderman Ex. O at S-22 to S-26.

- On March 19, 2007, NovaStar announced a plan to reduce its workforce by 17%, reflecting a steady 73% decline in 2007 loan originations (contrary to NJCHF's claims that new originations were being pumped up).  Dkt. No. 125, Ex. 13.

- NovaStar's May 10, 2007 Form 10-Q for the first quarter of 2007 attributed the quarter's cash decline of over $87 million to investor concerns over credit quality in the subprime market and cited the "challenging environment in the mortgage industry."  Dkt. No. 125, Ex. 7 at 6, 30-31.

- As NJCHF itself has admitted, Moody's in April 2007 made the "stunning admission" that it was reviewing its ratings model in light of the considerable evolution in the mortgage market.  Dkt. No. 56 at ¶ 108.

- By the time the 2007-2 Offering closed at the end of May 2007, investors had been hit with a barrage of news reports detailing the deteriorating housing and mortgage markets and criticizing underwriting practices in the industry generally.  *See* Exs. 17-27, 30-31 to Rice Decl. in Support of the Underwriter Defs.' Mot. to Dismiss First Amended Compl.  Dkt. No. 79.

Moreover, investors in each successive NovaStar securitization had a growing body of

data about how past NovaStar securitizations had performed.  Not only did the six Offerings vary

considerably in terms of the fully disclosed characteristics of the loans that supported them;

---

[8] NovaStar's substantial commitment of funds to repurchase loans that suffered early payment defaults or ended up revealing fraudulent representations by borrowers undermines the claims attributed (albeit falsely, as shown above) to "confidential witnesses" about poor underwriting. Even if any of the anecdotal claims could have been connected to loans in the 2007-2 Trust—an entirely speculative question at best, given that none of the "confidential witnesses" was involved in securitization or claims knowledge of loans that were securitized—the fact that NovaStar was obligated to repurchase any loans that were tainted by borrower fraud, and had a track record of stepping up with major outlays to perform that obligation, eviscerates NJCHF's hypothesis that the Trusts were adversely impacted by an alleged abandonment of underwriting guidelines.

every investor in each Offering also had unfettered access to the actual performance of all prior Offerings.  This too created a constantly varying landscape over the eleven months spanned by the Offerings.

For example, plaintiff NJCHF knew how all prior Offerings had performed when it chose to buy Certificates issued in the last of the Offerings—the 2007-2 Offering that closed in May 2007.  That knowledge included the fact that each of NovaStar's seven Offerings completed in the prior year had experienced high rates of delinquencies, bankruptcies, foreclosures and REOs (collectively, "impairments") in the supporting loan pools, with all five of the Offerings completed between April and September 2006 having rates close to 12%, with rates as high as 17% in the Group II loans.  Alderman ¶ 21, Ex. T.

In contrast, investors in the first of the challenged Offerings—the 2006-3 Offering that closed in June 2006—knew about the vastly better performance of prior Offerings that had benefitted from a rosier economic climate; the Offerings completed in the prior year reported impairment rates of only 1.96% and 2.66%, with the highest rate for Group II loans amounting to 2.54%.  Alderman ¶ 22, Ex. U.[9]

Plaintiff cannot dispute that the rapidly deteriorating housing and financial markets in the second half of 2006 and first half of 2007, as detailed above and in the Underwriter Defendants' Opposition, had a dramatic impact on the performance of the Offerings that NJCHF was well positioned to assess.  The monthly distribution reports for each Offering show that loan performance deteriorated in tandem with the broader markets—notwithstanding that NMI *tightened* its underwriting standards in what ultimately proved to be a futile attempt to counteract

---

[9] Two of the four Offerings completed in the year prior to 2006-3 had not yet reported results by the June 2006 time of that Offering (2006-1 that closed in April 2006 and 2006-2 that closed in June 2006).

the inexorable collapse of the housing market.  As shown in the Alderman Declaration at

Paragraph 19 and Exhibit R, the percentage of loan collateral that was impaired in the first six

months and first twelve months after an Offering rose dramatically with each successive

Offering:

| Offering | Date | After 6 months | After 12 months |
|----------|------|----------------|-----------------|
| 2006-3 | 6/22/06 | 8.14 | 14.99 |
| 2006-4 | 8/18/06 | 9.00 | 19.32 |
| 2006-5 | 9/22/06 | 8.80 | 22.59 |
| 2006-6 | 11/20/06 | 10.01 | 23.83 |
| 2007-1 | 2/23/07 | 13.79 | 32.96 |
| 2007-2 | 5/25/07 | 10.75 | 28.93 |

Common facts do not predominate in light of this evolving landscape.  Each of the facts

described above is pertinent to the proof of falsity and materiality NJCHF will be required to

provide and its knowledge of material facts by which defendants will be able to undermine its

claims.  So, too, for each putative class member.

### E. The Offerings Had Different Structures and Experienced Varying Actual Performance

Beyond the substantial variations in underwriting guidelines and loan characteristics from

Offering to Offering, the Offering structures also changed over time.  For example, NovaStar

retained percentages of the Certificates in each securitization that ranged from 1.76% in 2006-3

to 11.65% in 2007-1.  Alderman ¶ 17, Ex. P.  Freddie Mac, which bought the senior-most Class

A-1A Certificates in each Offering, bought 58.85% of the Certificates sold by the underwriters in

the 2007-2 Offering, but only 41.12% of those in the 2006-6 Offering.  *Id.*

Moreover, the Certificates issued in each Offering themselves varied substantially within a given Offering.  Close to or more than half of the Certificates in each Offering were acquired by Freddie Mac, as noted above.  These senior-most Certificates were supported primarily by "conforming" Group I loans underwritten to Freddie Mac standards.  Alderman Ex. O.  In contrast, the remaining Class A Certificates were supported primarily by Group II loans that were for the most part "nonconforming" (also known as "subprime") loans.  *Id*.  The Mezzanine Certificates were supported by loans in both groups.

The Group I and Group II loans had substantially different characteristics, as detailed in each ProSupp.  For example, the 2007-2 ProSupp noted that 42.05% of the initial Group I loans were fixed-rate, compared to 15.73% for the Group II loans; interest-only loans comprised 2.63% of Group I but 9.95% of Group II; 1.75% of Group I loans were second liens, compared to 5.64% for Group II; the average principal balance was $144,272 for Group I and $230,898 for Group II; the weighted average loan-to-value ratio was 79.49% for Group I and 84.25% for Group II; and while 25.72% of the Group I loans were in Florida and California, Group II had almost double that number at 47.53%.  Alderman Ex. O.  Each of these characteristics reflected the riskier nature of the Group II loan pool in contrast to the Freddie Mac standards that applied to the Group I loans.

As might be expected from these fully disclosed loan characteristics, the Group I and Group II loans experienced vastly different performance over time.  For example, by the time the housing and economic crises had wreaked their havoc on mortgage-backed securities a year after the final Offering, the May 25, 2008 distribution reports showed the following aggregate percentages of delinquencies, bankruptcies, foreclosures and REOs for the loan pools backing the six Offerings:

| Offering | Group I | Group II | Total |
|----------|---------|----------|-------|
| 2006-3 | 32.28 | 42.83 | 36.13 |
| 2006-4 | 34.96 | 44.00 | 38.85 |
| 2006-5 | 34.97 | 51.80 | 41.64 |
| 2006-6 | 33.13 | 47.53 | 40.68 |
| 2007-1 | 30.55 | 47.81 | 38.20 |
| 2007-2 | 23.29 | 40.55 | 27.93 |

Alderman Decl. ¶ 20, Ex. S.

As a consequence, the senior Class A and subordinate Mezzanine Certificates have also experienced dramatically different performance. While the Class A Certificates have performed as expected—making regularly-scheduled payments of principal and interest and incurring no realized losses—the Mezzanine Certificates in each Offering have been largely wiped out by the housing and economic crises that began in 2006 and escalated in subsequent years. Alderman ¶ 23, Ex. V. Thus, the percentage of realized losses in each Offering mirrors precisely the percentage of Mezzanine Certificates in the Offering and ranges from 12.59% in the 2007-1 Offering to 16.86% in the 2006-5 Offering. Alderman ¶ 24, Ex. W.

\* \* \*

NJCHF ignores the dramatic changes over the course of the six Offerings in the housing and economic climates, as well as the state of investor knowledge about those developments generally and NovaStar's financial condition in particular. NJCHF does not even acknowledge, let alone confront, the facts that the six ProSupps disclose different underwriting standards, different percentages of certificates retained by NovaStar affiliates, different production channels, different degrees by which the loans backing the offerings exceeded NovaStar's underwriting standards, different levels of mortgage insurance, different proportions of fixed-rate

loans, refinancings, full documentation loans, second liens, interest-only loans and loans on primary residences, and different disclosures of risk and current conditions in the housing and economic markets. These objective facts refute any claim that common issues predominate.

## II.

## NJCHF IS NOT AN ADEQUATE CLASS
## REPRESENTATIVE (AND NEITHER IS IPERS)

Beyond the absence of predominance, neither can NJCHF demonstrate that it is an adequate class representative. In addition to the reasons discussed by the Underwriter Defendants (*see* Underwriter Defs.' Opp. at 17-20), there are two significant conflicts between NJCHF and the putative class members. First, as an investor in the 2007-2 Offering, NJCHF has pled in the Third Amended Complaint that NovaStar's supposed abandonment of its underwriting guidelines occurred in 2007, or at the earliest in late 2006. This approach places NJCHF sharply in conflict with the interests of investors in earlier securitizations, who would have to show that NovaStar abandoned its underwriting guidelines earlier, when the mortgages backing those securitizations were originated. Second, NJCHF and putative class members have conflicting interests with respect to how the Certificates they purchased should be valued, depending on where those Certificates fall in the capital structure of the relevant securitization.[10]

Adequacy of representation "entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified,

---

[10] Each of these conflicts applies equally to the Iowa Public Employees' Retirement System ("IPERS"), and thus demonstrates that IPERS would not be an adequate class representative either—even if the Court were otherwise inclined to permit IPERS to participate at this juncture. (The Court should not permit IPERS to do so for the reasons discussed in the Underwriter Defendants' Opposition at 20.) IPERS invested only in 2007-1 and 2007-2, and thus has the same conflict as does NJCHF with earlier investors. IPERS also has conflicting interests with putative class members who purchased certificates placed differently in the capital structure of the relevant securitization, for the reasons discussed below.

experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  The focus is on uncovering "conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  To be adequate, "[r]epresentatives must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 594-95.  The adequacy requirement serves to ensure that class representatives "do not possess other, potentially conflicting interests that could impair the faithful performance of their duties as class representatives." *Kamean v. Local 363, Int'l Brotherhood of Teamsters*, 109 F.R.D. 391, 396 (S.D.N.Y. 1986).  As is explained below, NJCHF's theories concerning NovaStar's adherence to its underwriting guidelines and the calculation of damages put its interests squarely at odds with those of the putative class members.

### A.    NJCHF's Theory of Liability Favors Investors in the 2007 Offerings at the Expense of Investors in the 2006 Offerings

NJCHF's case is premised on the hypothesis—now refuted by its own "confidential witnesses"—that NMI abandoned its underwriting guidelines at the end of 2006 or early 2007, when the loans included as collateral for the 2007-1 and 2007-2 securitizations were being originated.  For instance, NJCHF alleges:

- NovaStar's underwriting guidelines were "strictly applied and were followed by Quality Control and Underwriting people at the Company.  As a result, *a large number of loan applications were being denied throughout 2006*."  TAC ¶ 94 (emphasis added).  According to NJCHF, this changed such that "*in late 2006 and into 2007*, denials of applications for having unreasonable stated income, were being overridden and deficiencies were 'swept under the rug' in order to push a loan through." *Id.* ¶ 95 (emphasis added).

- "*In 2007*, NovaStar eliminated the [Vice President of Operations] position at the Company, and vested all of the

authority of underwriting approvals to the Supervisors in Lake Forest and Ohio.  According to one former Vice President, ***this is when things got really bad at the Company and the guidelines were just 'tossed out the window'*** as volume became the primary goal." *Id.* ¶ 86 (emphasis added).

- "General overriding of denials of full documentation loan applications by QC and Underwriters became commonplace ***by 2007*** at NovaStar." *Id.* ¶ 87 (emphasis added).

- "***[S]tarting in October 2006***, NovaStar Underwriters and QC Auditors began routinely alerting their Supervisors about loans rejected due to suspicious or fraudulent documentation, only to learn that the rejection of the suspicious or fraudulent loan by the Underwriter and QC Auditor had been overridden by Supervisors and [Vice Presidents of Operations] and the loan had been approved." *Id.* ¶ 85 (emphasis added).

While NJCHF's conclusory allegations that guidelines were adhered to until they were abandoned in late 2006 or early 2007 are calculated to advance NJCHF's interests (and those of IPERS), they do so at the expense of investors in the 2006 securitizations.  This is the very sort of intra-class conflict that Rule 23(a)(4) is meant to guard against, precluding class certification. *See, e.g.*, *Kamean*, 109 F.R.D. at 396.

### B. NJCHF's Proposed "Common Methodology" for Calculating Classwide Damages Creates Intra-Class Conflicts

As Defendants' expert Walter N. Torous, Ph.D., explains in his report, NJCHF's proposed "common methodology" for measuring damages also creates a conflict between NJCHF (and IPERS) and putative class members.  Specifically, NJCHF's proposed approach to calculating classwide damages may require the use of a model to place a value on the Certificates purchased by putative class members at certain times (including, for instance, the date when this lawsuit was commenced).  Torous Report at ¶¶ 48-52.  "Employing models to value at-issue Certificates involves making assumptions and estimating inputs." *Id.* at ¶ 53.  Such assumptions and inputs may be more or less favorable to holders of senior Certificates as opposed to holders

of more junior Certificates.  *Id.* at ¶¶ 50-51.  NJCHF's (and IPERS') incentive to employ a

valuation model that favors them over putative class members who purchased different tranches

of the securitizations creates yet another conflict between NJCHF (and IPERS), on the one hand,

and the putative class members on the other.

This conflict is even more pronounced here because each of the Offerings was structured

so as to place the vast majority of the Offering amount in the senior Class A tranches,[11] with

losses to be first absorbed by the Class M Mezzanine tranches.  In addition, investors in Class A

Certificates for each of the six Offerings, such as the 2007-1 Class A2A1 and 2007-2 Class A2A

Certificates purchased by IPERS, have experienced *no realized losses*, and no unpaid interest

amounts.  Alderman ¶ 23, Ex. V at 6-7.  As Dr. Torous explains in his report, variation in the

losses and types of losses among investors in different certificate tranches precludes the

application of a common damages methodology.  *See, e.g.*, Torous Report at ¶ 59 (noting that

"there are six Certificate totaling $963.1 million in original principal balance that have been

completely paid off as of August 25, 2016," and that "Dr. Hartzmark does not clearly address the

issue of investors that have been repaid in full").

## III.

## EVEN IF A CLASS WERE OTHERWISE APPROPRIATE, IT WOULD HAVE TO EXCLUDE MANY OF THE DISPARATE PUTATIVE CLASS MEMBERS

The NovaStar Defendants respectfully urge that no class should be certified here, for the

many reasons given above and in the Underwriter Defendants' Opposition.  But even if a class

---

[11] This structure reveals another distinction between the 2006 and 2007 Offerings.  Compared to the 2006 Offerings, structured to place between 83.14% and 86.03% of the Certificates offered to investors in Class A tranches, the 2007-2 Offering had 80.66% of the Certificates offered to investors in Class A tranches.  Alderman Ex. P.  Thus, a significantly higher percentage of the 2007-2 Certificates was subordinate to and provided protection for the Class M-1 Certificates NJCHF bought than was the case in earlier Offerings.

were otherwise appropriate, it could not properly encompass many of the investors NJCHF seeks to include in its broadly-defined putative class.

For starters, more than half of the securities sold to investors in the six Offerings were Class A-1A Certificates bought by Freddie Mac.  The Group I loans that backed those Certificates were underwritten to Freddie Mac guidelines.  None of the A-1A Certificates have realized any loss, and all continue to receive all scheduled payments of principal and interest. They could not be more different from the $100,000 of Mezzanine Certificates bought by NJCHF.

The next largest portion of each Offering comprises the remaining Class A Certificates subordinate to Freddie Mac's A-1A tranche.  These Certificates similarly have experienced no loss and continue to receive all scheduled payments of principal and interest.  Indeed, many of these Class A Certificates have already been fully paid off and could not even in theory cause a loss to an investor.  Alderman Ex. V.

Beyond these obviously inappropriate members of any putative class are other species of investors that the Underwriters have highlighted:  investors who have brought their own claims, investors who have sustained no loss, investors who are affiliated with defendants, and investors who were themselves originators, sponsors, or underwriters for RMBS offerings or otherwise readily capable of understanding the loan characteristics and risks that were so fully articulated for each Offering.

## CONCLUSION

In sum, NJCHF—which invested $100,000 in a risky mezzanine tranche of a single May 2007 Offering after it received voluminous risk warnings and performance data about NovaStar and the declining housing market—has nothing in common with Freddie Mac and the other large

financial institutions that invested tens or hundreds of millions of dollars in senior bonds, both in the 2007-2 Offering and earlier. The only investors with which NJCHF arguably shares a common interest are the other investors in 2007-2 mezzanine tranches that sustained a loss, and even there NJCHF's modest investment pales in comparison with the far larger—by orders of magnitude—bets made by sophisticated investors that were willing to trade risk for higher interest rates and are fully capable of protecting their own perceived interests.

For the reasons given above and in the Underwriter Defendants' memorandum, plaintiff's motion for class certification should be denied.

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: _____

Steven J. Fink

Steven J. Fink (sfink@orrick.com)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 W. 52nd Street
New York, NY  10019-6142
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

William F. Alderman (walderman@orrick.com)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

*Attorneys for Defendants NovaStar Mortgage, Inc., NovaStar Mortgage Funding Corporation, Scott F. Hartman, Gregory S. Metz, W. Lance Anderson, and Mark Herpich*