**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND, *on Behalf of Itself and all Others Similarly Situated*, <br><br> Plaintiff , <br><br> *v.* <br><br> NOVASTAR MORTGAGE, INC., NOVASTAR MORTGAGE FUNDING CORPORATION, SCOTT F. HARTMAN, GREGORY S. METZ, W. LANCE ANDERSON, MARK HERPICH, RBS SECURITIES INC. f/k/a GREENWICH CAPITAL MARKETS, INC., d/b/a RBS GREENWICH CAPITAL, DEUTSCHE BANK SECURITIES INC., WELLS FARGO ADVISORS, LLC f/k/a WACHOVIA SECURITIES LLC, <br><br> Defendants. | Case No. 08-cv-5310 (DAB) <br><br> ECF Case |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION**
**FOR FINAL APPROVAL OF THE SETTLEMENT AND OF THE PLAN OF**
**ALLOCATION**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................ 1

II.    BACKGROUND OF THE LITIGATION............................................................... 2
       A.    Initial Ruling on Motion to Dismiss ............................................................ 3
       B.    Second Ruling on Motion to Dismiss and Appeal.................................... 4
       C.    Motion for Reconsideration and Reinstatement of Dismissed Offerings .............. 4
       D.    Third Amended Complaint ......................................................................... 5
       E.    Discovery Commences and Motion for Class Certification ..................... 5
       F.    Exhaustive Fact and Class-Certification Discovery ............................... 6
       G.    NovaStar Mortgage Inc. and NovaStar Mortgage Funding Corporation
             File for Bankruptcy, and Defendants Attempt to Stay this Action ....................... 6
       H.    Class Certification Granted and Expert Discovery Formally Commences ........... 7
       I.    Settlement and Preliminary Approval.......................................................... 7

III.   ARGUMENT ........................................................................................................... 8
       A.    The Settlement Was Reached after Arm's-Length Negotiations with the
             Assistance of an Experienced Mediator and Is Procedurally Fair ......................... 9
       B.    Application of the *Grinnell* Factors Supports Approval of the Settlement
             as Fair, Reasonable, and Adequate ........................................................... 10
             1.    The Complexity, Expense, and Likely Duration of the Litigation
                   Support Approval of the Settlement ......................................... 10
             2.    The Reaction of the Settlement Class Supports Final Approval............... 12
             3.    The Stage of the Proceedings and the Amount of Discovery
                   Completed Support Approval ................................................... 12
             4.    The Risks of Establishing Liability and Damages Support
                   Approval ................................................................................. 14
             5.    The Risks of Maintaining the Class Action through Trial Support
                   Approval ................................................................................. 16
             6.    The Ability of the Defendants to Withstand a Greater Judgment
                   does not Weigh Against Approval............................................. 16
             7.    The Range of Reasonableness of the Settlement, in Light of the
                   Best Possible Recovery and All of the Attendant Risks of
                   Litigation, Supports Approval ................................................. 16
       C.    The Plan of Allocation is Fair and Reasonable and Should Be Approved .......... 18
       D.    The Settlement Class Should Be Certified................................................. 20
       E.    Notice to the Settlement Class Satisfied the Requirement of Rule 23 and
             Due Process............................................................................................. 21

IV.    CONCLUSION........................................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*In re Am. Bank Note Holographics, Inc. Sec. Litig.,*
   127 F. Supp. 2d 418 (S.D.N.Y. 2001) .......................................................................15

*Charron v. Wiener,*
   731 F.3d 241 (2d Cir. 2013) ....................................................................................16

*Chavarria v. N.Y. Airport Serv., LLC,*
   875 F. Supp. 2d 164 (E.D.N.Y. 2012) ......................................................... *passim*

*Detroit v. Grinnell Corp.,*
   495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v.*
   *Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000) ........................................... *passim*

*In re Giant Interactive Grp., Inc. Sec. Litig.,*
   279 F.R.D. 151 (S.D.N.Y. 2011) .............................................................................13

*In re Gilat Satellite Networks, Ltd.,*
   No. 02 CV-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ...........................10

*In re IMAX Sec. Litig.,*
   283 F.R.D. 178 (S.D.N.Y. 2012) .............................................................................10

*In re Luxottica Grp. S.p.A. Sec. Litig.,*
   233 F.R.D. 306 (E.D.N.Y. 2006) .............................................................................11

*McReynolds v. Richards-Cantave,*
   588 F.3d 790 (2d Cir. 2009)......................................................................................10

*In re Metlife Demutualization Litig.,*
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) .....................................................................15

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.,*
   693 F.3d 145 (2d Cir. 2012).........................................................................................4

*Newman v. Stein,*
   464 F.2d 689 (2d Cir. 1972)........................................................................................9

*Padro v. Astrue,*
   No. 11-CV-1788 (CBA)(RLM), 2013 WL 5719076 (E.D.N.Y. Oct. 18, 2013) ............ *passim*

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,*
   No. 05-MD-1720 (JG)(JO), 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013)..........................20

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ......................................................................19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ................................................................8, 9, 10, 21

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ...................................13

STATUTES

15 U.S.C. § 77k(e) ......................................................................................................19

PSLRA, 15 U.S.C. § 77z-1(a)(7) ...............................................................................22

Securities Act .............................................................................................................2, 15

Securities Act Section 11 ......................................................................................1, 19, 20

Securities Act Sections 11, 12 and 15, 15 U.S.C. §§ 77k, 77l and 77o .....................3

Securities Act § 11(e) .........................................................................................15, 18, 19

OTHER AUTHORITIES

Fed. R. Civ. P. 23(e)(2) .................................................................................................8

Federal Rules of Civil Procedure Rules 23(a) and (b)(3) ...........................................21

Federal Rules of Civil Procedure Rule 23(e) ...............................................................8

Rule 23 .........................................................................................................................22

Rule 23(c)(2)(B) ......................................................................................................21, 22

Rule 23(e)(1) ................................................................................................................21

Lead Plaintiff and Class Representative New Jersey Carpenters Health Fund ("NJCHF") and Class Representative Iowa Public Employees' Retirement System ("IPERS," and, together with NJCHF, "Plaintiffs") respectfully submit this memorandum of law in support of their unopposed motion for the final approval of the proposed $165 million cash settlement ("Settlement") and of the proposed plan of allocation ("Plan of Allocation"). The Settlement should be approved because it is a substantively fair and reasonable settlement, achieved through a procedurally sound, arm's-length mediation conducted under the auspices of the Honorable Layn R. Phillips (ret.), reached by fully informed parties and counsel only after completing extensive discovery, and received a very favorable reaction from the Settlement Class after nine years of hard fought litigation.[1] The Plan of Allocation should be approved because it fairly distributes the Settlement funds to Settlement Class Members, in accordance with the damages formula set forth in Section 11 of the Securities Act, and in accord with a number of other approved mortgage-backed securities ("MBS") class action settlements approved by courts in this district.

## I.   INTRODUCTION

On March 8, 2017, after nine years of litigation, the parties in this Action reached a $165 million Settlement, which the Court preliminarily approved on May 9, 2017. This result was achieved only after a significant amount of work by all parties, and also the Court, including: (1) investigating and drafting an initial and three amended class action complaints asserting claims

---

[1] Unless otherwise defined herein, all capitalized terms have the same definitions as set forth in paragraph 1 of the Stipulation and Agreement of Settlement, dated March 8, 2017 ("Stipulation") (ECF No. 249), or in the Declaration of Joel P. Laitman in Support of Plaintiffs' Unopposed Motion for Final Approval of the Settlement and of the Plan of Allocation, and Lead Counsel's Motion for Approval of Attorneys' Fees and Reimbursement of Litigation Expenses from the Settlement Fund ("Laitman Decl." or "Laitman Declaration"), filed concurrently here. The Laitman Decl. is an integral part of this submission. For the sake of brevity, Plaintiffs respectfully refer the Court to it for a detailed description of: the history of the Action; the nature of the claims asserted in the Action; the negotiations leading to the Settlement; the value of the Settlement to the Class, as compared to the risks and uncertainties of continued litigation; the terms of the Plan of Allocation; and a description of the services Lead Counsel provided for the benefit of the Class.

under the Securities Act on behalf of purchasers of NovaStar Mortgage Funding Trust ("NMFT") bonds on multiple Offerings; (2) briefing two motions to dismiss; (3) briefing and arguing an appeal to the Second Circuit; (4) briefing a motion for class certification; (5) conducting class discovery, including taking or defending five representative and two expert depositions on class issues; (6) briefing a motion for reconsideration in light of a change in Second Circuit law pertaining to standing under the Securities Act; (7) conducting substantial fact discovery, including the review of over 9 million pages of documents and taking or defending at least 26 fact depositions; (8) briefing and arguing several discovery motions; and (9) engaging bankruptcy counsel and litigating in the bankruptcy court issues relating to the bankruptcy of certain NovaStar defendants.

As a result of this work, Plaintiffs and Lead Counsel well understood the strengths and weaknesses of the case. Indeed, hard-fought discovery revealed that numerous issues, including case-dispositive ones, would be the subject of intense litigation, such as the issues of loss causation, falsity, materiality, due diligence, damages, among others. And, given the complexity of these issues, there surely would also have been *Daubert* challenges to the anticipated expert work. If even some of these issues were resolved in Defendants' favor, the prospect of a meaningful recovery for the Class would have been reduced, potentially to zero. Moreover, even if Plaintiffs prevailed at each pre-trial step, there remained the risks attendant to trial, followed by appeal. Thus, although Plaintiffs believes their claims to be meritorious, there were substantial obstacles that remained before any recovery was in sight, as well as a significant risk of no recovery at all. The Settlement, however, eliminates all those risks, and gives the Settlement Class a meaningful and definite recovery now.

## II.   BACKGROUND OF THE LITIGATION

This securities class action alleges that Defendants violated Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o, in the offer and sale of certain NovaStar-issued mortgage-backed securities by issuing to investors materially false and misleading registration statement and prospectuses. Plaintiffs allege, *inter alia*, that the offering materials (*i.e.*, the registration statement, prospectuses, and prospectus supplements) failed to disclose that Defendants had "systematically disregarded" the applicable underwriting guidelines in the origination of mortgage loans underlying the Certificates. These material misstatements and omissions allegedly led to massive downgrades in the ratings for the Certificates and investors being damaged when the value of the Certificates they purchased collapsed.

The case commenced on May 21, 2008 when Lead Plaintiff New Jersey Carpenters Health Fund filed a Securities Class Action Complaint against Defendants in the New York State Supreme Court, New York County. On June 10, 2008, Defendants removed the Action to the United States District Court for the Southern District of New York. On June 16, 2009, Lead Plaintiff filed the Consolidated First Amended Securities Class Action Complaint ("First Amended Complaint") against Defendants on behalf of a class of purchasers of NMFT mortgage-backed securities. Specifically, the First Amended Complaint asserted claims on behalf of purchasers of NMFT 2006-3, NMFT 2006-4, NMFT 2006-5, NMFT 2006-6, NMFT 2007-1, and NMFT 2007-2 Certificates.[2]

### A.     Initial Ruling on Motion to Dismiss

On August 31, 2009, Defendants moved to dismiss the First Amended Complaint. On March 31, 2011, the Court granted Defendants' motion with prejudice as to certain claims, and without prejudice as to others ("First MTD Order"). The Court dismissed with prejudice Lead

---

[2] The First Amended Complaint also asserted claims against Moody's Investors Service, Inc. and The McGraw-Hill Companies, Inc. (the "Rating Agencies").

3

Plaintiff's claims with respect to the NMFT 2006-3, 2006-4, 2006-5, 2006-6, and 2007-1 offerings for lack of standing. As for NMFT 2007-2, the Court dismissed certain of Lead Plaintiff's claims under Section 11 and Section 12(a) with leave to amend within 45 days, while dismissing other such claims with prejudice.[3] On May 18, 2011 Lead Plaintiff filed the Second Amended Class Action Complaint ("Second Amended Complaint") in accordance with the First MTD Order.

**B.      Second Ruling on Motion to Dismiss and Appeal**

Defendants moved to dismiss the Second Amended Complaint on July 8, 2011 ("Second MTD Order"). On March 29, 2012, the Court granted that motion with prejudice. Lead Plaintiff filed a notice of appeal of the First MTD Order and the Second MTD Order on April 25, 2012. Appellate briefing before the Second Circuit was completed by September 2012, and oral argument was held on December 12, 2012. On March 1, 2013, the Second Circuit issued a decision reversing and vacating, in part, the First MTD Order and the Second MTD Order and remanded for further proceedings. Specifically, the Second Circuit held that Lead Plaintiff's factual allegations permitted "the reasonable inference that Defendants-Appellees are liable under §§ 11 & 12 of the [Securities] Act." The Second Circuit also vacated the holding in the First MTD Order that Lead Plaintiff "lacked standing to assert claims based on securities in which it had not invested," in light of the intervening Second Circuit decision in *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), and remanded for reconsideration in light of that opinion. The Second Circuit issued its mandate on March 25, 2013.

**C.      Motion for Reconsideration and Reinstatement of Dismissed Offerings**

---

[3] The Court also dismissed with prejudice the claims against the Rating Agencies.

On April 2, 2013, the Court ordered supplemental briefing on the issue of Lead Plaintiff's standing to assert claims relating to the five NMFT offerings in which it had not purchased certificates, which the Court had previously dismissed in its First MTD Order. On April 23, 2013, Lead Plaintiff submitted its motion for reconsideration of the First MTD Order and requested reinstatement of those claims. On February 5, 2015, the Court granted Lead Plaintiff's request, ordered Lead Plaintiff to file a Third Amended Class Action Complaint ("Third Amended Complaint") within 30 days, and ordered Defendants to answer within 30 days of the filing of the Third Amended Complaint.

**D.     Third Amended Complaint**

Lead Plaintiff filed the Third Amended Complaint on March 9, 2015, and Defendants filed answers on April 9, 2015.

**E.     Discovery Commences and Motion for Class Certification**

Around the same time, the parties began negotiating a discovery and case management schedule. The parties agreed that fact discovery should commence immediately, and agreed on a briefing schedule for class certification and the completion of fact discovery. However, the parties disagreed on the schedule for expert discovery and summary judgment proceedings. Lead Plaintiff's position was that the schedule for expert discovery and summary judgment should be fixed at dates certain, while Defendants' position was that those events should be based on when the Court ruled on class certification. The parties submitted their positions to the Court on May 8, 2015. On July 9, 2015, the Court entered an order approving the parties' agreed schedule for class certification and fact discovery, and approving Defendants' proposed schedule for expert discovery and summary judgment briefing.

On June 16, 2015, after subpoenaing over 50 financial institutions for trading records, reviewing certain documents produced by Defendants, and employing an expert on mortgage-

backed securities, Lead Plaintiff moved to certify a class consisting of purchasers of Certificates in the NMFT 2006-3, NMFT 2006-4, NMFT 2006-5, NMFT 2006-6, NMFT 2007-1, and NMFT 2007-2 Offerings. Lead Plaintiff also moved to appoint itself as well as IPERS as Class Representatives, and to approve Lead Counsel Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as counsel for the certified class.

### F.     Exhaustive Fact and Class-Certification Discovery

While Plaintiffs' motion for class certification was pending, the parties commenced intensive discovery. Specifically, from August 2015 through October 2016, the parties took *28* depositions, including two expert depositions in connection with class certification. In addition, the parties collectively produced, and Lead Counsel reviewed, over *9 million pages of documents*, including hundreds of thousands of documents relating to each Offering produced by Defendants and thousands of individual loan files produced by third-party loan servicers. Further, although formal expert discovery and exchange of expert reports would not commence until the Court's later class-certification ruling (discussed below), the amount and complexity of the data produced—including the sheer number of individual mortgage loan files that needed to be analyzed—meant that a substantial amount of expert work and review was being performed in parallel with fact discovery, both in connection with anticipated expert reports, and to assist with preparation for dozens of fact depositions.

### G.     NovaStar Mortgage Inc. and NovaStar Mortgage Funding Corporation File for Bankruptcy, and Defendants Attempt to Stay this Action

On July 22, 2016, defendants NovaStar Mortgage Inc. ("NMI") and NovaStar Mortgage Funding Corporation ("NMFC," and together with NMI the "Debtor Defendants") filed a notice of suggestion of bankruptcy in light of their filing for chapter 11 bankruptcy two days earlier. As a result, the action was automatically stayed against NMI and NMFC by operation of the

bankruptcy laws. However, Defendants took the position that in light of the nature and circumstances of this case the stay applied to the action in its entirety. The parties then submitted a series of letter briefs on the issue of whether the stay applied to the non-Debtor Defendants. On September 2, 2016, the Court held that it did not.

### H.  Class Certification Granted and Expert Discovery Formally Commences

On November 4, 2016, the Court granted Lead Plaintiff's class certification motion, certifying a class comprising all those who purchased or otherwise acquired publicly offered certificates in the Offerings prior to May 21, 2008, pursuant or traceable to the Registration Statement, and were damaged thereby (excluding Defendants), appointing Plaintiffs as class representatives, and appointing Lead Counsel as lead counsel for the certified class.

In accordance with the Court's July 9, 2015 order, Plaintiffs produced to Defendants the sample loan files to be used for expert re-underwriting reports on December 5, 2016.

### I.  Settlement and Preliminary Approval

On or around December 2015, Lead Counsel began formal mediation with Defendants under the auspices of the Honorable Layn Phillips (ret.), a former Federal Judge and U.S. Attorney and one of the most experienced and respected mediators in the country. After the submission of mediation statements and supplemental mediation statements, a full day of in-person mediation was held on December 3, 2015 in New York City, with Judge Phillips presiding. Although progress was made, the parties did not reach an agreement on that date.

The parties continued to negotiate, with Judge Phillips' assistance, throughout 2016. Additional mediation statements were exchanged in the summer of 2016, and then again in September 2016 at Judge Phillips' invitation, before another in-person mediation was held in New York City on September 30, 2016, again with Judge Phillips presiding. Thereafter, following additional telephone and email negotiations facilitated by Judge Phillips, the parties

7

reached an agreement in principle on December 11, 2016 with respect to the Settlement Amount of $165 million. On December 20, 2016, the parties executed a term sheet setting forth additional terms of the Settlement, and on March 8, 2017, the parties signed the Stipulation.

On March 15, 2017, Plaintiffs filed a motion for: (i) preliminary approval of the Settlement; (ii) certification of a Settlement Class; (iii) approval of the form and manner of notice to the Settlement Class; and (iv) scheduling of the Final Approval Hearing. On May 9, 2017, the Court granted the motion.

## III.   ARGUMENT

Under Rule 23(e) of the Federal Rules of Civil Procedure, the Settlement should be approved if the Court finds it "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2). "A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). In this Circuit, public policy favors the settlement of disputed claims among private litigants, particularly in complex class actions such as this one. *See Walmart*, 396 F.3d at 116 ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted); *Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 171 (E.D.N.Y. 2012) ("[S]ettlement approval is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'") (citation omitted).

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give "rubber stamp approval" to a proposed settlement, it should "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated*

8

*Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). Because "'[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation', the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial'." *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972) (citation omitted).

### A.   The Settlement Was Reached after Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Is Procedurally Fair

A strong initial presumption of fairness attaches when a proposed settlement is reached as a result of arm's-length negotiations between experienced counsel after meaningful discovery. *See Wal-Mart*, 396 F.3d at 116; *see also Padro v. Astrue*, No. 11-CV-1788 (CBA)(RLM), 2013 WL 5719076, at *3 (E.D.N.Y. Oct. 18, 2013) ("Where the integrity of the negotiation process is preserved, a strong initial presumption of fairness attaches to the proposed settlement.").

The Settlement here is entitled to this strong presumption of fairness, because all parties in the Action are represented by highly experienced counsel, Laitman Decl., ¶¶ 32, 58-59; the Settlement was reached after arm's-length negotiations before an experienced mediator and former Federal Judge, *id*., ¶ 7, 29; *see also* Phillips Decl., ¶¶ 1-7; and the parties understood the strengths and weaknesses of the claims and defenses before settlement was reached. Laitman Decl., ¶¶ 4-5, 32-35. As described above and in more detail in the Laitman Declaration, by the time the Settlement was reached, Lead Counsel had been vigorously litigating the case for nine years, and substantially completed fact discovery, including reviewing over 9 million pages of documents and taking or defending 26 fact depositions. Laitman Decl., ¶¶ 13-28. As a result of this work, Lead Counsel and Plaintiffs had meaningful insight into the strengths and weaknesses of the case. Because the Settlement was the result of an arm's-length negotiation between experienced counsel after meaningful discovery, it is entitled to a strong initial presumption of fairness.

**B.      Application of the *Grinnell* Factors Supports Approval of the Settlement as Fair, Reasonable, and Adequate**

The Settlement should also be finally approved because it is substantively fair, reasonable and adequate and in the best interests of the Settlement Class. The standards governing approval of class action settlements are well-established in this Circuit. In *Grinnell*, the Second Circuit held that the following were factors to be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463 (internal citations omitted); *see also McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009); *Wal-Mart*, 396 F.3d at 117. "A court need not find that every factor militates in favor of a finding of fairness; rather, a court considers the totality of these factors in light of the particular circumstances." *Padro*, 2013 WL 5719076, at *4 (citation omitted). Here, the Settlement satisfies the criteria set forth in *Grinnell*.

**1.      The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement**

"[I]n evaluating the settlement of a securities class action, federal courts, including this [c]ourt, have long recognized that such litigation is notably difficult and notoriously uncertain." *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 189 (S.D.N.Y. 2012) (citation omitted). Indeed, courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Gilat Satellite Networks, Ltd.*, No. 02 CV-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007). Accordingly, "[c]lass action suits readily lend themselves to compromise because of the

difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

Here, the complexity, expense, and likely duration of the litigation were extraordinarily high, and strongly favor approval of the Settlement. If this case were to proceed, Plaintiffs would have had to overcome numerous hurdles in order to achieve a litigated verdict. First, Plaintiffs would have had to overcome inevitable and potentially case-dispositive summary judgment and *Daubert* motions. Then, even assuming none of these motions were decided in Defendants' favor, the case would have proceeded to a jury trial, with all the attendant risks and uncertainties.

Moreover, the subject matter of the Action is extremely complex. Plaintiffs and Lead Counsel would have had to marshal and present a great deal of information concerning, among other things, the design and structure of the Certificates; the disclosures in numerous prospectus supplements and the relevant details about the more than 49,000 loans underlying the six Offerings; expert analysis of those loans, including evidence relating to statistical sampling and compliance with underwriting guidelines; and sophisticated statistical and econometric evidence to rebut Defendants' loss-causation defense. Further, achieving a favorable verdict was far from certain. Defendants would have presented multiple defenses, including lack of falsity, materiality, and loss causation, all of which would have added to the complexity of the case. Indeed, Defendants' answers collectively asserted no less than 160 affirmative defenses. *See* ECF Nos. 164 (RBS asserting 46 affirmative defenses); 165 (Deutsche Bank asserting 45 affirmative defenses); 166 (Wells Fargo asserting 45 affirmative defenses); and 167 (NovaStar asserting 25 affirmative defenses).

Further, whatever the outcome at trial, it is virtually certain that an appeal would have been taken. All of the foregoing would have posed considerable expense and risk and would

have delayed recovery for several years, assuming that Plaintiffs was ultimately successful on its claims.

In contrast to this complex, lengthy, and uncertain litigation, the Settlement here provides an immediate, significant and certain recovery of $165 million for members of the Settlement Class. Accordingly, this factor supports approval of the Settlement.

### 2.    The Reaction of the Settlement Class Supports Final Approval

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *See, e.g., Chavarria*, 875 F. Supp. 2d at 173; *see also Padro*, 2013 WL 5719076, at *5 ("The fact that a small number of objections were received weighs in favor of settlement," as does "the positive reaction of the class, particularly in light of its size."). Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator began mailing copies of the Notice and Claim Form to potential Settlement Class Members and nominees on May 30, 2017. *See* Laitman Decl., Exhibit 4 (Declaration of Alexander Villanova Regarding (A) Mailing of the Settlement Notice and Proof of Claim and (B) Report on Opt-Out Requests Received to Date) ("Villanova Decl." or "Villanova Declaration"), ¶¶ 5-7. As of August 15, 2017, 2,503 copies of the Notice and Claim Form had been disseminated to potential Settlement Class Members and their nominees. *Id*. ¶¶ 8-10. In addition, a Summary Notice was published in the national edition of *The Wall Street Journal* and on *PR Newswire* on May 30, 2017. *Id.*, ¶ 11. While the deadline set by the Court for Settlement Class Members to exclude themselves from the Settlement is today, to date, only 1 request for exclusion has been received and there have been no objections to the Settlement.

### 3.    The Stage of the Proceedings and the Amount of Discovery Completed Support Approval

12

At the time of settlement, nine years after commencement of the lawsuit, fact discovery—which included reviewing nearly 9 million pages of documents, 26 fact depositions, and motion practice relating to fact discovery—as well as discovery related to class certification, including two expert depositions, had been completed. This is, of course, in addition to the multiple hotly contested motions, including several discovery motions, two motions to dismiss, a class-certification motion, as well as an appeal to the Second Circuit. Accordingly, Plaintiffs and Lead Counsel had a strong grasp of the strengths and weaknesses of the case when negotiating and evaluating the proposed Settlement. Plaintiffs and Lead Counsel became thoroughly familiar with Defendants' defenses through briefing of the motions to dismiss, from their analysis of Defendants' documents, from written discovery, and from studying Defendants' pleadings and Defendants' mediation statements.

Thus, at the time the Settlement was reached, Plaintiffs and Lead Counsel "obtained sufficient information to be able to intelligently assess the strengths and weaknesses of the case and appraise settlement proposals." *Padro*, 2013 WL 5719076, at *6. As a result, Plaintiffs and Lead Counsel possessed a well-informed basis for their belief that the Settlement is a favorable resolution of the Action for the Class and this factor strongly supports approval of the Settlement. *See, e.g.*, *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 161 (S.D.N.Y. 2011) (this factor supported settlement where the action had proceeded through substantial document production, five depositions, "a round of mediation submissions and sessions, and expert consultations on damages and causation," and, thus, "the parties were able to make an intelligent appraisal of the value of the case"); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) (settlement approved where the parties "have a clear view of the strengths and weaknesses of their cases").

13

4.        **The Risks of Establishing Liability and Damages Support Approval**

*Grinnell* holds that, in assessing the fairness, reasonableness and adequacy of a settlement, courts should consider such factors as the "risks of establishing liability [and] . . . the risks of establishing damages." 495 F.2d at 463. Although Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit, they also recognize that there were significant risks as to whether they would ultimately be able to prove liability and establish damages on their claims in the Action, as well as with respect to the amount of damages that Plaintiffs could establish. These risks included challenges in proving that there were misstatements and omissions in the Offering Documents, which also contained disclosures that Defendants argued negated liability. Further risks included, for example, overcoming Defendants' arguments that whatever misstatements or omissions may have existed were immaterial to investors; that some or all of the declines in the value of the Certificates were due to causes other than the alleged misstatements or omissions (the "negative causation" defense); and that that Defendants had conducted a "reasonable investigation" and thus could satisfy their "due diligence" defense. Laitman Decl. ¶ 34.

*Risks of Establishing Liability.* To avoid summary judgment and prevail at trial, Plaintiffs would need to present evidence that the Offering Documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein related to the underwriting of the loans underlying the MBS. Defendants have argued and would continue to argue that the Offering Documents contained no untrue statements or omissions, that the Offering Document properly warned of the risks, and that any misstatements were immaterial in any event. Defendants have also argued, and could be expected to argue, that they had conducted reasonable due diligence, which, if successful, would also have cut off liability for the underwriter defendants.

14

*Risks of Establishing Damages.* Defendants have also contended that establishing damages under the Securities Act posed significant obstacles for Plaintiffs and the Settlement Class. Under § 11(e) of the Securities Act, damages may be reduced or eliminated if the defendant proves that a portion or all of the statutory damages are attributable to causes other than the misstatements or omissions. Defendants asserted throughout the litigation—and were expected to continue to assert through trial—that the overall economic downturn, housing price declines and reduced liquidity in the market for mortgage-backed securities, and not the alleged misstatements and omissions, were responsible for the declines in the Certificates' value.

Several of these contested issues, notably the "negative causation" defense and the "due diligence" defense would have required expert testimony before the jury. While Plaintiffs expected to present persuasive expert testimony establishing causation and damages and opining that Defendants' investigation was not sufficient, Defendants would have retained experts supporting their position as well. Defendants, moreover, could be expected to assert *Daubert* challenges to any expert proposed by Plaintiffs. Even assuming that Plaintiffs would have prevailed in these expected *Daubert* challenges, Plaintiffs could not be certain which experts' views the jury would credit, and who would prevail in this "battle of the experts." *E.g., In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 332 (E.D.N.Y. 2010) ("The proof on many disputed issues – which involve complex financial concepts – would likely have included a battle of experts, leaving the trier of fact with difficult questions to resolve."); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) ("In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants.").

15

In light of all these risks of establishing liability and damages in this Action, the proposed Settlement is fair, reasonable and adequate.

### 5.   The Risks of Maintaining the Class Action through Trial Support Approval

Plaintiffs were able to certify a class covering all six Offerings. However, there was no guarantee that it would have been able to maintain the class, because courts may always exercise their discretion to re-evaluate the appropriateness of class certification at any time. The Settlement avoids any uncertainty with respect to this issue, which militates in favor of approval. *See, e.g., Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013) ("[W]e cannot find that the district court abused its discretion in finding that the class faced significant risks of decertification, that decertification would drastically reduce the chances of any member of the class achieving meaningful relief, and that the litigation risks attendant to these possibilities weighed heavily in favor of the fairness of a settlement."). Thus, this factor also weights in favor of approval.

### 6.   The Ability of the Defendants to Withstand a Greater Judgment does not Weigh Against Approval

Here, certain of the Defendants are in bankruptcy, and unlikely to have been able to pay a meaningful judgment. This weighs in favor of approval. Other of the Defendants are among the world's biggest investment banks, and theoretically could have withstood paying a larger settlement. This fact, however, does not necessarily weigh against approval. "[D]efendants' ability to withstand a higher judgment . . . standing alone, does not suggest that the settlement is unfair." *D'Amato*, 236 F.3d at 86. And, given the bankruptcy of some of the Defendants, on balance, this factor is either neutral or weighs in favor of approval.

### 7.   The Range of Reasonableness of the Settlement, in Light of the Best Possible Recovery and All of the Attendant Risks of Litigation, Supports Approval

16

The last two substantive factors that courts consider are the range of reasonableness of the settlement fund in light of: (i) the best possible recovery and (ii) litigation risks. In analyzing these two factors, the issue for the court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case. A court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462 (citations omitted). "The determination of a reasonable settlement 'is not susceptible of a mathematical equation yielding a particularized sum,' but turns on whether the settlement falls within a 'range of reasonableness.'" *Chavarria*, 875 F. Supp. 2d at 174 (citation omitted). Thus, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. "In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Chavarria*, 875 F. Supp. 2d at 175 (citation omitted).

The Settlement here is well within the range of reasonableness in light of the substantial risks presented by this litigation. Although the damages that might be recoverable in this case were substantial, Defendants had formidable arguments with respect to those damages (as well as liability in general) that, if successful, could have greatly reduced or eliminated altogether those damages. Plaintiffs and Lead Counsel have concluded that, in light of these risks, the Settlement, which provides an immediate and substantial benefit to Settlement Class Members, outweighs the benefits of continued litigation. Laitman Decl. ¶¶ 32-35. A court may not "substitute its

17

judgment for that of the parties who negotiated the settlement." *Chavarria*, 875 F. Supp. 2d at 172.

Lead Counsel is intimately familiar with the facts in the case and has extensive experience prosecuting comparable securities class actions. In these circumstances, Lead Counsel's opinion that the Settlement is reasonable is entitled to "great weight." *Padro*, 2013 WL 5719076, at *7 ("Where, as here, settlement has been reached after an arms-length negotiation, 'great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.'") (citation omitted).

In sum, a review of the *Grinnell* factors, including the complexity, expense and delay of further litigation, discovery completed and the stage of the proceedings, and the substantial risks of the Action, strongly supports a finding that the Settlement is fair, reasonable and adequate.

**C.     The Plan of Allocation is Fair and Reasonable and Should Be Approved**

Plaintiffs have proposed a plan to allocate the proceeds of the Settlement among Settlement Class Members who submit valid Claim Forms that are approved for payment from the Net Settlement Fund ("Authorized Claimants"). The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Settlement Class Members who suffered economic losses as a result of the alleged misrepresentations and omissions, in proportion to the strength and viability of their claims in this case. *See* Laitman Decl. ¶ 41.

This Plan, as set forth in the Notice, allocates the settlement proceeds based on the statutory measure of damages set out in § 11(e) of the Securities Act, 15 U.S.C. § 77k(e). Plaintiffs engaged Dr. Michael Hartzmark, an economist with significant experience in securities class actions, including MBS class actions, to examine the Plan. On March 15, 2017, Plaintiff submitted a declaration from Dr. Hartzmark ("Hartzmark Declaration") explaining the

methodology for determining each Authorized Claimant's Recognized Claim under the Plan, and the basis for the analysis. *See* ECF No. 248-1.

In particular, as Dr. Hartzmark explains, the Plan of Allocation is based on the damages formula set forth in Section 11(e) of the Securities Act. Hartzmark Decl. ¶ 9. Specifically, the Plan of Allocation tracks Section 11(e)'s damages formula, which provides that damages are the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought." 15 U.S.C. § 77k(e). It accomplishes this by requiring a determination of, among other things, "(a) the face value of the Certificates purchased; (b) when the Certificates were purchased or acquired and the price paid; (c) any principal payments received; (d) whether the Certificates were sold, and if so, when the Certificates were sold and the price received; and/or (e) if held on May 21, 2008 (the day the lawsuit was filed), the price of the Certificates on that date." Hartzmark Decl. ¶ 11. Based on this data, a Section 11 loss, if one exists, can be calculated. *See generally id.*, ¶¶ 13-17.

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate." *See Chavarria*, 875 F. Supp. 2d at 175. A plan that allocates settlement funds to class members based on the extent of their injuries or the strengths of their claims is fair and reasonable. *See, e.g. In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) ("A reasonable plan may consider the relative

19

strength and values of different categories of claims."). Additionally, in assessing a proposed plan of allocation, the Court may give great weight to the opinion of informed counsel. *See, e.g., In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-MD-1720 (JG)(JO), 2013 WL 6510737, at *27 (E.D.N.Y. Dec. 13, 2013) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.") (citation omitted); *Chavarria*, 875 F. Supp. 2d at 175 ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel. That is, as a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.") (citations and internal quotations omitted).

Here, the proposed Plan of Allocation in this case is based on the statutory damages permitted under § 11 of the Securities Act and was fully explained in the Notice sent to Settlement Class Members. It was examined by an economic expert, and reflects Lead Counsel's assessment of the merits of the claims. Accordingly, it is the opinion of Lead Counsel that the Plan of Allocation is fair, reasonable and adequate to the Class as a whole. Laitman Decl., ¶¶ 41-43.

Additionally, very similar plans of allocation devised by Dr. Hartzmark based on the same principles have been approved in MBS settlements in this District over the last few years by Judges Preska, Failla, and Crotty. Moreover, following dissemination of 2,503 Notices, to date, there are ***no*** objections to the Plan of Allocation. *Id.*, ¶ 44.

Accordingly, for all of the reasons set forth herein, in the Laitman Declaration, and in the Hartzmark Declaration, the Plan of Allocation is fair and reasonable, and should be approved.

### D.    The Settlement Class Should Be Certified

The Stipulation contemplates the certification of a Settlement Class defined as:

All Persons who purchased or otherwise acquired publicly offered Certificates representing interests in any of the Offerings prior to May 21, 2008, pursuant or traceable to the Registration Statement, and who were damaged thereby, *except* those Persons that timely and validly request exclusion from the class pursuant to and in accordance with the terms of the Preliminary Approval Order. Also excluded from the Settlement Class are all Defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, *except* for any Investment Vehicle.

On May 9, 2017, the Court granted Plaintiffs' motion for preliminary approval of the Settlement and preliminarily approved the certification of the above class for settlement purposes, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. *See* ECF No. 252 (Preliminary Approval Order). And, as noted in Plaintiffs' Memorandum of Law in Support of Preliminary Approval, ECF No. 248, incorporated herein by reference, the Court has already certified a class consisting of essentially the same class members. *See* ECF No. 245. Nothing has changed to alter the propriety of certification and Plaintiffs now requests that the Court grant final certification of the Class pursuant to Rules 23(a) and (b)(3).

### E.   Notice to the Settlement Class Satisfied the Requirement of Rule 23 and Due Process

The Notice provided to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable." Fed. R. Civ. P. 23(e)(1). Notice of a settlement is reasonable if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential Class Members satisfied these standards. The Notice includes all the information required by Rule

23(c)(2)(B) and the PSLRA, 15 U.S.C. § 77z-1(a)(7). As noted above, in accordance with the

Court's Preliminary Approval Order, as of August 15, 2017, the Claims Administrator has

disseminated 2,503 copies of the Notice to potential Settlement Class Members and their

nominees. Villanova Decl. ¶¶ 8-10. In addition, Plaintiffs caused the Summary Notice to be

published in the national edition of the *Wall Street Journal,* and on *PR Newswire* and copies of

the Notice and Claim Form were made available on a dedicated website maintained by the

Claims Administrator and on Lead Counsel's websites. *See* Villanova Decl. ¶¶ 11, 16; Laitman

Decl. ¶ 65.

This combination of individual mail to all potential Settlement Class Members who could

be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated

publication, and set forth on Internet websites, was "the best notice . . . practicable under the

circumstances" and satisfies the requirements of due process and Rule 23. Fed. R. Civ. P.

23(c)(2)(B). *E.g., Padro*, 2013 WL 5719076, at *3 ("Notice need not be perfect, but need be only

the best notice practicable under the circumstances, and each and every class member need not

receive actual notice, so long as class counsel acted reasonably in choosing the means likely to

inform potential class members.").

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court finally approve

the proposed Settlement and Plan of Allocation as fair, reasonable and adequate. A proposed

Final Approval Order is being submitted herewith.

Dated: August 16, 2017                Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**


*/s/ Joel P. Laitman*
Joel P. Laitman (JL-8177)
Christopher Lometti (CL-9124)
Michael B. Eisenkraft (ME-6974)
Robert Dumas
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797

Steven J. Toll (*pro hac vice*)
Times Wang (*pro hac vice*)
1100 New York Avenue, N.W.
West Tower, Ste. 500
Washington, DC 20005
Telephone: (202) 408-4600

*Counsel for Plaintiffs and the Class*